# #1

In The Matter Of:

**FRANK FISCHER**
**v.**
**SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.**

**NO. 2:05-CV-00763**

---

**FRANK FISCHER**
**November 21, 2006**

---



**TYLER EATON**

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

THE HIGHEST QUALITY IN COURT REPORTING

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 1 to 4)

Page 1

```
     IN THE UNITED STATES DISTRICT COURT
          MIDDLE DISTRICT OF ALABAMA
               NORTHERN DIVISION

     CIVIL ACTION NO. 2:05-CV-00763

     FRANK FISCHER, an individual,
          Plaintiff,
     vs.
     SYSCO FOOD SERVICES OF
     CENTRAL ALABAMA, INC., et al.,
          Defendants.
          IN THE CIRCUIT COURT OF
     MONTGOMERY COUNTY, ALABAMA

     CIVIL ACTION NO.: CV-2005-1630

     FRANK FISCHER, an individual,
          Plaintiff,
     vs.
     SYSCO FOOD SERVICES OF
     CENTRAL ALABAMA, INC., et al.,
          Defendants.

               DEPOSITION
                    OF
               FRANK FISCHER
             November 21, 2006
     REPORTED BY:  Teresa Turquitt Davis
               Certified Court Reporter,
               Registered Professional
               Reporter and Notary Public
```

Page 2

```
1          S T I P U L A T I O N
2          IT IS STIPULATED AND AGREED,
3   by and between the parties, through their
4   respective counsel, that the deposition of
5   FRANK FISCHER may be taken before Teresa
6   Turquitt Davis, Commissioner, Certified
7   Court Reporter, Registered Professional
8   Reporter and Notary Public;
9          That the signature to and
10  reading of the deposition by the witness
11  is waived, the deposition to have the same
12  force and effect as if full compliance had
13  been had with all laws and rules of Court
14  relating to the taking of depositions;
15         That it shall not be necessary
16  for any objections to be made by counsel
17  to any questions, except as to form or
18  leading questions, and that counsel for
19  the parties may make objections and assign
20  grounds at the time of trial, or at the
21  time said deposition is offered in
22  evidence, or prior thereto.
23
```

Page 3

```
     A P P E A R A N C E S

FOR THE PLAINTIFF:
     Mr. Davis Middlemas
     Attorney at Law
     1740 Oxmoor Road
     Suite 210
     Birmingham, Alabama  35209

FOR THE DEFENDANT, SYSCO FOOD SERVICES OF
CENTRAL ALABAMA, INC.:
     Mr. Arnold W. Umbach, III
     Attorney at Law
     Starnes & Atchison, LLP
     7th Floor, 100 Brookwood Place
     Birmingham, Alabama  35209
          -and-
     Mr. T. J. Segrest
     Attorney at Law
     Carr Allison
     100 Vestavia Parkway, St. 200
     Birmingham, Alabama 35216
```

Page 4

```
     A P P E A R A N C E S (CONTINUING)

OTHERS PRESENT:
     Lynda Wheat
```

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 5 to 8)

Page 5

INDEX

INDEX OF EXAMINATION
                                            Page.
EXAMINATION BY MR. SEGREST          6
EXAMINATION BY MR. UMBACH           139
REEXAMINATION BY MR SEGREST         220
REEXAMINATION BY MR. UMBACH         225

INDEX OF EXHIBITS
                                            Page:
Defendant's Exhibit 1               36
Defendant's Exhibit 2               40
Defendant's Exhibit 3               41
Defendant's Exhibit 4               52
Defendant's Exhibit 5               62
Defendant's Exhibit 6               96
Defendant's Exhibit 7               97
Defendant's Exhibit 8               101
Defendant's Exhibit 9               101
Defendant's Exhibit 10              103
Defendant's Exhibit 11              106
Defendant's Exhibit 12              189
Defendant's Exhibit 13              190
Defendant's Exhibit 14              193
Defendant's Exhibit 15              193
Defendant's Exhibit 16              194
Defendant's Exhibit 17              197
Defendant's Exhibit 18              198
Defendant's Exhibit 19              198
Defendant's Exhibit 20              199
Defendant's Exhibit 21              210
Defendant's Exhibit 22              217
Defendant's Exhibit 23              224

Page 6

1     I, Teresa Turquitt Davis, a
2   Certified Court Reporter and Registered
3   Professional Reporter of Birmingham,
4   Alabama, and a Notary Public for the State
5   of Alabama at Large, acting as
6   Commissioner, certify that on this date,
7   as provided by the Federal Rules of Civil
8   Procedure of the United States District
9   Court, and the foregoing stipulation of
10   counsel, there came before me at 184
11   Commerce Street, Montgomery, Alabama, on
12   November 21, 2006, commencing at 9:00
13   a.m., FRANK FISCHER, witness in the above
14   cause, for oral examination, whereupon the
15   following proceedings were had:

17           FRANK FISCHER,
18   being first duly sworn, was examined and
19   testified as follows:

21   EXAMINATION BY MR. SEGREST:
22       Q.    State your full name for the
23   record, please, sir.

Page 7

1       A.    You have to speak up a little
2   bit, please.
3       Q.    I'm sorry.  Can you state your
4   full name, please, sir?
5       A.    Frank Ervin Fischer.
6       Q.    Is that E-R-V-I-N?
7       A.    E-R-V-I-N.
8       Q.    Mr. Fischer, my name is T. J.
9   Segrest and I'm here to take your
10   deposition in your worker's compensation
11   lawsuit.
12          Mr. Umbach is going to ask you
13   some questions about your other claims.
14          Let me ask you first, have you
15   given a deposition before?
16       A.    Is that one considered a
17   deposition when I was over at the other
18   place?
19          MR. MIDDLEMAS:  Let's go off
20   the record for just a second.
21          (Off-the-record discussion.)
22       Q.    (BY MR. SEGREST:)  Have you
23   ever been involved in a lawsuit besides

Page 8

1   this one we are here about today?
2       A.    No.
3       Q.    What I'm going to do is ask
4   you a series of questions about your
5   background, about the accident that you
6   claim today.  And what I need for you to
7   do is to answer to the best of your
8   ability.  I do need you to answer out
9   loud.  It's very hard for her to take nods
10   of the head, hand gestures, that type of
11   thing.
12       A.    Okay.
13       Q.    Also, yes and no is a much
14   better answer for her than uh-huh or
15   uh-uh.  It's something I forget easily as
16   well, but it's much easier for her to take
17   that down as well.
18       A.    Okay.
19       Q.    If I start talking too softly
20   or asking a question that confuses you,
21   please let me know and I'll be happy to
22   rephrase my question or ask it again
23   louder.

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 9 to 12)

Page 9

1    If you need to take a break at
2  any time, you are certainly welcome to do
3  that.  Just let us know if you need to do
4  that.
5    Let me ask you also, are you on
6  any medications today, or is there any
7  other reason that you would not be able to
8  give a deposition and understand and
9  answer my questions fully?
10    A.    There shouldn't be any.
11    Q.    What is your Social Security?
12    A.    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.
13    Q.    And what is your date of
14  birth?
15    A.    December 24th, 1953.
16    Q.    And do you have a valid
17  commercial driver's license currently?
18    A.    Right now, yes.
19    Q.    Is that issued in the state of
20  Florida?
21    A.    Yes.
22    Q.    What is the number of that
23  driver's license?

Page 10

1    A.    (Reviewing document.)
2  F260265534640.
3    Q.    Has that license ever been
4  suspended or revoked for any reason?
5    A.    No.
6    Q.    What is your current address?
7    A.    You want the mailing address
8  or the house?
9    Q.    Go ahead and give me physical
10  address first, the house.
11    A.    The house is 1227 Evritt
12  Avenue.
13    Q.    E-V-R?
14    A.    E-V-R-I-T-T.  P. O. Box 36023,
15  Panama City, Florida.
16    Q.    Is it a house at that address
17  that you live in?
18    A.    I'm sorry?
19    Q.    Is it a house at that address
20  or an apartment?
21    A.    It's a house.
22    Q.    Do you own that house?
23    A.    No.

Page 11

1    Q.    Are you renting that house?
2    A.    No.
3    Q.    Who owns that house?
4    A.    Tonya Martenez.
5    Q.    What is your relationship to
6  Ms. Martenez?
7    A.    She's my fiancee.
8    Q.    And I'm assuming she lives
9  there with you?
10    A.    I'm sorry?
11    Q.    I'm assuming she lives there
12  with you?
13    A.    Yeah.
14    Q.    Anybody else live there with
15  you?
16    A.    No.
17    Q.    Have you ever been married?
18    A.    No.
19    Q.    This will be your first?
20    A.    Yeah.
21    Q.    Okay.  Do you have any
22  children?
23    A.    No.

Page 12

1    Q.    Where were you born?
2    A.    I'm sorry?
3    Q.    Where were you born?
4    A.    Where was I born?
5    Q.    Yes.
6    A.    Appleton, Wisconsin.
7    Q.    How far did you go in school?
8  Did you finish high school?
9    A.    Yes.
10    Q.    Where did you go to high
11  school?
12    A.    Kimberly Senior High.
13    Q.    Is that in Appleton?
14    A.    No.  That is Kimberly,
15  Wisconsin.
16    Q.    What year did you graduate
17  high school?
18    A.    1972.
19    Q.    After high school, have you
20  done any further school such as college,
21  vocational school and that type of thing?
22    A.    No college.  But I did take a
23  course when they legalized doubles, double

3

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 13 to 16)

Page 13

1   trailer driving, I took a course at the
2   Fox Valley Technical Institute for
3   driving.
4       Q.   Where is Fox Valley?
5       A.   I'm sorry?
6       Q.   Where is the Fox Valley
7   Technical Institute?
8       A.   It's in Appleton.
9       Q.   And do you know about what
10  year you took that course?
11      A.   No, I don't know what year
12  that was.
13      Q.   How long a program was that?
14      A.   How long ago was it?
15      Q.   How long did it take you to
16  finish that course?
17      A.   Oh, I think it was either one
18  or two months or something like that.
19      Q.   And you completed that course?
20      A.   Yes.
21      Q.   Did you receive a certificate
22  of completion?
23      A.   If I did, I don't know where

Page 14

1   it is or -- I don't remember. It's been
2   quite a while ago.
3       Q.   Have you ever done any
4   military service?
5       A.   No.
6       Q.   And after high school -- let
7   me ask you this: Did you work during high
8   school at all?
9       A.   Did I work during high school?
10      Q.   Yes.
11      A.   I had a small job delivering
12  pizzas while I was in senior high school.
13      Q.   Okay. After high school, what
14  did you do? Did you take a job somewhere?
15      A.   After high school, I went -- I
16  built silos, cement silos. And I can't
17  remember what the company's name was. And
18  then I would just work for the local
19  farmers in the area bailing hay and doing
20  whatever had to be done, make some money.
21      Q.   Is this in Wisconsin?
22      A.   Yes.
23      Q.   You say you built silos, and

Page 15

1   you can't remember the company's name?
2       A.   No, I don't remember the
3   company's name.
4       Q.   How long did you work that
5   job?
6       A.   Not very long because I was
7   afraid of heights.
8       Q.   You just did that for one
9   company?
10      A.   Yeah.
11      Q.   Any injuries working that job?
12      A.   I'm sorry?
13      Q.   Did you ever injure yourself
14  working that job?
15      A.   No.
16      Q.   Would you say you worked there
17  less than a year?
18      A.   Oh, yes, yeah.
19      Q.   Less than a month?
20      A.   Probably be half a year at the
21  most.
22      Q.   Okay. And after that, did I
23  understand you to say you did some just

Page 16

1   odd jobs for local farmers?
2       A.   Farmers. And then after that,
3   I worked as a security guard. And I don't
4   know the company's name for that. And
5   after the security guard, I worked for
6   Holiday Inn.
7       Q.   Was the security guard job in
8   Wisconsin?
9       A.   Yes.
10      Q.   What town in Wisconsin?
11      A.   Wherever they put you.
12      Q.   Where were you living at the
13  time you were working as a security guard?
14      A.   I was living in -- I believe
15  it was -- I don't know. It could be
16  Kimberly or it could be Appleton. I'm not
17  sure.
18      Q.   Are they in the same basic
19  area, Kimberly?
20      A.   Yeah.
21      Q.   Okay. And how long did you
22  work as a security guard?
23      A.   I think it was about

Tyler Eaton Morgan Nichols & Pritchett, Inc.

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 17 to 20)

Page 17

1 two years.
2  Q.  And that was all for one
3 company?
4  A.  Yes.
5  Q.  You don't remember their name?
6  A.  No.
7  Q.  Were you just guarding
8 commercial buildings?  What were your
9 duties?
10  A.  It was like a warehouse and
11 you had to go make your rounds and take a
12 key and punch a clock, a big round clock
13 that we stuck a key in it and turned it.
14  Q.  Can you give me an idea about
15 what year this was, or what years you were
16 working there?
17  A.  I don't know.
18  Q.  '70s or '80s?
19  A.  '70s.
20  Q.  Any injuries working that job?
21  A.  I'm sorry?
22  Q.  Did you have any injuries
23 there?

Page 18

1  A.  No.
2  Q.  And did you quit that job or
3 were you let go?
4  A.  I quit it.
5  Q.  Any particular reason?
6  A.  I went and worked for Holiday
7 Inn.
8  Q.  Take a better job?
9  A.  Yes.
10  Q.  And where was the Holiday Inn
11 you worked at?
12  A.  Neenah, Wisconsin.
13  Q.  Is that N-I-N-A?
14  A.  N-E-E-N-A-H.
15  Q.  What did you do there?
16  A.  Night maintenance.
17  Q.  How long did you work that
18 job?
19  A.  I don't remember.  I'm
20 thinking maybe somewhere less than
21 five years, but I'm not sure.
22  Q.  And your duties would be just
23 general maintenance?

Page 19

1  A.  Cleaning the place up at
2 night, the kitchen, the dining room area
3 and the bar.
4  Q.  Were you ever injured working
5 that job?
6  A.  No.
7  Q.  Did you resign that job or
8 were you let go?
9  A.  They sold the place, so I just
10 left.
11  Q.  Where did you go to work next?
12  A.  I think I was unemployed for a
13 couple of years, and then I worked for
14 Sysco.
15  Q.  What year were you originally
16 hired at Sysco?
17  A.  Was it '77?
18  Q.  1977?
19  A.  I think it was in '77.
20  Q.  Since you started working for
21 Sysco, have you ever had any other jobs
22 with anybody else?
23  A.  No.

Page 20

1  Q.  And where were you initially
2 hired with Sysco, what location?
3  A.  In Appleton, Wisconsin.
4  Q.  And what were you hired to do
5 there?
6  A.  At first, I was the delivery
7 helper.  And six months later, they put me
8 on shuttle.
9  Q.  What would you do as a
10 delivery helper?  What were your job
11 duties?
12  A.  We delivered the food.
13  Q.  So you would ride with a
14 driver and assist them in delivering?
15  A.  In delivering food, yes.
16  Q.  And then you were transferred
17 to the shuttle driver position?
18  A.  Right.
19  Q.  Is that the position you have
20 held ever since that time?
21  A.  Since that time.
22  Q.  What were you making when you
23 were hired on initially at Sysco as a

5

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 21 to 24)

Page 21

1  delivery helper?
2      A.   At the beginning?
3      Q.   Yeah.
4      A.   I don't remember.
5      Q.   Have you ever filed for
6  unemployment benefits?
7      A.   No.
8      Q.   Have you filed for Social
9  Security disability benefits?
10     A.   Yes.
11     Q.   When did you make that filing?
12     A.   Right after the accident. I
13  believe it was right after the accident.
14     Q.   Did you file for those in
15  Florida or in Alabama? Where did you make
16  that filing?
17     A.   Social Security?
18     Q.   Yeah.
19     A.   In Florida.
20     Q.   And do you have an attorney
21  representing you on that?
22     A.   No, I have it. I'm receiving
23  it.

Page 22

1      Q.   You have been awarded those
2  benefits?
3      A.   Yes.
4      Q.   How much do you receive in
5  Social Security disability benefits?
6      A.   Just a little over 1,500.
7      Q.   Per month?
8      A.   Per month.
9      Q.   Have you ever filed for
10  bankruptcy?
11     A.   No.
12     Q.   Are you currently on Medicare
13  at this time?
14     A.   Medicare starts on the 1st of
15  December.
16     Q.   Do you already have your card
17  for that?
18     A.   Yes.
19     Q.   At any time in your life, have
20  you ever received medical treatment paid
21  for by Medicaid, any state Medicaid?
22     A.   No.
23     Q.   What was your pay when you

Page 23

1  were initially transferred to the shuttle
2  driver position, do you remember?
3      A.   The beginning?
4      Q.   Yeah.
5      A.   I don't remember none of the
6  pay back then.
7      Q.   Describe for me what the
8  duties of a shuttle driver are.
9      A.   You take the empty trailer,
10  take it to the warehouse, drop that. If
11  you have any returns, you take them into
12  the warehouse. Then they assign you a
13  trailer to go back to where your position
14  is, and you take that trailer and drive it
15  back home.
16     Q.   So you are shuttling between
17  two different warehouses?
18     A.   Right.
19     Q.   And as a shuttle driver, did
20  you have one tractor that you always drove
21  that was assigned to you?
22     A.   Most of the time, I would say.
23  And then as the company grew, you had to

Page 24

1  have more drivers so sometimes you would
2  have to switch trucks. The same truck
3  wasn't always the same.
4      Q.   But generally, on a day-to-day
5  basis, you would be driving the same
6  tractor?
7      A.   Right.
8      Q.   When you started as a shuttle
9  driver, were you there at the Appleton,
10  Wisconsin location?
11     A.   Yes.
12     Q.   And how long did you continue
13  working at that location?
14     A.   I think it was almost twenty
15  years, if not that much.
16     Q.   And at some point, you were
17  transferred to the Panama City location?
18     A.   Yeah. I came down to Florida,
19  liked it, found out Sysco was down there
20  and put in for a transfer.
21     Q.   Do you recall what year that
22  was?
23     A.   '95.

FRANK FISCHER                                                    FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.            November 21, 2006

(Pages 25 to 28)

Page 25 .

1    Q.    And you were transferred to
2    that location as a shuttle driver?
3    A.    In Panama City, yes.
4    Q.    While working at the Appleton,
5    Wisconsin location, did you ever have any
6    on-the-job injuries there?
7    A.    No.
8    Q.    Prior to the injury that we
9    are here about today, did you ever have
10   any previous injuries at the Panama City
11   location?
12   A.    No.
13   Q.    Who was your supervisor at the
14   Appleton location?
15   A.    Jim Coon.
16   Q.    How do you spell his last
17   name?
18   A.    C-O-O-N.
19   Q.    Was he your supervisor for the
20   entire twenty years that you worked there?
21   A.    Just a foreman.  I don't know
22   how much --
23   Q.    He was the foreman?

Page 26

1    A.    I believe it was what they
2    would call the foreman, yes.
3    Q.    Was he your supervisor at the
4    time that you left Appleton?
5    A.    Yes.
6    Q.    At that time immediately
7    before leaving there, did you have any
8    other supervisor you reported to besides
9    him?
10   A.    No, I don't believe so.  I
11   don't remember any.
12   Q.    When you transferred to
13   Florida, who was your supervisor at that
14   time?
15   A.    I don't remember.
16   Q.    And did your pay change at all
17   at the time that you transferred to
18   Florida?
19   A.    I think it did a little bit.
20   Q.    Did it go up or down?
21   A.    I think it went down.
22   Q.    And you don't recall who your
23   supervisor was when you transferred?

Page 27

1    A.    No.  It was somebody in
2    Mobile, Alabama.  I don't remember his
3    name.
4    Q.    Are you currently employed?
5    A.    Pardon?
6    Q.    Are you currently employed
7    anywhere?
8    A.    No.
9    Q.    Since your job with Sysco
10   ended, have you put in any applications to
11   work anywhere else?
12   A.    No.
13   Q.    Who was your supervisor when
14   you last worked for Sysco?
15   A.    For?
16   Q.    For Sysco.
17   A.    The last one?
18   Q.    The last supervisor you had
19   there.
20   A.    Jim Morris -- John Morris.
21   I'm sorry, John Morris.
22   Q.    What was his title or
23   position?

Page 28

1    A.    As far as I know, it was just
2    supervisor.
3    Q.    Is there anybody else that you
4    answered to?
5    A.    Besides him?
6    Q.    Yes.
7    A.    No, that was just him.
8    Q.    He would be --
9    A.    Go to him.  Otherwise, you
10   would go above to upper level.
11   Q.    Okay.  Did your duties change
12   as a shuttle driver between the Wisconsin
13   and the Florida locations?
14   A.    No.
15   Q.    Same pretty much?
16   A.    Uh-huh.  I was pulling doubles
17   in Wisconsin, came down here and I was
18   pulling doubles.
19   Q.    In Wisconsin, what was your
20   route?  Did you have a standard route you
21   drove every day?
22   A.    Yes.
23   Q.    And where was that?  What

7

Tyler Eaton Morgan Nichols & Pritchett, Inc.

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 29 to 32)

Page 29

1    locations were you going between?
2        A.    Well, I was going from Green
3    Bay, Wisconsin to Baraboo, Wisconsin and
4    back.
5        Q.    Green Bay to?
6        A.    Baraboo, B-A-R-A-boo, B-O-O.
7        Q.    And your route at the Florida
8    location was?
9        A.    When I first started in
10   Florida, it went from Panama City to
11   Mobile and back to Panama City.  And then
12   it changed.
13       Q.    What did it change to?
14       A.    Panama City to Calera and back
15   to Panama City.
16       Q.    How long did you drive the
17   Mobile route before switching?
18       A.    I don't remember what year the
19   Calera office opened up.  So from the time
20   it opened up, when they opened up, that is
21   when I switched, from '95 to whenever they
22   opened.
23       Q.    Okay.  Have you worked at any

Page 30

1    other locations for Sysco besides
2    Wisconsin and Panama City?
3        A.    That is it.
4        Q.    You mentioned doing a training
5    course for pulling double trailers at Fox
6    Valley?
7        A.    Fox Valley Tech, yeah.
8        Q.    Did you do that prior to
9    coming to work for Sysco?
10       A.    No.  I was already working for
11   Sysco.  At the time, I was driving single
12   trailers.  They just legalized double
13   trailers, so I took the course so I could
14   drive double trailers.
15       Q.    Did Sysco send you to that
16   course, or did you take it on your own?
17       A.    I took it on my own.
18       Q.    Do you have to have a certain
19   special license in Florida to pull double
20   trailers, or is that covered under your
21   commercial driver's license?
22       A.    It's covered -- it is a
23   special license.

Page 31

1        Q.    Before the incident that we
2    are here about today, had you ever had any
3    type of accident while driving for Sysco?
4        A.    Some minor ones, yes.
5        Q.    Okay.  Tell me about the
6    earliest one of those you can remember.
7        A.    The earliest one I can
8    remember?
9        Q.    Yeah.
10       A.    Besides hitting deer, running
11   over deer with the semi?
12       Q.    Yeah, I mean, just --
13       A.    I remember one where a car ran
14   a red light and bumped the front bumper of
15   the tractor.  This was in Wisconsin.
16             And I remember -- well, there
17   was one time in the Calera yard where I
18   backed into the Thermo King unit.
19             MR. UMBACH:  What did you say
20   that was?
21       A.    Thermo King unit.
22       Q.    How do you spell that, do you
23   know?

Page 32

1        A.    T-H-I-R-M-A-L-K-I-N-G.
2        Q.    What is the Thermo King unit?
3        A.    It's the refrigerating unit.
4        Q.    When did that occur?
5        A.    I don't remember.
6        Q.    Just looking at your
7    employment at the Florida location, prior
8    to the accident we are here about today,
9    did you suffer -- were you involved in any
10   other accidents before that?
11       A.    Oh, an accident?
12       Q.    Yeah.
13       A.    I do remember when I was
14   making a right-hand turn, somebody
15   tried -- you know, if you have got
16   doubles, somebody came in and slid right
17   into my middle dolly between the two
18   trailers.  I was found not guilty on that.
19       Q.    When did that happen?
20       A.    I think it was in 2000, 2002,
21   somewhere around there.
22       Q.    And where did that occur?
23       A.    Panama City.

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 33 to 36)

Page 33

1  Q.  A passenger car hit the dolly
2  between --
3  A.  Yes.
4  Q.  Between the two trailers?
5  A.  Yeah.
6  Q.  Were you injured in that at
7  all?
8  A.  No.
9  Q.  Was the other driver injured?
10  A.  No.
11  Q.  Any damage to your trailers?
12  A.  No.
13  Q.  Besides that incident and the
14  incident we are here about today, have you
15  been involved in any other accidents on
16  the road working at the Panama location?
17  A.  No, not that I can remember.
18  Q.  Do you recall an incident that
19  occurred on June 2nd, 2004 around Troy,
20  Alabama when you passed another vehicle
21  driven by Sysco management?  Do you
22  remember that incident at all?
23  A.  No.

Page 34

1  Q.  Do you remember talking to
2  John Cruz about an incident where you
3  might have passed another vehicle early in
4  June 2004?
5  A.  No, I don't remember.
6  Q.  You don't recall that at all?
7  Is Mr. Cruz one of your supervisors?
8  A.  John Cruz?
9  Q.  Yeah.
10  A.  Just another employee.
11  Q.  Another driver?
12  A.  Uh-huh.
13  Q.  All right.  Tell me about the
14  accident we are here about today.  In
15  your own words, just tell me what date and
16  time it happened and exactly what
17  happened.
18  A.  All I can remember about the
19  accident is what happened when I ended up
20  in the ditch.  Why it happened or
21  whatever, I don't know.  I can't remember.
22  Q.  All right.  You say all you
23  can remember is that you ended up in a

Page 35

1  ditch?
2  A.  Yes, sir.
3  Q.  What is the last thing that
4  you remember before ending up in the
5  ditch?
6  A.  Hitting the brakes.
7  Q.  Describe for me where you were
8  and where you were going when the accident
9  happened.
10  A.  I started out in Panama City,
11  went to Calera, dropped my empty trailers,
12  picked up my full trailers, and left and
13  headed back to Panama City.
14  Q.  Okay.  And where were you when
15  the accident happened?
16  A.  I think it's 271 intersection.
17  MR. MIDDLEMAS:  I think that
18  is it.
19  A.  And 231.
20  Q.  The intersection of 271 and
21  231?
22  A.  I believe that is the two
23  roads.

Page 36

1  Q.  I'm going to show you what I'm
2  going to mark as Defendant's Exhibit 1.
3       (Whereupon, Defendant's
4       Exhibit 1 was marked for
5       identification.)
6  Q.  Can you review that?
7  A.  (Reviewing document.)  Okay.
8  Q.  And that is a document
9  entitled Driver's Report of Accident, is
10  it not?
11  A.  Yeah.
12  Q.  Did you fill that document
13  out?
14  A.  Yes.
15  Q.  Do you remember filling that
16  document out?
17  A.  I don't remember filling it
18  out, but it's my signature and all.
19  Q.  That is your signature at the
20  bottom?
21  A.  Yeah.
22  Q.  Okay.  Read for me, if you
23  would, what the brief description of

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 37 to 40)

Page 37

1  accident --
2      A.   Came to intersection sooner
3  than expected, hit brakes and went into
4  ditch.
5      Q.   Okay.  The wreck occurred
6  there at the intersection?
7      A.   I'm sorry?
8      Q.   The wreck occurred there at
9  the intersection?
10     A.   Yes.
11     Q.   Is that a "T" intersection?
12     A.   Yes.
13     Q.   When you say in this form that
14  you came to the intersection sooner than
15  you expected, can you elaborate on what
16  you meant by that or what you mean by
17  that?
18     A.   Just all of a sudden I was on
19  the intersection and I had to hit the
20  brakes.
21     Q.   Okay.  Did you see the
22  intersection as you were approaching it?
23     A.   I don't remember.  All I can

Page 38

1  remember is from hitting the brakes and
2  going into the ditch.
3      Q.   Okay.  How fast were you going
4  when you hit the brakes?
5      A.   I don't know.
6      Q.   This intersection, is it on
7  your regular route that you would drive?
8      A.   Yes.
9      Q.   At the time of this accident,
10  how long had you been driving that route
11  from Panama City to Calera?
12     A.   Since the time Calera opened
13  up.
14     Q.   And --
15     A.   Is that when you meant?
16     Q.   Yeah.
17     A.   Okay.
18     Q.   Would you go through this
19  intersection every time on that route?
20     A.   Every time.
21     Q.   Is there a stop light at that
22  intersection?
23     A.   There is a stop light, yes.

Page 39

1      Q.   Was the light red or green for
2  you?
3      A.   I don't know.
4      Q.   Did you lose consciousness at
5  any point?
6      A.   I don't know.  All of a
7  sudden, I was in the ditch.  I don't know
8  how long I was in the truck.  The next
9  thing I know, I was out of the truck and
10  somebody was calling the police.  They
11  called the ambulance and took me to the
12  hospital.
13     Q.   You say the last thing you
14  remember was hitting the brakes?
15     A.   Hitting the brakes and going
16  into the ditch.
17     Q.   Where were you in relation to
18  this intersection when you hit the brakes?
19     A.   Before the intersection.
20     Q.   Before the intersection.  Do
21  you have any estimate how far before the
22  intersection you were?
23     A.   I don't know.

Page 40

1      Q.   Do you know how fast you were
2  going when you hit the brakes?
3      A.   I don't know.
4      Q.   All right.  I'm going to show
5  you what I'm going to mark as Defendant's
6  Exhibit 2, and let me get you to review
7  that for me.
8          (Whereupon, Defendant's
9           Exhibit 2 was marked for
10          identification.)
11     A.   Okay.
12     Q.   Is that your handwriting on 2?
13     A.   Yes.
14     Q.   Can you read for the Court
15  what that statement says, please?
16     A.   On Monday, the 28th of June,
17  around 2:00 p.m. I was heading back to
18  Panama City yard with two full trailers.
19  Went south on 65 and turned off on 85 exit
20  going towards Atlanta.  Turned off at exit
21  number 9, which is highway 271, and headed
22  east towards 231.  Didn't realize I was
23  close to 231 and 271 intersection and had

Page 41

1  to stop.  Slid through the intersection
2  and went into ditch.
3      Q.   How many miles, in your
4  understanding, is it between exit number 9
5  on the Highway 271 and the intersection of
6  231?
7      A.   I don't know.
8      Q.   Is it more than 5 miles?
9      A.   I wouldn't know.
10     Q.   More than a mile?
11     A.   It's more than a mile, yeah.
12     Q.   What is the speed limit on
13  271?
14     A.   I don't remember.
15     Q.   How fast were you going on 271
16  approaching that intersection?
17     A.   I don't know.
18     Q.   All right.  I'm going to show
19  you what I'm going to mark as Defendant's
20  Exhibit 3.  I'll get you to review this as
21  well.
22         (Whereupon, Defendant's
23         Exhibit 3 was marked for

Page 42

1         identification.)
2      A.   (Reviewing document.)
3      Q.   And that is a document titled
4  Accident Accountability Statement; is that
5  right?
6      A.   Uh-huh.
7      Q.   Did you fill that document
8  out?
9      A.   Yes.
10     Q.   And can you tell the Court
11  what that says?
12     A.   Came to intersection sooner
13  than expected and couldn't stop.  Shoulder
14  on left side got hurt.  Very large bruise
15  on the gut and upper arm.  Doc says need
16  MRI.  Head hit window, even though seat
17  belt was on.
18     Q.   Is that your signature at the
19  bottom of that document?
20     A.   I'm sorry?
21     Q.   That is your signature at the
22  bottom of that document?
23     A.   Yes.

Page 43

1      Q.   Okay.  Tell me what you did
2  immediately following the accident.
3      A.   They summoned the police and I
4  went into the ambulance.  We went to the
5  hospital.
6      Q.   Did you call in to report the
7  accident?
8      A.   I called John Morris.
9      Q.   How did you call him in?
10     A.   On a cell phone.
11     Q.   And what did you tell
12  Mr. Morris?
13     A.   I'm sorry?
14     Q.   What did you tell Mr. Morris?
15     A.   I told him I had a bad
16  accident.
17     Q.   And tell me in as much detail
18  as you can remember specifically what was
19  said in that conversation.
20     A.   Just that I called him, I said
21  that I had a bad accident, you are going
22  to have to get somebody out here, that --
23  I can't really remember that much more

Page 44

1  about it.
2      Q.   Did you talk with anybody else
3  immediately following the accident
4  employed with Sysco?
5      A.   Did I call anybody?
6      Q.   Call anybody with Sysco other
7  than --
8      A.   No.
9      Q.   Okay.  Were you wearing your
10  seat belt at the time this accident
11  happened?
12     A.   Yes.
13     Q.   Describe for the Court what
14  type of seat belt is in this truck that
15  you were driving.
16     A.   Just a normal seat belt like
17  you would have in any other car.
18     Q.   Does it have a waist belt and
19  a shoulder belt?
20     A.   Right.
21     Q.   And that comes across your
22  left shoulder?
23     A.   Left shoulder over to the

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 45 to 48)

Page 45

1  right.
2      Q.   Was this your regular tractor
3  that you were driving at the time of this
4  accident?
5      A.   I don't remember.
6      Q.   Did you have a regular tractor
7  at that time?
8      A.   Yes.
9      Q.   At the time this happened, you
10 had already been to Calera and were
11 returning to Panama City with your second
12 load of the shift; is that right?
13     A.   At the time what?
14     Q.   At the time the accident
15 happened, you had already been to the
16 Calera location?
17     A.   Right.
18     Q.   And were on the --
19     A.   I was on the way back home.
20     Q.   Pulling a set of doubles?
21     A.   Yes.
22     Q.   Was this your regular shift
23 that you had been working up to this

Page 46

1  point?
2      A.   The shift was, but the day was
3  supposed to be my day off.
4      Q.   What day of the week was this?
5      A.   I believe it was Tuesday.
6      Q.   And what was the time of your
7  shift?
8      A.   I can't remember the exact
9  time. I think it started around between
10 5:00 and 7:00 in the afternoon. Go until
11 I'm done and back home.
12     Q.   And how much time would it
13 typically take you to complete that route
14 and get off work or return to the Panama
15 City location?
16     A.   I think the average time was
17 about 9 and a half to 10 hours.
18     Q.   And this was your standard
19 regular route that you had been driving at
20 this point?
21     A.   Yes.
22     Q.   How long had you been driving
23 that route beginning at 5:00 to 7:00 p.m.

Page 47

1  and driving from Panama City to Calera and
2  back, how long had you been doing that at
3  the time of the accident?
4      A.   I think we started around
5  between 5:00 and 7:00, I can't remember.
6  But I do remember leaving Calera at
7  12:30 in the morning. So from Calera down
8  to the accident, started at 12:30 and then
9  whatever time it took me to get there.
10     Q.   Okay. You said when you first
11 went to work at Panama City, you drove a
12 Panama City to Mobile route?
13     A.   Right.
14     Q.   You later switched to the
15 Calera route?
16     A.   Yes.
17     Q.   The whole time you were
18 driving the Calera route, I mean, when you
19 switched to that in the beginning, was it
20 the same time frame, leave at 5:00 to
21 7:00 p.m.?
22     A.   It was earlier.
23     Q.   Earlier?

Page 48

1      A.   Yes.
2      Q.   How long, as of the time of
3  this accident, how many days, weeks,
4  months would you --
5      A.   I think I started around 9:00
6  when I went to Mobile and a couple of
7  hours earlier when I started to go to
8  Calera.
9      Q.   What I am asking is how long
10 had that been your regular shift? So the
11 Calera shift always had you leaving at
12 that time?
13     A.   Yes.
14     Q.   So you were pretty much
15 driving through the night?
16     A.   Yes.
17     Q.   And you had been working that
18 for, I'm assuming, at least a year before
19 this accident happened?
20     A.   Yes.
21     Q.   Several years?
22     A.   Several.
23     Q.   I know you said it changed

FRANK FISCHER                                                                FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.                          November 21, 2006

(Pages 49 to 52)

Page 49

1  when the Calera location opened, and you
2  don't remember what year that was. But it
3  had been more than a year before this
4  accident happened that you switched?
5      A.   Right.
6      Q.   And you said this was normally
7  your day off?
8      A.   Tuesday was supposed to be my
9  day off.
10     Q.   Was that your only day off?
11     A.   Friday and Saturday was my day
12 off also.
13     Q.   So you would have Tuesdays,
14 Fridays and Saturdays off?
15     A.   Yes.
16     Q.   And then you would drive this
17 route every other night of the week?
18     A.   I'm sorry?
19     Q.   You would drive this every
20 other night of the week?
21     A.   It would be the same route
22 every day that I had to work.
23     Q.   Okay. Were you driving any

Page 51

1      A.   It was getting to be quite
2  regular at the time.
3      Q.   Okay. So your standard route
4  would be just to shuttle between those two
5  locations, but sometimes you would have to
6  stop to make pickups?
7      A.   Right.
8      Q.   And you said something about
9  returns?
10     A.   If there is returns on the
11 trailer that the customer refused, that
12 had to be taken into the warehouse.
13     Q.   Okay. On this night that the
14 accident happened, had you had to do any
15 other extra stops like that?
16     A.   I don't remember.
17     Q.   Are you required as a shuttle
18 driver to do a pretrip inspection of your
19 tractor before you take off from Panama
20 City?
21     A.   Yes.
22     Q.   And is there any type of
23 written form you fill out?

Page 50

1  other routes at that time?
2      A.   No.
3      Q.   Did you have any
4  responsibility for actually unloading or
5  loading the trailers?
6      A.   Only when they sent me to pick
7  up food. Like fish house, they would send
8  me there, got it -- load it or unload the
9  trailers. If there is returns on the
10 trailers, you have to take and back it up
11 into the dock and then load those returns.
12     Q.   Okay. And I mean would the
13 fish house be part of your route from
14 Panama City to Calera?
15     A.   I'm sorry?
16     Q.   Is the fish house part of your
17 route from Panama City?
18     A.   Sometimes they just call you
19 up and say stop at this certain place to
20 make a pickup. And that is the only thing
21 I can think of right now where they had me
22 stop and pick up some cases of fish.
23     Q.   Is that unusual?

Page 52

1      A.   I believe we had written forms
2  we had to fill out.
3      Q.   Tell me what the steps in that
4  pretrip inspection would be and what you
5  would have to inspect before leaving.
6      A.   You do a walk-around, check
7  your lights, your tires, your air lines,
8  your oil, your belts and water in the
9  engine section.
10     Q.   Okay.
11     A.   And make sure everything looks
12 fine for going on the highway.
13     Q.   Let me show you what I am
14 going to mark as Defendant's Exhibit 4,
15 and get you to look at this for me.
16          (Whereupon, Defendant's
17          Exhibit 4 was marked for
18          identification.)
19     A.   (Reviewing document.)
20     Q.   That is several pages if you
21 want to look at all those.
22     A.   (Reviewing document.)
23     Q.   That document is titled Elite

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 53 to 56)

Page 53

1  Driver Program Pretrip Form; is that
2  right?
3       A.    This was, if I remember right,
4  the supervisor would take you and walk you
5  around and have you do a pretrip and check
6  off whichever -- the stuff you did.
7       Q.    Okay.  Your name is there at
8  the top under driver.  Is that your
9  handwriting or did somebody fill that out?
10      A.    That is not my handwriting
11  there.
12      Q.    And that is dated July 22,
13  2002.  And there is a blank for -- it says
14  attestor, Jeff Simmons.  Was he a
15  supervisor of yours?
16      A.    I think he was.
17      Q.    Do you recall doing that
18  pretrip inspection with him?
19      A.    I don't recall.
20      Q.    Okay.  Looking at the items on
21  that form, can you tell me if those were
22  what you would do as your normal pretrip
23  inspection?

Page 54

1       A.    Like the overview of the
2  tractor, yes.  Check under your hood,
3  yeah.
4       Q.    Okay.  Looking down to what is
5  highlighted in blue there under in the
6  cab, it says verify that the seat belt is
7  operational?
8       A.    Uh-huh.
9       Q.    Is that part of your normal
10  pretrip inspection?
11      A.    Yes.
12      Q.    How do you do that?  How do
13  you make sure the seat belt is
14  operational?
15      A.    Make sure you can bring it
16  around and hook it up.
17      Q.    Did you do that on the date of
18  your accident before leaving Panama City?
19      A.    Yes.
20      Q.    So is it simply a matter of
21  making sure that it fits all the way
22  around you and clips in?
23      A.    Make sure it comes around and

Page 55

1  latches.
2       Q.    And would you do this pretrip
3  inspection again before leaving the Calera
4  location as well?
5       A.    You were supposed to make a
6  walk-around on the truck before you leave
7  the yard and make sure everything is
8  right.
9       Q.    Are you supposed to stop at
10  any point in the middle of the trip and do
11  that as well?
12      A.    I believe you are stopped -- I
13  can't remember how many hours into your
14  trip where you stop and check your tires
15  and make sure they are all doing okay.
16      Q.    Before you left the Calera
17  location, did you do the pretrip
18  inspection there?
19      A.    Yes.
20      Q.    Did you check the seat belt at
21  that time?
22      A.    Yes.
23      Q.    Did you wear your seat belt

Page 56

1  when you left the Calera location?
2       A.    Yes.
3       Q.    Did you stop at any time
4  between Calera and where the accident
5  occurred?
6       A.    No.
7       Q.    When you put the seat belt on,
8  did you bring it across your left shoulder
9  and buckle it?
10      A.    Just down and hooked it up
11  just like you are supposed to.
12      Q.    Did anybody at Sysco ever show
13  you or give you any instructions on the
14  proper way to fasten your seat belt to
15  wear it?
16      A.    No.
17      Q.    You understand that that belt
18  is supposed to be over from left shoulder
19  to the bottom hip?
20      A.    Yes.
21      Q.    At any point from your trip to
22  Calera until this accident happened, did
23  you move that shoulder belt to any part of

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 57 to 60)

Page 57

1 your body? Did you move it under your
2 left arm?
3     A.    No.
4     Q.    Did you ever ride with your
5 shoulder belt anywhere other than going
6 over your left shoulder?
7     A.    I'm sorry, I didn't get that.
8     Q.    Did you ever, working for
9 Sysco, drive your trailer with your
10 shoulder seat belt going anywhere other
11 than your left shoulder; in other words,
12 hooked under your left arm?
13     A.    I don't know what you are
14 asking.
15     Q.    Did you ever put that belt
16 anywhere other than where it goes over
17 your shoulder?
18     A.    Yes.
19     Q.    You did?
20     A.    Uh-huh.
21     Q.    Where else did you put it?
22     A.    Yes.
23     Q.    Where else?

Page 58

1     A.    Behind my back.
2     Q.    Would you have the waist belt
3 behind your back as well?
4     A.    No.
5     Q.    How would you manage that? I
6 mean, is it the shoulder belt is going
7 back behind you?
8     A.    Waist belt would go in front.
9     Q.    Were you wearing it that way
10 on the night this accident happened?
11     A.    No.
12     Q.    When would you wear it that
13 way?
14     A.    It just depends on -- you
15 know, you jump in the truck in a hurry,
16 you flip it over. It's not -- sometimes I
17 do it and sometimes I don't.
18     Q.    Did you understand that was
19 not a proper way to wear the safety belt?
20     A.    I was told that, yes.
21     Q.    Who told you that?
22     A.    John Morris.
23     Q.    And did Mr. Morris witness you

Page 59

1 wearing the belt that way? Did he see
2 you?
3     A.    Yes.
4     Q.    When did that happen?
5     A.    I don't remember.
6     Q.    How did he see this? Was he
7 in the truck with you?
8     A.    He was in the yard hooking up
9 trailers. And he said -- he thought I
10 didn't have my seat belt on, and I did. I
11 just didn't have the shoulder belt on.
12     Q.    And he told you at that time
13 you needed to wear the shoulder belt as
14 well?
15     A.    Yeah.
16     Q.    How many times did that happen
17 that he told you about that?
18     A.    Just once.
19     Q.    Do you know if he wrote you up
20 for that?
21     A.    No, he didn't write me up.
22     Q.    Is the belt uncomfortable
23 going over the shoulder?

Page 60

1     MR. MIDDLEMAS: Object to the
2 form of the question. You go ahead and
3 answer.
4     A.    Not really.
5     Q.    What was your reason for
6 putting that belt back behind you?
7     A.    Just a habit.
8     Q.    Was it more comfortable behind
9 your back?
10     A.    I think so.
11     Q.    And the date of the accident
12 we are here about is June 29th, 2004; is
13 that correct?
14     A.    I'm not sure what the date is.
15     Q.    Okay. Looking at Defendant's
16 Exhibit 1, the date you have written there
17 was 6/29/04.
18     A.    Okay.
19     Q.    Was that, in your
20 understanding, the date the accident
21 occurred?
22     A.    Okay.
23     Q.    Is that right?

15

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 61 to 64)

Page 61

1      A.    I don't remember it.  But that
2  is what is written down, yeah, 6/29.
3      Q.    I mean, you don't have any
4  reason to dispute that is the correct
5  date, considering that is the date that
6  you put on the --
7      A.    I don't have any reason for
8  it.
9      Q.    When you left Panama City that
10  night around 5:00 to 7:00 p.m. to start
11  your load, did you fasten your seat belt
12  with the belt in front of your shoulder or
13  behind your back?
14      A.    In front.
15      Q.    Did you have it that way the
16  entire trip to Calera?
17      A.    Yes.
18      Q.    Did you stop at any point on
19  that trip to Calera?
20      A.    Did I stop, no.
21      Q.    Didn't have any returns or
22  pickups?  Didn't have to go by the fish
23  house?

Page 62

1      A.    I can't remember about pickups
2  and I can't remember if I had any returns
3  or not.  Once you get to Calera yard, you
4  have to drop your trailers and hook up to
5  the full ones.
6      Q.    When you got back in the cab
7  at Calera to come back to Panama City, did
8  you hook your seat belt up when you got in
9  the cab?
10      A.    I had the seat belt on when I
11  got back in the cab.
12      Q.    Did you have it over your
13  shoulder or behind your back?
14      A.    Over the shoulder.
15      Q.    Did you stop at any point
16  before the accident happened?
17      A.    No.
18      Q.    Let me show you what I am
19  going to mark as Defendant's Exhibit 5.
20          (Whereupon, Defendant's
21          Exhibit 5 was marked for
22          identification.)
23      Q.    This is the police report

Page 63

1  dated June 29th, 2004, if you could look
2  at that.
3          MR. MIDDLEMAS:  I'm going to
4  place an objection to the police report
5  being a hearsay document.  Go ahead and
6  answer his questions.
7      Q.    Have you seen that document
8  before?
9      A.    I think I did.
10      Q.    Okay.
11      A.    (Reviewing document.)
12      Q.    Did you talk to the police
13  when they arrived at the accident scene?
14      A.    I don't remember.
15      Q.    Look, if you would, on the
16  back of Defendant's Exhibit 5 at the
17  drawing.  And if you would look at the --
18  the drawing shows a tractor with two
19  trailers in the intersection there of 271/
20  231.  Is that a fair representation of
21  what the accident scene was, in your
22  opinion?
23      A.    It looks like it.

Page 64

1      Q.    If you look at the statement
2  under that, if you could read that?
3          MR. MIDDLEMAS:  I'm going to,
4  again, place an objection to the entry of
5  this police report.  Go ahead and read it.
6      A.    Vehicle one was traveling
7  southbound on Taylor Road.  Driver of
8  vehicle one went to sleep, causing vehicle one to
9  lose control of the vehicle.  Vehicle one
10  went through the traffic signal and left
11  the roadway and collided with the ditch.
12      Q.    Is that a fair and accurate
13  description of what occurred?
14      A.    I don't know.
15      Q.    Did you fall asleep --
16      A.    I don't know.
17      Q.    -- before the accident
18  happened?
19      A.    I don't know.
20      Q.    You don't know?
21      A.    If I fell asleep, how did I
22  put the brakes on?
23      Q.    So as we sit here today, you

16

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 65 to 68)

Page 65

1  do not know whether you fell asleep prior
2  to this accident happening or not?
3      A.   I don't know.
4      Q.   Do you know if you told the
5  police officer that you fell asleep?
6      A.   I don't remember talking to
7  anybody.
8      Q.   Did you tell John Morris you
9  fell asleep?
10     A.   No.
11     Q.   Do you recall if John Morris
12  asked you how the accident happened?
13     A.   No, I don't remember anybody
14  asking me how -- you are talking about the
15  police at the time of the accident?
16     Q.   I'm asking when you called
17  John Morris on the cell phone. In the
18  course of that conversation, did he ask
19  you how the accident happened?
20     A.   Oh, when I first reported it?
21     Q.   Right.
22     A.   No, I don't remember him
23  asking me about it.

Page 66

1      Q.   He didn't inquire as to how
2  the accident happened?
3      A.   He didn't --
4      Q.   You are saying he did not
5  inquire of you about how the accident
6  happened?
7      A.   All I remember is I called him
8  up and told him that I had had a bad
9  accident and where it was.
10     Q.   There were no other cars
11  involved in this accident?
12     A.   I'm sorry?
13     Q.   There were no other cars
14  involved in this accident?
15     A.   Not that I am aware of, not by
16  me.
17     Q.   Are you aware of any other
18  witnesses to this accident?
19     A.   I don't know who, if there was
20  any. Somebody called the police. I
21  didn't.
22     Q.   You didn't call the police?
23     A.   No.

Page 67

1      Q.   Did you speak with anyone at
2  the scene of the accident besides the
3  police?
4      A.   All I remember is somebody
5  asking me are you all right. Who it was,
6  I couldn't tell you.
7      Q.   Somebody other than a police
8  officer?
9      A.   Yes.
10     Q.   Male or female?
11     A.   I don't remember.
12     Q.   Were you sitting in your truck
13  when they asked you this?
14     A.   Yes.
15     Q.   Do you know if they had exited
16  a vehicle?
17     A.   I'm sorry?
18     Q.   Do you know if they had been
19  in a vehicle?
20     A.   I don't know.
21     Q.   What did you tell them?
22     A.   I told them I think so.
23     Q.   Did you lose consciousness at

Page 68

1  any point when the accident happened?
2      A.   I don't know.
3      Q.   Do you remember the actual
4  impact with the ditch?
5      A.   That is the only thing I can
6  remember.
7      Q.   Describe for me what happened
8  as far as when the impact was made with
9  the ditch, what parts of your body
10  collided with parts of the truck. Just
11  describe for me what happened to your body
12  when the impact was made.
13     A.   I'm bracing myself at the
14  wheels and all of a sudden being pulled
15  forward and it seemed like I was hitting
16  the windshield.
17     Q.   You said it seemed like you
18  were hitting the windshield?
19     A.   Yes.
20     Q.   Did your head hit the window,
21  windshield?
22     A.   I think it did.
23     Q.   Did any other part of your

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 69 to 72)

Page 69

1  body hit the windshield?
2      A.   Not that I am aware of.
3      Q.   Did any part of your body hit
4  the steering wheel?
5      A.   I don't think so.
6      Q.   Any part of your body hit the
7  dashboard?
8      A.   No.  You have the steering
9  wheel in your way.
10     Q.   Okay.  In Defendant's
11 Exhibit 3, which is the Accident
12 Accountability Statement you filled out,
13 you wrote that your shoulder on your left
14 side got hurt and you had a very large
15 bruise on your gut and upper arm.  And
16 then you said doc says need MRI, hit head
17 window, even though seat belt was on.
18         Did any other part of your body
19 besides your head hit any part of the
20 truck?
21     A.   I don't remember.
22     Q.   Did your shoulder hit any part
23 of the truck?

Page 70

1      A.   It could have.
2      Q.   You don't remember?
3      A.   Don't remember.
4      Q.   Was your seat belt still
5  intact and fastened around you after the
6  truck came to a stop?
7      A.   Yes.
8      Q.   Is there any type of air bag
9  in that trailer?
10     A.   I'm sorry, any type of what?
11     Q.   Air bag.
12     A.   No.
13     Q.   You said that you were taken
14 from the scene by ambulance?
15     A.   Yes.
16     Q.   Were you able to get out of
17 the truck on your own power?
18     A.   Yeah.  I got out of the truck
19 and I sat down at the back bumper of the
20 last trailer and called the ambulance.
21     Q.   Was the entire truck and both
22 trailers off the road at this point?
23     A.   I think the tractor and the

Page 71

1  first trailer was off the road and part of
2  the second trailer was sticking in the
3  road.
4      Q.   And you sat on the bumper of
5  the last trailer and waited for the
6  police?
7      A.   Yes.  I think the police were
8  there already.
9      Q.   How long did you remain in the
10 cab before you got out?
11     A.   I don't know.
12     Q.   Were the police there when you
13 got out of the cab?
14     A.   I don't think so.  I think
15 they were pulling up as I got out.
16     Q.   And you don't recall whether
17 or not you talked to a police officer?
18     A.   I don't recall.
19     Q.   Where did the ambulance take
20 you, what hospital?
21     A.   I think it was Montgomery
22 hospital, I think.  I'm not sure.
23     Q.   Were you seen in the emergency

Page 72

1  room?
2      A.   Yeah.
3      Q.   Was that at Jackson hospital?
4      A.   I don't know.
5      Q.   Were you given a drug test in
6  the emergency room?
7      A.   I'm sorry?
8      Q.   Were you given a drug test in
9  the emergency room, drug screen?
10     A.   I don't remember if I was or
11 not.
12     Q.   Describe for me what took
13 place in the emergency room.  Did they do
14 x-rays, any type of exam?
15     A.   They had somebody come and
16 look at me, look me over and they didn't
17 do any x-rays or nothing.  They just
18 prescribed some medication for the pain.
19 And if it continued, they said go see the
20 doctor again.
21     Q.   Did you actually have a doctor
22 examine you in the emergency room?
23     A.   I think it was a doctor.

18

Tyler Eaton Morgan Nichols & Pritchett, Inc.

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 73 to 76)

Page 73

1    Q.    Did they do any x-rays that
2    you recall?
3    A.    I don't remember them doing no
4    x-rays.
5    Q.    At that time in the ER, did
6    you have the bruise on your shoulder and
7    your gut?
8    A.    I don't know.
9    Q.    You were not admitted to the
10   hospital that night though?
11   A.    Admit -- all they did is took
12   me to the emergency room and then somebody
13   picked me up afterwards.
14   Q.    Who picked you up?
15   A.    I think it was Mr. Brown.  I'm
16   not sure.
17   Q.    Mr. Brown?
18   A.    I don't know his first name.
19   Q.    Is he with Sysco?
20   A.    I'm sorry?
21   Q.    Is he with Sysco?
22   A.    Yeah.
23   Q.    What is his position?

Page 74

1    A.    I don't know.
2    Q.    And did he take you back to
3    Panama City?
4    A.    He took me back to, I think,
5    the accident site.  And then another
6    person met -- took me back to Troy.  I
7    think it was Troy, and there my sister
8    picked me up and -- met and picked me up
9    there.
10   Q.    Mr. Brown took you to the
11   accident site?
12   A.    I think so.
13   Q.    What did you do there?
14   A.    I don't remember.
15   Q.    Was anybody else there with
16   you and Mr. Brown?
17   A.    I believe so.
18   Q.    Who else was there?
19   A.    I don't remember.
20   Q.    Did Mr. Brown discuss the
21   accident with you?
22   A.    I think he did.
23   Q.    Do you recall that

Page 75

1    conversation, what you told him?
2    A.    I don't recall it.
3    Q.    Did he ask you how it
4    happened?
5    A.    I think he did.
6    Q.    And do you have any
7    recollection of what you told him?
8    A.    No.
9    Q.    And he took you to Troy,
10   Alabama?
11   A.    It wasn't him.  It was
12   somebody else.  I'm not sure who.
13   Q.    Somebody else with Sysco?
14   A.    Yes.
15   Q.    There were other Sysco
16   employees there at the accident scene?
17   A.    Yes.
18   Q.    And you say your sister picked
19   you up in Troy?
20   A.    Yes.
21   Q.    What is her name?
22   A.    Margaret Loberger,
23   L-O-B-E-R-G-E-R.

Page 76

1    Q.    Did she take you back to
2    Panama City?
3    A.    Yes.
4    Q.    Where does she live?
5    A.    3907 West 19th Street.
6    Q.    Is that in Panama City?
7    A.    Yes.
8    Q.    Were you scheduled to work
9    that next day?
10   A.    Yes.
11   Q.    Wednesday?
12   A.    Yes.
13   Q.    Did you go to work?
14   A.    No.
15   Q.    Did you discuss with anybody,
16   your supervisor or anybody else not going
17   to work?  I mean, did you call in?  Did
18   you have a doctor's excuse?
19   A.    I don't remember.
20   Q.    You don't recall informing
21   anybody with Sysco you were not going to
22   be working that day?
23   A.    No, I can't remember.

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 77 to 80)

Page 77

```
1        Q.   Did you return to work at
2    Sysco at any point after the accident?
3        A.   No.
4        Q.   Why were you working on your
5    day off?
6        A.   I don't know.  They didn't
7    have anybody to drive, so he called me in.
8        Q.   Who called you in?
9        A.   John Morris.
10       Q.   At what point did he call you
11   in?  Was it actually that day?  Did he
12   call you at home Tuesday and say you need
13   to come in, even though it's your day off?
14       A.   I think, if I remember right,
15   when you have a day off like that, you
16   still have to call in to your mailbox and
17   he'll tell you whether you have to come in
18   or not, or if you have the day off.
19       Q.   So even if it's your day off,
20   you still have to call in and see if they
21   need you?
22       A.   Yes.
23       Q.   What had you done that Tuesday
```

Page 78

```
1    prior to going in to work?
2        A.   I don't remember.
3        Q.   Working this shift, would you
4    normally sleep through the day?
5        A.   You would normally sleep
6    through the day.
7        Q.   I guess, what time would you
8    typically get in from that shift?
9        A.   Probably about 5:00 or 6:00 in
10   the morning.
11       Q.   Would you immediately, as a
12   matter of habit, immediately go home and
13   go to bed at that time?
14       A.   Right.
15       Q.   What time would you usually
16   get up?
17       A.   I think around 3:00 or 4:00 in
18   the afternoon.
19       Q.   And what typically would you
20   do before going in to begin your shift,
21   just eat a meal, personal business, that
22   kind of thing?
23       A.   Eat a meal, call in your
```

Page 79

```
1    mailbox, find out what is going on and
2    then go to the yard.
3        Q.   So the calling in would be
4    something you would do in the afternoon
5    after you got up several hours before the
6    next shift had begun?
7        A.   Yes.
8        Q.   On the day that the accident
9    happened, is that what you did, did you
10   sleep until the afternoon, get up and call
11   in on your shift to see if you had to go
12   in?
13       A.   Yes.
14       Q.   Did you do anything else that
15   day?
16       A.   Nothing special that I can
17   think of.
18       Q.   Did you sleep from the time
19   you got in on your shift before until the
20   time you woke up and called?
21       A.   I don't know.
22       Q.   You don't remember?
23       A.   (Witness shakes head.)
```

Page 80

```
1        Q.   On the day the accident
2    happened on the 29th, had you taken any
3    medication at all?
4        A.   For my blood pressure and
5    diabetes.
6        Q.   And what meds had you taken
7    for your blood pressure and diabetes?
8        A.   I would have to go look at
9    them.
10       Q.   Are you taking those same
11   medications currently?
12       A.   Yes.
13       Q.   Any other medications besides
14   those?
15       A.   At the time, no.
16       Q.   Had you had anything alcoholic
17   to drink on the 29th?
18       A.   No.
19       Q.   Do you drink alcohol as a
20   matter of course?
21       A.   Very, very seldom.
22       Q.   Do you drink coffee as a rule?
23       A.   Coffee?
```

20

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 81 to 84)

Page 81

1    Q.    Yeah.
2    A.    I used to yeah.
3    Q.    Had you had any coffee before
4    leaving on your shift on the 29th?
5    A.    Yes.
6    Q.    Did you have any coffee before
7    returning from Calera on your shift that
8    day?
9    A.    I don't think so.
10   Q.    How much coffee had you had
11   before you left Panama City?
12   A.    About a cup.
13   Q.    As a rule, would you carry
14   coffee with you in the cab?
15   A.    No.
16   Q.    When you got back to Panama
17   City, was that actually the next day,
18   June 30th, that you got back?
19   A.    I believe so.
20   Q.    In other words, you went to
21   the ER, went back to the accident scene,
22   and then immediately went back.  So it
23   would have been the next day after the

Page 82

1    accident happened that you were back in
2    Panama City?
3    A.    They dropped me off at the
4    accident scene where other employees were,
5    and then somebody volunteered or something
6    to meet my sister in Troy.
7    Q.    Okay.  When you got back to
8    Panama City, what did you do?  Did you go
9    home?
10   A.    I think the next day I went to
11   the doctor for workmen's comp because my
12   shoulder wasn't working.  I couldn't raise
13   my arm or nothing.  And I think he sent me
14   in for an MRI and then we found out that
15   the muscles were torn off of the bone in
16   my shoulder.
17   Q.    Who sent you to the doctor?
18   A.    The first one, workmen's comp
19   doctor.  I got hurt on the job so that
20   is -- I went to the place where -- there
21   was a list where you had to go for them to
22   check me out.
23   Q.    Was it John Morris?  Who told

Page 83

1    you?
2    A.    Who?
3    Q.    Who told you what doctor to go
4    to?
5    A.    I think there was a list at
6    the time where the company has programs to
7    go to certain doctor areas.
8    Q.    What I'm asking though is:
9    Did John Morris tell you to go to the
10   doctor?
11   A.    No, I don't think so.
12   Q.    Did anybody at Sysco tell you
13   to go to the doctor?
14   A.    No.  I was just hurting bad
15   and I decided to go to the doctor.  And
16   since it was work-related, I went to the
17   one for workmen's comp.
18   Q.    How did you know which doctors
19   were the workmen's comp doctors?
20   A.    I think there was a list at
21   the time.
22   Q.    Is that posted some --
23   A.    I'm sorry?

Page 84

1    Q.    The list was posted somewhere
2    at a location --
3    A.    I think everybody had a list.
4    I think it was handed out to everybody.
5    Q.    You had a list yourself?
6    A.    Not anymore, but I had it.
7    Q.    What doctor did you go to?
8    A.    It was at Bay Medical Clinic,
9    I believe.
10   Q.    And what is the name of the
11   doctor there that you saw?
12   A.    I don't remember.
13   Q.    Had you been seen there at the
14   Bay Medical Clinic before?
15   A.    Yes.  It's the same place
16   where they send you for drug tests.
17   Q.    Other than drug tests, had you
18   gotten any treatment at the Bay Medical
19   Clinic before?
20   A.    No.
21   Q.    Had you ever had any
22   work-related injuries working for Sysco
23   before this accident?

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 85 to 88)

Page 85

1     A.   No.
2     Q.   And you said the doctor at the
3  Bay Walk-In Clinic sent you for an MRI?
4     A.   I think it was him that sent
5  me. Either that or they sent me to
6  Goodwiller and Goodwiller sent me for the
7  MRI. I can't remember who was the one
8  that originally sent me there.
9     Q.   Dr. Goodwiller is your
10 surgeon?
11    A.   Yes.
12    Q.   Other than Dr. Goodwiller and
13 the doctor at the Bay Walk-In Clinic and
14 of course the ER doc up in Montgomery,
15 have you seen or been treated by any other
16 doctors for this injury?
17    A.   No.
18    Q.   Just to recap, you said that
19 you called John Morris from the cab
20 immediately after the accident happened;
21 is that right?
22    A.   Right.
23    Q.   And then Mr. Brown picked you

Page 86

1  up from the ER and took you to the
2  accident scene?
3     A.   I believe so.
4     Q.   And he discussed the accident
5  with you at that time as well?
6     A.   I think he did.
7     Q.   Did you discuss the accident
8  with anybody else at the accident scene,
9  anybody else with Sysco?
10    A.   The other person that took me
11 to Troy, I think he might have been asking
12 me questions about it too.
13    Q.   Do you remember who that was?
14    A.   I don't remember who it was.
15    Q.   Do you remember the substance
16 of that conversation at all?
17    A.   I don't know.
18    Q.   After that day, after you got
19 back to Panama City, did you have any
20 other conversations with anybody at Sysco
21 about the accident?
22    A.   I don't believe I did.
23    Q.   Did you talk to John Morris

Page 87

1  about the accident at any time after you
2  got back to Panama City?
3     A.   I don't remember.
4     Q.   Did you call in to Sysco for
5  any reason after you got back after the
6  accident?
7     A.   Just to let them know that I
8  was injured on the job and I have to go
9  get an MRI.
10    Q.   Do you know who you spoke to
11 at that time?
12    A.   I think I told John Morris.
13    Q.   Okay. In your understanding,
14 was your accident and your injury reported
15 as a worker's compensation claim?
16    A.   Yes.
17    Q.   And that was reported as a
18 Florida worker's compensation claim?
19    A.   I think so.
20    Q.   Did you receive benefits for
21 the time that you were off work after the
22 accident?
23    A.   From workmen's comp?

Page 88

1     Q.   Yeah.
2     A.   Yes.
3     Q.   When did those begin, how long
4  after the accident?
5     A.   I don't remember. Do you have
6  anything for that?
7        MR. MIDDLEMAS:  That is okay.
8  You testify from your memory, that is
9  fine.
10    Q.   How much did you get per week?
11    A.   I think it was over $600.
12    Q.   Over 600 per week?
13    A.   Yeah.
14    Q.   Are you still getting those
15 benefits today?
16    A.   No.
17    Q.   When is the last time you
18 received those?
19    A.   I don't remember.
20    Q.   What did Dr. Goodwiller tell
21 you when you first went to see him?
22    A.   What did he tell -- what?
23    Q.   Did you discuss your injuries

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 89 to 92)

Page 89

1  with him when you first went to see him?
2      A.   He told me the MRI showed that
3  the bone was -- the muscle was torn off
4  the bone. And apparently, there was three
5  different muscles involved and that is why
6  I couldn't raise my arm up all the way.
7  And it would -- you would have to go in
8  and reattach the muscles right away before
9  they started curling back up on
10  themselves. And we went to the operating
11  room from there.
12      Q.   He did surgery on your left
13  shoulder on late July of 2004, July 29,
14  2004; does that sound right?
15      A.   It wasn't in the first week or
16  something like that of July? It was in
17  July. That is all I can remember.
18      Q.   Has he just done one surgery
19  on your shoulder?
20      A.   I'm sorry?
21      Q.   Did he ever go back and do
22  another surgery?
23      A.   No.

Page 90

1      Q.   In the ER in Montgomery, did
2  you receive any treatment for any head
3  injury?
4      A.   No.
5      Q.   At any time after that, have
6  you received any treatment from any doctor
7  for any head injury from this accident?
8      A.   No.
9      Q.   Any injury affecting your
10  stomach, your abdomen at all?
11      A.   I went back to the doctor
12  because it was really black, the bruise,
13  and I was concerned about it. And he
14  looked at it and he said that is just from
15  the seat belt.
16      Q.   And which doctor?
17      A.   I think it was the original
18  workmen's comp doctor.
19      Q.   At Bay Walk-In Clinic?
20      A.   I think that is the Bay
21  Walk-In Clinic, yeah.
22      Q.   Did you have any pain in your
23  head after the accident happened?

Page 91

1      A.   I don't think so.
2      Q.   Was the windshield damaged in
3  any way?
4      A.   I don't think so.
5      Q.   Did you ever have any bruise
6  on your head anywhere?
7      A.   I'm sorry?
8      Q.   Did you ever have a bruise on
9  the head?
10      A.   No.
11      Q.   Any visible mark on the head
12  at all?
13      A.   I don't remember. I don't
14  remember ever having a bruise on my head.
15      Q.   All right. So aside from the
16  bruise on your shoulder and the bruise on
17  your stomach, did you have any bruises
18  anywhere else on your body?
19      A.   I don't believe so.
20      Q.   Did you have any cuts anywhere
21  else on your body?
22      A.   No.
23      Q.   Did your legs or anything

Page 92

1  below your waist hit anywhere on the
2  truck, or was that lower part of your body
3  injured in any way?
4      A.   No.
5      Q.   Did you have any pain in any
6  part of your body following the accident
7  other than --
8      A.   Back. Back was bad.
9      Q.   What part of your back was
10  hurting?
11      A.   I couldn't twist like I used
12  to.
13      Q.   Did that eventually go away?
14      A.   No.
15      Q.   You still have that problem
16  today?
17      A.   Yes.
18      Q.   Have you had any medical
19  treatment for that problem?
20      A.   No.
21          MR. SEGREST: We probably need
22  to take a break.
23          (Short break taken.)

23

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 93 to 96)

Page 93

1    Q.   (BY MR. SEGREST:)
2  Mr. Fischer, before the break, we were
3  talking about the accident or the injuries
4  that you suffered in this accident.  And
5  let me just kind of recap.  You said that
6  you had problems with your shoulder that
7  Goodwiller eventually did surgery on; is
8  that right?
9    A.   Right.
10    Q.   And immediately following the
11  accident and when you were seen in the ER
12  and, say, the day following the accident,
13  was there a bruise or a mark on your
14  shoulder?
15    A.   I don't remember.
16    Q.   Okay.  There was at some point
17  a bruise on your gut, as you referred to
18  it?
19    A.   Yes.
20    Q.   And you got scared because
21  that was real dark at some point?
22    A.   Yes, sir.
23    Q.   Did that appear immediately

Page 94

1  after the accident?
2    A.   I don't remember.
3    Q.   When was it that you got
4  concerned about how dark it was and went
5  to the doctor?
6    A.   I think it was maybe one or
7  two days.  I'm just guessing.  I don't
8  remember.
9    Q.   You don't still have that
10  bruise today, do you?
11    A.   No.
12    Q.   How big was it?
13    A.   From one end of your hip to
14  the other end.
15    Q.   Was that where the seat belt
16  would have gone across your stomach?
17    A.   Yes, sir.
18    Q.   Did it extend up to the upper
19  part of your chest at all?
20    A.   I don't think so.
21    Q.   After the truck came to a stop
22  after the accident, did you remove your
23  seat belt or did somebody remove it for

Page 95

1  you?
2    A.   I did.
3    Q.   Did you do that before anybody
4  got to the accident scene?
5    A.   I don't know.  I don't know
6  what was going on outside of the truck.
7    Q.   Did you do it -- you said
8  somebody came up to you and asked you if
9  you were okay?
10    A.   Yes.
11    Q.   While you were still in the
12  cab?
13    A.   Yes.
14    Q.   At that point, did you still
15  have your seat belt on?
16    A.   I don't remember.
17    Q.   Also to recap, earlier I had
18  asked you did you have any mark on your
19  head where it may have hit something and
20  you said -- did you have any mark on your
21  head?
22    A.   I don't remember if I had any
23  marks on my head or not.

Page 96

1    Q.   Okay.  And was there any mark
2  on the windshield?  Was the windshield
3  damaged in any way?
4    A.   I don't think so.
5    Q.   I think I already asked you
6  this as well, was any other part of the
7  truck, the steering wheel or dash damaged
8  in any way?
9    A.   I don't know.
10    Q.   Okay.  I'm going to show you
11  what I am going to mark as Defendant's
12  Exhibit 6, and represent to you this is a
13  photograph of the truck taken after the
14  accident.
15       (Whereupon, Defendant's
16       Exhibit 6 was marked for
17       identification.)
18    Q.   And let me get you to look at
19  that, if you would.
20    A.   (Reviewing photograph.)
21    Q.   Would you have any reason to
22  dispute that is the truck?
23    A.   I'm sorry?

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 97 to 100)

Page 97

1    Q.    Would you have any reason to
2  dispute that is the truck you are driving?
3    A.    No.
4    Q.    That looks like the truck you
5  were driving?
6    A.    It looks like it.
7    Q.    I'm going to show you what I
8  am going to mark as Defendant's Exhibit 7,
9  and get you to look at this as well.  And
10  I'm going to represent to you that is a
11  picture of the truck windshield
12  (indicating).
13         (Whereupon, Defendant's
14          Exhibit 7 was marked for
15          identification.)
16    A.    Whew, I don't remember that at
17  all.
18    Q.    If you could, look back at
19  Defendant's Exhibit 6 and look at the
20  windshield there and tell me if you see a
21  spider web break similar to what is shown
22  on Defendant's Exhibit 7.
23    A.    (Reviewing photograph.)  I

Page 98

1  didn't remember that at all.
2    Q.    You don't remember seeing
3  that?
4    A.    I don't remember it, period.
5    Q.    You don't remember there being
6  a spider web fracture?
7    A.    I don't remember seeing it
8  until just now.
9    Q.    Did you go around and look at
10  the truck when you were taken back to the
11  site with Mr. Brown?
12    A.    No.  The truck was gone by the
13  time I got back.
14    Q.    It was just the accident site?
15    A.    It was just the accident area.
16    Q.    Immediately after the accident
17  when you were in the cab of the truck
18  before you got out, did you lose
19  consciousness at any point?
20    A.    I don't remember.
21    Q.    At some point though while you
22  were still in the cab, you had all of your
23  senses about you or regained your senses

Page 99

1  and were able to see and hear, were you
2  not?
3    A.    Right.
4    Q.    And you did not notice the
5  windshield being broken?
6    A.    No, I didn't.
7    Q.    Do you have any idea what
8  could have broken the windshield like
9  that?
10    A.    Probably my head.
11    Q.    Probably your head, okay.  Did
12  your head hit that windshield because you
13  weren't wearing your shoulder strap on
14  your seat belt?
15         MR. MIDDLEMAS:  Object to the
16  form of the question.
17    Q.    Is that what happened?
18    A.    No.
19    Q.    That is not what happened?
20    A.    I don't know why I hit the
21  windshield.
22    Q.    But it did hit the windshield?
23    A.    I don't know.  It looks like

Page 100

1  it.
2    Q.    Your testimony under oath here
3  today is you don't remember whether your
4  head hit the windshield or not?
5    A.    I don't.
6    Q.    Mr. Fischer, if you had had
7  your shoulder belt on the seat belt, your
8  head would not have hit the windshield,
9  would it?
10         MR. MIDDLEMAS:  Object to the
11  form of the question.
12    A.    If what?
13    Q.    If you had had the shoulder
14  belt on your seat belt fastened, your head
15  would not have hit the windshield, right?
16         MR. MIDDLEMAS:  Same
17  objection.
18    A.    I had it on.
19    Q.    Were you presented with an
20  Employee Handbook at Sysco?
21    A.    Yes.
22    Q.    And was that something you
23  would receive every year?  Would they give

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 101 to 104)

Page 101

1   you a new one?
2       A.   I think it's every year.
3       Q.   Every year.  And you would
4   sign an acknowledgment that you would
5   receive that handbook; is that right?
6       A.   Yes.
7       Q.   Let me show you what I will
8   collectively mark as Defendant's Exhibit
9   8, and get you to look at these and tell
10  me if these bear your signature.
11           (Whereupon, Defendant's
12           Exhibit 8 was marked for
13           identification.)
14      A.   (Reviewing document.)
15      Q.   Is that your signature on all
16  three of those documents?
17      A.   Yes.
18      Q.   Let me get you also to look at
19  what I am going to mark as Defendant's
20  Exhibit 9.  In addition to the handbook,
21  would you also be given a safety manual
22  each year?
23           (Whereupon, Defendant's

Page 102

1           Exhibit 9 was marked for
2           identification.)
3       A.   I don't know.
4       Q.   Let me get you to look at
5   Defendant's Exhibit 9, which is
6   acknowledgment and receipt of the safety
7   manual.
8       A.   (Reviewing document.)  I don't
9   remember it, but apparently I had one.
10      Q.   I'm sorry, is that your
11  signature on Defendant's Exhibit 9?
12      A.   Yes.
13      Q.   Okay.  And that certifies that
14  you have received a copy of the Sysco Food
15  Services of Central Alabama Safety Manual,
16  and that you have read and understood and
17  will comply with the policies contained in
18  the manual and any revisions made to it.
19  And you signed that February 7, 2004; is
20  that right?
21      A.   I guess.
22      Q.   Had you received a copy of the
23  manual and read and understood it at that

Page 103

1   time?
2       A.   I believe so.
3           (Whereupon, Defendant's
4           Exhibit 10 was marked for
5           identification.)
6       Q.   Let me have you look at what I
7   will mark as Defendant's Exhibit 10, which
8   I'll represent to you is a copy of the
9   safety manual.  And look, if you would, to
10  page 361, which is marked there with a
11  star, and it's marked at the bottom about
12  seat belts.
13      A.   (Reviewing document.)  Uh-huh.
14      Q.   And what does that rule say?
15      A.   The one that is marked?
16      Q.   Yeah.
17      A.   Use a seat belt continuously
18  throughout the trip.
19           MR. MIDDLEMAS:  T. J., let me
20  step in for just a second.  This has some
21  sort of -- two columns down the side of it
22  where, I guess, a check mark would be.  I
23  don't know what Preferred Work Methods

Page 104

1   Delivery Service Associate is.  I don't
2   know what the document is.  I don't know
3   what Preferred Work Method means and maybe
4   that can be better explained in the
5   questioning.
6           MR. SEGREST:  Sure.
7       Q.   Well, the document is entitled
8   Preferred Work Methods, Delivery Service
9   Associate.  And one of the rules there is
10  that you are to use your seat belt
11  continuously throughout the trip.  Did you
12  understand that was a rule that applied to
13  you as the shuttle driver?
14      A.   Yes.
15      Q.   You understood that that was a
16  company safety rule?
17      A.   Yes.
18      Q.   Company policy that you would
19  use your seat belt continuously throughout
20  the trip?
21      A.   Yes.
22      Q.   No question about that?
23      A.   No question.

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 105 to 108)

Page 105

1     Q.   And, in fact, John Morris had
2   previously given you a verbal warning
3   about not wearing your seat belt properly;
4   is that right?
5          MR. MIDDLEMAS: *Object to the*
6   *form of the question.*
7     Q.   When he saw you not wearing
8   *that shoulder strap earlier?*
9     A.   Yes.
10    Q.   He told you you had to have
11  *that shoulder strap on?*
12         MR. MIDDLEMAS: Objection to
13  the form of the question.
14    Q.   He told you you had to have
15  that shoulder strap on, did he not?
16    A.   Yes.
17    Q.   Are you aware of any other
18  employees at Sysco putting the shoulder
19  strap back behind their back?
20    A.   I don't know.
21    Q.   Do you know any other Sysco
22  employees who did not use their safety
23  belts?

Page 106

1     A.   I don't know.
2     Q.   Did anybody at Sysco, John
3   Morris or anybody else ever tell you it
4   was okay not to use your safety belt?
5     A.   No.
6     Q.   Did they ever tell you it was
7   okay to put your safety belt behind your
8   back?
9     A.   No.
10         (Whereupon, Defendant's
11         Exhibit 11 was marked for
12         identification.)
13    Q.   I'm going to show you what I
14  have marked as Defendant's Exhibit 11,
15  *which is a document entitled the Employee*
16  Handbook, 2004 Edition, which, I believe,
17  you signed off on as having received in
18  *Defendant's Exhibit 8.* And let me let you
19  look at this.
20    A.   (Reviewing document.)
21    Q.   And the page I have turned
22  back to, I have turned the corner back
23  there -- if you would -- what does it say

Page 107

1   there under General Safety Rules, policy
2   number 414, *motor vehicles?*
3     A.   Where?
4          MR. MIDDLEMAS: (Indicating.)
5     A.   Motor vehicles?
6     Q.   Yes.
7     A.   Employees, while on company
8   business and/or during working hours, are
9   required to wear safety belts when
10  operating any motor vehicle.
11    Q.   So you understand it's written
12  there as well, in the handbook, as well as
13  in the safety manual that you are required
14  to wear a seat belt at all times when you
15  are operating a vehicle?
16         MR. MIDDLEMAS: I'm going to
17  object to this line of questioning. The
18  plaintiff has testified he was wearing his
19  seat belt.
20    Q.   When was the last time that
21  *you saw Dr. Goodwiller?*
22    A.   I think it was a couple of
23  months ago, but I'm not sure.

Page 108

1     Q.   And do you have an appointment
2   to see him at any point in the future?
3     A.   Yes.
4     Q.   When is your next appointment
5   with him?
6     A.   I would have to look on the
7   slip that he gave me.
8     Q.   It's coming up though?
9     A.   I'm sorry?
10    Q.   It's coming up? You have an
11  appointment made with him?
12    A.   *Something like every*
13  six months he sees me or somewhere around
14  there. I'm not sure of the exact time.
15    Q.   He did not refer you to any
16  other physician?
17    A.   No.
18    Q.   Are you taking any medications
19  right now for anything related to this
20  accident?
21    A.   No.
22    Q.   Any pain medications?
23    A.   No.

27

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 109 to 112)

Page 109

1  Q.  Okay.  You mentioned earlier
2  that you take medications for your high
3  blood pressure and diabetes?
4  A.  Yes.
5  Q.  Can you tell me what those
6  medications are?
7  A.  I would have to look at them.
8  Q.  Do you have them handy where
9  you could tell me?
10  A.  Do I have what?
11  Q.  Do you have them handy here?
12  A.  No.
13  Q.  Do those medications have any
14  side effects?
15  A.  The side effects?
16  Q.  Your blood pressure
17  medication, is it just one medication you
18  take?
19  A.  I think just two.
20  Q.  Let me ask you this:  What
21  doctor writes those for you?
22  A.  What what?
23  Q.  What doctor prescribes those

Page 110

1  for you?
2  A.  I would have to look at his
3  name, too, because it's over at Prime
4  Care.
5  Q.  You have a doctor that manages
6  your high blood pressure for you though?
7  You have a doctor that sees you for that?
8  A.  Yeah.
9  Q.  Who?
10  A.  Whoever they assign you at
11  Prime Care.  I would have to look at the
12  bottle and see what his name is.
13  Q.  That is Prime Care?
14  A.  Prime Care.
15  Q.  Is that located in Panama
16  City?
17  A.  Yes.
18  Q.  What street is that clinic on?
19  A.  What street?
20  Q.  Yeah.
21  A.  I don't know.
22  Q.  Is there a big street that it
23  is near?

Page 111

1  A.  They have got several offices.
2  I don't know which one they go by.
3  Q.  Do you go to the same location
4  all the time?
5  A.  No.  I went to two different
6  offices.
7  Q.  And what are those offices
8  located near?
9  A.  One is on one side of Panama
10  City and the other one is on the other
11  side of Panama City.
12  Q.  Again, is there a major street
13  you can give me?
14  A.  The only thing I can think of
15  is Cherry Street, but I'm not sure.
16  Q.  They have two clinics you
17  said?
18  A.  I'm sorry?
19  Q.  They have two different
20  clinics?
21  A.  More than two, I think.
22  Q.  And is there a regular doctor
23  there at Prime Care that you see for your

Page 112

1  high blood pressure?
2  A.  I see most of the time, yes.
3  Once they assign you a doctor, I try to
4  stick with the same one.
5  Q.  What is that doctor's name?
6  A.  The who?
7  Q.  What is that doctor's name?
8  A.  All I can -- his name is -- I
9  think it's John, but I'm not sure.  I
10  would have to look at the bottle.
11  Q.  You don't know his last name?
12  A.  No, I don't.
13  Q.  When you make an appointment,
14  you don't have to ask to see Dr. so and
15  so?
16  A.  I've got the bottles, so I can
17  say whatever his name is.  They also ask
18  me when you call for an appointment who
19  you want to see, and I say let me see the
20  last one I have seen.
21  Q.  You don't have any idea right
22  now what his name is?
23  A.  Not right now, I don't.

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 113 to 116)

Page 113

1    Q.   How many times have you seen
2    him?
3    A.   Once or twice a year.
4    Q.   Was he prescribing the blood
5    pressure medication you were taking when
6    you had this accident?
7    A.   I don't know.  I don't think
8    so.
9    Q.   Did you have another doctor
10   before him that treated you for high blood
11   pressure?
12   A.   Yes.
13   Q.   Who was that?
14   A.   Some lady doctor.
15   Q.   You don't know her name?
16   A.   I don't know her name.
17   Q.   Was she at Prime Care as well?
18   A.   Prime Care.
19   Q.   Have you had in the past, say,
20   ten years any other doctor besides the
21   Prime Care doctors treating you for high
22   blood pressure?
23   A.   No.

Page 114

1    Q.   Who treats you for diabetes?
2    A.   Same people.
3    Q.   Prime Care doctors?
4    A.   Yes.
5    Q.   Has anybody else in the past
6    ten years been treating you for diabetes
7    besides Prime Care?
8    A.   No.
9    Q.   Prime Care, is that your
10   regular family doctor where you go?
11   A.   Yes.
12   Q.   Do you see any other doctors
13   on a regular basis?
14   A.   I see Prime Care, Goodwiller
15   and Nanfro, N-A-N-F-R-O.
16   Q.   N-A-N-F-R-O?
17   A.   Yes.
18   Q.   What type of doctor is
19   Dr. Nanfro?
20   A.   Cancer.
21   Q.   Do you have cancer?
22   A.   I had cancer, yes.
23   Q.   What type of cancer did you

Page 115

1    have?
2    A.   Breast.
3    Q.   Have you undergone treatment
4    for that?
5    A.   Yes.
6    Q.   Did you undergo chemotherapy?
7    A.   Yes.
8    Q.   Radiation?
9    A.   No.
10   Q.   When did you do treatment for
11   that?
12   A.   This is a year anniversary
13   now.
14   Q.   And Dr. Nanfro handled your
15   treatment?
16   A.   He handled the chemo
17   treatment.
18   Q.   And where is he located?
19   A.   I'm sorry?
20   Q.   Where is Dr. Nanfro located?
21   A.   Panama City.
22   Q.   Did you do your treatments at
23   a hospital there?

Page 116

1    A.   No, at his office.
2    Q.   Did you ever have to undergo
3    any surgery for that?
4    A.   Surgery for cancer, yes.
5    Q.   Where did you undergo that
6    surgery?
7    A.   I think it was Gulf, but I'm
8    not sure.
9    Q.   Gulf?
10   A.   Gulf Medical.
11   MR. MIDDLEMAS:  It's Gulf
12   Coast Hospital.
13   Q.   And what surgeon did that
14   surgery?
15   A.   Wong.
16   Q.   Dr. Wong.  Do you know
17   Dr. Wong's first name?
18   A.   W-O-N-G.
19   Q.   You don't know his first name
20   though?
21   A.   Larry.
22   Q.   Any other doctors besides
23   Nanfro and Wong treat you for cancer?

FRANK FISCHER
*SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.*

FRANK FISCHER
November 21, 2006

(Pages 117 to 120)

Page 117

1      A.   Those are the two doctors.
2      Q.   Is your cancer in remission
3  now?
4      A.   I hope so.
5      Q.   How often do you go back for
6  checkups?
7      A.   Every six or eight weeks.
8      Q.   Are you scheduled for any
9  other treatment, chemotherapy or radiation
10 or any other type of treatment for your
11 cancer?
12     A.   They have got me on some kind
13 of pills now for the treatment, and I
14 still have the port in me where they do
15 the chemo.  So that has got to get flushed
16 every six or eight weeks or something like
17 that.
18     Q.   Okay.  Do you know what type
19 of pills you are taking for that, what the
20 name of it is?
21     A.   The only one I can remember
22 for cancer is Warfarin.  I don't remember
23 what the other one is.

Page 118

1      Q.   Besides your blood pressure
2  medicine, your diabetes medicine and your
3  cancer medicine, are you taking any other
4  medicine currently?
5      A.   If my gout flares up, I have
6  gout medicine for that.
7      Q.   Gout?
8      A.   Gout.
9      Q.   What type of medicine do you
10 take for that?
11     A.   I think it's called Endomycin,
12 but I'm not sure.
13     Q.   What doctor prescribes that
14 for you?
15     A.   The same one for the blood
16 pressure and --
17     Q.   Prime Med doc?
18     A.   Prime Care.
19     Q.   Okay.  Before this accident,
20 had you ever had any pain or any problems
21 with your left shoulder before?
22     A.   No.
23     Q.   Had you ever injured your left

Page 119

1  shoulder in any way?
2      A.   No.
3      Q.   Did you play sports in high
4  school?
5      A.   No.
6      Q.   Had you ever in your life
7  before this accident ever had a
8  work-related accident of any kind?
9      A.   No.
10     Q.   And you did receive benefits
11 after this accident from worker's comp; is
12 that right?
13     A.   Yes.
14     Q.   And your understanding was
15 that it was a Florida worker's comp claim,
16 you got it under Florida worker's comp?
17     A.   I think so.  I'm not sure.
18     Q.   To your knowledge, have you
19 received any benefits whatsoever under
20 Alabama worker's comp?
21     A.   I don't know.
22     Q.   You just got the regular
23 check?

Page 120

1      A.   I just got the check from the
2  workmen's comp people.
3      Q.   You haven't received any other
4  compensation outside of that regular
5  weekly check that you got?
6      A.   Right.  Correct.
7      Q.   All right.  Prior to this
8  accident, and I understand you have told
9  me about your diabetes and high blood
10 pressure, had you had any serious
11 illnesses?
12     A.   No.
13     Q.   Have you ever been
14 hospitalized before this accident?
15     A.   No.
16     Q.   Have you ever had any broken
17 bones before this accident?
18     A.   No.
19     Q.   Have you ever been involved in
20 a car accident or a truck driving accident
21 before this one in which you sustained any
22 type of injuries at all?
23     A.   No.

30

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

Page 121

1  Q.  You were never hurt in a car
2  accident before this?
3  A.  No.
4  Q.  Since this accident, have you
5  had any other car accidents of any kind?
6  A.  No.
7  Q.  Have you ever had any other
8  accidents, period, of any kind at all?
9  A.  No.
10  Q.  And your diagnosis of cancer
11  was made after this accident happened?
12  A.  Yes.
13  Q.  Is that correct?  Have you
14  been diagnosed with any other serious
15  illnesses besides that since this
16  accident?
17  A.  No.
18  Q.  Tell me what problems -- and
19  by problems, I mean, pain, limited motion,
20  any symptoms you are having today
21  currently that you claim are a result of
22  this accident.
23  A.  I can't use my left shoulder

Page 122

1  like I used to.  I can barely lift up the
2  gallon of milk into the refrigerator.  I
3  lost all of my strength on my left side.
4  There is a constant pain in it and it's
5  very low, but after a while you just get
6  used to it.  And if you try to do
7  something, the harder it is to do it, the
8  more it starts to hurt.  And the most -- I
9  can do something, whatever I wanted to do,
10  the most I can stand is 15 minutes and
11  I've got to stop.
12  Q.  And this is all because of
13  pain and problems in your left shoulder?
14  A.  Yes.
15  Q.  Does that pain extend down
16  your arm at all?
17  A.  No, I don't think so.
18  Q.  Just in the left shoulder?
19  A.  Yes.
20  Q.  Does it extend back up towards
21  your neck at all?
22  A.  No.
23  Q.  Does it extend into your back

Page 123

1  at all?
2  A.  No.
3  Q.  Does the pain go to any other
4  part of your body besides the left
5  shoulder?
6  A.  The left shoulder is the part
7  that is hurting all the time.  And when
8  you asked about the back, my back hurts,
9  but I don't know if that is related to
10  this shoulder.
11  Q.  Had you ever had back pain
12  before this accident?
13  A.  Yes.
14  Q.  Is that the same back pain you
15  have now?
16  A.  No.  Now, I can't even twist.
17  Q.  Are you making a claim for any
18  injury to your back arising out of this
19  accident?
20  A.  No.
21  Q.  So when you say now, you can't
22  even twist, that is not something you
23  attribute to this accident; is that

Page 124

1  correct?
2  A.  Before the accident, I didn't
3  have any problems with it.  It's kind of
4  hard to say, but I can't even wipe myself.
5  I had to make myself a bidet so I can go
6  do that now.  So whatever happened after
7  the accident, I can't even do that now.
8  Q.  Is that because of your left
9  shoulder?
10  A.  My back doesn't twist.  I
11  can't get back there anymore, so I had to
12  make myself a homemade bidet.
13  Q.  Is the fact that your back
14  can't twist, is that something that you
15  allege resulted from your accident?
16  A.  I don't know.
17  Q.  Well, has any doctor told you
18  it's related to your accident?
19  A.  No.
20  Q.  Has any doctor told you your
21  inability to twist is related to your
22  accident?
23  A.  No.

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 125 to 128)

Page 125

1    Q.    Have you received any
2  treatment from a doctor for your inability
3  to twist?
4    A.    No.
5    Q.    Have you made any request from
6  Sysco or their workmen's compensation
7  insurance carrier for your back being
8  unable to twist?
9    A.    No, I don't think we did.
10   Q.    Besides the stuff we have
11 already talked about, is there any other
12 problem that you are having with any other
13 part of your body that you attribute to
14 this accident?
15   A.    I don't believe so.
16   Q.    What is the current typical
17 day for you?  What do you do when you get
18 up in the morning?
19   A.    I sit and listen to the radio
20 or watch a little TV, read whatever I can
21 on the computer, read books.
22   Q.    Are you currently able to
23 drive?

Page 127

1  income?
2    A.    Yes.
3    Q.    What income does she have?
4    A.    I don't know.  That is her
5  business.
6    Q.    She doesn't work?
7    A.    No.
8    Q.    Does she receive Social
9  Security benefits?
10   A.    Huh?
11   Q.    Does she receive Social
12 Security benefits?
13   A.    I don't know.
14   Q.    You haven't asked your fiancee
15 what her source of income is?
16   A.    No.
17   Q.    These are some standard
18 questions I ask everybody.  I don't want
19 you to think I'm implying anything.  Have
20 you ever been arrested for anything?
21   A.    No.
22   Q.    Have you ever received any
23 psychiatric treatment of any kind?

Page 126

1    A.    I'm sorry?
2    Q.    Do you drive currently?
3    A.    Very little.
4    Q.    Has any doctor restricted you
5  from driving?
6    A.    No.
7    Q.    Do you do any housework?
8    A.    Very little.
9    Q.    Do you do any yard work?
10   A.    Very little.
11   Q.    Does your fiancee do the
12 housework?
13   A.    Yes.
14   Q.    Does she work?
15   A.    No.
16   Q.    Other than your Social
17 Security disability benefits, what other
18 sources of income do you have currently?
19   A.    That is it.
20   Q.    That is all.  Does your
21 fiancee have any income?
22   A.    I'm sorry?
23   Q.    Does your fiancee have any

Page 128

1    A.    No.
2    Q.    Have you ever been treated for
3  drug or alcohol addiction of any kind?
4    A.    No.
5    Q.    Did you have a policy of
6  health insurance through your employment
7  with Sysco?
8    A.    Did I have what?
9    Q.    Did you have health insurance
10 through your employment with Sysco?
11   A.    Yes.
12   Q.    Did you have any other type of
13 insurance such as life insurance or
14 disability insurance?
15   A.    I think I did.
16   Q.    Did you have life insurance --
17   A.    Through Sysco.
18   Q.    Did you have life insurance
19 through Sysco?
20   A.    I believe so.
21   Q.    Did you have disability
22 insurance?
23   A.    I thought so.

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 129 to 132)

Page 129

1    Q.    Did you receive any disability
2  benefits following this accident?
3    A.    No.
4    Q.    Have you been seen by a
5  chiropractor at any time?
6    A.    No.
7    Q.    And have you suffered any
8  accident or injury of any kind since this
9  accident occurred?
10    A.    Have I what?
11    Q.    Have you suffered any accident
12  or injury --
13    A.    No.
14    Q.    -- of any kind since this
15  accident happened?
16    A.    Not since this accident, no.
17    Q.    Where do you get your
18  prescriptions filled?
19    A.    There is a program on the
20  Internet that I found where when you only
21  make so much money, you can send it in. I
22  don't know. I would have to look at the
23  paper again. That is now. But back then,

Page 130

1  is that when you wanted?
2    Q.    Well, let me ask you this: At
3  some point, were you prescribed some pain
4  medication?
5    A.    Either K Mart or CVS.
6    Q.    And is that where you would
7  get your prescriptions filled?
8    A.    Yes.
9    Q.    All of your prescriptions back
10  then?
11    A.    Yes.
12    Q.    How long have you been doing
13  the Internet program?
14    A.    This other program I have
15  mentioned, it's been about six months now.
16    Q.    Have you had any treatment for
17  any mental condition at all following this
18  accident?
19    A.    No.
20    Q.    Are you making any claim in
21  this case for any mental or psychiatric or
22  psychological injury or condition arising
23  out of this accident?

Page 131

1    A.    No.
2    Q.    And other than the Bay Walk-In
3  Clinic and Dr. Goodwiller and, of course,
4  the emergency room here in Montgomery, has
5  any other doctor treated you for this
6  accident, for any other injuries sustained
7  in this accident at all?
8    A.    No.
9    Q.    Did you have any neck pain at
10  all following this accident?
11    A.    No.
12    Q.    Are there any other effects of
13  this accident we haven't talked about?
14    A.    Any what?
15    Q.    Any other effects of this
16  accident? Has this accident affected you
17  in any way that we haven't talked about?
18    A.    My nightmares about this
19  accident, I get them all the time. They
20  even got so bad to the point where I would
21  be just sitting at a table and all of a
22  sudden having flashbacks of going into the
23  ditch and all.

Page 132

1    Q.    Have you had any treatment
2  from any doctor for that?
3    A.    No.
4    Q.    Have you requested any
5  treatment for that?
6    A.    Yes.
7    Q.    From who?
8    A.    Well, we asked workmen's comp.
9    Q.    Who did you ask?
10    A.    Just called it in and asked
11  for it to be treated by workmen's comp. I
12  don't know who it was.
13    Q.    Did you make that request or
14  did your attorney make that request?
15    A.    I don't remember if my sister
16  called it in or if I did.
17    Q.    When did you make the request?
18    A.    The same year, I think.
19    Q.    I'm sorry?
20    A.    The same year that the
21  accident happened.
22    Q.    Within a year of the accident?
23    A.    Yeah.

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

Page 133

1    Q.    In 2004?
2    A.    2004, I believe.
3    Q.    Is that a problem you are
4  having currently?
5    A.    I'm sorry?
6    Q.    Are you having a problem with
7  nightmares currently?
8    A.    I have them all the time.
9    Q.    Have any of your doctors at
10 Prime Care treated you for that at all?
11   A.    For any --
12   Q.    For your nightmares?
13   A.    No.
14   Q.    Have you discussed that with
15 them at all?
16   A.    Just at home.
17   Q.    Is this something that wakes
18 you up at night?
19   A.    Yes.
20   Q.    Does it affect you during the
21 day while you are awake as well?
22   A.    It's even worse in the
23 daytime.

Page 134

1    Q.    And you are not aware of any
2  witnesses to this accident?
3    A.    I don't know.
4    Q.    Do you know if anybody saw it
5  happen or not?
6    A.    I have no clue.
7    Q.    The person who came to your
8  window, you didn't ask them did they see
9  this happen?
10   A.    I was too much in shock.
11   Q.    Has workmen's comp, Sysco or
12 their worker's comp carrier paid for your
13 treatment for this accident with
14 Dr. Goodwiller and with Bay Walk-In?
15   A.    I think so.
16        MR. SEGREST:  Let me take a
17 break real quick.
18        (Short break taken.)
19   Q.    (BY MR. SEGREST:)
20 Mr. Fischer, when did you begin receiving
21 Social Security benefits?
22   A.    It was awarded to me right
23 at -- from the time of the accident.

Page 135

1    Q.    How soon after the accident?
2    A.    It was two years after.
3    Q.    You filed two years after the
4  accident?
5    A.    No, it took two years before I
6  got approved.
7    Q.    Okay.  How soon after the
8  accident did you file for Social Security?
9    A.    I think right away.  I don't
10 know exact time though.
11   Q.    And then it took roughly two
12 years for that to be approved?
13   A.    Yes.
14   Q.    And when did you actually
15 begin receiving Social Security benefits?
16   A.    I think this year.
17   Q.    And in addition to the monthly
18 benefits you get, were you also given a
19 lump sum for back benefits?
20   A.    For back pay, yes, sir.
21   Q.    How much was that?
22   A.    I don't remember.
23   Q.    Do you have any estimate at

Page 136

1  all?
2    A.    I'm sorry?
3    Q.    Do you have any estimate at
4  all as to how much it was?
5    A.    No, I wouldn't know.
6        MR. SEGREST:  Davis, I'm not
7  sure if we have already given y'all a
8  release or not.  I know we have got a
9  request in our written discovery for any
10 Social Security records.  Can you make
11 sure you get us what he's got?
12       MR. MIDDLEMAS:  Yeah.
13       MR. SEGREST:  The main thing
14 would be the award letter showing the date
15 of disability and all that.
16       MR. MIDDLEMAS:  Sure.
17       MR. SEGREST:  And also any of
18 the documents you have got, the entire
19 file, if possible.
20       MR. MIDDLEMAS:  Sure.
21   Q.    (BY MR. SEGREST:)  On what
22 basis were those benefits awarded?  On
23 what condition did you file for those

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 137 to 140)

Page 137

1 benefits?
2 A. Because of the shoulder and
3 also the cancer, but the Judge said it
4 was -- that I was disabled from the time
5 of the accident.
6 Q. They dated your disability
7 back to the accident?
8 A. Yes.
9 Q. And do you know if the award
10 was made based on the shoulder, or was it
11 based on the shoulder and the cancer?
12 A. I don't know. I would have to
13 look at the letter.
14 Q. Do you have a copy of that
15 letter?
16 A. Not on me, no.
17 Q. Do you have a copy that you
18 can give to Mr. Middlemas?
19 MR. MIDDLEMAS: He can get it
20 to me and I'll give it to you.
21 Q. How did you find out that you
22 had breast cancer?
23 A. How did I --

Page 138

1 Q. How was your breast cancer
2 discovered?
3 A. There was a lump.
4 Q. Did you find that lump
5 yourself?
6 A. Yeah. Me and my fiancee did,
7 yeah.
8 Q. When did you find that lump?
9 A. About a year ago.
10 Q. It wasn't a doctor that
11 discovered it?
12 A. No.
13 Q. You found it yourself?
14 A. Yeah.
15 Q. And what doctor did you
16 initially go to because of that lump?
17 A. The one at Prime Care.
18 Q. Was it the male or female
19 there?
20 A. Male.
21 Q. You don't remember his name?
22 A. I think his name is John, but
23 I can't remember what his last name is.

Page 139

1 Q. Do you have any of your
2 prescription bottles with you here in town
3 like today in your car that you could look
4 at and tell us?
5 A. No.
6 MR. SEGREST: And we have got
7 a discovery request for all docs that he
8 has seen, if you can make sure that is
9 complete.
10 MR. MIDDLEMAS: Sure, I will.
11 MR. SEGREST: That is all the
12 questions I have for now. Mr. Umbach is
13 going to ask you some questions as well,
14 and I'll go ahead and let him do that.
15
16 EXAMINATION BY MR. UMBACH:
17 Q. Mr. Fischer, my name is Tripp
18 Umbach and I represent Sysco for purposes
19 of the claims you have made relating to
20 your termination. And, as I understand
21 it, you are claiming that you were
22 terminated because of your age; is that
23 correct?

Page 140

1 A. Yes.
2 Q. And that you were terminated
3 because you made a worker's comp claim; is
4 that right?
5 A. Yes.
6 Q. Okay. Let me start by asking
7 this: Why do you believe you were
8 terminated because of your age?
9 A. The frequency about how long I
10 have been with the company was brought up
11 more and more at meetings that we were
12 having. And even a few times, I have had
13 a company supervisor tell me that I should
14 look up or look into retirement benefits
15 hinting that -- hinting to me that I
16 should retire. And I said -- I told him
17 no, I said I wanted to spend another
18 fifteen years with the company.
19 But it seems like every time we
20 had a safety meeting, how long have you
21 been with the company, asking me all of
22 these questions about my time with the
23 company and you are ready to retire, you

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 141 to 144)

Page 141

1  can retire now.
2      Q.   Okay.  Any other reason you
3  think you were terminated because of your
4  age?
5      A.   Any other reasons?
6      Q.   Right.
7      A.   I can't think of any right
8  now.
9      Q.   Why do you think you were
10  terminated because of your worker's comp
11  claim?
12      A.   It happened right away.  Right
13  after I told John Morris that I had to go
14  in for an operation, he said you are
15  kidding.  And then the fact that they
16  terminated me two days before my
17  operation.
18      Q.   Okay.  Any other reason you
19  think you were terminated because of your
20  worker's comp claim?
21      A.   None that I can think of right
22  now.
23      Q.   All right.  You said company

Page 142

1  supervisors had hinted to you about
2  retirement.  Which company supervisors are
3  you talking about?
4      A.   One that really upset me was
5  Dee Dunagan.
6      Q.   Any other supervisors?
7      A.   There was -- who is the one
8  that always goes with Eddie McConnell all
9  the time?
10      Q.   Why don't you describe the
11  person to me.
12      A.   They usually go for -- I can't
13  remember their names anymore.
14      Q.   Is it Doug Verteen?
15      A.   No.
16      Q.   Is it Danny Harpst?
17      A.   No.
18      Q.   Smoky Robinson -- Smoky
19  Parker?
20      A.   It may be Smoky Parker.  In
21  fact, you even mentioned something about
22  it at one of the benefit meetings.
23          MR. MIDDLEMAS:  Just answer

Page 143

1  his questions.
2          THE WITNESS:  I'm sorry?
3          MR. MIDDLEMAS:  Just answer
4  his questions.
5      Q.   Who mentioned what at a
6  benefit meeting?
7      A.   Lynda.
8      Q.   Lynda Wheat, right?
9      A.   (Witness nods head.)
10      Q.   You are nodding your head yes?
11      A.   Yes.
12      Q.   So when you testified earlier
13  that there were supervisors who had said
14  something about retirement or had hinted
15  about retirement, we are talking about
16  Dunagan, maybe Parker and Wheat?
17      A.   Right.
18      Q.   Any others?
19      A.   Not that I can think of right
20  now.
21      Q.   Okay.  And you said Dunagan is
22  the one that really upset you?
23      A.   Yeah.

Page 144

1      Q.   All right.  What did Dunagan
2  say that really upset you?
3      A.   He said that I should -- that
4  the company has good retirement benefits,
5  I should investigate it and I've got
6  enough time in with the company that I
7  could retire.
8      Q.   Anything else Dunagan said?
9      A.   That is all I can remember.
10      Q.   Was that on one occasion that
11  she said these things or more than once?
12      A.   I think it's just that one.
13      Q.   Okay.  What was it about her
14  statements that really upset you?
15      A.   It's like it felt like they
16  were hoping that I would retire or leave
17  because of my age.
18      Q.   Anything else about what she
19  said that really upset you?
20      A.   Well, I was at the point where
21  I was receiving double bonuses if we had
22  safe driving.  And I'm also getting -- I
23  thought that -- it felt like, too, because

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 145 to 148)

Page 145

1    of my seniority, I was getting all these
2    benefits that they wanted to -- oh, and I
3    also had four weeks of vacation. The
4    vacation was getting harder and harder to
5    pick, even though I was the senior driver.
6        Q.   All right. Let's stick with
7    what Dunagan said to you first. When did
8    you have this discussion with Dee Dunagan
9    about the company's retirement?
10       A.   I don't remember the time.
11       Q.   You don't remember the time?
12       A.   Uh-uh.
13       Q.   Was it during the time that
14   she was your supervisor?
15       A.   Yes.
16       Q.   Okay. Now, at the time of
17   your termination from Sysco, was Dunagan
18   your supervisor?
19       A.   No.
20       Q.   Was she still employed with
21   the company?
22       A.   I think so.
23       Q.   In what capacity?

Page 146

1        A.   I think she was just a driver.
2        Q.   Like you?
3        A.   Yeah.
4        Q.   The conversation that you had
5    with Dunagan about retirement, where did
6    it take place?
7        A.   I think it was at one of the
8    safety meetings.
9        Q.   How long did you have safety
10   meetings?
11       A.   I believe it was like once a
12   quarter.
13       Q.   Where did you have them?
14       A.   Sometimes it would be at the
15   office and sometimes it would be at Calera
16   and sometimes it would be at a restaurant.
17       Q.   Okay. Do you remember where
18   this one took place?
19       A.   No, I don't.
20       Q.   It could have been in Calera?
21       A.   It could have been. I don't
22   know.
23       Q.   It could have been --

Page 147

1        A.   At the office.
2        Q.   Is that Panama City?
3        A.   In Panama City, right.
4        Q.   Or it could have been at some
5    restaurant?
6        A.   It could have been.
7        Q.   Okay. Anyone else present
8    when you had this conversation with
9    Dunagan about retirement?
10       A.   No.
11       Q.   No?
12       A.   No.
13       Q.   Were the safety meetings one
14   on one?
15       A.   No. I would get there before
16   other people would show up and start
17   talking to me about stuff.
18       Q.   So your recollection is that
19   your conversation with Dunagan about
20   retirement took place just before a safety
21   meeting?
22       A.   Yes.
23       Q.   And it was just the two of

Page 148

1    you?
2        A.   Yes. There wasn't anybody
3    around.
4        Q.   No one else around to hear it?
5        A.   Not that I know of.
6        Q.   Okay. Did you make any
7    response to her when she asked you about
8    retirement?
9        A.   I just said I couldn't retire
10   now, that I wanted to keep on working.
11       Q.   Do you have any idea what
12   Dunagan's age is?
13       A.   No.
14       Q.   Did you make any notes of this
15   conversation with Dunagan?
16       A.   No, I didn't.
17       Q.   You didn't tape record it?
18       A.   No.
19       Q.   Do you recall whether at the
20   time of this discussion with Dunagan there
21   had been any change to the company's
22   retirement benefits?
23       A.   I don't remember.

37

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 149 to 152)

Page 149

1    Q.   Did you get information from
2  time to time about the company's
3  retirement benefits?
4    A.   Yes.
5    Q.   Do you recall the nature of
6  the information that you got?
7    A.   The retirement benefits
8  pension plan, how much -- I think it's
9  every year they show you how much you have
10  got in it and how much you have vested for
11  it.
12    Q.   You got that every year?
13    A.   I believe it was every year.
14    Q.   And did that explain to you
15  when you could retire and what amount of
16  benefits you would get if you did?
17    A.   I never saw it as that way.  I
18  only saw it as how much I have in my
19  pension plan.  And I didn't realize I
20  bought -- I don't think I realized that
21  much about it when I could retire.
22    Q.   Okay.  What did you understand
23  about when you could have retired, if you

Page 150

1  had wanted to from Sysco?
2    A.   That I had to be something
3  like in your late 50s, that is -- and then
4  that is all I can remember about that.
5    Q.   When did you plan to retire,
6  if you did?
7    A.   I was hoping to make it
8  another fifteen years.
9    Q.   Which would have made you how
10  old?
11    A.   65, I think.
12    Q.   Did you talk to anyone at
13  Sysco about your plans for retirement?
14    A.   Yes.
15    Q.   Who?
16    A.   Everyone at the meeting.  They
17  keep asking me how long I have been with
18  the company and I say well, I'm hoping to
19  last another fifteen years.
20    Q.   Okay.  And who asked you that?
21    A.   Well, if you walk into the
22  meeting early, they say how long have you
23  been with the company and I would tell

Page 151

1  them almost 26 years -- well, you have got
2  enough years in to retire, and I said I've
3  got to last another fifteen years.
4    Q.   Who do you recall asked you
5  how long you have been with the company
6  and told you you have got enough time to
7  retire?
8    A.   I'm sorry?
9    Q.   Who said those things to you,
10  asking you how long you have been with the
11  company and telling you that you have been
12  there long enough to retire?  Were these
13  other drivers?
14    A.   No.  It was the supervisors.
15    Q.   Okay.  All right.  And you
16  have told me about Dunagan?
17    A.   I'm sure about Dunagan, yes.
18    Q.   Anything else Dunagan said to
19  you about retirement that you haven't told
20  me about?
21    A.   Not that I recall.  All I
22  remember is for certain that I was very
23  upset when the meeting was over with.  And

Page 152

1  I came home and I said there is something
2  going on that they are trying to get rid
3  of me.
4    Q.   Who did you say that to?
5    A.   My sister.
6    Q.   What is your sister's name?
7    A.   Margaret Loberger.
8    Q.   I noticed there is somebody
9  down in the lobby with you today.  Is that
10  your sister?
11    A.   No, that is my fiancee.
12    Q.   And when you came home and
13  made this statement to Ms. Loberger, that
14  was after your conversation with Dee
15  Dunagan?
16    A.   Yes.
17    Q.   Okay.  Did you live with your
18  sister?
19    A.   Yes.
20    Q.   When did you live with your
21  sister?
22    A.   All the while I was working
23  for Sysco.

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 153 to 156)

Page 153

1    Q.    Even in Wisconsin?
2    A.    Huh?
3    Q.    Even in Wisconsin?
4    A.    Wisconsin, some of the time
5  with my sister and sometimes by myself.
6    Q.    But the whole time you have
7  lived in Florida, you have lived with your
8  sister?
9    A.    Yes.
10   Q.    Until when?
11   A.    Until 2005, I think, 2004,
12  2005.
13   Q.    Okay.  Is that when you became
14  engaged?
15   A.    Yes.
16   Q.    Were you engaged to be married
17  before your termination from Sysco?
18   A.    I think I was asking her.  And
19  I don't know if she was saying okay or
20  not.
21   Q.    You didn't have to ask her
22  more than once?
23   A.    Yeah, I did.

Page 154

1    Q.    Have you set a date to get
2  married?
3    A.    I'm hoping for October.
4    Q.    Are you still asking her about
5  that?
6    A.    I don't know.
7    Q.    I'm sorry, I'm picking at you.
8        All right.  What other
9  supervisors or managers at Sysco have
10  talked to you about your time with the
11  company or retirement?
12   A.    You mean just like any
13  comments about my retirement or what?
14   Q.    Well, let me back up.  I
15  started out by asking you why you thought
16  you were terminated because of your age.
17   A.    Yes.
18   Q.    And you mentioned that some
19  supervisors --
20   A.    Right.
21   Q.    -- had asked you about
22  retirement?
23   A.    Right.

Page 155

1    Q.    That is where I am coming
2  from.
3    A.    Okay.  Well, like at a safety
4  meeting, whatever we had, I would come in
5  early and they would go hey, small talk,
6  hi, how are you doing, how long have you
7  been with the company now.  They would ask
8  me how long I had been with the company
9  now.  I would tell them twenty-six or
10  twenty-five years.  And I don't know, it
11  was almost like they were joking with me,
12  but it seemed like more and more at these
13  safety meetings they kept asking me about
14  how long have you been with the company,
15  how long have you been with the company
16  and, you know --
17   Q.    Okay.  Who?  What supervisor?
18   A.    Eddie O'Conner asked me that.
19  I think smoky Robinson or Smoky -- what is
20  his name?
21   Q.    Smoky Parker.
22   A.    Parker.  Like I said, Dee and
23  them.  I don't know if John Morris said

Page 156

1  anything about it or not.  I can't
2  remember about him.
3    Q.    What do you remember
4  specifically Eddie O'Conner saying to you?
5    A.    Just like small talk if I
6  would come into a meeting.
7    Q.    He would say how long have you
8  been with the company?
9    A.    Hi, Frank, how are you doing,
10  how long have you been with the company
11  now.
12   Q.    And what response did you
13  make?
14   A.    I would tell him how many
15  years I've been with the company.  Are you
16  ready to retire?  You can retire now.
17   Q.    Did O'Conner use the word
18  "retire"?
19   A.    I don't remember.
20   Q.    Let's focus on O'Conner.
21   A.    Okay.
22   Q.    I understand you to say that
23  O'Conner asked you how long you have been

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 157 to 160)

Page 157

1  with the company?
2      A.  Uh-huh.
3      Q.  You are sure of that?
4      A.  Yes.
5      Q.  Did he use the word
6  "retirement"?
7      A.  I think he did.
8      Q.  But you are not sure?
9      A.  I'm not sure, yes.
10     Q.  When did this conversation
11  take place?
12     A.  One of the meetings that we
13  had.
14     Q.  Safety meeting?
15     A.  Yeah.
16     Q.  Where was it?
17     A.  It either could have been at
18  the -- I think it was at one of the
19  restaurants we had.
20     Q.  Do you remember when it was?
21     A.  At a restaurant.
22     Q.  When?
23     A.  I don't remember the time.

Page 158

1      Q.  When was it in relation to
2  your termination?
3      A.  It was before that.
4      Q.  I understand that.  But how
5  long before?
6      A.  Three months maybe.
7      Q.  Okay.  Do you remember anyone
8  else that was present?
9      A.  Like I said, you come in early
10  and they start talking to you.
11     Q.  Do you remember anyone else
12  that was present?
13     A.  No, I don't.
14     Q.  Okay.  Any other conversations
15  you had with O'Conner about how long you
16  had been with the company?
17     A.  Just small talk, that is all I
18  remember, where you would come in and
19  quite -- you know, it wasn't like a
20  serious talk or anything, just like small
21  talk.  Hey, how are you doing, how long
22  have you been with the company now, stuff
23  like that.

Page 159

1      Q.  Did what O'Conner say to
2  you -- did what he said to you offend you?
3      A.  No.
4      Q.  Did you complain to anyone
5  about what O'Conner said?
6      A.  No.
7      Q.  Did you complain to anyone
8  about what Dee Dunagan said?
9      A.  Just at home.
10     Q.  Just to your sister?
11     A.  (Witness nods head.)
12     Q.  Right?
13     A.  Right.
14     Q.  All right.  What do you
15  remember Smoky Parker saying, if anything?
16     A.  Same thing.
17     Q.  Same thing as O'Conner?
18     A.  Just like small talk.
19     Q.  Asked you how long have you
20  been with the company?
21     A.  Yeah.
22     Q.  Do you remember him, Smoky
23  Parker, using the word "retirement"?

Page 160

1      A.  No.
2      Q.  Were you offended by what
3  Parker said?
4      A.  No.
5      Q.  Did you complain to anybody
6  about what Parker said?
7      A.  No.
8      Q.  What other supervisors do you
9  remember saying something to you about
10  your time with the company and possibly
11  retirement?
12     A.  That is all I can remember as
13  far as names are concerned.
14     Q.  What?
15     A.  That is all I can remember as
16  far as names are concerned about who asked
17  me.
18     Q.  Now, you mentioned Lynda
19  Wheat's name earlier?
20     A.  Oh, yes, sir.
21     Q.  Do you remember her saying
22  something to you about --
23     A.  Yeah, at one of the benefit

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 161 to 164)

Page 161

1  meetings that we had at the some motel we
2  went to in Panama City. She would go
3  through all my benefits.
4      Q.   Was this a one-on-one
5  conversation or were there others?
6      A.   Yes, nobody was there yet.
7  The younger lady went outside to smoke.
8  And she would show me how long -- what my
9  benefits are and how long I have been with
10  the company and that I could retire, if I
11  wanted to.
12      Q.   Do you know if Ms. Wheat was
13  down in Panama City to have conversations
14  like that with all the drivers?
15      A.   I don't know.
16      Q.   Do you know if her reason for
17  being there was to go over benefits with
18  employees?
19      A.   With employees, yes.
20      Q.   Was that a helpful thing to
21  you to know what your benefits were?
22      A.   Yeah.
23      Q.   Did you appreciate being told

Page 162

1  when you could retire, if you wanted to?
2      A.   Did I appreciate it?
3      Q.   Did you find that helpful?
4      A.   Well, it was helpful maybe.
5      Q.   Good information to know?
6      A.   I guess so.
7      Q.   Were you offended by what Ms.
8  Wheat said to you?
9      A.   No.
10      Q.   Did you complain to anyone
11  about what she said to you?
12      A.   No.
13      Q.   Are there any other
14  supervisors at Sysco who you can recall
15  saying anything to you about your service
16  with the company or retirement?
17      A.   No.
18      Q.   Is there any other supervisor
19  that said anything to you that you found
20  offensive?
21      A.   That you what?
22      Q.   You found offensive?
23      A.   No.

Page 163

1      Q.   Has any supervisor ever said
2  anything that you are aware of that you
3  think is derogatory about a person's age?
4      A.   Not that I am aware of.
5      Q.   Or that, you know, might
6  offend somebody who is a certain age?
7      A.   Not that I am aware of.
8      Q.   Did you ever hear Jim -- John
9  Morris say anything that you thought
10  was --
11      A.   I can't remember if he ever
12  did or not.
13      Q.   Well, do you have any reason
14  to think that John Morris has got a
15  problem with older employees?
16      A.   I don't know.
17      Q.   Is there anybody, any
18  supervisor or manager at Sysco, that you
19  think has a problem with older employees?
20      A.   I don't know.
21      Q.   Tell me about this
22  conversation that you had with John Morris
23  about needing surgery.

Page 164

1      A.   I called him up and told him
2  that the doctor said I had to have surgery
3  on my shoulder, and he acted surprised and
4  he said you are kidding. And I said no,
5  I'm hurt.
6      Q.   Anything else you recall that
7  you said or that he said?
8      A.   That is just that -- I
9  remember that he was surprised, and that I
10  just told him that I had to have the
11  surgery.
12      Q.   Okay. And I take it this
13  would have been within a few days of your
14  accident?
15      A.   Right.
16      Q.   And it was a phone
17  conversation?
18      A.   Yes.
19      Q.   And when you say he acted
20  surprised, you base that on the fact that
21  he said you are kidding?
22      A.   Yes.
23      Q.   All right. Who informed you

41

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 165 to 168)

Page 165

1   that you were being terminated from Sysco?
2     A.   I don't know his name.
3     Q.   Was it one person or more than
4   one person?
5     A.   It was him that informed me.
6   The guy that informed me is the same one
7   that drove me to Troy. I don't remember
8   his name. John Morris was there.
9     Q.   If I told you his name, would
10   you recognize it?
11     A.   No.
12     Q.   Well, I'll tell you anyway,
13   Danny Harpst. That doesn't ring a bell at
14   all?
15     A.   No.
16     Q.   And so it was this gentleman,
17   whose name you don't know, who drove you
18   to Troy?
19     A.   Right.
20     Q.   And John Morris?
21     A.   John Morris was there and
22   there was also a salesman from Sysco
23   sitting at the table doing his business on

Page 166

1   the computer while they were telling me
2   all this.
3     Q.   Do you know who that was?
4     A.   No, I don't know the salesman.
5     Q.   And where did this take place?
6     A.   At the Panama City office.
7     Q.   Which is called the yard?
8     A.   Yes.
9     Q.   It was a trailer there; is
10   that right?
11     A.   Yes.
12     Q.   Okay. How did you know to
13   come to that meeting?
14     A.   They called me up and said
15   there was a meeting that I had to be at
16   concerning the accident. I told them I
17   had a doctor's appointment that day, and
18   he said you be here before the doctor's
19   appointment.
20     Q.   Who told you that, Morris?
21     A.   John Morris.
22     Q.   Called you on the phone?
23     A.   Yes.

Page 167

1     Q.   All right. Was anyone else
2   present besides you, Morris, the
3   salesperson, and the guy that drove you to
4   Troy?
5     A.   And my sister was there.
6     Q.   Okay. Why was she there?
7     A.   I'm sorry?
8     Q.   Why was your sister there?
9     A.   She drove me. I couldn't --
10   my shoulder was bad.
11     Q.   Did she sit in on the meeting?
12     A.   She was there, yes.
13     Q.   So she heard everything you
14   heard?
15     A.   Yes.
16     Q.   All right. Tell me everything
17   that was said in this meeting and who said
18   it.
19     A.   Okay. Did you say his name
20   was Dan?
21     Q.   I believe his name is Danny
22   Harpst.
23     A.   Well, he gave me a slip of

Page 168

1   paper and told me to read it and sign it.
2   And I read it and I didn't like what it
3   said, so I didn't sign it. I refused to
4   sign it. And he said well, you are
5   terminated.
6         And while all this was going
7   on, John Morris was taking all my stuff
8   out of the -- we have like a shelving box,
9   he was scraping all my stuff, paperwork
10   and whatever into a garbage bag. And all
11   the while -- he asked me to turn in my
12   keys. And all the while, the salesman was
13   sitting there at a different table doing
14   whatever he was doing. And I handed the
15   paper to my sister so she could look at
16   it, and that was it. It happened that
17   fast.
18     Q.   And you said something about
19   Morris putting stuff in a bag?
20     A.   Garbage bag, yeah.
21     Q.   And he was getting that stuff
22   out of what?
23     A.   I call it a pigeon coop. It's

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 169 to 172)

Page 169

1    like a shelf against the wall and each
2    section is for each driver and we store
3    our paperwork and whatever we -- personal
4    objects or whatever, books or whatever.
5        Q.    And you had some stuff in your
6    pigeon hole?
7        A.    Yes.
8        Q.    What did you have in there?
9        A.    I don't remember anymore.
10       Q.    And he put that in a bag?
11       A.    Garbage bag.
12       Q.    Garbage bag, and gave it to
13   you?
14       A.    Just scraped it right out of
15   the pigeon hole into the garbage bag and
16   handed me the bag.
17       Q.    Okay.  Did you have some
18   problem with him doing that?
19       A.    I just thought, for one thing,
20   to do it in front of a different employee
21   while he is working there, and then to
22   have him just scrape my stuff out in a
23   garbage bag like that -- he didn't even

Page 170

1    set it in the bag neatly and tie it up, he
2    just scraped it in there, like grabbing
3    all this and throwing it in a garbage bag
4    and handed it to you.
5        Q.    But you don't remember what it
6    was?
7        A.    No.
8        Q.    Did he damage any of it?
9        A.    I don't know.
10       Q.    Did he say anything to you
11   about your stuff?
12       A.    About what?
13       Q.    About the stuff he was putting
14   in the bag?
15       A.    No, I don't remember.
16       Q.    Anything else you recall being
17   said in that meeting?
18       A.    No, I don't recall nothing
19   else.
20       Q.    Did you say anything?
21       A.    I told them I wasn't going to
22   sign the paper, I disagreed with it.
23       Q.    Okay.  Anything else you said?

Page 171

1        A.    That is about it.
2        Q.    Did your sister say anything?
3        A.    No.  Not at the meeting, no.
4        Q.    Okay.  Was there anything said
5    about why you were being terminated other
6    than what was on the paper they showed
7    you?
8        A.    That they felt that it was
9    reckless driving, whatever that was
10   written on the paper.  That is why they
11   terminated me.
12       Q.    They didn't tell you anything
13   that wasn't on the paper?
14       A.    What?
15       Q.    Did they tell you anything
16   about why you were terminated other than
17   what is on the paper?
18       A.    Right, that is it.
19       Q.    That is it?
20       A.    Uh-huh.
21       Q.    Okay.  Anything else that
22   happened in that meeting?
23       A.    I can't remember.  I don't

Page 172

1    remember anything else other than that.
2        Q.    Anything else that was said
3    that you remember?
4        A.    Not that I can recall.
5        Q.    Do you have any notes about
6    that meeting?
7        A.    I don't know.
8        Q.    You didn't tape record it, did
9    you?
10       A.    No.
11       Q.    What did you and your sister
12   talk about after the meeting?
13       A.    She started trying to write
14   down everything she could remember because
15   they refused to give me the slip of paper
16   that I wouldn't sign, so she tried to
17   remember everything that happened and
18   wrote it down.
19       Q.    What happened to the paper
20   that she wrote that on?
21       A.    I don't know.  I would have to
22   ask her.  I think she turned it into
23   Higby.

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 173 to 176)

Page 173

1     Q.   Cliff Higby?
2     A.   Yes.
3     Q.   Who is he?
4     A.   He was the attorney that got
5  me assigned to Mr. Middlemas.
6     Q.   When did you first go see
7  Mr. Higby?
8     A.   I don't remember the dates.
9     Q.   How long was it after being
10 terminated, or was it before?
11    A.   I was terminated two days
12 before my operation, so it had to be after
13 my operation sometime.
14    Q.   Okay.
15         MR. UMBACH: Davis, do you
16 know if that has been produced, the notes?
17         MR. MIDDLEMAS: Has what?
18         MR. UMBACH: Sister's notes.
19         MR. MIDDLEMAS: I don't know.
20 It surprised me when I heard him testify
21 about it. Let me check. I may have it.
22         MR. UMBACH: All right.
23    Q.   (BY MR. UMBACH:) All right.

Page 174

1  Anything else you and your sister talked
2  about concerning what took place in the
3  meeting?
4     A.   Just that it was wrong the way
5  it was done, it was wrong that they
6  terminated me, and then two days before my
7  operation while I was still on workmen's
8  comp. That is what -- we have to see a
9  lawyer.
10    Q.   Y'all talked about on the ride
11 home?
12    A.   Yeah.
13         MR. UMBACH: Let me ask a
14 couple of more questions and then we will
15 take a lunch break, how about that?
16         MR. MIDDLEMAS: That is fine.
17    Q.   Let me see if I can clear up
18 your work history with Sysco. I
19 understand that you first worked for Sysco
20 in Appleton, Wisconsin?
21    A.   Yes.
22    Q.   Did Sysco up in Wisconsin have
23 a name?

Page 175

1     A.   Baraboo Sysco Foods.
2     Q.   Baraboo Sysco Foods?
3     A.   Yes.
4     Q.   And you worked up there for
5  about twenty years?
6     A.   I think it's pretty close to
7  twenty years, yeah.
8     Q.   And then you came to Florida
9  in 1995?
10    A.   Right.
11    Q.   And you transferred from
12 Baraboo Sysco Foods to Cochran Sysco?
13    A.   Right. I believe that is what
14 it is called.
15    Q.   And that company was based in
16 Jackson, Mississippi?
17    A.   I believe so.
18    Q.   Did you go through some kind
19 of hiring process with Cochran?
20    A.   No, just called them up and
21 asked for a transfer, if they had a job
22 opening. And one day they called me back
23 and said we have a job opening for you.

Page 176

1     Q.   Did you fill out an
2  application with Cochran?
3     A.   No.
4     Q.   No?
5     A.   I don't remember filling out
6  no application form when I asked for the
7  transfer.
8     Q.   Okay. And you worked for
9  Cochran Sysco from '95 until the Calera
10 company began; is that right?
11    A.   Yeah.
12    Q.   And this Calera company is
13 called Sysco Foods of Central Alabama; is
14 that right?
15    A.   That is right.
16    Q.   And that is who you worked for
17 at the time of your termination?
18    A.   Yes.
19    Q.   Does it sound accurate to you
20 that Sysco Central Alabama started in
21 Calera in 1999?
22    A.   Sounds like it, right.
23    Q.   And did you have to go through

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 177 to 180)

Page 177

1    any kind of hiring process with Sysco
2    Central Alabama?
3        A.    I don't remember doing it.
4    All we were is just transferred from one
5    division to another.
6        Q.    You don't recall whether you
7    filled out an application or had an
8    interview or anything like that?
9        A.    I don't remember doing that.
10       Q.    Okay.  If you were a woman, I
11   wouldn't ask you this question.  How much
12   do you weigh?
13       A.    How much do I weigh?
14       Q.    Yeah.
15       A.    Right now, about 3 and a half.
16       Q.    3 and a half, 350 pounds?
17       A.    Yeah.
18       Q.    Okay.  How does that weight
19   compare to your weight when you were
20   working at Sysco?
21       A.    I was about 300 when I was
22   working.
23       Q.    So you are heavier now than

Page 178

1    you were then?
2        A.    Yes.
3        Q.    Okay.  You mentioned earlier
4    this morning that you were involved in an
5    accident where a car hit the dolly of your
6    doubles?
7        A.    Yes.
8        Q.    And I think you said that you
9    were found not guilty?
10       A.    Yes.
11       Q.    Who found you not guilty?
12       A.    The Judge.  I took it to
13   court.  They wrote me a ticket for
14   improper right-hand turn.  I took it to
15   court and I was found not guilty.
16       Q.    Okay.  Are you familiar with
17   the Sysco Accident Review Committee?
18       A.    Yes.
19       Q.    Who is on the Committee, as
20   you understand it?
21       A.    I don't know who is on the
22   Committee.
23       Q.    Okay.  Do you know whether

Page 179

1    they are drivers or supervisors, or do you
2    know?
3        A.    I do not know.
4        Q.    Have you ever been on the
5    Committee?
6        A.    I have never been on a
7    Committee.
8        Q.    Do you know anybody who has
9    ever been on the Accident Committee?
10       A.    Not that I am aware of.
11       Q.    Okay.  That accident you had
12   where you were found not guilty, do you
13   know if the Accident Review Committee
14   reviewed that accident?
15       A.    I do not know.
16       Q.    A fellow named John Cruz, who
17   was your coworker?
18       A.    Yes.
19       Q.    Was he a friend of yours?
20       A.    Yes.
21       Q.    Was he your closest friend at
22   Sysco?
23       A.    At Sysco, yes.

Page 180

1        Q.    Did you have any other
2    coworkers that you would consider your
3    friends?
4        A.    Just acquaintances more than
5    friends.
6        Q.    Okay.  Did you and Cruz visit
7    each other at each other's houses?
8        A.    Yes.
9        Q.    How often did that take place?
10       A.    Every weekend that we had off,
11   we would probably visit if we had
12   something to do.  We would invite each
13   other to do something.
14       Q.    Was he married?
15       A.    I don't think he was.  I think
16   he was divorced.
17       Q.    How far apart did you live?
18       A.    Ten, fifteen miles.
19       Q.    Did y'all have hobbies you did
20   together?
21       A.    No, we probably just go out
22   once in a while.
23       Q.    You were asked about how many

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 181 to 184)

Page 181

1  times you have driven the route back and
2  forth from Panama City to Calera. And as
3  I understand it, that is the route you
4  drove the whole time you were working for
5  the Calera operation?
6      A.    Yes.
7      Q.    And so if I am right about the
8  date, that would have been since 1999,
9  right?
10     A.    Yeah.
11     Q.    And would you say you drove
12  that route on an average of four times a
13  week?
14     A.    Yes.
15     Q.    And that route from Panama
16  City to Calera and back always took you
17  through the intersection of 231 and 271?
18     A.    Yes.
19     Q.    In other words, that
20  intersection, that was the route, that was
21  the way to get from Panama City to Calera
22  and back?
23     A.    Without going through

Page 182

1  Montgomery, yes.
2      Q.    That is the route you always
3  took?
4      A.    Yes.
5      Q.    Did that intersection change
6  over that roughly five, five and a half
7  year period?
8      A.    Not drastically, no.
9      Q.    The truck you drove at Sysco,
10  do you know how much it weighed?
11     A.    No.
12     Q.    Any idea?
13     A.    No.
14     Q.    Do you know what the
15  dimensions were, how long it was, how tall
16  it was?
17     A.    No. I think the trailers were
18  13 feet high.
19     Q.    High, okay. Do you know how
20  long they were?
21     A.    I don't remember offhand.
22     MR. UMBACH:  Okay. All right.
23  Why don't we take a lunch break?

Page 183

1      MR. MIDDLEMAS:  That would be
2  fine.
3      (Lunch break taken.)
4      Q.    (BY MR. UMBACH:)  Okay.
5  Mr. Fischer, we are back from lunch. I
6  think we can get you finished up here
7  before long.
8      Did you have to have a physical
9  each year required by the Department of
10  Transportation to drive a truck?
11     A.    Every two years, I think, it
12  was.
13     Q.    Every two years. So you
14  had -- you call it a DOT physical?
15     A.    Yes.
16     Q.    Okay. And so you had those
17  every couple of years, give or take, while
18  you were at Sysco?
19     A.    Yes.
20     Q.    Which doctor did you go to for
21  that?
22     A.    I used to go to either Sea
23  Wind and got a physical or TriCare.

Page 184

1      Q.    Those are the names of
2  clinics?
3      A.    Uh-huh.
4      Q.    What is name of the first one?
5      A.    Sea Wind.
6      Q.    And Prime Care?
7      A.    Right.
8      Q.    Were those personal doctors
9  you were going to for those physicals?
10     A.    Yes.
11     Q.    And was there some point in
12  time where you were told you shouldn't go
13  to your personal doctor, but you ought to
14  go to the company doctor?
15     A.    No.
16     Q.    You always went to a personal
17  doctor for a DOT physical?
18     A.    Yes.
19     Q.    Did you always pass the DOT
20  physical?
21     A.    Yes.
22     Q.    Do you remember the names of
23  the doctors that did your physical?

46

Tyler Eaton Morgan Nichols & Pritchett, Inc.

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 185 to 188)

Page 185

1    A.   Not offhand, no.
2    Q.   Do you know of any other
3  drivers that went to their personal
4  doctors for a DOT physical as opposed to a
5  company doctor?
6    A.   No.
7    Q.   So as far as you know, the
8  other drivers went to the company doctor
9  for that?
10   A.   I don't know where they went.
11   Q.   You mentioned a problem with
12 taking vacation?
13   A.   Yes.
14   Q.   Do I understand that at some
15 point in time, the driver with the most
16 seniority got to select their vacations
17 first?
18   A.   Yes.
19   Q.   Is that the way they did it
20 when you were at Cochran Sysco?
21   A.   Yes.
22   Q.   And is that the way it was
23 done when you first came to Sysco Central

Page 187

1    Q.   And you would get to pick a
2  week?
3    A.   Yes.
4    Q.   And then it was passed down to
5  the next senior person?
6    A.   Yes.
7    Q.   And then it would come back to
8  you?
9    A.   No.  It would go all the way
10 down the line before it would come back to
11 me.
12   Q.   Then it would come back to you
13 to pick a second week?
14   A.   Yes.
15   Q.   So you got to pick first, but
16 you just didn't get to schedule all your
17 vacation?
18   A.   Yes.
19   Q.   That is correct?
20   A.   Correct.
21   Q.   Okay.  And who was your
22 supervisor when that changed?
23   A.   John Morris.

Page 186

1  Alabama?
2    A.   Yes.
3    Q.   And did it change at some
4  point?
5    A.   Yes.
6    Q.   Do you remember when it
7  changed?
8    A.   No, I don't, but it changed.
9    Q.   How did it change?
10   A.   He would only allow me
11 one week and then I had to turn the book
12 over to whoever was next in line.  And
13 they would get one week and they had to
14 turn the book over to the next in line.
15 So I couldn't take my full four weeks and
16 schedule it.
17   Q.   So you had four weeks of
18 vacation?
19   A.   I believe it was four weeks.
20   Q.   And you were the senior guy?
21   A.   Yes.
22   Q.   And so you got to pick first?
23   A.   Right.

Page 188

1    Q.   Okay.  Did you talk to him
2  about why he changed that?
3    A.   Yes.
4    Q.   What did he say?
5    A.   He thought it was more equal,
6  the equality was better the way it is now
7  where I could only schedule one week and
8  it gives the younger drivers a chance to
9  get their scheduled vacations in.
10   Q.   Was there some point in time
11 when you were taking care of your mother?
12 Was your mother ill?
13   A.   Yes.
14   Q.   Is she still living?
15   A.   No.
16   Q.   When did she pass away?
17   A.   December 2004.
18   Q.   And for what period of time
19 were you caring for her?
20   A.   All the time.  All the while I
21 was down here.
22   Q.   All the while that you were in
23 Florida?

Tyler Eaton Morgan Nichols & Pritchett, Inc.

47

FRANK FISCHER                                                FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL, ALABAMA, INC., ET AL.        November 21, 2006

(Pages 189 to 192)

Page 189

1     A.    Yes.
2     Q.    How did you take care of her?
3     A.    On my days off, I would take
4  her to her doctors' appointments and
5  wherever she wanted to go.
6     Q.    Was she living with you?
7     A.    Yes.
8     Q.    Okay. Was she living with you
9  the entire time you were living in
10 Florida?
11    A.    Yes.
12    Q.    Did the amount of care she
13 needed from you increase over time?
14    A.    No, about the same.
15    Q.    About the same, okay. Up
16 until she passed away?
17    A.    Yeah.
18    Q.    Okay.
19          (Whereupon, Defendant's
20          Exhibit 12 was marked for
21          identification.)
22    Q.    Is Defendant's Exhibit 12 an
23 application that you completed? Is this

Page 191

1     Q.    On July 27th?
2     A.    It's the one I would have
3  signed.
4     Q.    Does this refresh your memory
5  that it was Danny Harpst who met with you?
6     A.    Okay.
7     Q.    Do you see the name there,
8  Danny Harpst?
9     A.    Yeah, I see it.
10    Q.    So this was given to you
11 during the meeting in the trailer where
12 your sister was present?
13    A.    Yes.
14    Q.    All right. Do you see down at
15 the bottom where it says your contact for
16 worker's compensation, for your worker's
17 compensation claim is Nicole Bobe,
18 B-O-B-E, Gallagher Bassett; do you see
19 that?
20    A.    Yes.
21    Q.    Did you ever call her?
22    A.    Yes.
23    Q.    You did?

Page 190

1  an application that you completed?
2     A.    It looks like it.
3          (Reviewing document.)
4     Q.    And that is an application
5  with Cochran Sysco?
6     A.    That is what it says.
7     Q.    All right. Does this refresh
8  your memory that you did fill out an
9  application with Cochran Sysco?
10    A.    The way I took that was just
11 to get information for my address and
12 whatever personal information they needed.
13 I was already working for them when they
14 gave me that.
15    Q.    Okay.
16          (Whereupon, Defendant's
17          Exhibit 13 was marked for
18          identification.)
19    Q.    Take a look at Defendant's
20 Exhibit 13. Is that the termination
21 document that you were shown when you
22 met --
23    A.    Yes.

Page 192

1     A.    I'm sorry, I was just saying
2  yes. Did I ever call her for?
3     Q.    Did you ever call her?
4     A.    I don't know if I did or
5  didn't.
6     Q.    Okay. Do you know where she
7  was located?
8     A.    No, I don't know.
9     Q.    You were aware of the Accident
10 Review Committee, you told me about that
11 earlier?
12    A.    Say that again, please.
13    Q.    You have heard of the Accident
14 Review Committee?
15    A.    Yes.
16    Q.    And was there a point when you
17 understood that your accident was being
18 reviewed by the Accident Review Committee?
19    A.    I understood it was being
20 investigated. I didn't know it was being
21 reviewed.
22    Q.    Did you ever tell John Morris
23 you were concerned about what the Accident

48

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 193 to 196)

Page 193

1  Review Committee was going to do?
2      A.   I don't remember.
3          (Whereupon, Defendant's
4          Exhibit 14 was marked for
5          identification.)
6      Q.   Take a look at Number 14. Is
7  Defendant's Exhibit 14 a document you
8  signed showing that you had received a
9  copy of the Accident Review Policy?
10     A.   Sometime in 2000, yeah.
11     Q.   So this document, Number 14,
12  does have your signature on it?
13     A.   Yes.
14          (Whereupon, Defendant's
15          Exhibit 15 was marked for
16          identification.)
17     Q.   Is Defendant's Exhibit 15 a
18  copy of the Accident Review Policy?
19     A.   (Reviewing document.)
20     Q.   Is that the policy you
21  received?
22     A.   I don't know if it is. It
23  looks like it is.

Page 194

1      Q.   Okay. Were you ever told what
2  the Accident Review Committee decided
3  about your accident?
4      A.   By the letter that they showed
5  me.
6      Q.   The letter of termination?
7      A.   Yes.
8          (Whereupon, Defendant's
9          Exhibit 16 was marked for
10          identification.)
11     Q.   Did you understand that the
12  Committee determined your accident to be a
13  major accident?
14     A.   That is what it said, I
15  believe.
16     Q.   Have you ever seen Defendant's
17  Exhibit 16?
18     A.   (Reviewing document.)
19     Q.   Have you ever seen Number 16?
20     A.   Yes.
21     Q.   You have?
22     A.   No. This here, I haven't seen
23  this. I don't remember seeing this one at

Page 195

1  all.
2      Q.   Okay. Are you aware of any
3  Sysco driver who had a major accident, as
4  determined by the Review Committee, who
5  did not get terminated?
6      A.   I'm not aware of anyone that
7  had any major accident.
8      Q.   Okay. So can I take from that
9  that you are not aware of any driver who
10  had a major accident, as determined by the
11  Committee, who did not get fired?
12          MR. MIDDLEMAS: I'm going to
13  object to the question, asked and
14  answered. But go ahead.
15     A.   I don't know.
16     Q.   Okay. Now, you understood
17  that you had a right to appeal your
18  termination, right?
19     A.   Yes.
20     Q.   And you did that, correct?
21     A.   Yes.
22     Q.   And do you remember the appeal
23  hearing?

Page 196

1      A.   Just that we had it over the
2  telephone.
3      Q.   And you had a lawyer with you?
4      A.   Yes.
5      Q.   That was Cliff Higby?
6      A.   Yes.
7      Q.   And I think there were
8  actually two phone conversations over your
9  appeal, right?
10     A.   I think there was. It sounds
11  right.
12     Q.   And you remember there was a
13  court reporter?
14     A.   Yes.
15     Q.   On your end of the phone?
16     A.   Uh-huh.
17     Q.   Taking down everything that
18  was said?
19     A.   I think so.
20     Q.   Okay. And do you remember
21  that your lawyer asked you questions in
22  the course of that second phone
23  conversation?

Page 197

1    A.   Yes.
2    Q.   Did you answer his questions
3  truthfully?
4    A.   I believe so.
5    Q.   And then at some point after
6  that second conversation, did you receive
7  a decision about your appeal?
8    A.   I think we did, yes.
9    Q.   Defendant's Exhibit?
10         (Whereupon, Defendant's
11         Exhibit 17 was marked for
12         identification.)
13   Q.   I'll show you Number 17.  And
14 that is addressed to your lawyer, but
15 usually that means you have seen it.  Have
16 you seen this letter?
17   A.   I don't remember it.
18   Q.   This Clifford C. Higby, he was
19 your lawyer in September of 2004; is that
20 right?
21   A.   Uh-huh.
22   Q.   Is that right?
23   A.   Yes.

Page 198

1         (Whereupon, Defendant's
2         Exhibit 18 was marked for
3         identification.)
4    Q.   Did you receive a copy of
5  Defendant's Exhibit 18?
6    A.   I don't remember it.
7    Q.   Again, this one is addressed
8  in care of your lawyer, Mr. Higby, right?
9    A.   Okay.
10   Q.   I'm asking.  Isn't it?
11   A.   Yes.
12   Q.   Okay.  And you see in that
13 letter it says some documentation is
14 enclosed, documentation from each member?
15   A.   Yes.
16   Q.   Doesn't it say that?  Do you
17 recall receiving that documentation?
18   A.   I don't remember any of these.
19   Q.   Okay.
20         (Whereupon, Defendant's
21         Exhibit 19 was marked for
22         identification.)
23   Q.   I have marked as one exhibit

Page 199

1  Defendant's Exhibit 19, three memos
2  regarding your appeal.  Let me show those
3  to you.
4    A.   (Reviewing documents.)
5    Q.   My question to you is:  Is
6  that the documentation that came with the
7  previous letter I showed you marked as
8  Defendant's Exhibit 18?
9    A.   I don't remember.
10   Q.   Okay.  Let me show you a
11 document that is called a First Report of
12 Injury.  It's Defendant's Exhibit 20.
13         (Whereupon, Defendant's
14         Exhibit 20 was marked for
15         identification.)
16   Q.   Have you ever seen this one
17 before?
18   A.   I don't remember it.
19   Q.   Are you aware of any other
20 First Report of Injury that relates to
21 your accident other than this one?
22   A.   No, I'm not aware of it.
23   Q.   Who have you asked, if anyone,

Page 200

1  to be a witness in your lawsuit?
2    A.   I haven't asked anybody.
3    Q.   Who have you talked to about
4  the claims that you are making against
5  Sysco in your lawsuit?
6    A.   My family.
7    Q.   I'm sorry?
8    A.   My family.
9    Q.   And by your family, who are
10 you talking about?
11   A.   My sister.
12   Q.   All right.
13   A.   And my fiancee.
14   Q.   All right.  Anybody else that
15 you have talked about about your claims in
16 the case?
17   A.   Offhand, I can't remember
18 anybody else.
19   Q.   All right.  Tell me about your
20 conversations with your sister concerning
21 your claims against Sysco.
22   A.   We discussed the -- what we
23 believe is going on.

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                          http://www.TylerEaton.com

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 201 to 204)

Page 201

1    Q.    What do you believe is going
2  on?
3    A.    I believe that this was an
4  opportunity for them to get rid of me
5  because of my age.
6    Q.    Anything else y'all have
7  talked about?
8    A.    Just generally what happened.
9  She has seen me wake up with these
10  nightmares where I would be jumping out of
11  the bed or the couch or whatever, and she
12  saw what I went through with the operation
13  on the shoulder.  She saw how bad it was.
14    Q.    Okay.  Have you talked with
15  your fiancee about the claims you are
16  making in this lawsuit?
17    A.    Yes.
18    Q.    Tell me about those
19  discussions.
20    A.    She -- basically, the same
21  stuff, that she is aware of how -- what I
22  think is going on.  And she also seen me
23  have these nightmares.  She also seen me

Page 202

1  in the operation.
2    Q.    All right.  Would you describe
3  Sysco's business as seasonal?
4    A.    As seasonal?
5    Q.    Uh-huh.
6    A.    Yes, to some degree, yes.
7    Q.    All right.  And it's
8  particularly seasonal down in the
9  panhandle of Florida, isn't it?
10    A.    Yes.
11    Q.    So business is greater in the
12  spring and summer months, isn't it?
13    A.    Yes.
14    Q.    Because that is when the
15  restaurants are busiest, right?
16    A.    Yes.
17    Q.    And did your workload increase
18  in the spring and summer generally?
19    A.    Yes.
20    Q.    How so?
21    A.    Working more days.  Instead of
22  four days, we would have to be working
23  five days.  It got to be a point where we

Page 203

1  had to watch our hours so we would not
2  drive over hours.
3    Q.    Okay.  In other words, that is
4  something you had to watch?
5    A.    Yes.
6    Q.    Because the drivers were very
7  busy?
8    A.    Yes.
9    Q.    Would June and July be in the
10  peak of the season?
11    A.    I wouldn't know that.
12    Q.    You wouldn't know that?
13    A.    I don't know, just that it
14  seemed that the business was doing very
15  good all year long, but during the spring
16  break it was getting pretty heavy.
17    Q.    Okay.  In between spring break
18  and Labor Day was probably the busiest
19  part of the year, right?
20    A.    Yeah, probably, I would think
21  so.
22    Q.    Are you claiming in this
23  lawsuit that being terminated has caused

Page 204

1  you emotional distress?
2    A.    Yes.
3    Q.    Okay.  Can you describe for me
4  the distress that your termination has
5  caused you?
6    A.    I lost everything I had.  I
7  had to sign my house over to my sister so
8  that she has taken over the payments.  I
9  lost my car.  My motorcycle, I had to
10  sell.  These nightmares just will not go
11  away.  It was hard, very hard for me to
12  get in the car again.  Even now, it was
13  hard for me to come down here.
14    Q.    Any other way that you have
15  suffered emotional distress or mental
16  anguish as a result of being terminated?
17    A.    I'm sorry, would you say that
18  again, please?
19    Q.    Yes.  You have given me
20  examples of the effects of being
21  terminated have had on you, and I'm really
22  trying to focus on emotional effects.  Are
23  there any other emotional effects of being

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 205 to 208)

Page 205

1 terminated that you haven't told me about?
2    A.    Nothing I can think of right
3 now.
4    Q.    Okay.  Have you had nightmares
5 about being terminated?
6    A.    No.
7    Q.    You said it was hard for you
8 to get into the car again.  Is that as a
9 result of being terminated?
10    A.    No, that is a result of the
11 accident.
12    Q.    You said you had to sell your
13 motorcycle.  Is that as a result of being
14 terminated?
15    A.    Yes, I believe so.
16    Q.    How is that?
17    A.    I had to pay some bills.
18    Q.    Needed the money to pay some
19 bills?
20    A.    Yes.
21    Q.    Do I understand you to say
22 that you had to sell your car?
23    A.    Yeah.

Page 206

1    Q.    Was that to pay bills?
2    A.    Yes.
3    Q.    Do you have access to a car
4 now?
5    A.    Yes, I do.
6    Q.    Whose is that?
7    A.    Tonya's mother.  We use her
8 car.  And I have an old, I think, it's a
9 1990 Mazda Miata.
10    Q.    Okay.  That you own?
11    A.    Yes.
12    Q.    What car did you sell?
13    A.    My Cadillac.
14    Q.    And why did you assign your
15 house to your sister?
16    A.    Why what?
17    Q.    Why did you assign your house
18 to your sister?
19    A.    I can't afford the payments.
20    Q.    So you sold it to her?
21    A.    It's over $1,000 a month.  I
22 ain't got that.  And that is not counting
23 the electric and gas or whatever, the

Page 207

1 upkeep.
2    Q.    Have you seen any psychiatrist
3 or psychologist about being terminated?
4    A.    No.
5    Q.    Or any kind of counselor about
6 being terminated?
7    A.    No.
8    Q.    Pastor?
9    A.    No, not really.
10    Q.    Have you seen any doctor,
11 physician about being terminated?
12    A.    Not about being terminated,
13 no.
14    Q.    As I understand it, you have
15 not looked for a job since your
16 termination from Sysco?
17    A.    Correct.
18    Q.    Why not?
19    A.    I couldn't work.
20    Q.    Why not?
21    A.    Because of my shoulder.
22    Q.    Understanding that you have
23 not looked for a job, has anybody offered

Page 208

1 you a job?
2    A.    No.
3    Q.    I'm looking at a document that
4 your lawyer sent me that says that you
5 have endured severe pain and suffering and
6 mental anguish as a result of the
7 termination of your job, okay?
8         Have you now told me about all
9 of the severe pain, suffering and mental
10 anguish that you have suffered as a result
11 of being terminated?
12    A.    Severe pain for the shoulder I
13 had to go through.  That operation was
14 really, really bad.
15    Q.    What I am trying to do is
16 separate what you have suffered as a
17 result of your shoulder from suffering you
18 have experienced from being terminated.
19 Do you see?  And so I'm trying to focus on
20 the effect that being terminated has had
21 on you.
22         So is there pain and suffering
23 and mental anguish as a result of your

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 209 to 212)

Page 209

1 termination that you have not told me
2 about?
3    A.   I can't think of anything
4 right now.
5    Q.   You understand this is my
6 opportunity to find out. It's my only
7 opportunity, so I want you to think hard
8 about that. But if you have told me all
9 you can think of, I'll leave you alone.
10    A.   I don't know what else I can
11 say right now. I just don't.
12    Q.   Okay. Do you recall, did you
13 use cruise control when you were driving
14 your tractor trailer at Sysco?
15    A.   At times, depending on what
16 highway you were on.
17    Q.   Do you recall whether you were
18 using that just before the accident?
19    A.   No, I wasn't.
20    Q.   So you are saying you know for
21 sure you were not?
22    A.   Right. There is certain
23 highways I wouldn't use it because of

Page 210

1 where they were.
2    Q.   Okay.
3    A.   Like if there is stop lights,
4 I would not use them. If we get into
5 highway where there was long stretches, I
6 would use it.
7    Q.   So if there are a lot of stop
8 lights, you would not use it; if there was
9 a long stretch of highway, you might?
10    A.   Yes.
11    Q.   And what was it about the
12 location of this accident that makes you
13 sure that you are not using the cruise
14 control?
15    A.   Because of the stop lights
16 going through the city part.
17    Q.   Let me show this to you.
18        (Whereupon, Defendant's
19        Exhibit 21 was marked for
20        identification.)
21    Q.   I have marked this as
22 Defendant's Exhibit 21, and I understand
23 these to be your answers to some written

Page 211

1 questions that we sent to your lawyer.
2        And my first question is: Is
3 your signature on, I believe, it's the
4 fourth page?
5    A.   Yes.
6    Q.   Okay. And when you signed
7 these, did you understand that you were
8 signing them -- or that your signature
9 indicated that these answers were
10 truthful?
11    A.   Yes.
12    Q.   Now, I'm looking at your
13 answer to number ten, which is on the
14 second page. About two-thirds of the way
15 down in that answer, it says it is also my
16 understanding that due to my termination,
17 I have lost the ability to collect on
18 certain benefits, such as retirement, that
19 I had accumulated during my
20 twenty-six years at Sysco. Do you see
21 that?
22    A.   Yes.
23    Q.   Okay. What is your

Page 212

1 understanding about having lost the
2 ability to collect retirement benefits?
3    A.   At the time, I was getting
4 stock. I can't remember how -- they say
5 stock where you get it at a cheaper price
6 than what you can buy it for normally.
7    Q.   Uh-huh.
8    A.   And I lost it all. Stock
9 options -- and I had stock options coming
10 to me. And I vested up to a certain
11 amount, I can't remember offhand. But
12 when I see terminated, I lost it, whatever
13 was stock options I already had.
14    Q.   That were not vested?
15    A.   That is right.
16    Q.   But the vested ones you kept,
17 right?
18    A.   I sold them before they fired
19 me.
20    Q.   Okay. Why did you sell them?
21    A.   I needed the money.
22    Q.   Did you sell them because you
23 thought you were about to be fired?

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 213 to 216)

Page 213

1   A.   Yes.
2   Q.   What made you think you were
3   about to be fired?
4   A.   The way I was being treated.
5   Q.   Tell me about that.
6   A.   Just the way they reacted
7   towards me.
8   Q.   Who and what?
9   A.   John Morris.
10   Q.   As I understand it, you sold
11   these vested stock options, you sold your
12   stock because you thought you were about
13   to be terminated?
14   A.   Uh-huh.
15   Q.   And how soon before actually
16   being terminated did you sell this stock?
17   A.   I think it was the same week.
18   Q.   Same week?
19   A.   Yes.
20   Q.   Okay.  Because I take it you
21   were not surprised when you were told you
22   were being terminated?
23   MR. MIDDLEMAS:  Object to the

Page 214

1   form of the question.
2   A.   No.
3   Q.   No, meaning you were not
4   surprised?
5   A.   I was not surprised.
6   Q.   And you said the way John
7   Morris was treating you, you thought you
8   were going to be terminated?
9   A.   The way they were talking
10   towards me, yeah.
11   Q.   Who is "they" and what did
12   they say?
13   A.   Just the attitude.
14   Q.   Who is "they"?
15   A.   Like I said, John Morris and
16   people wouldn't talk to you that worked
17   there.  And I just figured this is it,
18   they are getting ready to get rid of me.
19   Q.   Anything John said that made
20   you think --
21   A.   Just his attitude.
22   Q.   Expression on his face?
23   A.   Huh?

Page 215

1   Q.   Any kind of expression on his
2   face?
3   A.   Probably.
4   Q.   Okay.  Did the fact that you
5   had had a major accident cause you to
6   think you might be terminated?
7   A.   Because of the accident, I
8   might, yes.
9   Q.   Anyone else make you think you
10   might be terminated other than John
11   Morris?
12   A.   No.  I can't say who, just the
13   way I was being treated.
14   Q.   As I understand it, there were
15   no other cars involved in this accident,
16   right?
17   A.   Right.
18   Q.   Let me ask you this:  The lane
19   that you went through, the intersection, I
20   think, that was Highway 231?
21   A.   Yes.
22   Q.   Is that a four-lane highway
23   there?

Page 216

1   A.   Yes.
2   Q.   And apparently at the time you
3   went through, there were no cars coming
4   through in either direction; isn't that
5   right?
6   A.   That is correct.
7   Q.   What do you think might have
8   happened if there been some cars coming
9   through there?
10   A.   I would be --
11   MR. MIDDLEMAS:  Object to the
12   form.
13   MR. UMBACH:  Did you get that
14   answer?
15   THE REPORTER:  No.
16   Q.   What was your answer?
17   A.   I would probably be dead.
18   Q.   You would probably be dead.
19   Do you think someone else, if there was
20   someone else in another car, they might be
21   dead, too?
22   A.   Yes.
23   Q.   Do you know who was on the

Page 217

1  Accident Review Committee that reviewed
2  your accident?
3      A.   No.
4      Q.   Did you ever talk to John
5  Morris about working in the warehouse?
6      A.   I remember saying something
7  about working in the safety department. I
8  don't know about warehouse.
9           (Whereupon, Defendant's
10          Exhibit 22 was marked for
11          identification.)
12     Q.   Mr. Fischer, I'm going to show
13 you a collection of documents. Some of
14 these may already be an exhibit. But my
15 question to you -- I think I'm going to
16 take a break after I ask you this
17 question.
18          But my only question is: Did
19 you sign each of these documents that is
20 Defendant's Exhibit 22? Did you sign
21 them?
22          MR. UMBACH: And while he's
23 doing that, let me go talk to Ms. Wheat

Page 218

1  and we may be about done.
2          MR. MIDDLEMAS: Okay.
3          (Short break taken.)
4      Q.   (BY MR. UMBACH:) All right.
5  Mr. Fischer, I gave you what, Defendant's
6  Exhibit 22?
7      A.   Yes.
8      Q.   Did you sign every page of
9  that exhibit?
10     A.   Yes.
11     Q.   Okay. Are you aware of any
12 other drivers that had injuries at work?
13     A.   That had injuries at work?
14     Q.   Yeah.
15     A.   I'm not aware of any.
16     Q.   Okay. Let me show you a
17 pamphlet that I have just received and
18 I'll --
19          MR. UMBACH: Let me get his
20 answer to my question before I decide
21 whether to make this an exhibit.
22     Q.   Have --
23          MR. MIDDLEMAS: Okay.

Page 219

1      Q.   Have you seen that before?
2      A.   It doesn't -- it doesn't ring
3  a bell.
4      Q.   If you look in here on page 3,
5  it says we are very pleased to announce,
6  effective April 1, 2000, Sysco's
7  retirement plan is being enhanced. Do you
8  see that?
9      A.   (Reviewing document.)
10     Q.   Do you see that?
11     A.   I see it, yeah.
12     Q.   You don't recall getting
13 information about the enhancement of
14 retirement?
15     A.   I don't recall it.
16     Q.   And do you recall whether Ms.
17 Dunagan was talking to you about the
18 enhanced retirement plan?
19     A.   No, I'm not aware of it.
20     Q.   All right. Does April 2000
21 sound like the time that you had your
22 discussion with Ms. Dunagan?
23     A.   I don't know.

Page 220

1          MR. UMBACH: I will not make
2  this an exhibit. All right. I think T.J.
3  has got a couple of questions and I'll let
4  him go.
5          MR. SEGREST: Just a couple of
6  more.
7
8  REEXAMINATION BY MR. SEGREST:
9      Q.   Mr. Fischer, have you been
10 seen by a vocational expert of any kind?
11     A.   A what?
12     Q.   Vocational expert?
13          MR. MIDDLEMAS: Not that I
14 know of, other than it was a part of the
15 Social Security disability claim. I don't
16 know, I didn't handle the Social Security
17 disability claim.
18     A.   What is a vocational expert?
19     Q.   An expert that would examine
20 you and give you any kind of opinion as to
21 your employability or vocational loss.
22     A.   I remember taking a test over
23 at the therapy office.

Page 221

1      MR. MIDDLEMAS:  The FCE.
2      Q.    Who was your attorney on the
3  Social Security claim, did you have one?
4      A.    Yes.
5      Q.    Who was your attorney in that?
6      A.    Syfrett.
7      Q.    How do you spell that?
8      A.    S-Y --
9      MR. MIDDLEMAS:  F-R-E-T-T, I
10  believe.
11     Q.    S-Y?
12     MR. MIDDLEMAS:  F-R-E-T-T, I
13  believe.
14     Q.    And where is Mr. or Ms.
15  Syfrett located?
16     A.    I'm sorry?
17     Q.    Is that a he or she?
18     A.    She.
19     Q.    In Panama City?
20     A.    Yes.
21     Q.    What is her first name?
22     A.    I don't remember her first
23  name.

Page 222

1      Q.    You are wearing glasses today.
2  Are those prescription lenses?
3      A.    Yes.
4      Q.    How long have you worn
5  glasses?
6      A.    Since grade school.
7      Q.    Have you ever worn contact
8  lenses?
9      A.    No.
10     Q.    What is your prescription in
11  those glasses?
12     A.    I don't know.
13     Q.    The doctor that gave you those
14  glasses or your eye doctor, is it your
15  understanding that you are supposed to
16  wear those glasses to drive?
17     A.    Yes.
18     Q.    You have to have them to
19  drive?
20     A.    Yes.
21     Q.    Are you nearsighted or
22  farsighted?
23     A.    Nearsighted.

Page 223

1      Q.    Were you wearing your glasses
2  at the time of the accident?
3      A.    No.  These are newer ones.
4      Q.    Were you wearing a pair of
5  glasses at the time of your accident?
6      A.    I was wearing prescription
7  glasses at the time of the accident.
8      Q.    Were they damaged in the
9  accident at all?
10     A.    No, I don't think so.
11     Q.    Were they still on your face
12  at the time you came to a stop?
13     A.    Yes.
14     Q.    And they weren't damaged at
15  all?
16     A.    I'm sorry?
17     Q.    They were not damaged at all?
18     A.    No.
19     Q.    When did you get those glasses
20  you are wearing now?
21     A.    I think at the end of 2005.
22     Q.    Let me show you what will be
23  Defendant's Exhibit 23.  And I just want

Page 224

1  you to look at this and tell me, just like
2  you did for 22, if this is your signature
3  on that document.
4      (Whereupon, Defendant's
5      Exhibit 23 was marked for
6      identification.)
7      A.    Yes, it's my signature.
8      Q.    The only thing else I've got
9  is you said that you assigned your house
10  to your sister?
11     A.    Yeah.  I had to sign a paper
12  stating that if this house is ever sold,
13  she gets the profits of it because she is
14  making all the payments.
15     Q.    Is that the house you are
16  living in now?
17     A.    No.
18     Q.    You are living in a different
19  house now that is owned by your fiancee?
20     A.    Yes.
21     Q.    Is your sister still living in
22  the house that you signed the payments
23  over to her on?

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

(Pages 225 to 226)

Page 225

1    A.    Yes.
2         MR. SEGREST:  That is all I've
3    got.
4
5    REEXAMINATION BY MR. UMBACH:
6         Q.    One more thing, Mr. Fischer.
7    Did any supervisor or manager at Sysco
8    ever say anything that indicated to you
9    that the company had a problem with
10   employees that got hurt at work?
11        A.    Not that I remember.
12        MR. UMBACH:  That is all I've
13   got.
14        MR. MIDDLEMAS:  Thank you.
15
16
17   FURTHER THE DEPONENT SAITH NOT
18
19
20
21
22
23

Page 226

1         C E R T I F I C A T E
2
3
4    STATE OF ALABAMA)
5    JEFFERSON COUNTY)
6
7         I hereby certify that the
8    above and foregoing deposition was taken
9    down by me in stenotypy, and the questions
10   and answers thereto were reduced to
11   typewriting under my supervision, and that
12   the foregoing represents a true and
13   correct transcript of the deposition given
14   by said witness upon said hearing.
15        I further certify that I am
16   neither of counsel nor of kin to the
17   parties to the action, nor am I in anywise
18   interested in the result of said cause.
19
20
21
22
23   COMMISSIONER - NOTARY PUBLIC

**FRANK FISCHER**
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

**FRANK FISCHER**
November 21, 2006

**A**

abdomen
90:10
ability
8:8 211:17 212:2
able
9:7 70:16 99:1 125:22
access
206:3
accident
8:5 21:12,13 31:3 32:8,11
34:14,19 35:8,15 36:9
37:1 38:9 42:4 43:2,7
43:16,21 44:3,10 45:4
45:14 47:3,8 48:3,19
49:4 51:14 54:18 56:4
56:22 58:10 60:11,20
62:16 63:13,21 64:17
65:2,12,15,19 66:2,5,9
66:11,14,18 67:2 68:1
69:11 74:5,11,21 75:16
77:2 79:8 80:1 81:21
82:1,4 84:23 85:20
86:2,4,7,8,21 87:1,6,14
87:22 88:4 90:7,23
92:6 93:3,4,11,12 94:1
94:22 95:4 96:14 98:14
98:15,16 108:20 113:6
118:19 119:7,8,11 120:8
120:14,17,20,20 121:2,4
121:11,16,22 123:12,19
123:23 124:2,7,15,18,22
125:14 129:2,8,9,11,15
129:16 130:18,23 131:6
131:7,10,13,16,16,19
132:21,22 134:2,13,23
135:1,4,8 137:5,7
164:14 166:16 178:5,17
179:9,11,13,14 192:9,13
192:17,18,23 193:9,18
194:2,3,12,13 195:3,7,10
199:21 205:11 209:18
210:12 215:5,7,15 217:1
217:22 223:2,5,7,9
accidents
32:10 33:15 121:5,8
Accountability
42:4 69:12
accumulated
211:19
accurate
64:12 176:19
acknowledgment
101:4 102:6
acquaintances
180:4
acted
164:3,19
acting
6:5

action
1:4,10 226:17
actual
68:3
addiction
128:3
addition
101:20 135.17
address
10:6,7,10,16,19 190:11
addressed
197:14 198:7
Admit
73:11
admitted
73:9
affect
133:20
afford
206:19
afraid
15:7
afternoon
46:10 78:18 79:4,10
age
139:22 140:8 141:4
144:17 148:12 154:16
163:3,6 201:5
ago
13:14 14:2 107:23 138:9
AGREED
2:2
ahead
10:9 60:2 63:5 64:5
139:14 195:14
ain't
206:22
air
52:7 70:8,11
al
1:7,13
Alabama
1:2,7,9,13 3:8,11,16,22
6:4,5,11 21:15 27:2
33:20 75:10 102:15
119:20 176:13,20 177:2
186:1 226:4
alcohol
80:19 128:3
alcoholic
80:16
allege
124:15
Allison
3:20
allow
186:10
ambulance
39:11 43:4 70:14,20 71:19
amount
149:15 189:12 212:11

and/or
107:8
anguish
204:16 208:6.10.23
anniversary
115:12
announce
219:5
answer
8:7,8,14 9:9 60:3 63:6
142:23 143:3 197:2
211:13,15 216:14,16
218:20
answered
28:4 195:14
answers
210:23 211:9 226:10
anybody
11:14 19:22 28:3 44:2,5,6
56:12 65:7,13 74:15
76:15,16,21 77:7 83:12
86:8,9,20 95:3 106:2,3
114:5 134:4 148:2
160:5 163:17 179:8
200:2,14,18 207:23
anymore
84:6 124:11 142:13 169:9
anyway
165:12
anywise
226:17
apart
180:17
apartment
10:20
apparently
89:4 102:9 216:2
appeal
195:17,22 196:9 197:7
199:2
appear
93:23
Appleton
12:6,13 13:8 16:16 20:3
24:9 25:4,14 26:4
174:20
application
176:2,6 177:7 189:23
190:1,4,9
applications
27:10
applied
104:12
appointment
108:1,4,11 112:13,18
166:17,19
appointments
189:4
appreciate
161:23 162:2
approaching

37:22 41:16
approved
135:6,12
Apnl
219:6.20
area
14:19 16:19 19:2 98:15
areas
83:7
arising
123:18 130:22
arm
42:15 57:2,12 69:15
82:13 89:6 122:16
Arnold
3:12
arrested
127:20
arrived
61:13
aside
91:15
asked
65:12 67:13 95:8,18 96:5
123:8 127:14 132 8.10
148:7 150:20 151:4
154:21 155:18 156:23
159 19 160:16 168:11
175:21 176:6 180:23
195:13 196:21 199:23
200:2
asking
8:20 48:9 57:14 65:14,16
65 23 67:5 83:8 86:11
140:6,21 150:17 151:10
153:18 154:4.15 155:13
198:10
asleep
64:15.21 65:1,5,9
assign
2:19 23:12 110:10 112:3
206:14,17
assigned
23:21 173:5 224:9
assist
20:14
Associate
104:1,9
assuming
11:8,11 48:18
Atchison
3:14
Atlanta
40:20
attestor
53:14
attitude
214:13,21
attorney
3:5,13,19 21:20 132:14
173:4 221:2,5

attribute
123:23 125:13
Avenue
10:12
average
46:16 181:12
awake
133:21
award
136:14 137:9
awarded
22:1 134:22 136:22
aware
66:15,17 69:2 105:17
134:1 163:2,4,7 179:10
192:9 195:2,6,9 199:19
199:22 201:21 218:11,15
219:19
a.m
6:13

**B**

back
23:6.13,15 29:4,11,14
35:13 40:17 45:19
46:11 47:2 50:10 58:1,3
58:7 60:6,9 61:13 62:6
62:7,11,13 63:16 70:19
74:2,4,6 76:1 81:16,18
81:21,22 82:1,7 86:19
87:2,5 89:9,21 90:11
92:8,8,9 97:18 98:10,13
105:19,19 106:8,22,22
117:5 122:20,23 123:8,8
123:11,14,18 124:10,11,13
125:7 129:23 130:9
135:19,20 137:7 154:14
175:22 181:1,16,22
183:5 187:7,10,12
backed
31:18
background
8:5
bad
43:15,21 66:8 83:14 92:8
131:20 167:10 201:13
208:14
bag
70:8,11 168:10.19,20
169:10,11,12,15,16,23
170:1,3,14
bailing
14:19
bankruptcy
22:10
bar
19:3
Baraboo
29:3,6 175:1,2,12
barely
122:1

**Tyler Eaton Morgan Nichols & Pritchett, Inc.**

800.458.6031

http://www.TylerEaton.com

FRANK FISCHER
*SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.*

FRANK FISCHER
November 21, 2006

| | | | | |
|---|---|---|---|---|
| **base** 164:20 | 212:2 | **break** 9:1 92:22,23 93:2 97:21 | **Catera** 29:14,19 31:17 35:11 | 64:8 **cell** |
| **based** 137:10,11 175:15 | **best** 8:7 | 134:17,18 174:15 182:23 183:3 203:16,17 217:16 | 38:11,12 45:10,16 47:1,6 47:7,15,18 48:8,11 49:1 | 43:10 65:17 **cement** |
| **basic** 16:18 | **better** 8:14 18:8 104:4 188:6 | 218:3 **breast** | 50:14 55:3,16 56:1,4,22 61:16,19 62:3,7 81:7 | 14:16 **Central** |
| **basically** 201:20 | **bidet** 124:5,12 | 115:2 137:22 138:1 **brief** | 146:15,20 176:9,12,21 181:2,5,16,21 | 1:7,13 3:11 102:15 176:13 176:20 177:2 185:23 |
| **basis** 24:5 114:13 136:22 | **big** 17:12 94:12 110:22 | 36:23 **bring** | **call** 26:2 43:6,9 44:5,6 50:18 | **certain** 30:18 50:19 83:7 151:22 |
| **Bassett** 191:18 | **bills** 205:17,19 206:1 | 54:15 56:8 **broken** | 66:22 76:7 77:10,12,16 77:20 78:23 79:10 | 163:6 209:22 211:18 212:10 |
| **Bay** 29:3,5 84:8,14,18 85:3,13 | **Birmingham** 3:8,16,22 6:3 | 99:5,8 120:16 **Brookwood** | 87:4 112:18 168:23 183:14 191:21 192:2,3 | **certainly** 9:2 |
| 90:19,20 131:2 134:14 | **birth** 9:14 | 3:15 **brought** | **called** 39:11 43:8,20 65:16 66:7 | **certificate** 13:21 |
| **bear** 101:10 | **bit** 7:2 26:19 | 140:10 **Brown** | 66:20 70:20 77:7,8 79:20 85:19 118:11 | **Certified** 1:21 2:6 6:2 |
| **bed** 78:13 201:11 | **black** 90:12 | 73:15,17 74:10,16,20 85:23 98:11 | 132:10,16 164:1 166:7 166:14,22 175:14,20,22 | **certifies** 102:13 |
| **began** 176:10 | **blank** 53:13 | **bruise** 42:14 69:15 73:6 90:12 | 176:13 199:11 **calling** | **certify** 6:6 226:7,15 |
| **beginning** 21:2 23:3 46:23 47:19 | **blood** 80:4,7 109:3,16 110:6 | 91:5,8,14,16,16 93:13,17 94:10 | 39:10 79:3 **cancer** | **chance** 188:8 |
| **begun** 79:6 | 112:1 113:4,10,22 118:1 118:15 120:9 | **bruises** 91:17 | 114:20,21,22,23 116:4,23 117:2,11,22 118:3 121:10 | **change** 26:16 28:11 29:13 148:21 |
| **believe** 16:14 21:13 26:1,10 35:22 | **blue** 54:5 | **buckle** 56:9 | 137:3,11,22 138:1 **capacity** | 187:5 186:3,9 **changed** |
| 46:5 52:1 55:12 74:17 81:19 84:9 86:3,22 | **Bobe** 191:17 | **buildings** 17:8 | 145:23 **car** | 29:12 48:23 186:7,8 187:22 188:2 |
| 91:19 103:2 106:16 125:15 128:20 133:2 | **body** 57:1 68:9,11 69:1,3,6,18 | **built** 14:16,23 | 31:13 33:1 44:17 120:20 121:1,5 139:3 178:5 | **cheaper** 212:5 |
| 140:7 146:11 149:13 167:21 175:13,17 186:19 | 91:18,21 92:2,6 123:4 125:13 | **bumped** 31:14 | 204:9,12 205:8,22 206:3,8,12 216:20 | **check** 52:6 53:5 54:2 55:14,20 |
| 194:15 197:4 200:23 201:1,3 205:15 211:3 | **bone** 82:15 89:3,4 | **bumper** 31:14 70:19 71:4 | **card** 72:16 | 82:22 103:22 119:23 120:1,5 173:21 |
| 221:10,13 | **bones** 120:17 | **busiest** 202:15 203:18 | **care** 110:4,11,13,14 111:23 | **checkups** 117:6 |
| **bell** 165:13 219:3 | **bonuses** 144:21 | **business** 78:21 107:8 127:5 165:23 | 113:17,18,21 114:3,7,9,14 118:18 133:10 138:17 | **chemo** 115:16 117:15 |
| **belt** 42:17 44:10,14,16,18,19 | **book** 186:11,14 | 202:3,11 203:14 **busy** | 184:6 188:11 189:2,12 198:8 | **chemotherapy** 115:6 117:9 |
| 54:6,13 55:20,23 56:7 56:14,17,23 57:5,10,15 | **books** 125:21 169:4 | 203:7 **buy** | **caring** 188:19 | **Cherry** 111:15 |
| 58:2,6,8,19 59:1,10,11 59:13,22 60:6 61:11.12 | **born** 12:1,3,4 | 212:6 **B–A–R–A–boo** | **Carr** 3:20 | **chest** 94:19 |
| 62:8,10 69:17 70:4 90:15 94:15,23 95:15 | **bottle** 110:12 112:10 | 29:6 **B–O–B–E** | **carrier** 125:7 134:12 | **children** 11:22 |
| 99:14 100:7,7,14,14 103:17 104:10,19 105:3 | **bottles** 112:16 139:2 | 191:18 **B–O–O** | **carry** 81:13 | **chiropractor** 129:5 |
| 106:4,7 107:14,19 | **bottom** 36:20 42:19,22 56:19 | 29:6 | **cars** 66:10,13 215:15 216:3,8 | **CIRCUIT** 1:9 |
| **belts** 52:8 103:12 105:23 107:9 | 103:11 191:15 | —————— C —————— | **case** 130:21 200:16 | **city** 10:15 24:17 25:3,10 |
| **benefit** 142:22 143:6 160:23 | **bought** 149:20 | **C** 3:1 4:1 197:18 226:1,1 | **cases** 50:22 | 29:10,11,14,15 30:2 32:23 35:10,13 38:11 |
| **benefits** 21:6,9 22:2,5 87:20 | **box** 10:14 168:8 | **cab** 54:6 62:6,9,11 71:10,13 | **cause** 6:14 215:5 226:18 | 40:18 45:11 46:15 47:1 47:11,12 50:14,17 51:20 |
| 88:15 119:10,19 126:17 127:9,12 129:2 134:21 | **bracing** 68:13 | 81:14 85:19 95:12 98:17 98:22 | **caused** 203:23 204:5 | 54:18 61:9 62:7 74:3 76:2,6 81:11,17 82:2,8 |
| 135:15,18,19 136:22 137:1 140:14 144:4 | **brakes** 35:6 37:3,20 38:1,4 | **Cadillac** 206:13 | **causing** | 86:19 87:2 110:16 |
| 145:2 148:22 149:3,7,16 161:3,9,17,21 211:18 | 39:14,15,18 40:2 64:22 | | | |

**FRANK FISCHER**
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

111:10,11 115:21 147:2,3
161:2,13 166:6 181:2,16
181:21 210:16 221:19
Civil
1:4,10 6.7
claim
8:6 87:15,18 119:15
121:21 123:17 130:20
140:3 141:11,20 191:17
220:15,17 221:3
claiming
139:21 203:22
claims
7:13 139:19 200:4.15,21
201:15
Cleaning
19:1
clear
174:17
Cliff
173:1 196:5
Clifford
197:18
clinic
84:8,14,19 85:3.13 90:19
90:21 110:18 131:3
clinics
111:16,20 184:2
clips
54:22
clock
17:12,12
close
40:23 175:6
closest
179:21
clue
134:6
Coast
116:12
Cochran
175:12,19 176:2,9 185:20
190:5,9
coffee
80:22,23 81:3,6,10,14
collect
211:17 212:2
collection
217:13
collectively
101:8
college
12:20.22
collided
64:11 68:10
columns
103:21
come
62:7 72:15 77:13,17
155:4 156:6 158:9,18
166:13 187:7,10,12

204:13
comes
44:21 54:23
comfortable
60:8
coming
30:9 108:8,10 155:1
212:9 216:3,8
commencing
6:12
comments
154:13
Commerce
6:11
commercial
9:17 17:8 30:21
Commissioner
2:6 6:6 226:23
Committee
178:17,19,22 179:5,7,9,13
192:10,14,18 193:1
194:2,12 195:4,11 217:1
comp
82:11,18 83:17,19 87:23
90:18 119:11,15,16,20
120:2 132:8,11 134:11,12
140:3 141:10,20 174:8
company
15:9 17:3 23:23 83:6
104:16,18 107:7 140:10
140:13,18,21,23 141:23
142:2 144:4,6 145:21
150:18,23 151:5,11
154:11 155:7,8,14,15
156:8,10,15 157:1
158:16,22 159:20
160:10 161:10 162:16
175:15 176:10,12 184:14
185:5,8 225:9
company's
14:17 15:1,3 16:4 145:9
148:21 149:2
compare
177:19
compensation
7:10 87:15,18 120:4 125:6
191:16,17
complain
159:4,7 160:5 162:10
complete
46:13 139:9
completed
13:19 189:23 190:1
completion
13:22
compliance
2:12
comply
102:17
computer
125:21 166:1

concerned
90:13 94:4 160:13,16
192:23
concerning
166:16 174:2 200:20
condition
130:17,22 136:23
confuses
8:20
consciousness
39:4 67:23 98:19
consider
180:2
considered
7:16
considering
61:5
constant
122:4
contact
191:15 222:7
contained
102:17
continue
24:12
continued
72:19
CONTINUING
4:1
continuously
103:17 104:11,19
control
64:9 209:13 210:14
conversation
43:19 65:18 75:1 86:16
146:4 147:8,19 148:15
152:14 157:10 161:5
163:22 164:17 196:23
197:6
conversations
86:20 158:14 161:13
196:8 200:20
Coon
25:15
coop
168:23
copy
102:14,22 103:8 137:14,17
193:9,18 198:4
corner
106:22
correct
60:13 61:4 120:6 121:13
124:1 139:23 187:19,20
195:20 207:17 216:6
226:13
couch
201:11
counsel
2:4,16,18 6:10 226:16
counselor

207:5
counting
206:22
COUNTY
1:9 226:5
couple
19:13 48:6 107:22 174:14
183:17 220:3.5
course
12:23 13:1,10.16,19 30:5
30:13.16 65:18 80:20
85:14 131:3 196:22
court
1:1,9,21 2:7,13 6:2,9
40:14 42:10 44:13
178:13,15 196:13
covered
30:20,22
coworker
179:17
coworkers
180:2
cruise
209:13 210:13
Cruz
34:2,7,8 179.16 180:6
cup
81:12
curling
89:9
current
10:6 125:16
currently
9:17 77:12 27:4.6 80:11
118:4 121:21 125:22
126:2,18 133:4.7
customer
51:11
cuts
91:20
CVS
130:5
CV-2005-1630
1:10
C-O-O-N
25:18

_____ D _____

D
5:1
damage
33:11 170:8
damaged
91:2 96:3,7 223:8,14,17
Dan
167:20
Danny
142:16 165:13 167:21
191:5,8
dark
93:21 94:4

dash
96:7
dashboard
69:7
date
6:6 9:13 34:15 54:17
60:11,14,16,20 61:5,5
136:14 154:1 181:8
dated
53:12 63:1 137:6
dates
173:8
Davis
1:20 2:6 3:4 6:1 136:6
173:15
day
28:21 46:2,3,4 49:7,9,10
49:11,22 76:9,22 77:5
77:11,13,15,18,19 78:4,6
79:8.15 80:1 81:8,17,23
82:10 86:18 93:12
125:17 133:21 166:17
175 22 203:18
days
48:3 94:7 141:16 164:13
173:11 174:6 189:3
202:21,22,23
daytime
133:23
day-to-day
24:4
dead
216:17,18,21
December
9:15 22:15 188:17
decide
218:20
decided
83:15 194:2
decision
197:7
Dee
142:5 145:8 152:14
155:22 159:8
deer
31:10.11
DEFENDANT
3:10
*Defendants*
1:8,14
Defendant's
5:11,12,12,13,13,14,14,15,15
5:16,16,17,17,18,18,19,19
5:20,20,21,21,22,22
36:2,3 40:5,8 41:19,22
52:14,16 60:15 62:19,20
63:16 69:10 96:11,15
97:8.13,19,22 101:8,11
101:19,23 102:5,11
103:3,7 106:10,14,18
189:19,22 190:16,19

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                                    http://www.TylerEaton.com

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

193:3,7,14,17 194:8,16
197:9,10 198:1,5,20
199:1,8,12,13 210:18,22
217:9,20 218:5 223:23
224:4
**degree**
202:6
**delivered**
20:12
**delivering**
14:11 20:14,15
**delivery**
20:6,10 21:1 104:1,8
**department**
183:9 217:7
**depending**
209:15
**depends**
58:14
**DEPONENT**
225:17
**deposition**
1:16 2:4,10,11,21 7:10,15
7:17 9:8 226:8,13
**depositions**
2:14
**derogatory**
163:3
**describe**
23:7 35:7 44:13 68:7,11
72:12 142:10 202:2
204:3
**description**
36:23 64:13
**detail**
43:17
**determined**
194:12 195:4,10
**diabetes**
80:5,7 109:3 114:1,6
118:2 120:9
**diagnosed**
121:14
**diagnosis**
121:10
**different**
23:17 89:5 111:5,19
168:13 169:20 224:18
**dimensions**
182:15
**dining**
19:2
**direction**
216:4
**disability**
21:9 22:5 126:17 128:14
128:21 129:1 136:15
137:6 220:15,17
**disabled**
137:4
**disagreed**

170:22
**discovered**
138:2,11
**discovery**
136:9 139:7
**discuss**
74:20 76:15 86:7 88:23
**discussed**
86:4 133:14 200:22
**discussion**
7:21 145:8 148:20 219:22
**discussions**
201:19
**dispute**
61:4 96:22 97:2
**distress**
204:1,4,15
**District**
1:1,2 6:8
**ditch**
34:20 35:1,5 37:4 38:2
39:7,16 41:2 64:11 68:4
68:9 131:23
**division**
1:3 177:5
**divorced**
180:16
**doc**
42:15 69:16 85:14 118:17
**dock**
50:11
**docs**
139:7
**doctor**
72:20,21,23 82:11,17,19
83:3,7,10,13,15 84:7,11
85:2,13 90:6,11,16,18
94:5 109:21,23 110:5,7
111:22 112:13 113:9,14,20
114:10,18 118:13 124:17
124:20 125:2 126:4
131:5 132:2 138:10,15
164:2 183:20 184:13,14
184:17 185:5,8 207:10
222:13,14
**doctors**
83:18,19 85:16 113:21
114:3,12 116:22 117:1
133:9 184:8,23 185:4
189:4
**doctor's**
76:18 112:5,7 166:17,18
**document**
10:1 36:7,8,12,16 42:2,3
42:7,19,22 52:19,22,23
63:5,7,11 101:14 102:8
103:13 104:2,7 106:15
106:20 190:3,21 193:7
193:11,19 194:18 199:11
208:3 219:9 224:3
**documentation**

198:13,14,17 199:6
**documents**
101:16 136:18 199:4
217:13,19
**doing**
14:19 30:4 47:2 53:17
55:15 73:3 130:12
155:6 156:9 158:21
165:23 168:13,14 169:18
177:3,9 203:14 217:23
**dolly**
32:17 33:1 178:5
**DOT**
183:14 184:17,19 185:4
**double**
12:23 30:5,12,14,19
144:21
**doubles**
12:23 28:16,18 32:16
45:20 178:6
**Doug**
142:14
**Dr**
85:9,12 88:20 107:21
112:14 114:19 115:14,20
116:16,17 131:3 134:14
**drastically**
182:8
**drawing**
63:17,18
**drink**
80:17,19,22
**drive**
23:14 29:16 30:14 38:7
49:16,19 57:9 77:7
125:23 126:2 183:10
203:2 222:16.19
**driven**
33:21 181:1
**driver**
20:14,17 23:2,8,19 24:9
25:2 28:12 33:9 34:11
51:18 53:1,8 64:7
104:13 145:5 146:1
169:2 185:15 195:3,9
**drivers**
24:1 151:13 161:14 179:1
185:3,8 188:8 203:6
218:12
**driver's**
9:17,23 30:21 36:9
**driving**
13:1,3 24:5 30:11 31:3
38:10 44:15 45:3 46:19
46:22 47:1,18 48:15
49:23 97:2,5 120:20
126:5 144:22 171:9
209:13
**drop**
23:10 62:4
**dropped**

35:11 82:3
**drove**
23:20 28:21 47:11 165:7
165:17 167:3,9 181:4,11
182:9
**drug**
72:5,8,9 84:16,17 128:3
**due**
211:16
**duly**
6:18
**Dunagan**
142:5 143:16,21 144:1,8
145:7,8,17 146:5 147:9
147:19 148:15,20 151:16
151:17,18 152:15 159:8
219:17,22
**Dunagan's**
148:12
**duties**
17:9 18:22 20:11 23:8
28:11

_____ E _____

E
3:1,1 4:1,1 5:1 226:1,1
**earlier**
47:22,23 48:7 95:17
105:8 109:1 143:12
160:19 178:3 192:11
**earliest**
31:6,7
**early**
34:3 150:22 155:5 158:9
**easier**
8:16
**easily**
8:15
**east**
40:22
**eat**
78:21,23
**Eddie**
142:8 155:18 156:4
**Edition**
106:16
**effect**
2:12 208:20
**effective**
219:6
**effects**
109:14,15 131:12,15
204:20,22,23
**eight**
117:7,16
**either**
13:17 85:5 130:5 157:17
183:22 216:4
**elaborate**
37:15
**electric**

206:23
**Elite**
52:23
**emergency**
71:23 72:6,9,13,22 73:12
131:4
**emotional**
204:1,15,22,23
**employability**
220:21
**employed**
27:4,6 44:4 145.20
**employee**
34:10 100-20 106:15
169:20
**employees**
75:16 82:4 105:18,22
107:7 161:18,19 163:15
163:19 225:10
**employment**
32:7 128:6,10
**empty**
23:9 35:11
**enclosed**
198:14
**ended**
27:10 34:19,23
**Endomycin**
118:11
**endured**
208:5
**engaged**
153:14,16
**engine**
52:9
**enhanced**
219:7,18
**enhancement**
219:13
**entire**
25:20 61:16 70:21 136:18
189:9
**entitled**
36:9 104:7 106:15
**entry**
64:4
**equal**
188:5
**equality**
188:6
**ER**
73:5 81:21 85:14 86:1
90:1 93:11
**Ervin**
7:5
**estimate**
39:21 135:23 136:3
**et**
1:7,13
**eventually**
92:13 93:7

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

everybody
84:3,4 127:18
evidence
2:22
Evritt
10:11
exact
46:8 108:14 135:10
exactly
34:16
exam
72:14
examination
5:3,5,6 6:14,21 139:16
examine
72:22 220:19
examined
6:18
examples
204:20
excuse
76:18
exhibit
5:11,12,12,13,13,14,14,15,15
5:16,16,17,17,18,18,19,19
5:20,20,21,21,22,22
36:2,4 40:6,9 41:20,23
52:14,17 60:16 62:19,21
63:16 69:11 96:12,16
97:8,14,19,22 101:8,12
101:20 102:1,5,11 103:4
103:7 106:11,14,18
189:20,22 190:17,20
193:4,7,15,17 194:9,17
197:9,11 198:2,5,21,23
199:1,8,12,14 210:19,22
217:10,14,20 218:6,9,21
220:2 223:23 224:5
EXHIBITS
5:10
exit
40:19,20 41:4
exited
67:15
expected
37:3,15 42:13
experienced
208:18
expert
220:10,12,18,19
explain
149:14
explained
104:4
expression
214:22 215:1
extend
94:18 122:15,20,23
extra
51:15
eye

222:14
E-R-V-I-N
7:6,7
E-V-R
10:13
E-V-R-I-T-T
10:14

_____ F _____
F
226:1
face
214:22 215:2 223:11
fact
105:1 124:13 141:15
142:21 164:20 215:4
fair
63:20 64:12
fall
64:15
familiar
178:16
family
114:10 200:6,8,9
far
12:7 28:1 39:21 68:8
160:13,16 180:17 185:7
farmers
14:19 16:1,2
farsighted
222:22
fast
38:3 40:1 41:15 168:17
fasten
56:14 61:11
fastened
70:5 100:14
FCE
221:1
February
102:19
Federal
6:7
feet
182:18
fell
64:21 65:1,5,9
fellow
179:16
felt
144:15,23 171:8
female
67:10 138:18
fiancee
11:7 126:11,21,23 127:14
138:6 152:11 200:13
201:15 224:19
fifteen
140:18 150:8,19 151:3
180:18
figured

214:17
file
21:14 135:8 136:19,23
filed
21:5,8 22:9 135:3
filing
21:11,16
fill
36:12 42:7 51:23 52:2
53:9 176:1 190:8
filled
69:12 129:18 130:7 177:7
filling
36:15,17 176:5
find
79:1 137:21 138:4,8 162:3
209:6
fine
52:12 88:9 174:16 183:2
finish
12:8 13:16
finished
183:6
fired
195:11 212:18,23 213:3
first
6:18 7:14 10:10 11:19
20:6 29:9 47:10 65:20
71:1 73:18 82:18 88:21
89:1,15 116:17,19 145:7
173:6 174:19 184:4
185:17,23 186:22 187:15
199:11,20 211:2 221:21
221:22
Fischer
1:5,11,18 2:5 6:13,17 7:5
7:8 93:2 100:6 134:20
139:17 183:5 217:12
218:5 220:9 225:6
fish
50:7,13,16,22 61:22
fits
54:21
five
18:21 182:6,6 202:23
flares
118:5
flashbacks
131:22
flip
58:16
Floor
3:15
Florida
9:20 10:15 21:15,19 24:18
26:13,18 28:13 29:7,10
30:19 32:7 87:18
119:15,16 153:7 175:8
188:23 189:10 202:9
flushed
117:15

focus
156:20 204:22 208:19
following
6:15 43:2 44:3 92:6
93:10,12 129:2 130:17
131:10
follows
6:19
food
1:7,13 3:10 20:12,15 50:7
102:14
Foods
175:1,2,12 176:13
force
2:12
foregoing
6:9 226:8,12
foreman
25:21,23 26:2
forget
8:15
form
2:17 37:13 51:23 53:1,21
60:2 99:16 100:11
105:6,13 176:6 214:1
216:12
forms
52:1
forth
181:2
forward
68:15
found
24:19 32:18 82:14 129:20
138:13 162:19,22 178:9
178:11,15 179:12
four
145:3 181:12 186:15,17,19
202:22
fourth
211:4
four-lane
215:22
Fox
13:2,4,6 30:5,7
fracture
98:6
frame
47:20
Frank
1:5,11,18 2:5 6:13,17 7:5
156:9
frequency
140:9
Friday
49:11
Fridays
49:14
friend
179:19,21
friends

180:3,5
front
31:14 58:8 61:12,14
169:20
full
2:12 6:22 7:4 35:12
40:18 62:5 186:15
fully
9:9
further
12:20 225:17 226:15
future
108:2
F-R-E-T-T
221:9,12
F260265534640
10:2

_____ G _____
Gallagher
191:18
gallon
122:2
garbage
168:10,20 169:11,12,15,23
170:3
gas
206:23
general
18:23 107:1
generally
24:4 201:8 202:18
gentleman
165:16
gestures
8:10
getting
51:1 88:14 144:22 145:1,4
168:21 203:16 212:3
214:18 219:12
give
9:8 10:9 17:14 56:13
100:23 111:13 137:18,20
172:15 183:17 220:20
given
7:15 72:5,8 101:21 105:2
135:18 136:7 191:10
204:19 226:13
gives
188:8
glasses
222:1,5,11,14,16 223:1,5,7
223:19
go
7:19 10:9 12:7,10 17:11
18:3 19:8,11 23:13
26:20 28:9,10 38:18
46:10 48:7 58:8 60:2
61:22 63:5 64:5 72:19
76:13 78:12,13 79:2,11
80:8 82:8,21 83:3,7,9

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                             http://www.TylerEaton.com

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

83:13,15 84:7 87:8
89:7,21 92:13 98:9
111:2,3 114:10 117:5
123:3 124:5 138:16
139:14 141:13 142:12
155:5 161:2,17 173:6
175:18 176:23 180:21
183:20,22 184:12,14
187:9 189:5 195:14
204:10 208:13 217:23
220:4

**goes**
57:16 142:8

**going**
7:12 8:3 29:1,2 35:8
36:1,2 38:2,3 39:15
40:2,4,5,20 41:15,18,19
43:21 52:12,14 57:5,10
58 6 59:23 62:19 63:3
64:3 76:16,21 78:1,20
79:1 95:6 96:10,11 97:7
97:8,10 101:19 106:13
107:16 131:22 139:13
152:2 168:6 170:21
181:23 184:9 193:1
195:12 200:23 201:1,22
210:16 214:8 217:12,15

**good**
144 4 162:5 203:15

**Goodwiller**
85:6,6,9,12 88:20 93:7
107:21 114:14 131:3
134:16

**gotten**
84:18

**gout**
118:5,6,7,8

**grabbing**
170:2

**grade**
222:6

**graduate**
12:16

**greater**
202:11

**green**
29:2,5 39:1

**grew**
23:23

**grounds**
2:20

**guard**
16:3.5,7.13,22

**guarding**
17:7

**guess**
78:7 102:21 103:22 162:6

**guessing**
94:7

**guilty**
32:18 178:9,11,15 179:12

**Gulf**
116:7,9,10,11

**gut**
42:15 69:15 73:7 93:17

**guy**
165:6 167:3 186:20

_____ H _____

**habit**
60:7 78:12

**haif**
15:20 46:17 177:15,16
182:6

**hand**
8:10

**handbook**
100:20 101:5,20 106:16
107:12

**handed**
84:4 168:14 169:16 170:4

**handle**
220:16

**handled**
115:14,16

**handwriting**
40:12 53:9,10

**handy**
109:8,11

**happen**
32:19 59:4.16 134:5,9

**happened**
34:16,17,19,20 35:9,15
44:11 45:9,15 48:19
49:4 51:14 56:22 58:10
62:16 64:18 65:12,19
66:2,6 68:1.7,11 75:4
79:9 80:2 82:1 85:20
90:23 99:17,19 121:11
124:6 129:15 132 21
141:12 168:16 1/1:22
172:17,19 201:8 216:8

**happening**
65:2

**happy**
8:21

**hard**
8:9 124:4 204:11,11,13
205:7 209:7

**harder**
122:7 145:4.4

**Harpst**
142:16 165:13 167:22
191:5.8

**hay**
14:19

**head**
8:10 42:16 68:20 69:16
69:19 79:23 90:2,7,23
91:6,9,11,14 95:19,21,23
99:10,11,12 100:4,8,14
143:9,10 159:11

**headed**
35:13 40:21

**heading**
40:17

**health**
128:6,9

**hear**
99:1 148:4 163:8

**heard**
167:13,14 173:20 192:13

**hearing**
195:23 226:14

**hearsay**
63:5

**heavier**
177:23

**heavy**
203:16

**heights**
15:7

**held**
20:20

**helper**
20:7,10 21:1

**helpful**
161:20 162:3,4

**hey**
155:5 158:21

**he'll**
77:17

**hi**
155:6 156:9

**Higby**
172:23 173:1,7 196:5
197:18 198:8

**high**
12:8,10,12,17,19 14:6,7,9
14:12,13,15 109:2 110:6
112:1 113:10,21 119:3
120:9 182:18,19

**highlighted**
54:5

**highway**
40:21 41:5 52:12 209:16
210:5,9 215:20.22

**highways**
209:23

**hinted**
142:1 143:14

**hinting**
140:15,15

**hip**
56:19 94:13

**hired**
19:16 20:2,4,23

**hiring**
175:19 177:1

**history**
174:18

**hit**
33:1 37:3,19 38:4 39:18

40:2 42:16 68:20 69:1
69:3,6,16,19,22 92:1
95:19 99:12,20,22
100:4,8,15 178:5

**hitting**
31:10 35:6 38:1 39:14,15
68:15,18

**hobbies**
180:19

**hole**
169:6,15

**Holiday**
16:6 18:6,10

**home**
23:15 45:19 46:11 77:12
78:12 82:9 133:16 152:1
152:12 159:9 174:11

**homemade**
124:12

**hood**
54:2

**hook**
54:16 62:4.8

**hooked**
56:10 57:12

**hooking**
59:8

**hope**
117:4

**hoping**
144:16 150:7,18 154:3

**hospital**
39:12 43:5 71:20,22 72:3
73:10 115:23 116:17

**hospitalized**
120:14

**hours**
46:17 48:7 55:13 79:5
107:8 203:1,2

**house**
10:8,10,11,16,19,21,22 11:1
11:3 50:7,13,16 61:23
204:7 206:15.17 224:9
224:12,15,19,22

**houses**
180:7

**housework**
126:7,12

**Huh**
127:10 153:2 214:23

**hurry**
58:15

**hurt**
42:14 69:14 82:19 121:1
122:8 164:5 225:10

**hurting**
83:14 92:10 123:7

**hurts**
123:8

**idea**
17:14 99:7 112:21 148:11
182:12

**identification**
36:5 40:10 42:1 52:18
62:22 96:17 97:15
101:13 102:2 103:5
106:12 189:21 190:18
193:5,16 194:10 197:12
198:3,22 199:15 210:20
217:11 224:6

**Ill**
3:12

**ill**
188:12

**illnesses**
120:11 121:15

**immediately**
26:6 43:2 44:3 78:11,12
81:22 85:20 93:10,23
98:16

**impact**
68:4,8,12

**implying**
127:19

**improper**
178:14

**inability**
124:21 125:2

**incident**
31:1 33:13,14,18,22 34:2

**income**
126:18,21 127:1,3,15

**increase**
189:13 202:17

**INDEX**
5:3,10

**indicated**
211:9 225:8

**indicating**
97:12 107:4

**individual**
1:5,11

**information**
149:1,6 162:5 190:11,12
219:13

**informed**
164:23 165:5,6

**informing**
76:20

**initially**
20:1,23 23:1 138:16

**injure**
15:13

**injured**
19:4 33:6,9 87:8 92:3
118:23

**injuries**
15:11 17:20,22 25:6,10
84:22 88:23 93:3
120:22 131:6 218:12,13

_____ I _____

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

**FRANK FISCHER**
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

| | | | | |
|---|---|---|---|---|
| **injury** | 14:11,14  15:5,11,14  16:7 | **know** | 174:9  196:3,21  197:14,19 | **lives** |
| 25:8  85:16  87:14  90:3,7 | 17:20  18:2,8,18  19:5,7 | 8:21  9:3  13:9,11,23  16:4 | 198:8  208:4  211:1 | 11:8,11 |
| 90:9  123:18  129:8,12 | 20:10  27:9  82:19  87:8 | 16:15  17:17  25:21  28:1 | **leading** | **living** |
| 130:22  199:12,20 | 175:21,23  207:15,23 | 31:23  32:15  34:21  38:5 | 2:18 | 16:12,14  188:14  189:6,8,9 |
| **Inn** | 208:1,7 | 39:3,6,7,9,23  40:1,3 | **leave** | 224:16,18,21 |
| 16:6  18:7,10 | **jobs** | 41:7,9,17  48:23  57:13 | 47:20  55:6  144:16  209:9 | **LLP** |
| **inquire** | 16:1  19:21 | 58:15  59:19  64:14,16,19 | **leaving** | 3:14 |
| 66:1,5 | **John** | 64:20  65:1,3,4  66:19 | 26:7  47:6  48:11  52:5 | **load** |
| **inspect** | 27:20,21  34:2,8  43:8 | 67:15,18,20  68:2  71:11 | 54:18  55:3  81:4 | 45:12  50:8,11  61:11 |
| 52:5 | 58:22  65:8,11,17  77:9 | 72:4  73:8,18  74:1  77:6 | **left** | **loading** |
| **inspection** | 82:23  83:9  85:19 | 79:21  83:18  86:17  87:7 | 19:10  26:4  35:12  42:14 | 50:5 |
| 51:18  52:4  53:18,23 | 86:23  87:12  105:1 | 87:10  95:5,5  96:9 | 44:22,23  55:16  56:1,8 | **lobby** |
| 54:10  55:3,18 | 106:2  112:9  138:22 | 99:20,23  102:3  103:23 | 56:18  57:2,6,11,12  61:9 | 152:9 |
| **Institute** | 141:13  155:23  163:8,14 | 104:2,2  105:20,21  106:1 | 64:10  69:13  81:11  89:12 | **Loberger** |
| 13:2,7 | 163:22  165:8,20,21 | 110:21  111:2  112:11 | 118:21,23  121:23  122:3 | 75:22  152:7,13 |
| **instructions** | 166:21  168:7  179:16 | 113:7,15,16  116:16,19 | 122:13,18  123:4,6  124:8 | **local** |
| 56:13 | 187:23  192:22  213:9 | 117:18  119:21  123:9 | **legalized** | 14:18  16:1 |
| **insurance** | 214:6,15,19  215:10 | 124:16  127:4,13  129:22 | 12:23  30:12 | **located** |
| 125:7  128:6,9,13,14,16 | 217:4 | 132:12  134:3,4  135:10 | **legs** | 110:15  111:8  115:18,20 |
| 128:18,22 | **joking** | 136:5,8  137:9,12  146:22 | 91:23 | 192:7  221:15 |
| **intact** | 155:11 | 148:5  153:19  154:6 | **lenses** | **location** |
| 70:5 | **Judge** | 155:10,16,23  158:9  159:1 | 222:2,8 | 20:2  24:10,13,17  25:2,5 |
| **interested** | 137:3  178:12 | 161:12,15,16,21  162:5 | **letter** | 25:11,14  29:8  32:7 |
| 226:18 | **July** | 163:5,16,20  165:2,17 | 136:14  137:13,15  194:4,6 | 33:16  45:16  46:15  49:1 |
| **Internet** | 53:12  89:13,13,16,17  191:1 | 166:3,4,12  170:9  172:7 | 197:16  198:13  199:7 | 55:4,17  56:1  84:2  111:3 |
| 129:20  130:13 | 203:9 | 172:21  173:16,19  178:21 | **Let's** | 210:12 |
| **intersection** | **jump** | 178:23  179:2,3,8,13,15 | 7:19  145:6  156:20 | **locations** |
| 35:16,20  37:2,6,9,11,14,19 | 58:15 | 182:10,14,19  185:2,7,10 | **level** | 28:13  29:1  30:1  51:5 |
| 37:22  38:6,19,22  39:18 | **jumping** | 192:4,6,8,20  193:22 | 28:10 | **long** |
| 39:19,20,22  40:23  41:1 | 201:10 | 195:15  203:11,12,13 | **license** | 13:13,14,15  15:4,6  16:21 |
| 41:5,16  42:12  63:19 | **June** | 209:10,20  216:23  217:8 | 9:17,23  10:3  30:19,21,23 | 18:17  24:12  29:16 |
| 181:17,20  182:5  215:19 | 33:19  34:4  40:16  60:12 | 219:23  220:14,16 | **life** | 38:10  39:8  46:22  47:2 |
| **interview** | 63:1  81:18  203:9 | 222:12 | 22:19  119:6  128:13,16,18 | 48:2,9  71:9  88:3 |
| 177:8 | | **knowledge** | **lift** | 130:12  140:9,20  146:9 |
| **investigate** | | 119:18 | 122:1 | 150:17,22  151:5,10,12 |
| 144:5 | **———— K ————** | | **light** | 155:6,8,14,15  156:7,10 |
| **investigated** | **K** | **———— L ————** | 31:14  38:21,23  39:1 | 156:23  158:5,15,21 |
| 192:20 | 130:5 | **L** | **lights** | 159:19  161:8,9  173:9 |
| **invite** | **keep** | 2:1 | 52:7  210:3,8,15 | 182:15,20  183:7  203:15 |
| 180:12 | 148:10  150:17 | **Labor** | **liked** | 210:5,9  222:4 |
| **involved** | **kept** | 203:18 | 24:19 | **look** |
| 7:23  32:9  33:15  66:11,14 | 155:13  212:16 | **lady** | **limit** | 52:15,21  63:1,15,17  64:1 |
| 89:5  120:19  178:4 | **key** | 113:14  161:7 | 41:12 | 72:16,16  80:8  96:18 |
| 215:15 | 17:12,13 | **lane** | **limited** | 97:9,18,19  98:9  101:9 |
| **issued** | **keys** | 215:18 | 121:19 | 101:18  102:4  103:6,9 |
| 9:19 | 168:12 | **large** | **line** | 106:19  108:6  109:7 |
| **items** | **kidding** | 6:5  42:14  69:14 | 107:17  186:12,14  187:10 | 110:2,11  112:10  129:22 |
| 53:20 | 141:15  164:4,21 | **Larry** | **lines** | 137:13  139:3  140:14,14 |
| | **Kimberly** | 116:21 | 52:7 | 168:15  190:19  193:6 |
| **———— J ————** | 12:12,14  16:16,19 | **latches** | **list** | 219:4  224:1 |
| **J** | **kin** | 55:1 | 82:21  83:5,20  84:1,3,5 | **looked** |
| 3:18  7:8  103:19 | 226:16 | **late** | **listen** | 90:14  207:15,23 |
| **Jackson** | **kind** | 89:13  150:3 | 125:19 | **looking** |
| 72:3  175:16 | 78:22  93:5  117:12  119:8 | **Law** | **little** | 32:6  53:20  54:4  60:15 |
| **Jeff** | 121:5,8  124:3  127:23 | 3:5,13,19 | 7:1  22:6  26:19  125:20 | 208:3  211:12 |
| 53:14 | 128:3  129:8,14  175:18 | **laws** | 126:3,8,10 | **looks** |
| **JEFFERSON** | 177:1  207:5  215:1 | 2:13 | **live** | 52:11  63:23  97:4,6  99:23 |
| 226:5 | 220:10,20 | **lawsuit** | 10:17  11:14  76:4  152:17 | 190:2  193:23 |
| **Jim** | **King** | 7:11,23  200:1,5  201:16 | 152:20  180:17 | **lose** |
| 25:15  27:20  163:8 | 31:18,21  32:2 | 203:23 | **lived** | 39:4  64:9  67:23  98:18 |
| **job** | **kitchen** | **lawyer** | 153:7,7 | **loss** |
| | 19:2 | | | |

**Tyler Eaton Morgan Nichols & Pritchett, Inc.**

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

220:21
lost
122:3 204:6,9 211:17
212:1,8,12
lot
210:7
loud
8:9
louder
8:23
low
122:5
lower
92:2
lump
135:19 138:3,4,8,16
lunch
174:15 182:23 183:3,5
Lynda
4:4 143:7,8 160:18
L-O-B-E-R-G-E-R
75:23

**M**

mailbox
77:16 79:1
mailing
10:7
main
136:13
maintenance
18:16,23
major
111:12 194:13 195:3,7,10
215:5
making
20:22 32:14 54:21 123:17
130:20 200:4 201:10
224:14
male
67:10 138:18,20
manage
58:5
management
33:21
manager
163:18 225:7
managers
154:9
manages
110:5
manual
101:21 102:7,15,18,23
103:9 107:13
Margaret
75:22 152:7
mark
36:2 40:5 41:19 52:14
62:19 91:11 93:13 95:18
95:20 96:1,11 97:8
101:8,19 103:7,22

marked
36:4 40:9 41:23 52:17
62:21 96:16 97:14
101:12 102:1 103:4,10,11
103:15 106:11,14 189:20
190:17 193:4,15 194:9
197:11 198:2,21,23
199:7,14 210:19,21
217:10 224:5
marks
95:23
married
11:17 153:16 154:2 180:14
Mart
130:5
Martenez
11:4,6
matter
54:20 78:12 80:20
Mazda
206:9
McConnell
142:8
meal
78:21,23
mean
31:12 37:16 47:18 50:12
58:6 61:3 76:17 121:19
154:12
meaning
214:3
means
104:3 197:15
meant
37:16 38:15
Med
118:17
Medicaid
22:21,21
medical
22:20 84:8,14,18 92:18
116:10
Medicare
22:12,14
medication
72:18 80:3 109:17,17
113:5 130:4
medications
9:6 80:11,13 108:18,22
109:2,6,13
medicine
118:2,2,3,4,6,9
meds
80:6
meet
82:6
meeting
140:20 143:6 147:21
150:16,22 151:23 155:4
156:6 157:14 166:13,15
167:11,17 170:17 171:3

171:22 172:6,12 174:3
191:11
meetings
140:11 142:22 146:8,10
147:13 155:13 157:12
161:1
member
198:14
memory
88:8 190:8 191:4
memos
199:1
mental
130:17,21 204:15 208:6,9
208:23
mentioned
30:4 109:1 130:15 142:21
143:5 154:18 160:18
178:3 185:11
met
74:6,8 190:22 191:5
Method
104:3
Methods
103:23 104:8
Miata
206:9
middle
1:2 32:17 55:10
Middlemas
3:4 7:19 35:17 60:1 63:3
64:3 88:7 99:15 100:10
100:16 103:19 105:5,12
107:4,16 116:11 136:12
136:16,20 137:18,19
139:10 142:23 143:3
173:5,17,19 174:16
183:1 195:12 213:23
216:11 218:2,23 220:13
221:1,9,12 225:14
mile
41:10,11
miles
41:3,8 180:18
military
14:4
milk
122:2
minor
31:4
minutes
122:10
Mississippi
175:16
Mobile
27:2 29:11,17 47:12 48:6
Monday
40:16
money
14:20 129:21 205:18
212:21

Montgomery
1:9 6:11 71:21 85:14 90:1
131:4 182:1
month
15:19 22:7,8 206:21
monthly
135:17
months
13:18 20:7 48:4 107:23
108:13 130:15 158:6
202:12
morning
47:7 78:10 125:18 178:4
Morris
27:20,20,21 43:8,12,14
58:22,23 65:8,11,17
77:9 82:23 83:9 85:19
86:23 87:12 105:1
106:3 141:13 155:23
163:9,14,22 165:8,20,21
166:20,21 167:2 168:7
168:19 187:23 192:22
213:9 214:7,15 215:11
217:5
motel
161:1
mother
188:11,12 206:7
motion
121:19
motor
107:2,5,10
motorcycle
204:9 205:13
move
56:23 57:1
MRI
42:16 69:16 82:14 85:3,7
87:9 89:2
muscle
89:3
muscles
82:15 89:5,8

**N**

N
2:1 3:1 4:1 5:1
name
6:22 7:4,8 14:17 15:1,3
16:4 17:5 25:17 27:3
53:7 73:18 75:21 84:10
110:3,12 112:5,7,8,11,17
112:22 113:15,16 116:17
116:19 117:20 118:21,22
138:23 139:17 152:6
155:20 160:19 165:2,8,9
165:17 167:19,21 174:23
184:4 191:7 221:21,23
named
179:16
names

142:13 160:13,16 184:1,22
Nanfro
114:15,19 115:14,20 116:23
nature
149:5
near
110:23 111:8
nearsighted
222:21,23
neatly
170:1
necessary
2:15
neck
122:21 131:9
need
8:6,8 9:1,3 42:15 69:16
77:12,21 92:21
needed
59:13 189:13 190:12
205:18 212:21
needing
163:23
Neenah
18:12
neither
226:16
never
121:1 149:17 179:6
new
101:1
newer
223:3
Nicole
191:17
night
18:16 19:2 48:15 49:17,20
51:13 58:10 61:10 73:10
133:18
nightmares
131:18 133:7,12 201:10,23
204:10 205:4
nodding
143:10
nods
8:9 143:9 159:11
normal
44:16 53:22 54:9
normally
49:6 78:4,5 212:6
NORTHERN
1:3
Notary
1:23 2:8 6:4 226:23
notes
148:14 172:5 173:16,18
notice
99:4
noticed
152:8
November

1:19 6:12
number
  9:22 40:21 41:4 107:2
  193:6,11 194:19 197:13
  211:13
N-A-N-F-R-O
  114:15,16
N-E-E-N-A-H
  18:14
N-I-N-A
  18:13

_____ O _____

O
  2:1 10:14
oath
  100:2
object
  60:1 99:15 100:10 105:5
  107:17 195:13 213:23
  216:11
objection
  63:4 64:4 100:17 105:12
objections
  2:16,19
objects
  169.4
occasion
  144·10
occur
  32:4,22
occurred
  33:19 37:5,8 56:5 60:21
  64:13 129:9
October
  154:3
odd
  16:1
offend
  159:2 163:6
offended
  160:2 162:7
offensive
  162:20,22
offered
  2:21 207:23
offhand
  182:21 185:1 200:17
  212:11
office
  29:19 116:1 146:15 147:1
  166:6 220:23
officer
  65:5 67:8 71:17
offices
  111:1,6,7
Off-the-record
  7:21
oh
  13:17 15:18 32:11 65:20
  145:2 160:20

oil
  52:8
okay
  8:12,18 11:21 14:13 15:22
  16:21 28:11 29:23 31:5
  35:14 36:7,27 37:5,21
  38:3,17 40:11 43:1 44:9
  47:10 49:23 50:12 51:3
  51:13 52:10 53:7,20
  54:4 55:15 60:15,18,22
  63:10 69:10 82:7 87:13
  88:7 93:16 95:9 96:1
  96:10 99:11 102:13
  106:4,7 109:1 117:18
  118:19 135:7 140:6
  141:2,18 143:21 144:13
  145:16 146:17 147:7
  148:6 149:22 150:20
  151:15 152·17 153:13,19
  155:3,17 156:21 158.7
  158:14 164:12 166:12
  167:6,19 169:17 170:23
  171:4,21 173:14 176:8
  177:10,18 178:3,16,23
  179:11 180:6 182:19,22
  183:4,16 187:21 188:1
  189:8,15,18 190:15
  191:6 192:6 194:1 195:2
  195:8,16 196:20 198:9
  198:12,19 199:10 201:14
  203:3,17 204:3 205·4
  206:10 208:7 209:12
  210:7 211:6,23 212:20
  213:20 215:4 218:2,11
  218:16,23
old
  150:10 206:8
older
  163:15,19
once
  59:18 62:3 112:3 113:3
  146:11 153:22 180:22
ones
  31:4 62:5 212:16 223:3
one-on-one
  161:4
on-the-job
  25:6
opened
  29:19,20,20,22 38:12
  49:1
opening
  175:22,23
operating
  89:10 107:10,15
operation
  141:14,17 173:12,13 174:7
  181:5 201:12 202:1
  208:13
operational
  54:7,14

opinion
  63:22 220:20
opportunity
  201:4 209:6,7
opposed
  185:4
options
  212:9,9,13 213:11
oral
  6:14
original
  90:17
originally
  19:15 85:8
other's
  180:7
ought
  184:13
outside
  95.6 120:4 161:7
overview
  54:1
owned
  224:19
owns
  11-3
Oxmoor
  3:6
O'Conner
  155:18 156:4,17,20,23
  158:15 159:1,5,17

_____ P _____

P
  2:1 3:1,1 4.1,1 10:14
page
  5:4,11 103:10 106:21
  211:4,14 218:8 219:4
pages
  52:20
paid
  22:20 134:12
pain
  72:18 90:22 92:5 108:22
  118:20 121:19 122:4,13
  122:15 123:3,11,14
  130:3 131:9 208:5,9,12
  208:22
pair
  223:4
pamphlet
  218:17
Panama
  10:15 24:17 25:3,10
  29:10,11,14,15 30:2
  32:23 33:16 35:10,13
  38:11 40:18 45:11 46:14
  47:1,11,12 50:14,17
  51:19 54:18 61:9 62:7
  74:3 76:2,6 81:11,16
  82:2,8 86:19 87:2

110:15 111:9,11 115:21
  147:2,3 161:2,13 166:6
  181:2,15,21 221:19
panhandle
  202:9
paper
  129:23 168.1,15 170:22
  171:6,10,13,17 172:15,19
  224:11
paperwork
  168:9 169:3
Pardon
  27:5
Parker
  142:19,20 143:16 155:21
  155:22 159:15,23 160:3
  160:6
Parkway
  3:21
part
  50:13,16 54:9 56:23
  68:23 69:3,6,18,19,22
  71:1 92:2,6,9 94:19
  96:6 123:4,6 125:13
  203:19 210:16 220:14
particular
  18:5
particularly
  202:8
parties
  2:3,19 226:17
parts
  89:10
pass
  184:19 188:16
passed
  33:20 34:3 187:4 189:16
passenger
  33:1
Pastor
  207:8
pay
  22:23 23:6 26:16 135:20
  205:17,18 206:1
payments
  204:8 206:19 224:14,22
peak
  203:10
pension
  149:8,19
people
  114:2 120:2 147:16 214:16
period
  98:4 121:8 182:7 188:18
person
  74:6 86:10 134:7 142:11
  165:3,4 187:5
personal
  78:21 169:3 184:8,13,16
  185:3 190:12
person's

163:3
phone
  43:10 65:17 164:16
  166:22 196:8,15,22
photograph
  96:13,20 97:23
physical
  10:9 183:8,14,23 184:17
  184:20,23 185:4
physicals
  184:9
physician
  108:16 207:11
pick
  50:6,22 145:5 186.22
  187:1,13,15
picked
  35:12 73:13,14 74:8,8
  75:18 85:23
picking
  154:7
pickup
  50:20
pickups
  51:6 61:22 62:1
picture
  97:11
pigeon
  168:23 169:6,15
pills
  117:13,19
pizzas
  14:12
place
  3:15 7:18 19:1,9 50:19
  63:4 64:4 72:13 82:20
  84:15 146:6,18 147:20
  157:11 166:5 174:2
  180:9
plaintiff
  1:6,12 3:3 107:18
plan
  149:8,19 150:5 219:7,18
plans
  150:13
play
  119:3
please
  6:23 7:2,4 8:21 40:15
  192:12 204:18
pleased
  219:5
point
  24:16 39:5 46:1,20 55:10
  56:21 61:18 62:15 68:1
  70:22 77:2,10 93:16,21
  95:14 98:19,21 108:2
  130:3 131:20 144:20
  184:11 185:15 186:4
  188:10 192:16 197:5
  202:23

**FRANK FISCHER**
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

| | | | | |
|---|---|---|---|---|
| police | pnor | 64:22 106:7 169:10 | 143:22 144:2,14,19 | refused |
| 39:10 43:3 62:23 63:4,12 | 2:22 25:8 30:8 32:7 | putting | 204:21 207:9 208:14,14 | 51:11 168:3 172:15 |
| 64:5 65:5,15 66:20,22 | 65:1 78:1 120:7 | 60:6 105:18 168:19 | reason | regained |
| 67:3,7 71:6,7,12,17 | probably | 170:13 | 9:7 10:4 18:5 60:5 61:4 | 98:23 |
| policies | 15:20 78:9 92:21 99:10,11 | | 61:7 87:5 96:21 97:1 | regarding |
| 102:17 | 180:11,21 203:18,20 | p.m | 141:2,18 161:16 163:13 | 199:2 |
| policy | 215:3 216:17,18 | 40:17 46:23 47:21 61:10 | reasons | Registered |
| 104:18 107:1 128:5 193:9 | problem | | 141:5 | 1:22 2:7 6:2 |
| 193:18,20 | 92:15,19 125:12 133:3,6 | **Q** | reattach | regular |
| port | 163:15,19 169:18 185:11 | quarter | 89:8 | 38:7 45:2,6,22 46:19 |
| 117:14 | 225:9 | 146:12 | recall | 48:10 51:2 111:22 |
| position | problems | question | 24:21 26:22 33:18 34:6 | 114:10,13 119:22 120:4 |
| 20:17,19 23:2,13 27:23 | 93:6 118:20 121:18,19 | 8:20,22 60:2 99:16 | 53:17,19 65:11 71:16,18 | related |
| 73:23 | 122:13 124:3 | 100:11 104:22,23 105:6 | 73:2 74:23 75:2 76:20 | 108:19 123:9 124:18,21 |
| possible | Procedure | 105:13 127:11 195:13 | 148:19 149:5 151:4,21 | relates |
| 136:19 | 6:8 | 199:5 211:2 214:1 | 162:14 164:6 170:16,18 | 199:20 |
| possibly | proceedings | 217:15,17,18 218:20 | 172:4 177:6 198:17 | relating |
| 160:10 | 6:15 | questioning | 209:12,17 219:12,15,16 | 2:14 139:19 |
| posted | process | 104:5 107:17 | recap | relation |
| 83:22 84:1 | 175:19 177:1 | questions | 85:18 93:5 95:17 | 39:17 158:1 |
| pounds | produced | 2:17,18 7:13 8:4 9:9 | receipt | relationship |
| 177:16 | 173:16 | 63:6 86:12 127:18 | 102:6 | 11:5 |
| power | Professional | 139:12,13 140:22 143:1 | receive | release |
| 70:17 | 1:22 2:7 6:3 | 143:4 174:14 196:21 | 13:21 22:4 87:20 90:2 | 136:8 |
| Preferred | profits | 197:2 211:1 220:3 | 100:23 101:5 119:10 | remain |
| 103:23 104:3,8 | 224:13 | 226:9 | 127:8,11 129:1 197:6 | 71:9 |
| prescribed | program | quick | 198:4 | remember |
| 72:18 130:3 | 13:13 53:1 129:19 130:13 | 134:17 | received | 14:1,17 15:1,2 17:5 18:19 |
| prescribes | 130:14 | quit | 22:20 88:18 90:6 102:14 | 21:4 23:2,5 26:11,15 |
| 109:23 118:13 | programs | 18:2,4 | 102:22 106:17 119:19 | 27:2 29:18 31:6,8,13,16 |
| prescribing | 83:6 | quite | 120:3 125:1 127:22 | 32:5,13 33:17,22 34:1,5 |
| 113:4 | proper | 14:2 51:1 158:19 | 193:8,21 218:17 | 34:18,21,23 35:4 36:15 |
| prescription | 56:14 58:19 | | receiving | 36:17 37:23 38:1 39:14 |
| 139:2 222:2,10 223:6 | properly | **R** | 21:22 134:20 135:15 | 41:4 43:18,23 45:5 |
| prescriptions | 105:3 | 3:1 4:1 226:1 | 144:21 198:17 | 46:8 47:5,6 49:2 51:16 |
| 129:18 130:7,9 | provided | radiation | reckless | 53:3 55:13 59:5 61:1 |
| present | 6:7 | 115:8 117:9 | 171:9 | 62:1,2 63:14 65:6,13,22 |
| 4:3 147:7 158:8,12 167:2 | psychiatric | radio | recognize | 66:7 67:4,11 68:3,6 |
| 191:12 | 127:23 130:21 | 125:19 | 165:10 | 69:21 70:2,3 72:10 |
| presented | psychiatrist | raise | recollection | 73:3 74:14,19 76:19,23 |
| 100:19 | 207:2 | 82:12 89:6 | 75:7 147:18 | 77:14 78:2 79:22 84:12 |
| pressure | psychological | ran | record | 85:7 86:13,14,15 87:3 |
| 80:4,7 109:3,16 110:6 | 130:22 | 31:13 | 6:23 7:20 148:17 172:8 | 88:5,19 89:17 91:13,14 |
| 112:1 113:5,11,22 118:1 | psychologist | reacted | records | 93:15 94:2,8 95:16,22 |
| 118:16 120:10 | 207:3 | 213:6 | 136:10 | 97:16 98:1,2,4,5,7,20 |
| pretrip | Public | read | red | 100:3 102:9 117:21,22 |
| 51:18 52:4 53:1,5,18,22 | 1:23 2:8 6:4 226:23 | 36:22 40:14 64:2,5 | 31:14 39:1 | 132:15 135:22 138:21,23 |
| 54:10 55:2,17 | pull | 102:16,23 125:20,21 | reduced | 142:13 144:9 145:10,11 |
| pretty | 30:19 | 168:1,2 | 226:10 | 146:17 148:23 150:4 |
| 28:15 48:14 175:6 203:16 | pulled | reading | REEXAMINATION | 151:22 156:2,3,19 |
| previous | 68:14 | 2:10 | 5:7,8 220:8 225:5 | 157:20,23 158:7,11,18 |
| 25:10 199:7 | pulling | ready | refer | 159:15,22 160:9,12,15,21 |
| previously | 28:16,18 30:5 45:20 | 140:23 156:16 214:18 | 108:15 | 163:11 164:9 165:7 |
| 105:2 | 71:15 | real | referred | 169:9 170:5,15 171:23 |
| price | punch | 93:21 134:17 | 93:17 | 172:1,3,14,17 173:8 |
| 212:5 | 17:12 | realize | refresh | 176:5 177:3,9 182:21 |
| Prime | purposes | 40:22 149:19 | 190:7 191:4 | 184:22 186:6 193:2 |
| 110:3,11,13,14 111:23 | 139:18 | realized | refrigerating | 194:23 195:22 196:12 |
| 113:17,18,21 114:3,7,9,14 | put | 149:20 | 32:3 | 196:20 197:17 198:6,18 |
| 118:17,18 133:10 138:17 | 16:11 20:7 24:20 27:10 | really | refrigerator | 199:9,18 200:17 212:4 |
| 184:6 | 56:7 57:15,21 61:6 | 43:23 60:4 90:12 142:4 | 122:2 | 212:11 217:6 220:22 |

**Tyler Eaton Morgan Nichols & Pritchett, Inc.**

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

221:22 225:11

**remission**
117:2

**remove**
94:22,23

**renting**
11:1

**rephrase**
8:22

**report**
36:9 43:6 62:23 63:4
64:5 199:11,20

**reported**
1:20 26:8 65:20 87:14,17

**reporter**
1:21,23 2:7,8 6:2,3
196:13 216:15

**represent**
96:12 97:10 103:8 139:18

**representation**
63:20

**representing**
21:21

**represents**
226:12

**request**
125:5 132:13.14.17 136:9
139:7

**requested**
132:4

**required**
51:17 107:9.13 183:9

**resign**
19:7

**respective**
2:4

**response**
148:7 156:12

**responsibility**
50:4

**restaurant**
146:16 147:5 157:21

**restaurants**
157:19 202:15

**restricted**
126:4

**result**
121:21 204:16 205:9,10,13
208:6,10,17,23 226:18

**resulted**
124:15

**retire**
140:16,23 141:1 144:7,16
148:9 149:15,21 150:5
151:2,7,12 156:16,16,18
161:10 162:1

**retired**
149:23

**retirement**
140:14 142:2 143:14,15
144:4 146:5 146:5

147:9,20 148:8,22
149:3,7 150:13 151:19
154:11,13,22 157.6
159:23 160:11 162:16
211:18 212:2 219:7,14
219:18

**return**
46:14 77:1

**returning**
45:11 81:7

**returns**
23:11 50:9,11 51:9,10
61:21 62:2

**review**
36:6 40:6 41:20 178:17
179:13 192:10,14,18
193:1,9.18 194:2 195:4
217:1

**reviewed**
179:14 192:18,21 217:1

**Reviewing**
10:1 36:7 42:2 52:19,22
63:11 96:20 97:23
101:14 102:8 103:13
106:20 190:3 193:19
194:18 199:4 219:9

**revisions**
102:18

**revoked**
10:4

**rid**
152.2 201:4 214:18

**ride**
20:13 57:4 174:10

**right**
9:18 20:18 21:12,13 23:18
24:7 32:16 34:13,22
40:4 41:18 42:5 44:20
45:1,12,17 47:13 49:5
50:21 51:7 53:2,3 55:8
60:23 65:21 67:5 77:14
78:14 85:21,22 89:8,14
91:15 93:8,9 99:3
100:15 101:5 102:20
105:4 108:19 112:21,23
119:12 120:6,7 134:22
135:9 140:4 141:6,7,12
141:12,21,23 143:8,17,19
144:1 145:6 147:3
151:15 154:8,20,23
159:12,13,14 164:15.23
165:19 166:10 167:1,16
169:14 171:18 173:22,23
175:10,13 176:10,14,15
176:22 177:15 181:7,9
182:22 184:7 186:23
190:7 191:14 195:2,18
196:9,11 197:20,22
198:8 200:12,14,19
202:2,7,15 203:19
205:2 209:4,11,22

212:15,17 215:16,17
216:5 218:4 219:20
220:2

**right-hand**
32:14 178:14

**ring**
165:13 219:2

**road**
3:6 33:16 64:7 70:22
71:1,3

**roads**
35:23

**roadway**
64:11

**Robinson**
142:18 155:19

**room**
19:2 72:1,6,9.13,22 73:12
89:11 131:4

**roughly**
135:11 182:6

**round**
17:12

**rounds**
17:11

**route**
28:20,20 29:7,17 38:7,10
38:19 46:13,19,23 47:12
47:15,18 49:17,21 50:13
50-17 51-3 181:1,3,12,15
181:20 182:2

**routes**
50-1

**rule**
80:22 81:13 103:14
104-12,16

**rules**
2:13 6:7 104:9 107:1

**running**
31:10

_____ S _____

**S**
2:1 3:1 4:1

**safe**
144:22

**safety**
58:19 101:21 102:6,15
103:9 104:16 105:22
106:4,7 107:1,9,13
140:20 146:8,9 147:13
147:20 155:3,13 157:14
217:7

**SAITH**
225:17

**salesman**
165:22 166:4 168:12

**salesperson**
167:3

**sat**
70:19 71:4

**Saturday**
49:11

**Saturdays**
49:14

**saw**
84:11 105:7 107:21 134:4
149:17,18 201:12,13

**saying**
66:4 153:19 156:4 159:15
160:9,21 162:15 192:1
209:20 217:6

**says**
40:15 42:11,15 53:13 54:6
69:16 190:6 191:15
198:13 208:4 211:15
219:5

**scared**
93:20

**scene**
63:13,21 67:2 70:14
75:16 81:21 82:4 86:2
86:8 95:4

**schedule**
186:16 187:16 188:7

**scheduled**
76:8 117:8 188:9

**school**
12:7,8,11,17,19,20,21 14:6
14:8,9,12,13,15 119:4
222:6

**scrape**
169:22

**scraped**
169:14 170:2

**scraping**
168:9

**screen**
72:9

**Sea**
183:22 184:5

**season**
203:10

**seasonal**
202:3,4,8

**seat**
42:16 44:10,14,16 54:6,13
55:20,23 56:7,14 57:10
59:10 61:11 62:8,10
69:17 70:4 90:15 94:15
94:23 95:15 99:14
100:7,14 103:12,17
104:10,19 105:3 107:14
107:19

**second**
7:20 45:11 71:2 103:20
187:13 196:22 197:6
211:14

**section**
52:9 169:2

**security**
9:11 16:3,5,7,13,22 21:9

21:17 22:5 126:17 127:9
127:12 134:21 135:8,15
136:10 220:15,16 221:3

**see**
37:21 59:1,6 72:19 77:20
79:11 88:21 89:1 97:20
99:1 108:2 110:12
111:23 112:2,14,19,19
114:12,14 134:8 173:6
174:8,17 191:7,9,14,18
198:12 208:19 211:20
212:12 219:8,10,11

**seeing**
98:2,7 194:23

**seen**
63:7 71:23 84:13 85:15
93:11 112:20 113:1
129:4 139:8 194:16,19
194:22 197:15,16 199:16
201:9,22,23 207:2,10
219:1 220:10

**sees**
108:13 110:7

**Segrest**
3:18 5:5,7 6:21 7:9,22
92:21 93:1 104:6
134:16,19 136:6,13,17,21
139:6,11 220:5,8 225:2

**seldom**
80:21

**select**
185:16

**sell**
204:10 205.12,22 206:12
212:20,22 213:16

**semi**
31:11

**send**
30:15 50:7 84:16 129:21

**senior**
12:12 14:12 145:5 186:20
187:5

**seniority**
145:1 185:16

**senses**
98:23,23

**sent**
50:6 82:13,17 85:3,4,5,6
85:8 208:4 211:1

**separate**
208:16

**September**
197:19

**series**
8:4

**serious**
120:10 121:14 158:20

**service**
14:4 104:1,8 162:15

**Services**
1:7,13 3:10 102:15

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

set
45:20 154:1 170:1
severe
208:5,9,12
shakes
79:23
shelf
169:1
shelving
168:8
shift
45:12,22 46:2,7 48:10,11
78:3,8,20 79:6,11,19
81-4,7
shock
134:10
Short
92:23 134:18 218:3
shoulder
42:13 44:19,22,23 56:8
56:18,23 57:5,6,10,11,17
58:6 59:11,13,23 61:12
62:13,14 69:13,22 73:6
82:12,16 89:13,19 91:16
93:6,14 99:13 100:7,13
105:8,11,15,18 118:21
119:1 121:23 122:13,18
123:5,6,10 124:9 137:2
137:10,11 164:3 167:10
201:13 207:21 208:12
208:17
show
36:1 40:4 41:18 52:13
56:12 62:18 96:10 97:7
101:7 106:13 147:16
149:9 161:8 197:13
199:2,10 210:17 217:12
218:16 223:22
showed
89:2 171:6 194:4 199:7
showing
136:14 193:8
shown
97:21 190:21
shows
63:18
shuttle
20:8,17 23:1,8,19 24:8
25:2 28:12 51:4,17
104:13
shuttling
23:16
side
42:14 69:14 103:21
109:14,15 111:9,11 122:3
sign
101:4 168:1,3,4 170:22
172:16 204:7 217:19,20
218:8 224:11
signal
64:10

signature
2:9 36:18,19 42:18,21
101:10,15 102:11 193:12
211:3,8 224:2,7
signed
102:19 106:17 191:3 193:8
211:6 224:22
signing
211:8
silos
14:16,16,23
similar
97:21
Simmons
53:14
simply
54:20
single
30:11
sir
6:23 7:4 35.2 93:22
94:17 135:20 160:20
sister
74:7 75:18 82:6 132:15
152:5,10.18,21 153:5,8
159:10 167:5,8 168:15
171:2 172:11 174:1
191:12 200:11,20 204:7
206:15,18 224:10.21
sister's
152:6 173:18
sit
64:23 125:19 167:11
site
74:5,11 98:11.14
sitting
67:12 131:21 165:23
168:13
six
20:7 108:13 117:7,16
130:15
sleep
64:8 78:4,5 79:10,18
slid
32:16 41:1
slip
108:7 167:23 172:15
small
14:11 155:5 156:5 158:17
158:20 159:18
smoke
161:7
smoky
142:18,18,20 155:19,19,21
159:15,22
Social
9:11 21:8,17 22:5 126:16
127:8,11 134:21 135:8
135:15 136:10 220:15,16
221:3
softly

8:19
sold
19:9 206:20 212:18
213:10,11 224:12
somebody
27:1 32:14,16 39:10
43:22 53:9 66:20 67:4
67:7 72:15 73:12 75:12
75:13 82:5 94:23 95:8
152:8 163:6
soon
135:1,7 213:15
sooner
37:2,14 42:12
sorry
7:3 10:18 11:10 12:2 13:5
15:12 17:21 27:21 37:7
42:20 43:13 49:18
50:15 57:7 66:12 67:17
70:10 72:7 73:20
83:23 89:20 91:7
96:23 102:10 108:9
111:18 115:19 126:1,22
132:19 133:5 136:2
143:2 151:8 154:7 167:7
192:1 200:7 204:17
221:16 223:16
sort
103:21
sound
89:14 176:19 219:21
sounds
176:22 196:10
source
127:15
sources
126.18
south
40:19
southbound
64:7
speak
7:1 67:1
special
30:19,23 79:16
specifically
43:18 156:4
speed
41:12
spell
25:16 31:22 221:7
spend
140:17
spider
97:21 98:6
spoke
87:10
sports
119:3
spring
202:12,18 203:15,17

St
3:21
stand
122:10
standard
28:20 46:18 51:3 127:17
star
103:11
Stames
3:14
start
8:19 61:10 140:6 147:16
158:10
started
19:20 24:8 29:9 35:10
46:9 47:4,8 48:5,7
89:9 154:15 172:13
176:20
starts
22:14 122:8
state
6:4,22 7:3 9:19 22:21
226:4
statement
40:15 42:4 64:1 69:12
152:13
statements
144:14
States
1:1 6:8
stating
224:12
steering
69:4,8 96:7
stenotype
226:9
step
103:20
steps
52:3
stick
112:4 145:6
sticking
71:2
STIPULATED
2:2
stipulation
6:9
stock
212:4,5,8,9,13 213:11,12
213:16
stomach
90:10 91:17 94:16
stop
38:21,23 41:1 42:13 50:19
50:22 51:6 55:9,14
56:3 61:18,20 62:15
70:6 94:21 122:11
210:3,7,15 223:12
stopped
55:12

stops
51:15
store
169:2
strap
99:13 105:8,11,15,19
street
6:11 76:5 110:18,19,22
111:12,15
strength
122:3
stretch
210:5
stretches
210:5
stuck
17:13
stuff
53:6 125:10 147:17
158:22 168:7,9,19,21
169:5,22 170:11,13
201:21
substance
86:15
sudden
37:18 39:7 68:14 131:22
suffer
32:9
suffered
93:4 129:7,11 204:15
208:10,16
suffering
208:5,9,17,22
Suite
3:7
sum
135:19
summer
202:12,18
summoned
43:3
supervision
226:11
supervisor
25:13,19 26:3,8,13,23
27:13,18 28:2 53:4,15
76:16 140:13 145:14,18
155:17 162:18 163:1,18
187:22 225:7
supervisors
34:7 142:1,2,6 143.13
151:14 154:9,19 160:8
162:14 179:1
supposed
46:3 49:8 55:5,9 56:11
56:18 222:15
sure
16:17 18:21 52:11 54:13
54:15,21,23 55:7,15
60:14 71:22 73:16
75:12 104:6 107:23

Tyler Eaton Morgan Nichols & Pritchett, Inc.

**FRANK FISCHER**
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

108:14 111:15 112:9
116:8 118:12 119:17
136:7,11,16,20 139:8,10
151:17 157:3,8,9 209:21
210:13

surgeon
85:10 116:13

surgery
89:12,18,22 93:7 116:3,4
116:6,14 163:23 164:2
164:11

surprised
164:3,9,20 173:20 213:21
214:4,5

suspended
10:4

sustained
120:21 131:6

switch
24:2

switched
29:21 47:14,19 49:4

switching
29:17

sworn
6:18

Syfrett
221:6,15

symptoms
121:20

Sysco
1:7,13 3.10 19:14,16,21
20:2,23 24:19 27:9,14
27:16 30:1,9,11,15 31:3
33:21 44:4,6 56:12
57:9 73:19,21 75:13,15
76:21 77:2 83:12 84:22
86:9,20 87:4 100:20
102:14 105:18,21 106:7
125:6 128:7,10,17,19
134:11 139:18 145:17
150:1,13 152:23 153:17
154:9 162:14 163:18
165:1,22 174:18,19,22
175:1,2,12,12 176:9.13
176:20 177:1,20 178:17
179:22,23 182:9 183:18
185:20,23 190:5,9
195:3 200:5,21 207:16
209:14 211:20 225:7

Sysco's
202:3 219:6

S-Y
221:8,11

---

| T |
|---|

T
2:1,1 3:18 7:8 37:11
103:19 226:1,1

table
131:21 165:23 168:13

take
7:9 8:9,16 9:1 12:22
13:15 14:14 17:11 18:8
23:9,10,11,14 30:16
46:13 50:10 51:19 53:4
71:19 74:2 76:1 92:22
109:2,18 118:10 134:16
146:6 157:11 164.12
166:5 174:15 180:9
182:23 183:17 186:15
189:2,3 190:19 193:6
195:8 213:20 217:16

taken
2:5 51:12 70:13 80:2,6
92:23 96:13 98:10
134:18 183:3 204:8
218:3 226:8

talk
44:2 63:12 86:23 150:12
155:5 156:5 158:17,20
158:21 159:18 172:12
188:1 214:16 217:4,23

talked
71:17 125:11 131:13,17
154:10 174:1,10 200:3
200:15 201:7,14

talking
8:19 34:1 65:6,14 93:3
142:3 143:15 147:17
158-10 200:10 214:9
219 17

tall
182:15

tape
148:17 172:8

Taylor
64:7

Tech
30:7

Technical
13:2.7

telephone
196:2

tell
31:5 34:13,15 42:10 43:1
43:11,14,17 52:3 53:21
65:8 67:6,21 77:17
83:9,12 88:20,22 97:20
101:9 106:3,6 109:5,9
121:18 139:4 140:13
150:23 155:9 156:14
163:21 165:12 167:16
171:12,15 192:22 200:19
201:18 213:5 224:1

telling
151:11 166:1

ten
113:20 114:6 180:18
211:13

Teresa
1:20 2:5 6:1

terminated
139:22 140:2,8 141:3,10
141:16,19 154:16 165:1
168:5 171:5,11,16 173:10
173:11 174:6 195:5
203:23 204:16,21 205:1
205:5,9,14 207:3,6,11
207:12 208:11,18,20
212:12 213.13,16,22
214:8 215:6,10

termination
139:20 145:17 153:17
158:2 176:17 190:20
194:6 195:18 204:4
207:16 208:7 209:1
211:16

test
72:5.8 220:22

testified
6:19 107:18 143:12

testify
88:8 173:20

testimony
100:2

tests
84.16,17

Thank
225:14

therapy
220:23

thereto
2:22 226:10

Thermo
31:18,21 32:2

thing
8:11 12:21 35:3 39:9,13
50:20 68:5 78:22
111:14 136:13 159:16,17
161:20 169:19 224:8
225:6

things
144:11 151.9

think
13:17 16:23 19:12,19
24:14 26.19,21 32:20
35:16,17 46:9,16 47:4
48:5 50:21 53:16 60:10
63:9 67:22 68:22 69:5
70:23 71:7.14,14,21,22
72:23 73:15 74:4,7,12
74:22 75:5 77:14 78:17
79:17 81:9 82:10,13
83:5,11,20 84:3,4 85:4
86:6,11 87:12,19 88:11
90:17,20 91:1,4 94:6,20
96:4,5 101:2 107:22
109:19 111:14,21 112:9
113:7 116:7 118:11
119:17 122:17 125:9
127:19 128:15 132:18
134:15 135:9.16 138:22

141:3,7,9,19,21 143:19
144:12 145:22 146:1,7
149:8,20 150:11 153:11
153:18 155:19 157:7.18
163:3,14,19 172:22
175:6 178:8 180:15,15
182:17 183:6,11 196:7
196:10,19 197:8 201:22
203:20 205:2 206:8
209:3,7,9 213:2,17
210:20 215:6,9,20
216:7,19 217:15 220:22
223:10,21

thinking
18:20

thought
59:9 128:23 144:23
154:15 163:9 169:19
188:5 212:23 213:12
214:7

three
89:4 101:16 158:6 199:1

throwing
170:3

ticket
178:13

tie
170:1

time
2:20,21 9:2 16:13 20:20
20:21 22:13,19 23:22
26:4,6,14,17 29:19
30:11 31:17 34:16 38:9
38:12,19,20 44.10 45:3
45:7,9,13,14 46:6,9,12
46:16 47:3,9,17,20 48:2
48:12 50:1 51:2 55:21
56:3 59:12 65:15 73:5
78:7,13,15 79:18,20
80:15 83:6,21 86:5
87:1,11,21 88:17 90:5
98:13 103.1 107:20
108:14 111:4 112:2
123:7 129:5 131:19
133:8 134:23 135:10
137:4 140:19,22 142:9
144:6 145:10,11,13,16
148:20 149:2,2 151:6
153:4,6 154:10 157:23
160:10 176:17 181:4
184:12 185:15 188:10,18
188:20 189:9,13 212:3
216:2 219:21 223:2,5,7
223:12

times
59:16 107:14 113:1 140:12
181:1,12 209:15

tires
52:7 55:14

title
27:22

titled
42:3 52:23

today
8:1,6 9:6 25:9 31:2 32:8
33:14 34:14 64:23
88:15 92:16 94:10
100:3 121:20 139:3
152:9 222:1

told
43:15 58:20,21 59:12,17
65:4 66:8 67:22 75:1,7
82:23 83:3 87:12 89:2
105:10,14 120:8 124:17
124:20 140:16 141:13
151:6,16,19 161:23 164:1
164:10 165:9 166:16,20
168:1 170:21 184:12
192:10 194:1 205:1
208:8 209:1,8 213:21

Tonya
11:4

Tonya's
206:7

top
53:8

tom
82:15 89:3

town
16:10 139:2

tractor
23:20 24:6 31:15 45:2,6
51:19 54:2 63:18 70:23
209:14

traffic
64:10

trailer
13:1 23:9,13,14 51:11
57:9 70:9,20 71:1,2,5
166:9 191:11 209:14

trailers
30:5,12,13,14,20 32:18
33:4,11 35:11,12 40:18
50:5,9,10 59:9 62:4
63:19 70:22 182:17

training
30:4

transcript
226:13

transfer
24:20 175:21 176:7

transferred
20:16 23:1 24:17 25:1
26:12,17,23 175:11
177:4

Transportation
183:10

traveling
64:6

treat
116:23

treated

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

| | | | | |
|---|---|---|---|---|
| 85:15 113:10 128:2 | 1:20 2:6 6:1 | 59:22 | 33:20 34:3 64:6,8,9,9 | warning |
| 131:5 132:11 133:10 | TV | undergo | 67:16,19 107:10,15 | 105:2 |
| 213:4 215:13 | 125:20 | 115:6 116:2,5 | vehicles | wasn't |
| treating | twenty | undergone | 107:2,5 | 24:3 75:11 82:12 89:15 |
| 113:21 114:6 214:7 | 24:14 25:20 175:5,7 | 115:3 | verbal | 138:10 148:2 158:19 |
| treatment | twenty-five | understand | 105:2 | 170:21 171:13 209:19 |
| 22:20 84:18 90:2,6 92:19 | 155:10 | 9:8 15:23 56:17 58:18 | verify | watch |
| 115:3,10,15,17 117:9,10 | twenty-six | 104:12 107:11 120:8 | 54:6 | 125:20 203:1,4 |
| 117:13 125:2 127:23 | 155:9 211:20 | 139:20 149:22 156:22 | Verteen | water |
| 130:16 132:1,5 134:13 | twice | 158:4 174:19 178:20 | 142:14 | 52:8 |
| treatments | 113:3 | 181:3 185:14 194:11 | Vestavia | way |
| 115:22 | twist | 205:21 207:14 209:5 | 3:21 | 45:19 54:21 56:14 58:9 |
| treats | 92:11 123:16,22 124:10,14 | 210:22 211:7 213:10 | vested | 58:13,19 59:1 61:15 |
| 114:1 | 124:21 125:3,8 | 215:14 | 149:10 212:10,14,16 213:11 | 69:9 89:6 91:3 92:3 |
| trial | two | understanding | visible | 96:3,8 119:1 131:17 |
| 2:20 | 13:18 17:1 23:17 32:17 | 41:4 60:20 87:13 119:14 | 91:11 | 149:17 174:4 181:21 |
| TriCare | 33:4 35:22 40:18 51:4 | 207:22 211:16 212:1 | visit | 185:19,22 187:9 188:6 |
| 183:23 | 63:18 94:7 103:21 | 222:15 | 180:6,11 | 190:10 204:14 211:14 |
| tried | 109:19 111:5,16,19,21 | understood | vocational | 213:4,6 214:6,9 215:13 |
| 32:15 172:16 | 117:1 135:2,3,5,11 | 102:16,23 104:15 192:17 | 12:21 220:10,12,18,21 | wear |
| trip | 141:16 147:23 173:11 | 192:19 195:16 | volunteered | 55:23 56:15 58:12,19 |
| 55:10,14 56:21 61:16,19 | 174:6 183:11,13 196:8 | unemployed | 82:5 | 59:13 107:9,14 222:16 |
| 103:18 104:11,20 | two-thirds | 19:12 | vs | wearing |
| Tripp | 211:14 | unemployment | 1:6,12 | 44:9 58:9 59:1 99:13 |
| 139:17 | type | 21:6 | | 105:3,7 107:18 222:1 |
| Troy | 8:10 12:21 31:3 44:14 | unit | W | 223:1,4,6,20 |
| 33:19 74:6,7 75:9,19 | 51:22 70:8,10 72:14 | 31:18,21 32:2,3 | | web |
| 82:6 86:11 165:7,18 | 114:18,23 117:10,18 | United | W | 97:21 98:6 |
| 167:4 | 118:9 120:22 128:12 | 1:1 6:8 | 3:12 | Wednesday |
| truck | typewriting | unload | waist | 76:11 |
| 24:2 39:8,9 44:14 55:6 | 226:11 | 50:8 | 44:18 58:2,8 92:1 | week |
| 58:15 59:7 67:12 68:10 | typical | unloading | waited | 46:4 49:17,20 88:10,12 |
| 69:20,23 70:6,17,18,21 | 125:16 | 50:4 | 71:5 | 89:15 181:13 186:11,13 |
| 92:2 94:21 95:6 96:7 | typically | unusual | waived | 187:2,13 188:7 213:17 |
| 96:13,22 97:2,4,11 | 46:13 78:8,19 | 50:23 | 2:11 | 213:18 |
| 98:10,12,17 120:20 | T-H-I-R-M-A-L-K-I-N... | upkeep | wake | weekend |
| 182:9 183:10 | 32:1 | 207:1 | 201:9 | 180:10 |
| trucks | T.J | upper | wakes | weekly |
| 24:2 | 220:2 | 28:10 42:15 69:15 94:18 | 133:17 | 120:5 |
| true | | upset | walk | weeks |
| 226:12 | U | 142:4 143:22 144:2,14,19 | 53:4 150:21 | 48:3 117:7,16 145:3 |
| truthful | | 151:23 | walk-around | 186:15,17,19 |
| 211:10 | U | use | 52:6 55:6 | weigh |
| truthfully | 2:1 | 103:17 104:10,19 105:22 | Walk-in | 177:12,13 |
| 197:3 | uh-huh | 106:4 121:23 156:17 | 85:3,13 90:19,21 131:2 | weighed |
| try | 8:14 28:16 34:12 42:6 | 157:5 206:7 209:13,23 | 134:14 | 182:10 |
| 112:3 122:6 | 54:8 57:20 103:13 | 210:4,6,8 | wall | weight |
| trying | 157:2 171:20 184:3 | usually | 169:1 | 177:18,19 |
| 152:2 172:13 204:22 | 196:16 197:21 202:5 | 78:15 142:12 197:15 | want | welcome |
| 208:15,19 | 212:7 213:14 | | 10:7 52:21 112:19 127:18 | 9:2 |
| Tuesday | uh-uh | V | 209:7 223:23 | went |
| 46:5 49:8 77:12,23 | 8:15 145:12 | | wanted | 14:15 18:6 26:21 29:10 |
| Tuesdays | Umbach | vacation | 122:9 130:1 140:17 145:2 | 35:11 37:3 40:19 41:2 |
| 49:13 | 3:12 5:6,8 7:12 31:19 | 145:3,4 185:12 186:18 | 148:10 150:1 161:11 | 43:4,4 47:11 48:6 64:8 |
| turn | 139:12,16,18 173:15,18 | 187:17 | 162:1 189:5 | 64:10 81:20,21,22 82:10 |
| 32:14 168:11 178:14 | 173:22,23 174:13 | vacations | warehouse | 82:20 83:16 88:21 89:1 |
| 186:11,14 | 182:22 183:4 216:13 | 185:16 188:9 | 17:10 23:10,12 51:12 | 89:10 90:11 94:4 111:5 |
| turned | 217:22 218:4,19 220:1 | valid | 217:5,8 | 161:2,7 184:16 185:3,8 |
| 17:13 40:19,20 106:21,22 | 225:5,12 | 9:16 | warehouses | 185:10 201:12 215:19 |
| 172:22 | unable | Valley | 23:17 | 216:3 |
| Turquitt | 125:8 | 13:2,4,6 30:6,7 | Warfarin | weren't |
| | uncomfortable | vehicle | 117:22 | |

Tyler Eaton Morgan Nichols & Pritchett, Inc.

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

99:13 223:14

**West**
76:5

**whatsoever**
119:19

**Wheat**
4:4 143:8,16 161:12 162:8
217:23

**Wheat's**
160:19

**wheel**
69:4,9 96:7

**wheels**
68:14

**Whew**
97:16

**whichever**
53:6

**Wind**
183:23 184:5

**window**
42:16 68:20 69:17 134:8

**windshield**
68:16,18,21 69:1 91:2
96:2,2 97:11,20 99:5,8
99:12,21,22 100:4,8,15

**wipe**
124:4

**Wisconsin**
12:6,15 14:21 16:8,10
18:12 20:3 24:10 25:5
28:12,17,19 29:3,3 30:2
31:15 153:1,3,4 174:20
1/4:22

**witness**
2:10 6:13 58:23 79:23
143:2,9 159:11 200:1
226:14

**witnesses**
66:18 134:2

**woke**
79:20

**woman**
177:10

**Wong**
116:15,16,23

**Wong's**
116:17

**word**
156:17 157:5 159:23

**words**
34:15 57:11 81:20 181:19
203:3

**work**
14:7,9,18 15:4 16:22
18:17 19:11 27:11 30:9
46:14 47:11 49:22 76:8
76:13,17 77:1 78:1
87:21 103:23 104:3,8
126:9,14 127:6 174:18
207:19 218:12,13 225:10

**worked**
15:16 16:3,5 18:6,11 19:13
25:20 27:14 29:23
174:19 175.4 176:8,16
214:16

**worker's**
7:10 87:15,18 119:11,15,16
119:20 134:12 140:3
141:10,20 191:16,16

**working**
15:11,14 16:13 17:16,20
19:4,20 24:13 25:4
30:10 33:16 45:23
48:17 57:8 76:22 77:4
78:3 82:12 84:22 107:8
148:10 152:22 169:21
177:20,22 181:4 190:13
202:21,22 217:5,7

**workload**
202:17

**workmen's**
82:11,18 83:17,19 87:23
90:18 120:2 125:6
132:8,11 134:11 174:7

**work-related**
83:16 84:22 119:8

**worn**
222:4,7

**worse**
133:22

**wouldn't**
41:9 136:5 172:16 177:11
203:11,12 209:23 214:16

**wreck**
37:5,8

**write**
59:21 172:13

**writes**
109:21

**written**
51:23 52:1 60:16 61:2
107:11 136:9 171:10
210:23

**wrong**
174:4,5

**wrote**
59:19 69:13 172:18,20
178.13

**W-O-N-G**
116:18

---

**X**

**X**
5:1

**x-rays**
72:14.17 73:1,4

---

**Y**

**yard**
31:17 40:18 55:7 59:8
62:3 79:2 126:9 166:7

**yeah**
11:13,20 15:10,18 16:20
21:3,18 23:4 24:18
30:7 31:9,12 32:12
33:5 34:9 36:11,21
38:16 41:11 54:3 59:15
61:2 70:18 72:2 73:22
81:1,2 88:1,13 90:21
103:16 110:8,20 132:23
136:12 138:6,7,14
143:23 146:3 153:23
157:15 159:21 160:23
161:22 168:20 174:12
175:7 176:11 177:14,17
181:10 189:17 191:9
193:10 203:20 205:23
214:10 218:14 219:11
224:11

**year**
12:16 13:10,11 15:17,20
17:15 19:15 24:21 29:18
48:18 49:2,3 100:23
101:2,3,22 113:3 115:12
132:18,20,22 135:16
138:9 149:9,12,13 182:7
183:9 203:15,19

**years**
17:1,15 18:21 19:13 24:15
25:20 48:21 113:20
114:6 135:2,3,5,12
140:18 150:8,19 151:1,2
151:3 155:10 156:15
175:5,7 183:11,13,17
211:20

**younger**
161:7 188:8

**y'all**
136:7 174:10 180:19
201:6

---

**$**

**$1,000**
206:21

**$600**
88:11

---

**1**

**1**
5:11 36:2,4 60:16 219:6

**1st**
22:14

**1,500**
22:6

**10**
5:16 46:17 103:4,7

**100**
3:15,21

**101**
5:15,15

**103**
5:16

106
5:16

11
5:16 106:11,14

12
5:17 189:20,22

12:30
47:7,8

1227
10:11

13
5:17 182:18 190:17,20

139
5:6

14
5:18 193:4,6,7,11

15
5:18 122:10 193:15,17

16
5:19 194:9,17,19

17
5:19 197:11,13

1740
3:6

18
5:20 198:2,5 199:8

184
6:10

189
5:17

19
5:20 198:21 199.1

19th
76:5

190
5:17

193
5:18,18

194
5:19

1953
9:15

197
5:19

1972
12:18

1977
19:18

198
5:20,20

199
5:21

1990
206:9

1995
175:9

1999
176:21 181:8

---

2
2

5:12 40:6,9,12

**2nd**
33:19

**2:00**
40:17

**2:05-CV-00763**
1:4

**20**
5:21 199:12,14

**200**
3:21

**2000**
32:20 193:10 219:6,20

**2002**
32:20 53:13

**2004**
33:19 34:4 60:12 63·1
89:13,14 102:19 106:16
133:1,2 153:11 188:17
197:19

**2005**
153:11,12 223:21

**2006**
1:19 6:12

**21**
1:19 5:21 6:12 210:19,22

**210**
3:7 5:21

**217**
5:22

**22**
5:22 53:12 217:10,20
218:6 224:2

**220**
5:7

**224**
5:22

**225**
5:8

**23**
5:22 223:23 224:5

**231**
35:19,21 40:22,23 41:6
63:20 181:17 215:20

**24th**
9:15

**26**
151:1

**27th**
191:1

**271**
35:16,20 40:21,23 41:5,13
41:15 63:19 181:17

**28th**
40:16

**29**
89:13

**29th**
60:12 63:1 80:2,17 81:4

---

3

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

FRANK FISCHER
November 21, 2006

**3**
5:12 41:20,23 69:11
  177:15,16 219:4
**3:00**
78:17
**30th**
81:18
**300**
177:21
**350**
177:16
**35209**
3:8,16
**35216**
3:22
**36**
5:11
**36023**
10:14
**361**
103:10
**3907**
76:5
**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**
9:12

--- **4** ---
**4**
5:13 52:14,17
**4:00**
78:17
**40**
5:12
**41**
5:12
**414**
107:2

--- **5** ---
**5**
5:13 41:8 62:19,21 63:16
**5:00**
46:10,23 47:5,20 61:10
  78:9
**50s**
150:3
**52**
5:13

--- **6** ---
**6**
5:5,14 96:12,16 97:19
**6/29**
61:2
**6/29/04**
60:17
**6:00**
78:9
**600**
88:12

**62**
5:13
**65**
40:19 150:11

--- **7** ---
**7**
5:14 97:8,14,22 102:19
**7th**
3:15
**7:00**
46:10,23 47:5,21 61:10
**70s**
17:18,19
**77**
19:17,19

--- **8** ---
**8**
5:15 101:9,12 106:18
**80s**
17:18
**85**
40:19

--- **9** ---
**9**
5:15 40:21 41:4 46:17
  101:20 102:1,5,11
**9:00**
6:12 48:5
**95**
24:23 29:21 1/6:9
**96**
5:14
**97**
5:14

**Tyler Eaton Morgan Nichols & Pritchett, Inc.**

# EXHIBIT A

## ACKNOWLEDGMENT AND RECEIPT OF HANDBOOK

I understand that the employee handbook describes important information about SYSCO Central Alabama and that I should consult my manager regarding any questions not answered in the handbook.

Since provisions of the handbook are subject to change, I further understand that revisions to the handbook may supersede or eliminate one or more existing policies.

My employment relationship with SYSCO Central Alabama is voluntarily entered into and is subject to termination by me or my employer at will, with or without cause, at any time either party believes such action to be appropriate.

I acknowledge that this handbook is neither a contract of employment nor a legal document. I have received, read, understood and will comply with both the policies contained in this handbook and any revisions made to it. I understand that this handbook belongs to the Company and I will return it when I am no longer employed by the Company.

_Frank Fischer_          4-22-99
Employee's Signature          Date

_FRANK FISCHER_
Employee's Name (Print)



Fischer v. Sysco
Sys 0214

## ACKNOWLEDGMENT AND RECEIPT OF HANDBOOK

I understand that the employee handbook describes important information about SYSCO Central Alabama and that I should consult my manager regarding any questions not answered in the handbook.

Since provisions of the handbook are subject to change, I further understand that revisions to the handbook may supersede or eliminate one or more existing policies.

My employment relationship with SYSCO Central Alabama is voluntarily entered into and is subject to termination by me or my employer at will, with or without cause, at any time either party believes such action to be appropriate.

I acknowledge that this handbook is neither a contract of employment nor a legal document. I have received, read, understood and will comply with both the policies contained in this handbook and any revisions made to it. I understand that this handbook belongs to the Company and I will return it when I am no longer employed by the Company.


_Frank Fischer_                    1-8-2
Employee's Signature               Date


FRANK   FISCHER
Employee's Name (Print)


Sysco Central Alabama Employee Handbook
Handbook Edition – January 2003

**Fischer v. Sysco
Sys 0210**

## ACKNOWLEDGMENT AND RECEIPT OF HANDBOOK

I understand that the employee handbook describes important information about SYSCO Central Alabama and that I should consult my manager regarding any questions not answered in the handbook.

Since provisions of the handbook are subject to change, I further understand that revisions to the handbook may supersede or eliminate one or more existing policies.

My employment relationship with SYSCO Central Alabama is voluntarily entered into and is subject to termination by me or my employer at will, with or without cause, at any time either party believes such action to be appropriate.

I acknowledge that this handbook is neither a contract of employment nor a legal document. I have received, read, understood and will comply with both the policies contained in this handbook and any revisions made to it. I understand that this handbook belongs to the Company and I will return it when I am no longer employed by the Company.

_____    6-11-3
Employee's Signature                Date

FRANK FISCHER
Employee's Name (Print)

## ACKNOWLEDGMENT AND RECEIPT OF HANDBOOK

I understand that the employee handbook describes important information about SYSCO Central Alabama and that I should consult my manager regarding any questions not answered in the handbook.

Since provisions of the handbook are subject to change, I further understand that revisions to the handbook may supersede or eliminate one or more existing policies.

My employment relationship with SYSCO Central Alabama is voluntarily entered into and is subject to termination by me or my employer at will, with or without cause, at any time either party believes such action to be appropriate.

I acknowledge that this handbook is neither a contract of employment nor a legal document. I have received, read, understood and will comply with both the policies contained in this handbook and any revisions made to it. I understand that this handbook belongs to the Company and I will return it when I am no longer employed by the Company.

_____     6-11-3
Employee's Signature          Date

_____
Employee's Name (Print)

Sysco Central Alabama Employee Handbook
Handbook Edition – May 2003

Fischer v. Sysco
Sys 0263

# EXHIBIT B

Safety Manual 2004

# _Acknowledgement and Receipt of Manual_

I understand that the Safety Manual describes important information about SYSCO Food Services of Central Alabama and that I should consult my manager regarding any questions not answered in the manual.

Since provisions of the manual are subject to change, I further understand that revisions to the manual may supersede or eliminate one or more existing policies.

I hereby certify that I have received a copy of SYSCO Food Services of Central Alabama Safety Manual and that I have read, understood and will comply with both the policies contained in this manual and any revisions made to it. I understand that this handbook belongs to the Company and I will return it when the Company no longer employs me.

_Frank Fischer_     2-7-4
Employee's Signature     Date

FRANK FISCHER
Employee's Name (Print)

