# # 2

In The Matter Of:

**FRANK FISCHER**
**v.**
**SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.**

**NO. 2:05-CV-00763**

---

**JOHN MORRIS**
**November 21, 2006**

---



**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

THE HIGHEST QUALITY IN COURT REPORTING

FRANK FISCHER                                          JOHN MORRIS
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.          November 21, 2006

(Pages 1 to 4)

---

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO. 2:05-CV-00763

FRANK FISCHER, an individual,
        Plaintiff,
vs.
SYSCO FOOD SERVICES OF
CENTRAL ALABAMA, INC., et al.,
        Defendants.
        IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA

CIVIL ACTION NO.: CV-2005-1630

FRANK FISCHER, an individual,
        Plaintiff,
vs.
SYSCO FOOD SERVICES OF
CENTRAL ALABAMA, INC., et al.,
        Defendants.

        DEPOSITION
        OF
        JOHN MORRIS
        November 21, 2006
REPORTED BY: Teresa Turquitt Davis
        Certified Court Reporter,
        Registered Professional
        Reporter and Notary Public

---

Page 2

1          S T I P U L A T I O N
2          IT IS STIPULATED AND AGREED,
3   by and between the parties, through their
4   respective counsel, that the deposition of
5   JOHN MORRIS may be taken before Teresa
6   Turquitt Davis, Commissioner, Certified
7   Court Reporter, Registered Professional
8   Reporter and Notary Public;
9          That the signature to and
10  reading of the deposition by the witness
11  is waived, the deposition to have the same
12  force and effect as if full compliance had
13  been had with all laws and rules of Court
14  relating to the taking of depositions;
15         That it shall not be necessary
16  for any objections to be made by counsel
17  to any questions, except as to form or
18  leading questions, and that counsel for
19  the parties may make objections and assign
20  grounds at the time of trial, or at the
21  time said deposition is offered in
22  evidence, or prior thereto.
23

---

Page 3

1          A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4       Mr. Davis Middlemas
5       Attorney at Law
6       1740 Oxmoor Road
7       Suite 210
8       Birmingham, Alabama  35209
9
10  FOR THE DEFENDANT, SYSCO FOOD SERVICES OF
11  CENTRAL ALABAMA, INC.:
12      Mr. Arnold W. Umbach, III
13      Attorney at Law
14      Starnes & Atchison, LLP
15      7th Floor, 100 Brookwood Place
16      Birmingham, Alabama  35209
17          -and-
18      Mr. T. J. Segrest
19      Attorney at Law
20      Carr Allison
21      100 Vestavia Parkway, St. 200
22      Birmingham, Alabama 35216
23

---

Page 4

1          A P P E A R A N C E S (CONTINUING)
2
3   OTHERS PRESENT:
4       Lynda Wheat
5
6
7
8

---

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

JOHN MORRIS
November 21, 2006

(Pages 5 to 8)

Page 5

I N D E X

INDEX OF EXAMINATION
Page:
EXAMINATION BY MR. MIDDLEMAS        6
EXAMINATION BY MR. UMBACH           82
REEXAMINATION BY MR. MIDDLEMAS       83

INDEX OF EXHIBITS
Page:
Plaintiff's Exhibit 1        69
Plaintiff's Exhibit 2        76
Plaintiff's Exhibit 3        77

Page 6

1    I, Teresa Turquitt Davis, a
2  Certified Court Reporter and Registered
3  Professional Reporter of Birmingham,
4  Alabama, and a Notary Public for the State
5  of Alabama at Large, acting as
6  Commissioner, certify that on this date,
7  as provided by the Federal Rules of Civil
8  Procedure of the United States District
9  Court, and the foregoing stipulation of
10 counsel, there came before me at 184
11 Commerce Street, Montgomery, Alabama, on
12 November 21, 2006, commencing at 2:38
13 p.m., JOHN MORRIS, witness in the above
14 cause, for oral examination, whereupon the
15 following proceedings were had:

17        JOHN MORRIS,
18 being first duly sworn, was examined and
19 testified as follows:

21 EXAMINATION BY MR. MIDDLEMAS:
22    Q.   If you will, state your full
23 name.

Page 7

1    A.   John Timothy Morris.
2    Q.   Mr. Morris, my name is Davis
3  Middlemas. I'm representing Mr. Frank
4  Fischer in this lawsuit we are here about
5  today. I'm just going to ask you some
6  questions. And if you need for me to
7  repeat anything, just let me know. And if
8  you need to take a break, that is fine as
9  well.
10   A.   Okay.
11   Q.   Where do you work now?
12   A.   Sysco Foods in Geneva.
13   Q.   How long have you worked with
14 Sysco Foods in Geneva?
15   A.   December of '99 is when we
16 folded out from Sysco Calera.
17        MR. UMBACH: December when?
18        THE WITNESS: '99 -- I'm
19 sorry, this year, '05.
20   Q.   '05?
21   A.   I'm sorry, yes.
22   Q.   Prior to December of 2005,
23 where were you working?

Page 8

1    A.   I worked for Sysco Calera out
2  of Birmingham and I worked down in the
3  panhandle, which is Pensacola, Panama City
4  area.
5    Q.   How long had you worked for
6  Sysco Calera?
7    A.   December '99 is when I first
8  started working for them.
9    Q.   Prior to December 1999, where
10 did you work?
11   A.   I worked for Shelton Trucking
12 Company.
13   Q.   Shelton?
14   A.   Shelton, S-H-E-L-T-O-N.
15   Q.   Where is that?
16   A.   They are out of -- by
17 Blountstown -- Altha, Florida, A-L-T-H-A,
18 yeah, that is it, Altha, Florida.
19   Q.   Where do you live now?
20   A.   I live in Enterprise, Alabama.
21   Q.   How long were you at Shelton
22 Trucking?
23   A.   About a couple of months,

Page 9

1   three months.
2       Q.   Where did you work before
3   Shelton?
4       A.   I was in the United States
5   Navy.
6       Q.   How many years in the Navy?
7       A.   Twenty-two.
8       Q.   So your first job outside of
9   the Navy was Shelton?
10      A.   Yes, sir.
11      Q.   What did you do at Shelton, or
12  what was your job title?
13      A.   I was a truck driver.
14      Q.   And you said you left there
15  after two or three months, and then went
16  to Sysco?
17      A.   Yes.
18      Q.   Hired into Sysco as what?
19      A.   A delivery associate.
20      Q.   Delivery associate?
21      A.   Yes, sir.
22      Q.   Can you tell me what a
23  delivery associate does?

Page 11

1       Q.   Okay.  You were hired into
2   that position in December of 1999?
3       A.   Yes, sir.
4       Q.   Did you keep that position
5   your entire time?
6       A.   No.  I moved to shuttles, I
7   would say around September of 2000.
8       Q.   To shuttle driver?
9       A.   Shuttle driving, yes.  I
10  shuttled out of the Pensacola, Florida
11  yard.
12      Q.   That was in September of 2000?
13      A.   Yes.
14      Q.   Did you maintain that
15  position?
16      A.   Until 2003 when I was promoted
17  to what we call DTS.
18      Q.   What does DTS stand for?
19      A.   District transportation
20  supervisor.
21      Q.   District what?
22      A.   Transportation supervisor.
23      Q.   What does the position of

Page 10

1       A.   They are responsible for
2   operating a single axle tractor with a
3   20-foot trailer, depending on -- and
4   delivering food, groceries to customers.
5       Q.   I believe Mr. Fischer
6   testified, he described his position as
7   shuttle driver?
8       A.   Yes, sir.
9       Q.   That is different than a
10  delivery associate?
11      A.   Yes, we have two jobs.
12  Delivery associates work during the day
13  and shuttle drivers work at night.  They
14  shuttle the trailers from the Sysco house
15  in Birmingham down to our yards down in
16  the panhandle.
17      Q.   And you mean a delivery
18  associate, you are doing --
19      A.   The daytime deliveries to
20  customers.
21      Q.   Can I describe it as short
22  haul around the area?
23      A.   Yes, sir.

Page 12

1   district transportation supervisor entail?
2       A.   Managing -- I was responsible
3   for my district, which was the panhandle,
4   Pensacola, Panama City, making the
5   schedules, making sure on-time deliveries,
6   schedules for both shuttle drivers and day
7   drivers, coordinating between the sales
8   force to make sure drivers got the
9   deliveries done and coordinating our
10  operation with Birmingham.
11      Q.   And so what you just
12  described, are you supervisor over all of
13  these drivers?
14      A.   Yes, sir.
15      Q.   How many persons overall would
16  you be supervising, were you over?
17      A.   I would estimate twenty-two to
18  twenty-four, somewhere like that,
19  depending on who is quitting.  It's about
20  twenty-two or twenty-four.
21      Q.   They are all shuttle drivers?
22      A.   No, no.  I think we had six
23  shuttle drivers in Pensacola and, I

3

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

JOHN MORRIS
November 21, 2006

(Pages 13 to 16)

Page 13

1  believe, three or four shuttle drivers in
2  Panama City. I remember Frank and John
3  Cruz were the two main ones in Panama
4  City.
5      Q.    And Frank Fischer and John
6  Cruz were running back and forth between
7  Panama City and Calera?
8      A.    Yes, sir.
9      Q.    Four times a week or something
10 like that?
11     A.    Yes.
12     Q.    And you became district
13 transportation supervisor. Is that when
14 you took over supervisory positions over
15 Frank Fischer?
16     A.    Yes, sir.
17     Q.    And, again, that was when?
18     A.    2003, July of 2003.
19     Q.    Prior to July of 2003 when you
20 took that position, who was the supervisor
21 over Frank Fischer immediately before you?
22     A.    Denita Dunagan.
23     Q.    Denita Dunagan?

Page 14

1      A.    Yes.
2      Q.    And she had held the post of
3  district transportation supervisor?
4      A.    Yes, sir.
5      Q.    Why did she leave that
6  position, or why was it given to you, do
7  you know?
8      A.    She stepped down.
9      Q.    Do you know why she stepped
10 down?
11     A.    Her son was getting ready to
12 go into high school and she was wanting to
13 be around more with him.
14     Q.    So she is no longer employed
15 with Sysco at all?
16     A.    She still works for Sysco
17 Calera.
18     Q.    Do you know what she does at
19 Sysco Calera now?
20     A.    Shuttle driver.
21     Q.    Working out of Panama City?
22     A.    Working out of Milton,
23 Florida.

Page 15

1      Q.    Milton?
2      A.    Yes, sir.
3      Q.    As part of your duties as the
4  DTS, did you have to perform evaluations
5  on employees?
6      A.    Written evaluations, no. I
7  had not done any, no, sir.
8      Q.    Who did perform written
9  evaluations on shuttle drivers during the
10 time that you were the district
11 transportation supervisor, if you know?
12     A.    I would have to talk to HR.
13           THE WITNESS: Did we do --
14           MR. UMBACH: You just answer
15 his question as best you can. If you
16 don't know, tell him.
17     A.    I don't remember having to do
18 any at all.
19     Q.    You didn't yourself?
20     A.    No, sir. We did Hall of Fames
21 on the drivers where we -- let me rephrase
22 that. We had to do the Hall of Fame once
23 a year where we did evaluate the driver's

Page 16

1  performance and it's based off four
2  quarters, I remember, and we would turn
3  that in to find out who our Hall of Fame
4  drivers were.
5      Q.    Tell me about the Hall of Fame
6  drivers. What was that about?
7      A.    It's a program that corporate
8  has to recognize your top drivers at each
9  house. And once they get recognized, I
10 think their names are forwarded to
11 corporate or they win awards or something
12 like that. I don't know the full extent
13 of the program, but I would have all the
14 drivers' names and have to do an
15 evaluation on that part, yes, I would.
16     Q.    Was, to your recollection,
17 Frank Fischer recognized in the Hall of
18 Fame?
19     A.    No.
20     Q.    What does it take to be
21 recognized as a Hall of Fame driver?
22     A.    It's broken down in different
23 criterias. I think one is appearance --

4

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

JOHN MORRIS
November 21, 2006

(Pages 17 to 20)

Page 17

1  not appearance, performance, productivity,
2  safety. And I can't remember all of them,
3  but you have different blocks that you
4  would have to evaluate them on.
5      Q.   Was one driver selected from
6  each area? For instance, was one driver
7  selected from the Panama City yard, one
8  driver selected from the Pensacola yard,
9  or can you tell me about that?
10     A.   No. I would turn all mine
11 into Birmingham and the supervisors up
12 there would put them all in one package
13 and then find out who the top five drivers
14 were out of the whole company.
15     Q.   When you say Birmingham, is
16 that synonymous with Calera?
17     A.   Yeah, Calera. Sorry.
18     Q.   That is fine. Prior to June
19 of 2004 when this accident happened --
20     A.   Yes, sir.
21     Q.   -- can you describe, per your
22 recollection, the performance of Frank
23 Fischer as a shuttle driver?

Page 18

1      MR. MIDDLEMAS: Object to the
2  form of the question. You can answer.
3      A.   Positivewise, he got the job
4  done. Negativewise, he would do things
5  that would make other drivers upset.
6      Q.   Tell me what you are talking
7  about when you say he would do things to
8  make other drivers upset.
9      A.   Basically how he would drop
10 his trailers in the yard where he would --
11 if you understand a tractor trailer, you
12 have your land legs. He would just crank
13 them down where they barely touched the
14 ground, pull off and leave the trailer.
15 So it would drop it down, so the next
16 driver comes and can't get underneath it,
17 so he would have to crank up this heavy
18 trailer, and I would get calls on that and
19 have to remind Frank that hey, you need to
20 jack your trailer up, just being -- but
21 other than that, he did what he had to do.
22 He came to work on time. They got the
23 trailers where they needed to go.

Page 19

1      And was I concerned for safety,
2  yeah, we worked very -- we enforce safety
3  pretty much in everything we did because
4  they were driving at night and they had
5  deer that would run out on 231 and that
6  kind of stuff, so --
7      Q.   Did you ever have any problem
8  with safety about Frank Fischer?
9      A.   I would -- safety is one of
10 the things I always come down to the yards
11 and checked on. And when he would be
12 hooking up in the yard in Panama City, you
13 are always supposed to wear your seat
14 belt. And it's an orange-colored belt, so
15 you could see it, and I would look and say
16 Frank, put your seat belt on. And he
17 would say I've got it on. It was always
18 under his arm is one of the things that I
19 would catch him doing quite a bit.
20     Q.   When you say quite a bit, how
21 often do you mean when you say quite a
22 bit?
23     A.   I would go to the Panama City

Page 20

1  yard at least two or three times a month.
2  And I was always there in the evening when
3  they were hooking up, so it was something
4  I noticed -- I would tell him about three
5  or four times maybe. I can't tell you
6  over the period of time, say hey, Frank,
7  this is a reminder that you have got to
8  wear it right.
9      Q.   When you say you would go to
10 the Panama City yard, when you had this
11 position of district transportation
12 supervisor, where were you actually based
13 every day?
14     A.   In Pensacola.
15     Q.   Pensacola?
16     A.   Yes, sir.
17     Q.   Was there anybody else that
18 oversaw the Panama City yard besides you
19 that was there on site every day that was
20 underneath you perhaps?
21     A.   I used David Bailey as my --
22 he didn't have a position as lead man, but
23 he was the senior man over there, so --

FRANK FISCHER                                                JOHN MORRIS
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.                November 21, 2006

(Pages 21 to 24)

Page 21

1 daytime driver, so I used him a lot of
2 times to help me get things done.
3     Q.    David Bailey?
4     A.    Yes, sir.
5     Q.    Is he still there?
6     A.    Yes, he's the district
7 transportation supervisor for that area
8 now out of Geneva.
9     Q.    He took your position when you
10 moved up to Geneva; is that right?
11     A.    Yes, sir. But he covers --
12 it's spread out more now because we have
13 got a new house.
14     Q.    You mentioned the seat belt
15 where you would remind him from time to
16 time to make sure he wore the seat belt?
17     A.    Yes, sir.
18     Q.    Not under his arm, but across
19 the shoulder. Anything else that you had
20 to remind Frank Fischer about about
21 safety, or were there not any other
22 things?
23     A.    Not him overall. We would

Page 22

1 constantly remind the drivers as far as
2 DOT that you should take a break your
3 first two hours, you should stop somewhere
4 and take a break and show that on your
5 Tripmaster. So if you have a problem, you
6 know, DOT got back that you have shown on
7 the Tripmaster that you did stop. And if
8 you got sleepy, to stop. And we weren't
9 pushing anybody.
10     Q.    What is Tripmaster?
11     A.    It's a program that we have in
12 the trucks, a computer program that they
13 log on the truck. It counts your hours,
14 how fast you are driving, your braking,
15 where you stop. Because we had GPS in the
16 trucks, so we could tell where drivers
17 stopped by GPS and it helped us for the
18 day drivers because every customer that we
19 stopped at, it would show it in there, and
20 all they had to do is log how many cases
21 of stuff they delivered.
22     Q.    Okay. So during your time as
23 district transportation supervisor, if a

Page 23

1 driver needed to be reprimanded for some
2 reason --
3     A.    Yes, sir.
4     Q.    -- would you handle that for
5 the drivers working out of the Panama City
6 yard?
7     A.    Yes, sir.
8     Q.    At any time prior to June of
9 2004, did you have to reprimand Frank
10 Fischer about any violation of any safety
11 policy or any other rule that Sysco had?
12     A.    I can't remember.
13           MR. MIDDLEMAS: Object to the
14 form.
15     A.    I have done a lot of
16 discipline -- we call it disciplinary
17 action forms. And I don't know if I have
18 written any up on Frank. I have done a
19 lot of them on a lot of drivers.
20     Q.    Disciplinary action forms is
21 what you call them?
22     A.    I believe that is the name
23 they use or employee disciplinary forms.

Page 24

1     Q.    I know you can't remember
2 specifically, but what sort of things
3 would you write a driver up for or write a
4 disciplinary action form up on a driver?
5     A.    A lot of ours were over hours
6 driving, forgetting to log off the
7 Tripmaster so it would show that they
8 worked -- they were only allowed to work
9 at that time 14 hours. And then you could
10 work sixteen hours a week, and some
11 drivers would forget to log off and go
12 over sixteen hours.
13           And we had somebody at Calera
14 that managed this program every day, so
15 that is a violation. They would be nonDOT
16 compliant. So we would have to remind
17 them, hey, you are supposed to log off the
18 truck, remember to log on, those kind of
19 things I would get a lot drivers on.
20           Or we have a set speed limit
21 for our company, so the Tripmaster tells
22 you how fast you are driving. If we had
23 anybody -- I think it's 62, then I would,

6

Page 25

1  of course, write them up.
2      Everything is documented that I
3  talk to, verbal counseling about over
4  speed.
5      Q.   Do you have any recollection
6  of ever citing or giving a disciplinary
7  action form to Frank Fischer for speeding?
8      A.   Not that I can recall.
9      Q.   Was he ever cited for driving
10 under the influence of either alcohol or
11 narcotics?
12     A.   Not that I know of.
13     Q.   Did you have random drug
14 testing at Sysco during the time that you
15 were there?
16     A.   I didn't run that program, but
17 we did have a program.  That is done by HR
18 and safety.
19     Q.   Do you know how often they
20 were tested, the shuttle drivers?
21     A.   It was random and names would
22 come up.  I would get an e-mail have these
23 drivers go down and take a drug test and

Page 26

1  make sure it was done that day.  It was a
2  program that I ran and I had to make sure
3  it got done and told them.
4      Q.   To your knowledge, did Frank
5  Fischer ever have a positive drug screen
6  or drug test?
7      A.   I know if he did, he wouldn't
8  be working for Sysco because they would
9  automatically get fired.
10     Q.   Before Frank Fischer's
11 accident that we are here about now in
12 June of 2004, did you ever have any
13 conversations with him about retirement
14 possibilities?
15     A.   No.
16     Q.   Did anyone at Sysco discuss
17 with you the need to talk to Frank Fischer
18 about retirement?
19     A.   No.  I would like to add one
20 thing.  This was during the summer, which
21 is our peak season and it's very hard to
22 hire drivers.  It's very hard to hire
23 shuttle drivers who will work at night, so

Page 27

1  I know we weren't in any way trying to get
2  rid of anybody.
3      MR. UMBACH:  Let him ask you
4  the question.  If he wants to know, he'll
5  ask you.
6      Q.   At any time while you held the
7  position of district transportation
8  supervisor, did you have to fire a shuttle
9  driver for any reason?
10     A.   Not that I can recall.
11     Q.   Can you recall at any time
12 while you held the DTS position any
13 shuttle drivers that you supervised having
14 major accidents, defining major accidents
15 the way Sysco defines major accidents?
16     A.   Yes.
17     Q.   Other than Frank Fischer's
18 accident, can you tell me what other
19 accidents there were that were defined as
20 major?
21     A.   A driver, I don't recall his
22 name, he was going northbound on 65 and
23 dropped both trailers on the road on 65.

Page 28

1      Q.   When you say dropped the
2  trailers, what does that mean?
3      A.   The trailers just came off the
4  fifth wheel and landed on the freeway.
5      Q.   Do you know why that happened?
6      A.   I can assume.
7      Q.   What is your assumption?
8      A.   He didn't check the fifth
9  wheel, the king pin lock.
10     Q.   Can you explain to me what the
11 king pin lock is?
12     A.   On your fifth wheel, the
13 trailers have a king pin, the back of the
14 tractors have a fifth wheel.  The king pin
15 goes in the fifth wheel and it's a bar
16 that goes across the back and you are
17 supposed to visually go back there and
18 check it.  And what this particular driver
19 did, he high centered where he had the
20 trailer a little too high and sat on top
21 of it, he thought it was locked and he
22 went down the freeway and it just kind of
23 came off the trailer, came off the fifth

Page 29

1   wheel.
2       Q.    Was anybody injured in the
3   accident?
4       A.    No.
5       Q.    What happened to that driver
6   in terms of discipline?
7       A.    He was not my driver.  And
8   since I was not in Birmingham, I did not
9   know the result of the Accident Review
10  Committee.  I just know he was fired, or
11  he was no longer working for Sysco.
12      Q.    You don't know if he was fired
13  for that incident?
14      A.    I knew he had an incident and
15  I knew he was gone.
16      Q.    Do you know any other details
17  about that accident, the name of the
18  driver or anything?
19      A.    No, sir, I can't remember.
20      Q.    Any other major accidents that
21  occurred during your term as DTS?
22      A.    We had a driver that ran off
23  the road going north.  He ran off the road

Page 30

1   and the tractor hit a culvert and came to
2   a stop.
3       Q.    Was that one of the drivers
4   you supervised?
5       A.    No.  It was a Northern driver,
6   driver from up North.
7       Q.    Do you know any other details
8   about what happened to that driver in
9   terms of discipline?
10      A.    He no longer works for Sysco.
11      Q.    To your recollection, did any
12  of the drivers during the time that you
13  held the DTS position have accidents and
14  those drivers were not fired?
15      A.    No.
16      Q.    Okay.  Can you tell me how you
17  first learned that Frank Fischer had had
18  his accident in June of 2004?
19      A.    He called me right after it
20  happened.
21      Q.    Where did he call you?
22      A.    At my house.
23      Q.    Tell me what you recall about

Page 31

1   that conversation.  What did he tell you?
2       A.    It was early in the morning.
3   He said John, I just -- I believe he said
4   I just had an accident.  I said -- I
5   believe I asked him was anybody hurt and
6   he says no.  And I said what happened, and
7   he said I don't know, I think I fell
8   asleep.  And I said okay, let me call you
9   back.  So then I started calling all my
10  upper management and let them know what
11  was going on.
12      Q.    When you say you called the
13  upper management --
14      A.    Yes, sir.
15      Q.    -- who do you call?
16      A.    I first notified the
17  warehouse, which I believe was Craig
18  Cottscaker, that was on duty that night.
19      Q.    I'm sorry, Craig?
20      A.    Cottscaker.
21          MR. UMBACH:  Gottscaker.
22      A.    Gottscaker.
23          MR. UMBACH:  G-O-T --

Page 32

1       A.    G-O-T-T-S-C-A-K-E-R.
2       Q.    Okay.
3       A.    And told him that we just had
4   an accident.  Actually, I asked Frank
5   whose trailers he had because we knew we
6   had to rebuild them out so we can get the
7   groceries delivered.  So I let them
8   know -- I informed him that a shuttle
9   driver had a crash, we needed to get the
10  trailers rebuilt.  Then I called Danny
11  Harpst, who was the transportation
12  manager.
13      Q.    He's the transportation
14  manager.  Where is he based?
15      A.    Calera.
16      Q.    Where is Gottscaker based?
17      A.    Calera.
18      Q.    Okay.
19      A.    Then I called Margie Self.
20      Q.    Margie Self?
21      A.    Yes.  She was safety at the
22  time.
23      Q.    Based in Calera?

Page 33

1  A.  Yes.
2  Q.  Can you tell me when you
3 called these people what you told them?
4 What was your conversation with them?
5  A.  That our shuttle driver just
6 had a major accident, no injuries, a
7 single-vehicle accident, ran off the road.
8 I didn't know the details. I told Danny
9 about it and that we were getting the
10 trailers rebuilt out and we needed to make
11 sure that -- priority is to get the
12 trailers down to Panama City where he was
13 heading and also make sure that Frank was
14 okay. And he said that the police was on
15 the way and that kind of stuff.
16  I also called Bo Brown, who is
17 safety. And I think Danny went out to the
18 accident site. In fact, I know he did.
19  Q.  So you made all these calls
20 right after Frank Fischer had called you
21 and told you sometime very early in the
22 morning?
23  A.  Yes, sir.

Page 34

1  Q.  On June the 29th, I believe?
2  A.  Yes, sir.
3  Q.  Okay. What is the next
4 conversation you had about Frank Fischer's
5 accident, and with whom did you have that
6 conversation?
7  A.  Can you rephrase that
8 question?
9  Q.  Yeah. You said you called
10 these four people that you think you
11 called at least right after Frank Fischer
12 had told you about the accident, Craig
13 Gottscaker, Margie Self and Bo Brown?
14  A.  Yes.
15  Q.  Who was the next person you
16 talked to about the accident --
17  A.  I called Frank back to get his
18 status, what was going on. And he said
19 the ambulance came, the police was there.
20 I told him that Danny Harpst and, I
21 believe, Bo Brown were, I believe, on the
22 way there. And after that, then Danny
23 Harpst and I talked and said that the

Page 35

1 ambulance was taking Frank to the
2 hospital. And they had called a tow truck
3 to pull the trailer out and all that
4 stuff.
5  Q.  Okay. And did you talk the
6 next morning when you -- what time did you
7 go to work?
8  A.  They brought two trailers down
9 and I helped deliver those routes. So I
10 ended up working that day to make sure the
11 customers got what they needed.
12  Q.  In the position of DTS, do you
13 still make those deliveries like that?
14  A.  Whenever needed. You do what
15 you have got to do.
16  Q.  When was the next time you
17 talked to Frank Fischer, if you can
18 recall?
19  A.  I believe I saw him in the
20 yard. Because I was working out of Panama
21 City and he showed up in the yard that
22 evening to pick up his vehicle.
23  Q.  The evening after that --

Page 36

1 well, I guess, the same evening?
2  A.  Same day, yes, sir.
3  Q.  The accident happened early in
4 the morning that day. You saw him in the
5 yard to pick up his personal vehicle?
6  A.  Yes, sir.
7  Q.  Did y'all discuss the accident
8 again then?
9  A.  I think I more discussed how
10 he was feeling, how he was doing, his
11 injuries and that kind of stuff.
12  Q.  Was there any discussion about
13 a need to report it specifically for
14 worker's compensation purposes or anything
15 like that?
16  A.  No, that was not my
17 department. I didn't handle that.
18  Q.  Did he discuss with you at all
19 or ask you how he could contact or whom he
20 needed to contact to make a worker's
21 compensation claim?
22  A.  Not that I recall.
23  Q.  For the rest of that day, the

FRANK FISCHER

JOHN MORRIS

SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

November 21, 2006

(Pages 37 to 40)

Page 37

1  same day of the accident, did you have any
2  follow-up conversations with anyone,
3  either the four people that you described
4  already that you talked to, or anyone else
5  about the accident?
6      A.   Danny Harpst.
7      Q.   What did you and Danny Harpst
8  later talk about that day?
9      A.   What he seen at the accident
10 site.
11     Q.   Tell me what he told you that
12 he saw.
13     A.   That the skid marks -- the
14 brake trailer skid marks happened within
15 an intersection. In other words, the
16 brakes weren't put on until past the
17 intersection where you can see the skid
18 marks going into --
19     Q.   What significance did he
20 attach to that? Why was he telling you
21 that?
22     A.   Basically when he applied the
23 brakes on the truck.

Page 38

1      Q.   And after he told you that,
2  did he follow it up with saying that Frank
3  Fischer did something wrong or this showed
4  that Frank Fischer did something wrong?
5      A.   We were waiting for the
6  Tripmaster report to come out of the
7  computer, which would tell us how fast he
8  was going and if there was any -- if it
9  showed the truck slowing down at all and
10 when the brakes were applied.
11     Q.   In that conversation you had
12 with Danny Harpst that day when he told
13 you about the skid marks, did he discuss
14 with you then whether or not Frank Fischer
15 might need to be fired for this offense?
16     A.   No, sir.
17     Q.   Is that the only person you
18 talked to, to your knowledge, about
19 Frank's accident that day?
20     A.   Yes, sir, that I recall, yes,
21 sir.
22     Q.   What is the next time and whom
23 did you talk to about his accident?

Page 39

1      A.   I can't recall.
2      Q.   To your recollection, when is
3  the next time you talked to Frank Fischer
4  himself about his accident?
5      A.   I can't recall.
6      Q.   At some point were you
7  approached by Danny Harpst again after the
8  Tripmaster report was back?
9      A.   Yes, sir.
10     Q.   How soon after the accident
11 did that report come back, to your
12 knowledge?
13     A.   The very next day.
14     Q.   So y'all had another
15 discussion?
16     A.   Yes, sir.
17     Q.   Tell me about that discussion.
18 What did Danny Harpst say to you and what
19 did you say to him?
20     A.   It showed that the truck was
21 traveling at 55 miles an hour. I'm
22 estimating the speed. I think it was 55.
23 He was doing the speed limit. We were

Page 40

1  looking to see if he was speeding. That
2  is the first thing you check. So he
3  wasn't speeding, he was doing the speed
4  limit. But it showed a consistent speed,
5  which told us that the cruise control was
6  on the truck.
7      Q.   You say it showed a consistent
8  speed, a consistent speed over what period
9  of time?
10     A.   From the time you leave 85 to
11 get on Taylor Road until he comes to 231,
12 that stretch of road there which, I think,
13 is about thirteen miles.
14     Q.   You think I-85 -- once you
15 turn onto Taylor Road off of I-85 onto 271
16 until you hit 231, you think is
17 thirteen miles?
18     A.   I'm estimating the distance,
19 sir.
20     Q.   Is Highway 271, from the point
21 that you get off of I-85, are there some
22 traffic lights that you must go through?
23     A.   Yes, sir.

10

Tyler Eaton Morgan Nichols & Pritchett, Inc.

FRANK FISCHER

JOHN MORRIS

SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

November 21, 2006

(Pages 41 to 44)

Page 41

1    Q.    A driver is not able to run
2  cruise control when he has to be at the
3  traffic lights?
4    A.    No, sir.
5    Q.    Once Danny Harpst told you
6  about the Tripmaster report, did you
7  contact Frank Fisher to talk about what
8  the findings were?
9    A.    No, sir.  I don't recall
10 talking to Frank Fischer.
11   Q.    Did anyone else talk to you
12 about the Tripmaster findings?
13   A.    No.
14   Q.    What is, to your recollection,
15 the next conversation you had with Frank
16 Fischer about anything?
17   A.    I can't recall.  We had phone
18 conversations between the accident to when
19 the day he was terminated.  I can't
20 remember if we ever did.  I think I
21 remember calling him saying that you need
22 to be at the office the day we were going
23 to terminate him, we needed to see him.

Page 42

1    Q.    At any point before he was
2  actually fired --
3    A.    Yes, sir.
4    Q.    -- did you have any discussion
5  with him that this accident may result in
6  his termination?
7    A.    No, sir.  That was not my job.
8    Q.    To your knowledge, did anyone
9  have any conversation with him before the
10 actual date he was fired, telling him that
11 this may result in his termination?
12   A.    No, sir.
13   Q.    Did you have a conversation
14 with Frank Fischer before the date of the
15 firing about what the doctor said he
16 needed to be done to him or whether he was
17 going to need to have surgery?
18   A.    I can't recall.
19   Q.    Do you have any recollection
20 of learning that Frank Fischer was going
21 to need surgery for this shoulder injury?
22   A.    I can't remember at all.
23   Q.    Okay.  Who else did you talk

Page 43

1  to before the date of the firing about
2  Frank Fischer's employment situation,
3  anybody you talked to before that date,
4  discussed with them whether or not he was
5  going to be fired?
6    A.    That is not done by me.
7    Q.    Well, did it come as a
8  surprise to you -- did it surprise you as
9  much as it surprised Frank on the date he
10 was fired?
11       MR. UMBACH:  Object to the
12 form.
13   Q.    Or did you have any knowledge
14 that he was going to be fired?
15   A.    After -- when I was told that
16 we were going to meet with him, they told
17 me what they were going to do.
18   Q.    Are you familiar with
19 something they call the Accident Review
20 Committee?
21   A.    Yes, sir.
22   Q.    What is the Accident Review
23 Committee?

Page 44

1    A.    Once you do your investigation
2  of the accident, Bo Brown would get five
3  drivers that are peers, drivers like the
4  driver, and they would get together and
5  decide -- they would be given the facts of
6  the accident, photos or whatever, and the
7  drivers would decide if the accident was
8  either minor, major or serious -- or
9  minor, serious or major.  Minor being the
10 least, serious being the middle, and major
11 being the worst.
12   Q.    And, again, Bo Brown's
13 position was what in the company?
14   A.    Safety.
15   Q.    Head of safety?
16   A.    Head of safety, yes.
17   Q.    Did Frank Fischer's case go to
18 the Accident Review Committee, to your
19 knowledge?
20   A.    Since I didn't work out of
21 Calera, I wasn't part of that, but that
22 was normal procedure.
23   Q.    Do you know when it went to

Tyler Eaton Morgan Nichols & Pritchett, Inc.

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

JOHN MORRIS
November 21, 2006

(Pages 45 to 48)

Page 45

1 the Accident Review Committee in terms of
2 how long after the accident happened?
3      A.    No, sir.
4      Q.    *Do you remember the date that*
5 *you had the meeting with Frank Fischer to*
6 *tell him that he was terminated?*
7      A.    I believe it was in July.
8      Q.    Who contacted you to say that
9 we were going to have this meeting?
10     A.    Danny Harpst.
11     Q.    What did he tell you when he
12 contacted you?
13     A.    He told me to get ahold of
14 Frank to tell him that we needed to meet
15 him. He was coming down and we needed to
16 meet with Frank on the findings of the
17 accident he had.
18     Q.    Did he tell you -- you said a
19 minute ago that you knew what they were
20 going to do when they were going to have
21 this meeting. Did Danny Harpst tell you
22 what the decision had been?
23     A.    I asked him what the decision

Page 46

1 was and he said they were going to
2 terminate him.
3      Q.    Did you have any reaction to
4 that?
5      A.    Yes.
6      Q.    What was that?
7      A.    I was a little bit upset.
8      Q.    Why were you upset?
9      A.    Because it was during our peak
10 season more or less, losing a shuttle
11 driver and having to regroup and get
12 somebody to hire. That is all basically.
13     Q.    Did anyone ever ask your
14 opinion about whether or not he should be
15 fired for this --
16     A.    No, sir.
17     Q.    -- accident? I'm going to
18 show you what has been marked previously
19 Defendant's Exhibit 13. Can you tell me
20 if you have seen that document before?
21     A.    Yes, sir.
22     Q.    Okay. When were you shown
23 that document for the first time?

Page 47

1      A.    At the time we signed it.
2      Q.    There is a date down here that
3 says July 27th, 2004.
4      A.    Okay.
5      Q.    The memorandum is dated
6 July 23rd, 2004. I mean, is it your
7 understanding that the meeting with Frank
8 Fischer was on July 27th?
9      A.    The day we signed it, yes,
10 sir.
11     Q.    To your knowledge, was it sent
12 to Frank Fischer on the date it was
13 written, on July the 23rd?
14     A.    I don't know, sir.
15     Q.    *Who all was present -- let me*
16 back up. Where was this meeting held?
17     A.    Panama City shuttle location.
18     Q.    In a particular room or
19 building?
20     A.    We have a trailer that we use
21 for an office.
22     Q.    By the way, where is the yard
23 in Panama City?

Page 48

1      A.    *It's in Lynn Haven, Florida.*
2      Q.    Where in Lynn Haven?
3      A.    Off of 25th Street, I believe,
4 25th or 26th Street.
5      Q.    Who were all the persons in
6 the room when this meeting happened?
7      A.    Danny Harpst, myself, and
8 Frank Fischer came in and, I believe,
9 brought his sister. He asked if his
10 sister could be in present and we said
11 yeah, she could.
12     Q.    Was there any other person
13 there, a salesman associated with Sysco or
14 anything like that?
15     A.    No, sir.
16     Q.    When Frank Fischer arrived
17 with his sister, what was said? Who
18 started talking and what was said?
19     A.    Danny Harpst did all the
20 talking and basically went through the
21 memo and told him the findings of the memo
22 and what the outcome of the memo was
23 through upper management and what was to

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

JOHN MORRIS
November 21, 2006

(Pages 49 to 52)

Page 49

1  happen.
2      Q.  Do you know who the members
3  were who served on the Accident Review
4  Committee during this time?
5      A.  No, sir.
6      Q.  Do you know if Danny Harpst
7  was a member of the Accident Review
8  Committee?
9      A.  Accident Review Committee were
10  all -- by the book, was all peers.
11      Q.  Other shuttle drivers, in
12  other words?
13      A.  Yes, sir, any of the drivers.
14      Q.  You don't know who served on
15  that Committee at this time, who
16  investigated this accident?
17      A.  (Witness shakes head.)
18      Q.  You don't know when they met
19  after this accident?
20      A.  No, sir.
21      Q.  Do you know who would know
22  when the Accident Review Committee met?
23  Would Danny Harpst know?

Page 50

1      A.  No. It was -- Bo works for HR
2  department.
3      Q.  Do you know the procedure that
4  is followed once the Accident Review
5  Committee makes a recommendation? Is the
6  decision of the Accident Review Committee
7  binding or is it simply a recommendation
8  that whoever makes the final decision can
9  either follow the recommendation or not
10  follow it?
11      A.  I can't answer that.
12      Q.  Bo Brown was head of safety.
13  Do you know if the ultimate decision on
14  whether or not to fire somebody for an
15  accident on the job laid with him?
16      A.  No, sir.
17      Q.  Do you know if there was a
18  particular person at Sysco that would make
19  the final decision about whether someone
20  would be fired because of an accident that
21  occurred on the job?
22      A.  Just said upper management, so
23  I never knew who would do that.

Page 51

1      Q.  Okay. Did anybody ever from
2  the Safety Review Committee, I think, is
3  what -- Accident Review Committee or
4  anyone else, Bo Brown or anyone, ever ask
5  your opinion about the seriousness of the
6  accident that Frank Fischer had?
7      A.  No. That wasn't my job.
8      Q.  Did anyone ever ask you about
9  what kind of employee Frank Fischer was
10  generally when they were making their
11  decision about whether to terminate him or
12  not?
13      A.  No, sir.
14      Q.  If I have asked this before, I
15  apologize. Let me make sure I understand.
16  During this meeting, the reasons given by
17  Danny Harpst for his firing, did you say
18  he simply read from the memo?
19      A.  Yes, sir.
20      Q.  Do you remember what the
21  response from Frank Fischer was?
22      A.  He was upset.
23      Q.  When you say he was upset, do

Page 52

1  you remember what he said?
2      A.  He said he was not going to
3  sign it and that was it. And basically,
4  it was -- it was very few words said, very
5  few. He got his stuff out of the box and
6  I said I need your keys and that was it.
7      Q.  What did you say about getting
8  his stuff?
9      A.  He had a little cubby hole
10  where they kept their books and stuff like
11  that, a shelf where they kept their stuff,
12  personal gear.
13      Q.  Did you clear that out for
14  him?
15      A.  Yeah, it was right there.
16  It's in that little trailer, so he was
17  able to get it.
18      Q.  Did you get it for him or did
19  he?
20      A.  I can't recall.
21      Q.  At any time during the entire
22  time you worked for Sysco Calera, can you
23  recall any other driver being terminated

13

FRANK FISCHER

SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

JOHN MORRIS

November 21, 2006

(Pages 53 to 56)

Page 53

1  after an on-the-job accident?
2       MR. UMBACH:  I'm sorry, can
3  you ask that again?
4       Q.    Anytime during you have been
5  employed with Sysco Calera, do you recall
6  a driver that was terminated following an
7  on-the-job accident?
8       MR. UMBACH:  Other than what
9  he's already testified about?
10      MR. MIDDLEMAS:  Right, but I'm
11 not certain I have asked it like that.  If
12 I'm being repetitive, I apologize, but if
13 you can just --
14      MR. UMBACH:  Let me object to
15 the form.
16      Q.    Go ahead and answer that.
17      A.    Just the ones that we
18 mentioned earlier.
19      Q.    In the meeting with you and
20 Danny Harpst when this memorandum was
21 presented to Frank Fischer, was there any
22 discussion about him falling asleep or did
23 he deny falling asleep, or do you have any

Page 54

1  recollection about that?
2       A.    That was not discussed in
3  there because -- what was discussed is
4  what is in here (indicating).
5       Q.    Did Danny Harpst review the
6  company policies and the rules that he
7  claims Frank violated?
8       MR. UMBACH:  Object to the
9  form.
10      Q.    I'm sorry, you can go ahead
11 and answer.
12      A.    During this discussion?
13      Q.    Yes.  Did he go over the
14 rules?  There are rules cited in the
15 second paragraph that he says were
16 violated.  Did he go through those rules
17 with Frank Fischer?
18      A.    I can't recall.
19      Q.    At any time after this
20 termination, did you have any conversation
21 with Frank Fischer about this meeting?
22      A.    No, sir.
23      Q.    Did he ever try to contact you

Page 55

1  again?
2       A.    No, sir.
3       Q.    Did you ever speak with Danny
4  Harpst about it again?
5       A.    About Frank again?
6       Q.    Yes.
7       A.    No, sir.
8       Q.    Other than either attorneys
9  representing Sysco or someone associated
10 with risk management, have you since this
11 meeting had any conversation with anyone
12 about the firing of Frank Fischer?
13      A.    No, sir.
14      Q.    I'm going to show you,
15 Mr. Morris, what is marked as Defendant's
16 Exhibit 1.  I think it's entitled Driver's
17 Report of Accident.
18      I believe that Frank Fischer
19 has testified that he did, in fact, sign
20 this and fill this out.  And under brief
21 description of accident, it says came to
22 intersection sooner than expected, hit
23 brakes and went into ditch.

Page 56

1       Is that your recollection of
2  how Frank Fischer described to you how
3  this accident happened?
4       A.    No, sir.
5       Q.    Can you tell me again how it
6  differed from that?
7       A.    I said what happened, and he
8  says I think I fell asleep.
9       Q.    Do you remember the day of the
10 week this was this happened on?
11      A.    No, sir.
12      Q.    Do you remember if whether or
13 not this was his regularly scheduled
14 workday or if you had asked him to work on
15 his off day?
16      A.    They didn't really have off
17 days.  They were available five days a
18 week.  Their off days were Saturday and
19 Sunday.  If they had an off day during the
20 middle of the week, it's because we didn't
21 need them.
22      Q.    They had no set off day?
23      A.    Saturday and Sunday.

14

Page 57

```
 1      Q.    Other than the Saturday and
 2   Sunday, they have no set off days?
 3      A.    No, sir.
 4      Q.    Were there at times that Sysco
 5   was shorthanded for drivers?
 6      A.    Yes, sir.
 7      Q.    Would that require the
 8   existing drivers to work longer hours
 9   during the week than they ordinarily
10   would?
11      A.    They could only work within
12   DOT standards.
13      Q.    And what were the DOT
14   standards again?
15      A.    If I recall, they couldn't
16   work more than sixteen hours in one day,
17   one shift per week, fourteen hours per
18   shift, and they couldn't work more than
19   seventy hours a week.
20      Q.    At any time while you were
21   employed there with Sysco Calera, were
22   there instances where drivers would drive
23   over their limit?
```

Page 58

```
 1      A.    They couldn't.
 2      Q.    When you say they couldn't,
 3   could you explain that?
 4      A.    If they reached their limit,
 5   they were told to park the trucks and we
 6   would come and get them.
 7      Q.    Was Sysco tracking them to see
 8   if they were working over their limit?
 9      A.    Yes, sir.
10      Q.    Did Sysco track all of its
11   trucks?
12      A.    Yes, sir.
13      Q.    For instance, would someone be
14   aware that Frank had wrecked his truck
15   when it happened before he ever made a
16   call to you?
17      A.    The way we track our trucks
18   was through Tripmaster program. The very
19   next day, they would have had a card and
20   when you finish your route, you would
21   download that card -- this is in the
22   shuttle yard -- and then they would -- the
23   card would go through a machine.
```

Page 59

```
 1   In Calera, they had a microwave
 2   system that read it. It was automatic.
 3   When they pull in the yard, it would
 4   download the truck. But the driver had to
 5   put that information in the computer to
 6   extract information from the computer.
 7      The very next morning somebody
 8   would come in and read it, and the driver
 9   is responsible to make sure that he's DOT
10   compliant in everything he does.
11      Q.    You have listed some people
12   that might have some knowledge about this
13   accident and also the subsequent
14   termination, Craig Gottscaker, Danny
15   Harpst, Margie Self and Bo Brown.
16      To your knowledge, are there
17   any other persons that have knowledge
18   about the accident and the subsequent
19   termination?
20      A.    Smoky Parker, who was the
21   director of transportation, was also that
22   night, I believe, or he was called by
23   Danny. He's part of chain of command.
```

Page 60

```
 1      Q.    Smoky Parker?
 2      A.    Yes, sir.
 3      Q.    He was?
 4      A.    Director of transportation.
 5      Q.    What does the director of
 6   transportation position entail?
 7      A.    Overall responsibility of
 8   transportation operations.
 9      Q.    Where was he based?
10      A.    In Calera.
11      Q.    So you didn't talk to him that
12   night, or did you talk to him that night?
13      A.    Either I called him or Danny
14   called him, but one of us called him as
15   part of the chain of command.
16      Q.    At any time after the night of
17   the accident, did you have a conversation
18   with Smoky Parker about the accident?
19      A.    No, sir.
20      Q.    At any point after the
21   accident, did you or anyone else, to your
22   knowledge, claim that Frank Fischer was
23   not wearing his seat belt on the night the
```

Page 61

1   accident occurred?
2       A.   Can you rephrase that?
3       Q.   Yes. Did you, at any point
4   after this accident happened, tell Frank
5   Fischer that you thought he was not
6   wearing his seat belt when this accident
7   happened?
8       A.   He had a nugget on his head
9   where he had hit the windshield.
10      Q.   Did he tell you he hit the
11  windshield?
12      A.   Yes, sir.
13      Q.   Anyway, go on. I'm sorry.
14      A.   And I cannot recall if I said
15  well, did you have the seat belt
16  underneath your arm like you always do. I
17  know that came up in conversation, but I
18  can't really remember. But I know he had
19  a goose egg on his forehead where he had
20  hit the windshield.
21      Q.   Was he cut at all on his
22  forehead, to your knowledge?
23      A.   He had a ball cap on.

Page 62

1       Q.   How did you know he had a ball
2   cap on?
3       A.   I saw him after he had the
4   accident. I was still in the yard after
5   delivery. And when he came to get his
6   vehicle, I talked to him about his
7   injuries and he said he had hit the
8   windshield with his head.
9       Q.   Is that when you asked him
10  about the seat belt, you think?
11      A.   I might have made a comment to
12  him.
13      Q.   Did anybody else talk to you
14  about the issue of whether Frank Fischer
15  was wearing his seat belt when the
16  accident happened?
17      A.   Danny Harpst and I talked
18  about it.
19      Q.   When did y'all talk about it?
20      A.   When the truck was in the
21  yard, towed back to the yard, we went out
22  to the yard to look at the tractor and saw
23  where the windshield had been broken out.

Page 63

1       Q.   And this is when now?
2       A.   A couple of days after the
3   tractor finally arrived at Calera.
4   Sometime in the month of when the accident
5   happened.
6       Q.   June 29th, I believe.
7       A.   Sometime in July.
8       Q.   You mean the tractor was towed
9   back to the Calera yard?
10      A.   Yes, sir.
11      Q.   Did Danny Harpst call you
12  after it had been towed back; is that what
13  happened?
14      A.   No. I would go up there for
15  meetings.
16      Q.   Oh, you would?
17      A.   Yes.
18      Q.   You discussed this with him on
19  one of the times you went up there for a
20  meeting, or did you go up there
21  specifically to talk about Frank Fischer's
22  case?
23      A.   No. I went up for a meeting

Page 64

1   and we went out and looked at the truck.
2   I was looking for the Tripmaster cards and
3   Frank asked me to get his toolbox that he
4   had left in the truck.
5       Q.   And when you and Danny Harpst
6   went out there to look at the tractor,
7   what did Danny Harpst say?
8       A.   It was me. I looked at the
9   tractor. I got in the driver's seat and
10  saw where the windshield -- he had hit his
11  head on the windshield and it had a little
12  bit of hair particles. And I think at the
13  time I said well, no way you are going to
14  hit your windshield -- this happened not
15  probably wearing your safety belts.
16      Q.   Why would you say that? And
17  what I mean is, was there already
18  discussion about whether or not this is
19  going to be an accident that resulted in
20  termination?
21      A.   No, sir. It was just
22  conversation.
23      Q.   Was the issue of a seat belt

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

JOHN MORRIS
November 21, 2006

(Pages 65 to 68)

Page 65

1 brought up in the meeting that happened
2 right here on July the 27th?
3 　　A.　No, sir.
4 　　Q.　Did anyone, before Frank
5 Fischer was fired on July the 27th, ever
6 discuss with you the fact that Frank
7 Fischer had made a worker's compensation
8 claim?
9 　　A.　No, sir.
10 　　Q.　Were you aware that he had
11 made a worker's compensation claim?
12 　　A.　No, sir.
13 　　Q.　During this meeting, did Danny
14 Harpst discuss the worker's compensation
15 claim that Frank Fischer had made?
16 　　A.　No. He only discussed what
17 was within that paragraph.
18 　　Q.　Well, as you see, there is a
19 PS written down there that gives the name
20 of a worker's compensation adjuster or
21 agent or something like that.
22 　　A.　Yes, sir.
23 　　Q.　Was that discussed?

Page 66

1 　　A.　I can't recall.
2 　　Q.　Other than when you were
3 looking at the tractor with Danny Harpst
4 up in Calera and you discussed the fact
5 that you thought perhaps the seat belt
6 wasn't on right because he hit his head
7 like that, was there ever any other
8 discussion that you had with anyone about
9 the seat belt?
10 　　A.　No, sir.
11 　　Q.　And I asked a question similar
12 to this earlier, I just want to make sure
13 I'm completely clear about it.
14 　　　To your recollection, was Frank
15 Fischer, before the date of 6/29/04, ever
16 cited for a safety violation while driving
17 for Sysco?
18 　　A.　No, sir.
19 　　Q.　Do you know how long he had
20 worked for Sysco at the time he had this
21 accident?
22 　　A.　He was one of the most senior
23 men, twenty plus years with the company.

Page 67

1 　　Q.　Did anybody ever discuss that
2 fact with you, that he was one of the most
3 senior persons driving?
4 　　MR. UMBACH: Object to the
5 form.
6 　　A.　Pertaining to what?
7 　　Q.　To anything. And what I mean
8 is, was there ever any discussion, either
9 before this accident happened or after,
10 where anyone affiliated with Sysco
11 discussed with you that Frank Fischer was
12 the most senior driver they had?
13 　　MR. UMBACH: Object to the
14 form.
15 　　A.　No, sir.
16 　　Q.　In the chain of command at
17 Sysco when you held the position of
18 district transportation supervisor, who
19 was your immediate supervisor?
20 　　A.　Smoky Parker.
21 　　Q.　At any time prior to this
22 accident on June 29, 2004, did you and
23 Smoky Parker have any discussion about any

Page 68

1 problems with Frank Fischer as an
2 employee?
3 　　A.　No, sir.
4 　　Q.　After the accident happened,
5 you have described the conversation with
6 Danny Harpst. Did you have any
7 conversation with Smoky Parker about a
8 seat belt or anything to do with the
9 accident Frank Fischer had?
10 　　A.　No, sir.
11 　　Q.　Is that unusual? And what I
12 mean is, you are the supervisor of
13 Fischer?
14 　　A.　Yes, sir.
15 　　Q.　Parker is your supervisor?
16 　　A.　Yes, sir.
17 　　Q.　This was listed as a major
18 accident. Why would you not discuss it
19 with Parker?
20 　　A.　The only responsibility I had
21 was to turn in my report, which I typed up
22 and turned in the very next day. Then
23 they took that information, the report I

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

JOHN MORRIS
November 21, 2006

(Pages 69 to 72)

Page 69

1    did, and that was my input.
2        Q.    Can you show me the report or
3    maybe the report is in that exhibit.
4        MR. MIDDLEMAS:  Has it already
5    been --
6        MR. UMBACH:  I'll give it to
7    you.
8        MR. MIDDLEMAS:  Has it already
9    been entered as an exhibit?
10        MR. UMBACH:  I don't know.  I
11    don't think so.
12        (Reviewing documents.)
13        MR. MIDDLEMAS:  Give me just a
14    moment to look through this real quick.
15        (Reviewing document.)
16        (Whereupon, Plaintiff's
17        Exhibit 1 was marked for
18        identification.)
19        Q.    So, Mr. Morris, this is the
20    Supervisor Incident Report that you just
21    cited in your testimony; is that right?
22        A.    Yes.  This is the one I
23    printed up and faxed.  I sent it by

Page 70

1    e-mail, attached to an e-mail.
2        Q.    When was this created?
3        A.    The very next day.
4        Q.    And I notice in here that you
5    write I asked where are you and what
6    happened.  Frank said he was southbound on
7    Highway 271 and ran off the
8    intersection -- ran off the road at the
9    intersection of Highway 271 and Highway
10    231.  And I asked how did that happen, and
11    Frank said uh, I don't know, maybe I fell
12    asleep.
13        I want to make sure I
14    understand your testimony.  You don't
15    remember Frank Fischer saying definitively
16    that he fell asleep, do you?
17        A.    I'm saying what is right
18    there.  That was right after the accident
19    when he called me.
20        Q.    It also cites down here in the
21    investigation summary portion that you
22    received a phone call from John Cruz
23    asking about Frank Fischer's condition.

Page 71

1    And you said during our conversation, John
2    made the comment he called Frank on the
3    two-way early that morning and warned him
4    about the construction barriers at the end
5    of Highway 271 before you approach 231.
6        Why did John Cruz tell you
7    that, to your recollection?
8        A.    John Cruz and Frank ran
9    together a lot of times.
10        Q.    What do you mean ran together?
11        A.    They would take -- behind each
12    other.  Like going down the road when you
13    see a convoy of two Sysco trucks.
14        Q.    Okay.
15        A.    And John and Frank -- well,
16    John would check on Frank throughout the
17    night and make sure he was okay.
18        Q.    They weren't running together
19    on this night?
20        A.    No, sir.  John was ahead of
21    Frank and just let him know -- they would
22    call deer are out, it's foggy, whatever,
23    just talking to each other.

Page 72

1        Q.    And it says down here I asked
2    John where was Frank when he talked to him
3    and John replied southbound on I-65.  Why
4    did you put that in your report?  Why was
5    that important enough to put in your
6    report?
7        A.    I can't recall.  Just
8    documenting everything that happened, all
9    the conversations, what was going on and
10    everything that happened.
11        Q.    And right up here where it
12    says what do you think caused this
13    incident, root cause?  And if stuck, ask
14    if you were in the exact same situation
15    right now, what would you do different?
16    Did you respond to that, or is there a
17    response to that?  I'm not sure I follow
18    that exactly.
19        A.    (Reviewing document.)  That is
20    usually what you would do after you find
21    out the results of the Accident Review
22    Committee.  And I didn't know -- it says
23    action taken, Accident Review Committee,

Page 73

1  because I didn't know what the cause of
2  the accident was at the time.
3      Q.   Right here, there is the
4  choice of is further investigation of this
5  incident necessary, and you checked yes or
6  marked yes?
7      A.   Yes, sir.
8      Q.   How is it determined whether
9  further investigation of this incident is
10 necessary, and does that decision lie with
11 you?
12     A.   If I am the first person to go
13 up, let's say, a driver had a small
14 accident, say, he bumped into something, a
15 hole, no damage done; well, of course, no
16 further investigation.
17         But in this case, the accident
18 running off the road and damage, we didn't
19 know if the tractor had problems, in other
20 words, we have to look at mechanically if
21 something happened, we didn't know.
22         This is where you have like a
23 minor, minor accident that you have a bump

Page 74

1  in the yard or something like that.  Those
2  things happen all the time.
3      Q.   Before July the 27th, 2004
4  when he actually was terminated, did you
5  have any expectation or any opinion as to
6  what should happen to Frank Fischer?
7      A.   No, sir.
8      Q.   Did you want to keep him on as
9  an employee?
10     A.   Yes, sir.
11         MR. MIDDLEMAS:  Can you give
12 me just a couple of minutes to look
13 through some stuff, and I don't have much
14 more?
15         MR. UMBACH:  Sure.
16         (Short break taken.)
17         MR. MIDDLEMAS:  Okay.  We are
18 back on.
19     Q.   (BY MR. MIDDLEMAS:)  At any
20 time, not in preparation for this
21 deposition, but at any other time, did you
22 discuss the Fischer accident with Lynda
23 Wheat?

Page 75

1      A.   No, sir.
2      Q.   Did you ever discuss with
3  Lynda Wheat the termination of Frank
4  Fischer?
5      A.   No, sir.
6      Q.   We talked a minute ago about
7  how many years Frank Fischer had worked
8  for the company.  Was he, to your
9  knowledge, the most senior driver driving
10 for Sysco at that time?
11         MR. UMBACH:  Object to the
12 form.  You can answer.
13     A.   Yearswise?
14     Q.   Yes, sir.
15     A.   Yes, sir.
16     Q.   And, to your knowledge, the
17 person closest to him in terms of number
18 of years of driving, how many years had
19 they been driving for the company?
20     A.   I think we had some up to
21 fifteen years.  I'm only guessing.  I know
22 we had some at minimum, between ten and
23 twenty.

Page 76

1         (Whereupon, Plaintiff's
2          Exhibit 2 was marked for
3          identification.)
4      Q.   I'm going to show you what I
5  am going to mark as Plaintiff's Exhibit 2,
6  which was just a document provided to me
7  by the lawyers for Sysco in discovery.
8  And this, I believe, says Driver
9  Evaluation Form.  Do you know, does this
10 appear to be an evaluation of Frank
11 Fischer?
12     A.   Yes, sir.
13     Q.   It's got here, instructor.
14 Can you tell me that name right now?
15     A.   Judd Brogden.
16     Q.   Who is Judd Brogden?
17     A.   He was the lead safety
18 director for Sysco Calera.
19     Q.   I mean, is that prior to Bo
20 Brown, or am I getting the positions mixed
21 up here?
22     A.   Bo worked for Judd.
23     Q.   Does he still hold that

FRANK FISCHER

JOHN MORRIS

SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

November 21, 2006

(Pages 77 to 80)

Page 77

1  position?
2      A.   Judd is no longer with Sysco.
3      Q.   Do you know where he is now?
4      A.   No, sir.
5      Q.   When did he leave Sysco, to
6  your knowledge?
7      A.   I don't know, sir.
8      Q.   When this evaluation was done,
9  did he contact you and ask you questions
10  about Frank Fischer's performance?
11      A.   No, sir.
12          (Whereupon, Plaintiff's
13          Exhibit 3 was marked for
14          identification.)
15      Q.   I'm going to mark this as
16  Plaintiff's Exhibit 3, which, again, is
17  another document I received from Sysco's
18  attorneys.  It says a Certificate of
19  Completion Presented to Frank Fischer,
20  Three Dimensions of Safe Driving Large
21  Vehicle.  Are you familiar with this
22  document?  Have you ever seen it before?
23      A.   No, sir.

Page 78

1      Q.   Then when they state
2  certificate of completion for this three
3  dimensions of safe driving large vehicle,
4  do you even know what that is in reference
5  to?
6      A.   No, sir.
7      Q.   You don't know if that was a
8  prerequisite to continue driving as a
9  shuttle driver for Sysco or not?
10      A.   These are safety programs that
11  we have.  I teach this class here now and
12  this is the Smith System, which is the
13  five points of defensive driving we teach
14  all the drivers.  And it's the techniques
15  of driving.  It's not really driving
16  tractor trailers.  It's techniques for
17  safety that we want them to use when they
18  are driving, whether it be in their
19  privately-owned vehicle or in a tractor
20  trailer.  It's five steps.  We want you to
21  aim high, keep your eyes moving, leave
22  yourself an out and make sure they see
23  you.  And Sysco overall does this program

Page 79

1  in every Sysco house.
2          And once a year, we have a
3  forty-hour safety meeting where everybody
4  has -- not forty hours -- four-hour safety
5  meeting and everybody has to attend.  I
6  believe we did Three Dimensions of Safe
7  Driving Large Vehicles in this meeting.
8      Q.   Okay.
9          MR. UMBACH:  I want the record
10  to be clear that you were just testifying
11  about Plaintiff's Exhibit 2.
12          MR. MIDDLEMAS:  Right.
13          MR. UMBACH:  When you were
14  talking about the Smith System, you were
15  referring to Plaintiff's Exhibit 2?
16          THE WITNESS:  Yes, sir.
17      Q.   (BY MR. MIDDLEMAS:)  All
18  right.  And you say you teach this course
19  now, so do you fill out these evaluation
20  forms now?
21      A.   Yes, sir.  And as you know,
22  it's not in the van -- it's not from
23  tractor trailers.  It's safe driving that

Page 80

1  we want them to use these techniques.  And
2  when they are driving tractor trailers,
3  aim high in steering, saying look
4  15 seconds ahead down the road.  Where are
5  you going to be 15 seconds from now,
6  getting the big picture, keeping your eyes
7  moving 360 degrees around your vehicle,
8  keep your eyes moving.  We want them to
9  move their eyes every 5 to 8 seconds,
10  checking the mirrors, checking around you,
11  being alert.
12          Leave yourself an out is if you
13  are driving down the road and you get
14  closed in, how are you going to get out to
15  avoid an accident, and make sure they see
16  you at intersections when you come up on
17  intersections.  Like you and I get eye
18  contact, that is what it is all about, and
19  we teach all our drivers this, it's
20  supposed to be every two years.
21      Q.   Did you ever evaluate Frank
22  Fischer?
23      A.   I was not an instructor at

20

Tyler Eaton Morgan Nichols & Pritchett, Inc.

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

JOHN MORRIS
November 21, 2006

(Pages 81 to 84)

Page 81

1  that time.
2      Q.   Okay.  And, again, you have
3  never had to cite Frank Fischer for any
4  safety violations, to your recollection,
5  while you were at Sysco?
6          MR. UMBACH:  Object to the
7  form.
8      Q.   While he was at Sysco?
9          MR. UMBACH:  Other than what
10  he has already testified about?
11          MR. MIDDLEMAS:  Correct.
12      A.   Just wearing his seat belt.
13      Q.   On the seat belts, was there
14  anything that was ever written up?
15      A.   No, sir.  It was verbal.
16      Q.   Was Judd Brogden still at
17  Sysco at the time of Frank Fischer's
18  accident in June of 2004, to your
19  knowledge?
20      A.   No, sir.  Margie Self took his
21  place.
22      Q.   The meeting on July the 27th
23  when Frank Fischer was fired where you

Page 82

1  were present and Danny Harpst was present,
2  you have testified that Danny Harpst went
3  through the language that was in the memo?
4      A.   Yes, sir.
5      Q.   Was there any other discussion
6  about what would occur with health
7  insurance benefits or any other benefits
8  that were available to Frank Fischer as an
9  employee?
10      A.   I can't recall.
11          MR. MIDDLEMAS:  I don't have
12  anything else.
13          MR. UMBACH:  One quick
14  question.
15
16  EXAMINATION BY MR. UMBACH:
17      Q.   John, when you said Fischer
18  was the most senior, what did you mean?
19      A.   Years of service.
20      Q.   Years of service with the
21  company?
22      A.   With the company, yes, sir.
23      Q.   In other words, seniority with

Page 83

1  the company?
2      A.   Yes, sir.
3          MR. UMBACH:  Okay.  That is
4  all I've got.
5          MR. MIDDLEMAS:  Let me ask one
6  follow-up about that.
7
8  REEXAMINATION BY MR. MIDDLEMAS:
9      Q.   In terms of age, was he the
10  oldest driver that you had at Sysco during
11  the time that he was there and that you
12  had the position of DTS?
13      A.   I can't recall.  I don't know
14  how old Frank is.
15      Q.   He's in his 50s.
16      A.   Okay.
17      Q.   Do you know if there were
18  other drivers that were that age or older
19  at the time that you were over them as
20  supervisor?
21      A.   In our yard down there?
22      Q.   Yes.
23      A.   No.

Page 84

1          MR. MIDDLEMAS:  Okay.  That is
2  all I have.
3          MR. SEGREST:  No questions.
4          MR. UMBACH:  That is all.
5
6      FURTHER THE DEPONENT SAITH NOT

21

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

JOHN MORRIS
November 21, 2006

(Page 85)

Page 85

```
 1          C E R T I F I C A T E
 2
 3
 4     STATE OF ALABAMA)
 5     JEFFERSON COUNTY)
 6
 7          I hereby certify that the
 8     above and foregoing deposition was taken
 9     down by me in stenotypy, and the questions
10     and answers thereto were reduced to
11     typewriting under my supervision, and that
12     the foregoing represents a true and
13     correct transcript of the deposition given
14     by said witness upon said hearing.
15          I further certify that I am
16     neither of counsel nor of kin to the
17     parties to the action, nor am I in anywise
18     interested in the result of said cause.
19
20
21
22
23          COMMISSIONER - NOTARY PUBLIC
```

**FRANK FISCHER**
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

**JOHN MORRIS**
November 21, 2006

---

**A**

**able**
41:1 52:17

**accident**
17:19 26:11 27:18 29:3,9
29:17 30:18 31:4 32:4
33:6,7,18 34:5,12,16
36:3,7 37:1,5,9 38:19
38:23 39:4,10 41:18
42:5 43:19,22 44:2,6,7
44:18 45:1,2,17 46:17
49:3,7,9,16,19,22 50:4
50:6,15,20 51:3,6 53:1
53:7 55:17,21 56:3
59:13,18 60:17,18,21
61:1,4,6 62:4,16 63:4
64:19 66:21 67:9,22
68:4,9,18 70:18 72:21
72:23 73:2,14,17,23
74:22 80:15 81:18

**accidents**
27:14,14,15,19 29:20
30:13

**acting**
6:5

**action**
1:4,10 23:17,20 24:4
25:7 72:23 85:17

**actual**
42:10

**add**
26:19

**adjuster**
65:20

**affiliated**
67:10

**age**
83:9,18

**agent**
65:21

**ago**
45:19 75:6

**AGREED**
2:2

**ahead**
53:16 54:10 71:20 80:4

**ahold**
45:13

**aim**
78:21 80:3

**al**
1:7,13

**Alabama**
1:2,7,9,13 3:8,11,16,22
6:4,5,11 8:20 85:4

**alcohol**
25:10

**alert**
80:11

**Allison**

**3:20**

**allowed**
24:8

**Altha**
8:17,18

**ambulance**
34:19 35:1

**answer**
15:14 18:2 50:11 53:16
54:11 75:12

**answers**
85:10

**anybody**
20:17 22:9 24:23 27:2
29:2 31:5 43:3 51:1
62:13 67:1

**Anytime**
53:4

**Anyway**
61:13

**anywise**
85:17

**apologize**
51:15 53:12

**appear**
76:10

**appearance**
16:23 17:1

**applied**
37:22 38:10

**approach**
71:5

**approached**
39:7

**area**
8:4 10:22 17:6 21:7

**arm**
19:18 21:18 61:16

**Arnold**
3:12

**arrived**
48:16 63:3

**asked**
31:5 32:4 45:23 48:9
51:14 53:11 56:14 62:9
64:3 66:11 70:5,10 72:1

**asking**
70:23

**asleep**
31:8 53:22,23 56:8 70:12
70:16

**assign**
2:19

**associate**
9:19,20,23 10:10,18

**associated**
48:13 55:9

**associates**
10:12

**assume**
28:6

**assumption**
28:7

**Atchison**
3:14

**attach**
37:20

**attached**
70:1

**attend**
79:5

**Attorney**
3:5,13,19

**attorneys**
55:8 77:18

**automatic**
59:2

**automatically**
26:9

**available**
56:17 82:8

**avoid**
80:15

**awards**
16:11

**aware**
58:14 65:10

**axle**
10:2

**A–L–T–H–A**
8:17

---

**B**

**back**
13:6 22:6 28:13,16,17
31:9 34:17 39:8,11
47:16 62:21 63:9,12
74:18

**Bailey**
20:21 21:3

**ball**
61:23 62:1

**bar**
28:15

**barely**
18:13

**barriers**
71:4

**based**
16:1 20:12 32:14,16,23
60:9

**basically**
18:9 37:22 46:12 48:20
52:3

**believe**
10:5 13:1 23:22 31:3,5,17
34:1,21,21 35:19 45:7
48:3,8 55:18 59:22
63:6 76:8 79:6

**belt**
19:14,14,16 21:14,16 60:23
61:6,15 62:10,15 64:23

**belts**
64:15 81:13

**benefits**
82:7,7

**best**
15:15

**big**
80:6

**binding**
50:7

**Birmingham**
3:8,16,22 6:3 8:2 10:15
12:10 17:11,15 29:8

**bit**
19:19,20,22 46:7 64:12

**blocks**
17:3

**Blountstown**
8:17

**Bo**
33:16 34:13,21 44:2,12
50:1,12 51:4 59:15
76:19,22

**book**
49:10

**books**
52:10

**box**
52:5

**brake**
37:14

**brakes**
37:16,23 38:10 55:23

**braking**
22:14

**break**
7:8 22:2,4 74:16

**brief**
55:20

**Brogden**
76:15,16 81:16

**broken**
16:22 62:23

**Brookwood**
3:15

**brought**
35:8 48:9 65:1

**Brown**
33:16 34:13,21 44:2
50:12 51:4 59:15 76:20

**Brown's**
44:12

**building**
47:19

**bump**
73:23

**bumped**
73:14

---

**C**

**66:5,9 68:8 81:12**

**C**
3:1 4:1 85:1,1

**Calera**
7:16 8:1,6 13:7 14:17,19
17:16,17 24:13 32:15,17
32:23 44:21 52:22
53:5 57:21 59:1 60:10
63:3,9 66:4 76:18

**call**
11:17 23:16,21 30:21 31:8
31:15 43:19 58:16 63:11
70:22 71:22

**called**
30:19 31:12 32:10,19 33:3
33:16,20 34:9,11,17
35:2 59:22 60:13,14,14
70:19 71:2

**calling**
31:9 41:21

**calls**
18:18 33:19

**cap**
61:23 62:2

**card**
58:19,21,23

**cards**
64:2

**Carr**
3:20

**case**
44:17 63:22 73:17

**cases**
22:20

**catch**
19:19

**cause**
6:14 72:13 73:1 85:18

**caused**
72:12

**centered**
28:19

**CENTRAL**
1:7,13 3:11

**certain**
53:11

**certificate**
77:18 78:2

**Certified**
1:21 2:6 6:2

**certify**
6:6 85:7,15

**chain**
59:23 60:15 67:16

**check**
28:8,18 40:2 71:16

**checked**
19:11 73:5

**checking**
80:10,10

**choice**
73:4

---

Tyler Eaton Morgan Nichols & Pritchett, Inc.

CIRCUIT
1:9
cite
81:3
cited
25:9 54:14 66:16 69:21
cites
70:20
citing
25:6
City
8:3 12:4 13:2,4,7 14:21
17:7 19:12,23 20:10,18
23:5 33:12 35:21 47:17
47:23
Civil
1:4,10 6:7
claim
36:21 60:22 65:8,11,15
claims
54:7
class
78:11
clear
52:13 66:13 79:10
closed
80:14
closest
75:17
come
19:10 25:22 38:6 39:11
43:7 58:6 59:8 80:16
comes
18:16 40:11
coming
45:15
command
59:23 60:15 67:16
commencing
6:12
comment
62:11 71:2
Commerce
6:11
Commissioner
2:6 6:6 85:23
Committee
29:10 43:20,23 44:18
45:1 49:4,8,9,15,22
50:5,6 51:2,3 72:22,23
company
8:12 17:14 24:21 44:13
54:6 66:23 75:8,19
82:21,22 83:1
compensation
36:14,21 65:7,11,14,20
completely
66:13
completion
77:19 78:2
compliance

2:12
compliant
24:16 59:10
computer
22:12 38:7 59:5,6
concerned
19:1
condition
70:23
consistent
40:4,7,8
constantly
22:1
construction
71:4
contact
36:19,20 41:7 54:23 77:9
80:18
contacted
45:8,12
continue
78:8
CONTINUING
4:1
control
40:5 41:2
conversation
31:1 33:4 34:4,6 38:11
41:15 42:9,13 54:20
55:11 60:17 61:17
64:22 68:5,7 71:1
conversations
26:13 37:2 41:18 72:9
convoy
71:13
coordinating
12:7,9
corporate
16:7,11
correct
81:11 85:13
Cottsaker
31:18,20
counsel
2:4,16,18 6:10 85:16
counseling
25:3
counts
22:13
COUNTY
1:9 85:5
couple
8:23 63:2 74:12
course
25:1 73:15 79:18
Court
1:1,9,21 2:7,13 6:2,9
covers
21:11
Craig
31:17,19 34:12 59:14

crank
18:12,17
crash
32:9
created
70:2
criterias
16:23
cruise
40:5 41:2
Cruz
13:3,6 70:22 71:6,8
cubby
52:9
culvert
30:1
customer
22:18
customers
10:4,20 35:11
cut
61:21
CV-2005-1630
1:10

─────── D ───────

D
5:1
damage
73:15,18
Danny
32:10 33:8,17 34:20,22
37:6,7 38:12 39:7,18
41:5 45:10,21 48:7,19
49:6,23 51:17 53:20
54:5 55:3 59:14,23
60:13 62:17 63:11 64:5
64:7 65:13 66:3 68:6
82:1,2
date
6:6 42:10,14 43:1,3,9
45:4 47:2,12 66:15
dated
47:5
David
2G:21 21:3
Davis
1:20 2:6 3:4 6:1 7:2
day
10:12 12:6 20:13,19 22:18
24:14 26:1 35:10 36:2
36:4,23 37:1,8 38:12,19
39:13 41:19,22 47:9
56:9,15,19,22 57:16
58:19 68:22 70:3
days
56:17,17,18 57:2 63:2
daytime
10:19 21:1
December
7:15,17,22 8:7,9 11:2

decide
44:5,7
decision
45:22,23 50:6,8,13,19
51:11 73:10
deer
19:5 71:22
DEFENDANT
3:10
Defendants
1:8,14
Defendant's
46:19 55:15
defensive
78:13
defined
27:19
defines
27:15
defining
27:14
definitively
70:15
degrees
80:7
deliver
35:9
delivered
22:21 32:7
deliveries
10:19 12:5,9 35:13
delivering
10:4
delivery
9:19,20,23 10:10,12,17
62:5
Denita
13:22,23
deny
53:23
department
36:17 50:2
depending
10:3 12:19
DEPONENT
84:6
deposition
1:16 2:4,10,11,21 74:21
85:8,13
depositions
2:14
describe
10:21 17:21
described
10:6 12:12 37:3 56:2
68:5
description
55:21
details
29:16 30:7 33:8
determined

73:8
differed
56:6
different
10:9 16:22 17:3 72:15
dimensions
77:20 78:3 79:6
director
59:21 60:4,5 76:18
disciplinary
23:16,20,23 24:4 25:6
discipline
23:16 29:6 30:9
discovery
76:7
discuss
26:16 36:7,18 38:13 65:6
65:14 67:1 68:18 74:22
75:2
discussed
36:9 43:4 54:2,3 63:18
65:16,23 66:4 67:11
discussion
36:12 39:15,17 42:4
53:22 54:12 64:18 66:8
67:8,23 82:5
distance
40:18
district
1:1,2 6:8 11:19,21 12:1,3
13:12 14:3 15:10 20:11
21:6 22:23 27:7 67:18
ditch
55:23
DIVISION
1:3
doctor
42:15
document
46:20,23 69:15 72:19
76:6 77:17,22
documented
25:2
documenting
72:8
documents
69:12
doing
10:18 19:19 36:10 39:23
40:3
DOT
22:2,6 57:12,13 59:9
download
58:21 59:4
drive
57:22
driver
9:13 10:7 11:8 14:20
16:21 17:5,6,8,23 18:16
21:1 23:1 24:3,4 27:9
27:21 28:18 29:5,7,18

Tyler Eaton Morgan Nichols & Pritchett, Inc.

**FRANK FISCHER**
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

**JOHN MORRIS**
November 21, 2006

| | | | |
|---|---|---|---|
| 29:22 30:5,6,8 32:9 | employment | 80:17 | first | 25:7 43:12 53:15 54:9 |
| 33:5 41:1 44:4 46:11 | 43:2 | eyes | 6:18 8:7 9:8 22:3 30:17 | 67:5,14 75:12 76:9 |
| 52:23 53:6 59:4,8 | ended | 78:21 80:6,8,9 | 31:16 40:2 46:23 73:12 | 81:7 |
| 67:12 73:13 75:9 76:8 | 35:10 | e-mail | Fischer | forms |
| 78:9 83:10 | enforce | 25:22 70:1,1 | 1:5,11 7:4 10:5 13:5,15,21 | 23:17,20,23 79:20 |
| **drivers** | 19:2 | | 16:17 17:21 19:8 21:20 | forth |
| *10:13 12:6,7,8,13,21,23* | entail | —————— | 23:10 25:7 26:5,17 | 13:6 |
| 13:1 15:9,21 16:4,6,8,14 | 12:1 60:6 | **F** | 30:17 33:20 34:11 | forty |
| 17:13 18:5,8 22:1,16,18 | entered | **F** | 35:17 38:3,4,14 39:3 | 79:4 |
| 23:5,19 24:11,19 25:20 | 69:9 | 85:1 | 41:10,16 42:14,20 45:5 | forty-hour |
| 25:23 26:22,23 27:13 | **Enterprise** | fact | 47:8,12 48:8,16 51:6,9 | 79:3 |
| 30:3,12,14 44:3,3,7 | 8:20 | 33:18 55:19 65:6 66:4 | 51:21 53:21 54:17,21 | forwarded |
| 49:11,13 57:5,8,22 | entire | 67:2 | 55:12,18 56:2 60:22 | 16:10 |
| 78:14 80:19 83:18 | 11:5 52:21 | facts | 61:5 62:14 65:5,7,15 | four |
| **driver's** | entitled | 44:5 | 66:15 67:11 68:1,9,13 | 13:1,9 16:1 20:5 34:10 |
| 15:23 55:16 64:9 | 55:16 | falling | 70:15 74:6,22 75:4,7 | 37:3 |
| **driving** | estimate | 53:22,23 | 76:11 77:19 80:22 81:3 | fourteen |
| 11:9 19:4 22:14 24:6,22 | 12:17 | Fame | 81:23 82:8,17 | 57:17 |
| 25:9 66:16 67:3 75:9 | estimating | 15:22 16:3,5,18,21 | **Fischer's** | four-hour |
| 75:18,19 77:20 78:3,8 | 39:22 40:18 | Fames | 26:10 27:17 34:4 43:2 | 79:4 |
| 78:13,15,15,18 79:7,23 | et | 15:20 | 44:17 63:21 70:23 | Frank |
| 80:2,13 | 1:7,13 | familiar | 77:10 81:17 | 1:5,11 7:3 13:2,5,15,21 |
| **drop** | evaluate | 43:18 77:21 | Fisher | 16:17 17:22 18:19 19:8 |
| 18:9,15 | 15:23 17:4 80:21 | far | 41:7 | 19:16 20:6 21:20 23:9 |
| **dropped** | evaluation | 22:1 | five | 23:18 25:7 26:4,10,17 |
| 27:23 28:1 | 16:15 76:9,10 77:8 79:19 | fast | 17:13 44:2 56:17 78:13 | 27:17 30:17 32:4 33:13 |
| **drug** | evaluations | 22:14 24:22 38:7 | 78:20 | 33:20 34:4,11,17 35:1 |
| 25:13,23 26:5,6 | 15:4,6,9 | faxed | Floor | 35:17 38:2,4,14 39:3 |
| **DTS** | evening | 69:23 | 3:15 | 41:7,10,15 42:14,20 |
| 11:17,18 15:4 27:12 29:21 | 20:2 35:22,23 36:1 | Federal | Florida | 43:2,9 44:17 45:5,14,16 |
| 30:13 35:12 83:12 | everybody | 6:7 | 8:17,18 11:10 14:23 48:1 | 47:7,12 48:8,16 51:6,9 |
| **duly** | 79:3,5 | feeling | foggy | 51:21 53:21 54:7,17,21 |
| 6:18 | evidence | 36:10 | 71:22 | 55:5,12,18 56:2 58:14 |
| **Dunagan** | 2:22 | felt | folded | 60:22 61:4 62:14 63:21 |
| 13:22,23 | exact | 31:7 56:8 70:11,16 | 7:16 | 64:3 65:4,6,15 66:14 |
| **duties** | 72:14 | fifteen | follow | 67:11 68:1,9 70:6,11,15 |
| 15:3 | exactly | 75:21 | 38:2 50:9,10 72:17 | 70:23 71:2,8,15,16,21 |
| **duty** | 72:18 | fifth | followed | 72:2 74:6 75:3,7 76:10 |
| 31:18 | examination | 28:4,8,12,14,15,23 | 50:4 | 77:10,19 80:21 81:3,17 |
| | 5:3,5,6 6:14,21 82:16 | fill | following | 81:23 82:8 83:14 |
| —————— | examined | 55:20 79:19 | 6:15 53:6 | Frank's |
| **E** | 6:18 | final | follows | 38:19 |
| **E** | exhibit | 50:8,19 | 6:19 | freeway |
| 3:1,1 4:1,1 5:1 85:1,1 | 5:12,13,14 46:19 55:16 | finally | follow-up | 28:4,22 |
| earlier | 69:3,9,17 76:2,5,7 77:13 | 63:3 | 37:2 83:6 | full |
| 53:18 66:12 | 77:16 79:11,15 | find | food | 2:12 6:22 16:12 |
| early | **EXHIBITS** | 16:3 17:13 72:20 | 1:7,13 3:10 10:4 | further |
| 31:2 33:21 36:3 71:3 | 5:10 | findings | Foods | 73:4,9,16 84:6 85:15 |
| *effect* | existing | *41:8,12 45:16 48:21* | 7:12,14 | |
| 2:12 | 57:8 | fine | force | —————— |
| egg | expectation | 7:8 17:18 | 2:12 12:8 | **G** |
| 61:19 | 74:5 | finish | foregoing | |
| either | expected | 58:20 | 6:9 85:8,12 | gear |
| 25:10 37:3 44:8 50:9 | 55:22 | fire | forehead | 52:12 |
| 55:8 60:13 67:8 | explain | 27:8 50:14 | 61:19,22 | generally |
| employed | 28:10 58:3 | fired | forget | 51:10 |
| 14:14 53:5 57:21 | extent | 26:9 29:10,12 30:14 | 24:11 | Geneva |
| employee | 16:12 | 38:15 42:2,10 43:5,10 | forgetting | 7:12,14 21:8,10 |
| 23:23 51:9 68:2 74:9 | extract | 43:14 46:15 50:20 65:5 | 24:6 | getting |
| 82:9 | 59:6 | 81:23 | form | 14:11 33:9 52:7 76:20 |
| employees | eye | firing | 2:17 18:2 23:14 24:4 | 80:6 |
| 15:5 | | 42:15 43:1 51:17 55:12 | | give |
| | | | | 69:6,13 74:11 |

FRANK FISCHER                                                    JOHN MORRIS
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.            November 21, 2006

given
14:6  44:5  51:16  85:13
gives
65:19
giving
25:6
go
14:12  18:23  19:23  20:9
   24:11  25:23  28:17  35:7
   40:22  44:17  53:16
   54:10,13,16  58:23  61:13
   63:14,20  73:12
goes
28:15,16
going
7:5  27:22  29:23  31:11
   34:18  37:18  38:8  41:22
   42:17,20  43:5,14,16,17
   45:9,20,20  46:1,17
   52:2  55:14  64:13,19
   71:12  72:9  76:4,5
   77:15  80:5,14
goose
61:19
Gottscaker
31:21,22  32:16  34:13
   59:14
GPS
22:15,17
groceries
10:4  32:7
ground
18:14
grounds
2:20
guess
36:1
guessing
75:21
G-O-T
31:23
G-O-T-T-S-C-A-K-E-R
32:1

— H —
hair
64:12
Hall
15:20,22  16:3,5,17,21
handle
23:4  36:17
happen
49:1  70:10  74:2,6
happened
17:19  28:5  29:5  30:8,20
   31:6  36:3  37:14  45:2
   48:6  56:3,7,10  58:15
   61:4,7  62:16  63:5,13
   64:14  65:1  67:9  68:4
   70:6  72:8,10  73:21
hard

26:21,22
Harpst
32:11  34:20,23  37:6,7
   38:12  39:7,18  41:5
   45:10,21  48:7,19  49:6
   49:23  51:17  53:20  54:5
   55:4  59:15  62:17  63:11
   64:5,7  65:14  66:3  68:6
   82:1,2
haul
10:22
Haven
48:1,2
head
44:15,16  49:17  50:12  61:8
   62:8  64:11  66:6
heading
33:13
health
82:6
hearing
85:14
heavy
18:17
held
14:2  27:6,12  30:13  47:16
   67:17
help
21:2
helped
22:17  35:9
hey
18:19  20:6  24:17
he'll
27:4
high
14:12  28:19,20  78:21
   80:3
Highway
40:20  70:7,9,9  71:5
hire
26:22,22  46:12
hired
9:18  11:1
hit
30:1  40:16  55:22  61:9,10
   61:20  62:7  64:10,14
   66:6
hold
76:23
hole
52:9  73:15
hooking
19:12  20:3
hospital
35:2
hour
39:21
hours
22:3,13  24:5,9,10,12  57:8
   57:16,17,19  79:4

house
10:14  16:9  21:13  30:22
   79:1
HR
15:12  25:17  50:1
hurt
31:5

— I —
identification
69:18  76:3  77:14
III
3:12
immediate
67:19
immediately
13:21
important
72:5
incident
29:13,14  69:20  72:13
   73:5,9
INDEX
5:3,10
indicating
54:4
individual
1:5,11
influence
25:10
information
59:5,6  68:23
informed
32:8
injured
29:2
injuries
31:6  36:11  62:7
injury
42:21
input
69:1
instance
17:6  58:13
instances
57:22
instructor
76:13  80:23
insurance
82:7
interested
85:18
intersection
37:15,17  55:22  70:8,9
intersections
80:16,17
investigated
49:16
investigation
44:1  70:21  73:4,9,16
issue

62:14  64:23
I-65
72:3
I-85
40:14,15,21

— J —
J
3:18
jack
18:20
JEFFERSON
85:5
job
9:8,12  18:3  42:7  50:15,21
   51:7
jobs
10:11
John
1:18  2:5  6:13,17  7:1  13:2
   13:5  31:3  70:22  71:1,6
   71:8,15,16,20  72:2,3
   82:17
Judd
76:15,16,22  77:2  81:16
July
13:18,19  45:7  47:3,6,8,13
   63:7  65:2,5  74:3  81:22
June
17:18  23:8  26:12  30:18
   34:1  63:6  67:22  81:18

— K —
keep
11:4  74:8  78:21  80:8
keeping
80:6
kept
52:10,11
keys
52:6
kin
85:16
kind
19:6  24:18  28:22  33:15
   36:11  51:9
king
28:9,11,13,14
knew
29:14,15  32:5  45:19
   50:23
know
7:7  14:7,9,18  15:11,16
   16:12  22:6  23:17  24:1
   25:12,19  26:7  27:1,4
   28:5  29:9,10,12,16  30:7
   31:7,10  32:8  33:8,18
   44:23  47:14  49:2,6,14
   49:18,21,21,23  50:3,13
   50:17  61:17,18  62:1
   66:19  69:10  70:11  71:21

72:22  73:1,19,21  75:21
   76:9  77:3,7  78:4,7
   79:21  83:13,17
knowledge
26:4  38:18  39:12  42:8
   43:13  44:19  47:11  59:12
   59:16,17  60:22  61:22
   75:9,16  77:6  81:19

— L —
L
2:1
laid
50:15
land
18:12
landed
28:4
language
82:3
large
6:5  77:20  78:3  79:7
Law
3:5,13,19
laws
2:13
lawsuit
7:4
lawyers
76:7
lead
20:22  76:17
leading
2:18
learned
30:17
learning
42:20
leave
14:5  18:14  40:10  77:5
   78:21  80:12
left
9:14  64:4
legs
18:12
let's
73:13
lie
73:10
lights
40:22  41:3
limit
24:20  39:23  40:4  57:23
   58:4,8
listed
59:11  68:17
little
28:20  46:7  52:9,16  64:11
live
8:19,20
LLP

**FRANK FISCHER**
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

**JOHN MORRIS**
November 21, 2006

3:14

**location**
47:17

**lock**
28:9,11

**locked**
28:21

**log**
22:13,20  24:6,11,17,18

**long**
7:13  8:5,21  45:2  66:19

**longer**
14:14  29:11  30:10  57:8
77:2

**look**
19:15  62:22  64:6  69:14
73:20  74:12  80:3

**looked**
64:1,8

**looking**
40:1  64:2  66:3

**losing**
46:10

**lot**
21:1  23:15,19,19  24:5,19
71:9

**Lynda**
4:4  74:22  75:3

**Lynn**
48:1,2

---
**M**
---

**machine**
58:23

**man**
13:3

**maintain**
11:14

**major**
27:14,14,15,20  29:20
33:6  44:8,9,10  68:17

**making**
12:4,5  51:10

**man**
20:22,23

**managed**
24:14

**management**
31:10,13  48:23  50:22
55:10

**manager**
32:12,14

**Managing**
12:2

**Margie**
32:19,20  34:13  59:15
81:20

**mark**
76:5  77:15

**marked**
46:18  55:15  69:17  73:6

76:2  77:13

**marks**
37:13,14,18  38:13

**mean**
10:17  19:21  28:2  47:6
63:8  64:17  67:7  68:12
71:10  76:19  82:18

**mechanically**
73:20

**meet**
43:16  45:14,16

**meeting**
45:5,9,21  47:7,16  48:6
51:16  53:19  54:21  55:11
63:20,23  65:1,13  79:3,5
79:7  81:22

**meetings**
63:15

**member**
49:7

**members**
49:2

**memo**
48:21,21,22  51:18  82:3

**memorandum**
47:5  53:20

**men**
66:23

**mentioned**
21:14  53:18

**met**
49:18,22

**microwave**
59:1

**middle**
1:2  44:10  56:20

**Middlemas**
3:4  5:5,7  6:21  7:3  18:1
23:13  53:10  69:4,8,13
74:11,17,19  79:12,17
81:11  82:11  83:5,8  84:1

**miles**
39:21  40:13,17

**Milton**
14:22  15:1

**mine**
17:10

**minimum**
75:22

**minor**
44:8,9,9  73:23,23

**minute**
45:19  75:6

**minutes**
74:12

**mirrors**
80:10

**mixed**
76:20

**moment**
69:14

**Montgomery**
1:9  6:11

**month**
20:1  63:4

**months**
8:23  9:1,15

**morning**
31:2  33:22  35:6  36:4
59:7  71:3

**Morris**
1:18  2:5  6:13,17  7:1,2
55:15  69:19

**move**
80:9

**moved**
11:6  21:10

**moving**
78:21  80:7,8

---
**N**
---

**N**
2:1  3:1  4:1  5:1

**name**
6:23  7:2  23:22  27:22
29:17  65:19  76:14

**names**
16:10,14  25:21

**narcotics**
25:11

**Navy**
9:5,6,9

**necessary**
2:15  73:5,10

**need**
7:6,8  18:19  26:17  36:13
38:15  41:21  42:17,21
52:6  56:21

**needed**
18:23  23:1  32:9  33:10
35:11,14  36:20  41:23
42:16  45:14,15

**Negativewise**
18:4

**neither**
85:16

**never**
50:23  81:3

**new**
21:13

**night**
10:13  19:4  26:23  31:18
59:22  60:12,12,16,23
71:17,19

**nonDOT**
24:15

**normal**
44:22

**north**
29:23  30:6

**northbound**
27:22

**Northern**
1:3  30:5

**Notary**
1:23  2:8  6:4  85:23

**notice**
70:4

**noticed**
20:4

**notified**
31:16

**November**
1:19  6:12

**nugget**
61:8

**number**
75:17

---
**O**
---

**O**
2:1

**object**
18:1  23:13  43:11  53:14
54:8  67:4,13  75:11  81:6

**objections**
2:16,19

**occur**
82:6

**occurred**
29:21  50:21  61:1

**offense**
38:15

**offered**
2:21

**office**
41:22  47:21

**Oh**
63:16

**okay**
7:10  11:1  22:22  30:16
31:8  32:2,18  33:14
34:3  35:5  42:23  46:22
47:4  51:1  71:14,17
74:17  79:8  81:2  83:3
83:16  84:1

**old**
83:14

**older**
83:18

**oldest**
83:10

**once**
15:22  16:9  40:14  41:5
44:1  50:4  79:2

**ones**
13:3  53:17

**on-the-job**
53:1,7

**on-time**
12:5

**operating**
10:2

**operation**
12:10

**operations**
60:8

**opinion**
46:14  51:5  74:5

**oral**
6:14

**orange-colored**
19:14

**ordinarily**
57:9

**outcome**
48:22

**outside**
9:8

**overall**
12:15  21:23  60:7  78:23

**oversaw**
20:18

**Oxmoor**
3:6

---
**P**
---

**P**
2:1  3:1,1  4:1,1

**package**
17:12

**Page**
5:4,11

**Panama**
8:3  12:4  13:2,3,7  14:21
17:7  19:12,23  20:10,18
23:5  33:12  35:20  47:17
47:23

**panhandle**
8:3  10:16  12:3

**paragraph**
54:15  65:17

**park**
58:5

**Parker**
59:20  60:1,18  67:20,23
68:7,15,19

**Parkway**
3:21

**part**
15:3  16:15  44:21  59:23
60:15

**particles**
64:12

**particular**
28:18  47:18  50:18

**parties**
2:3,19  85:17

**peak**
26:21  46:9

**peers**
44:3  49:10

**Pensacola**
8:3  11:10  12:4,23  17:8

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

**FRANK FISCHER**
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

**JOHN MORRIS**
November 21, 2006

20:14,15
people
33:3 34:10 37:3 59:11
perform
15:4,8
performance
16:1 17:1,22 77:10
period
20:6 40:8
person
34:15 38:17 48:12 50:18
73:12 75:17
personal
36:5 52:12
persons
12:15 48:5 59:17 67:3
Pertaining
67:6
phone
41:17 70:22
photos
44:6
pick
35:22 36:5
picture
80:6
pin
28:9,11,13,14
place
3:15 81:21
Plaintiff
1:6,12 3:3
Plaintiff's
5:12,13,14 69:16 76:1,5
77:12,16 79:11,15
plus
66:23
point
39:6 40:20 42:1 60:20
61:3
points
78:13
police
33:14 34:19
policies
54:6
policy
23:11
portion
70:21
position
10:6 11:2,4,15,23 13:20
14:6 20:11,22 21:9 27:7
27:12 30:13 35:12
44:13 60:6 67:17 77:1
83:12
positions
13:14 76:20
positive
26:5
Positivewise

18:3
possibilities
26:14
post
14:2
preparation
74:20
prerequisite
78:8
present
4:3 47:15 48:10 82:1,1
presented
53:21 77:19
pretty
19:3
previously
46:18
printed
69:23
prior
2:22 7:22 8:9 13:19
17:18 23:8 67:21 76:19
priority
33:11
privately-owned
78:19
probably
64:15
problem
19:7 22:5
problems
68:1 73:19
procedure
6:8 44:22 50:3
proceedings
6:15
productivity
17:1
Professional
1:22 2:7 6:3
program
16:7,13 22:11,12 24:14
25:16,17 26:2 58:18
78:23
programs
78:10
promoted
11:16
provided
6:7 76:6
PS
65:19
Public
1:23 2:8 6:4 85:23
pull
18:14 35:3 59:3
purposes
36:14
pushing
22:9
put

17:12 19:16 37:16 59:5
72:4,5
p-m
6:13

---

**Q**

quarters
16:2
question
15:15 18:2 27:4 34:8
66:11 82:14
questions
2:17,18 7:6 77:9 84:3
85:9
quick
69:14 82:13
quite
19:19,20,21
quitting
12:19

---

**R**

R
3:1 4:1 85:1
ran
26:2 29:22,23 33:7 70:7
70:8 71:8,10
random
25:13,21
reached
58:4
reaction
46:3
read
51:18 59:2,8
reading
2:10
ready
14:11
real
69:14
really
56:16 61:18 78:15
reason
23:2 27:9
reasons
51:16
rebuild
32:6
rebuilt
32:10 33:10
recall
25:8 27:10,11,21 30:23
35:18 36:22 38:20 39:1
39:5 41:9,17 42:18
52:20,23 53:5 54:18
57:15 61:14 66:1 72:7
82:10 83:13
received
70:22 77:17
recognize

16:8
recognized
16:9,17,21
recollection
16:16 17:12 25:5 30:11
39:2 41:14 42:19 54:1
56:1 66:14 71:7 81:4
recommendation
50:5,7,9
record
79:9
reduced
85:10
REEXAMINATION
5:7 83:8
reference
78:4
referring
79:15
Registered
1:22 2:7 6:2
regroup
46:11
regularly
56:13
relating
2:14
remember
13:2 15:17 16:2 17:2
23:12 24:1,18 29:19
41:20,21 42:22 45:4
51:20 52:1 56:9,12
61:18 70:15
remind
18:19 21:15,20 22:1 24:16
reminder
20:7
repeat
7:7
repetitive
53:12
rephrase
15:21 34:7 61:2
replied
72:3
report
36:13 38:6 39:8,11 41:6
55:17 68:21,23 69:2,3
69:20 72:4,6
REPORTED
1:20
Reporter
1:21,23 2:7,8 6:2,3
representing
7:3 55:9
represents
85:12
reprimand
23:9
reprimanded
23:1

require
57:7
respective
2:4
respond
72:16
response
51:21 72:17
responsibility
60:7 68:20
responsible
10:1 12:2 59:9
rest
36:23
result
29:9 42:5,11 85:18
resulted
64:19
results
72:21
retirement
26:13,18
review
29:9 43:19,22 44:18 45:1
49:3,7,9,22 50:4,6 51:2
51:3 54:5 72:21,23
Reviewing
69:12,15 72:19
rid
27:2
right
20:8 21:10 30:19 33:20
34:11 52:15 53:10 65:2
66:6 69:21 70:17,18
72:11,15 73:3 76:14
79:12,18
risk
55:10
road
3:6 27:23 29:23,23 33:7
40:11,12,15 70:8 71:12
73:18 80:4,13
room
47:18 48:6
root
72:13
route
58:20
routes
35:9
rule
23:11
rules
2:13 6:7 54:6,14,14,16
run
19:5 25:16 41:1
running
13:6 71:18 73:18

---

**S**

S

FRANK FISCHER                                                           JOHN MORRIS
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.                    November 21, 2006

2:1  3:1  4:1
**safe**
77:20  78:3  79:6,23
**safety**
17:2  19:1,2,8,9  21:21
  23:10  25:18  32:21
  33:17  44:14,15,16  50:12
  51:2  64:15  66:16  76:17
  78:10,17  79:3,4  81:4
**SAITH**
84:6
**sales**
12:7
**salesman**
48:13
**sat**
28:20
**Saturday**
56:18,23  57:1
**saw**
35:19  36:4  37:12  62:3,22
  64:10
**saying**
38:2  41:21  70:15,17  80:3
**says**
31:6  47:3  54:15  55:21
  56:8  72:1,12,22  76:8
  77:18
**scheduled**
56:13
**schedules**
12:5,6
**school**
14:12
**screen**
26:5
**season**
26:21  46:10
**seat**
19:13,16  21:14,16  60:23
  61:6,15  62:10,15  64:9
  64:23  66:5,9  68:8
  81:12,13
**second**
54:15
**seconds**
80:4,5,9
**see**
19:15  37:17  40:1  41:23
  58:7  65:18  71:13  78:22
  80:15
**seen**
37:9  46:20  77:22
**Segrest**
3:18  84:3
**selected**
17:5,7,8
**Self**
32:19,20  34:13  59:15
  81:20
**senior**

20:23  66:22  67:3,12
  75:9  82:18
**seniority**
82:23
**sent**
47:11  69:23
**September**
11:7,12
**serious**
44:8,9,10
**seriousness**
51:5
**served**
49:3,14
**service**
82:19,20
**SERVICES**
1:7,13  3:10
**set**
24:20  56:22  57:2
**seventy**
57:19
**shakes**
49:17
**shelf**
52:11
**Shelton**
8:11,13,14,21  9:3,9,11
**shift**
57:17,18
**short**
10:21  74:16
**shorthanded**
57:5
**shoulder**
21:19  42:21
**show**
22:4,19  24:7  46:18  55:14
  69:2  76:4
**showed**
35:21  38:3,9  39:20  40:4
  40:7
**shown**
22:6  46:22
**shuttle**
10:7,13,14  11:8,9  12:6,21
  12:23  13:1  14:20  15:9
  17:23  25:20  26:23
  27:8,13  32:8  33:5
  46:10  47:17  49:11
  58:22  78:9
**shuttled**
11:10
**shuttles**
11:6
**sign**
52:3  55:19
**signature**
2:9
**signed**
47:1,9

**significance**
37:19
**similar**
66:11
**simply**
50:7  51:18
**single**
10:2
**single-vehicle**
33:7
**sir**
9:10,21  10:8,23  11:3
  12:1  13:8,16  14:4  15:2
  15:7,20  17:20  20:16
  21:4,11,17  23:3,7  29:19
  31:14  33:23  34:2  36:2
  36:6  38:16,20,21  39:9
  39:16  40:19,23  41:4,9
  42:3,7,12  43:21  45:3
  46:16,21  47:10,14  48:15
  49:5,13,20  50:6  51:13
  51:19  54:22  55:2,7,13
  56:4,11  57:3,6  58:9,12
  60:2,19  61:12  63:10
  64:21  65:3,9,12,22
  66:10,18  67:15  68:3,10
  68:14,16  71:20  73:7
  74:7,10  75:1,5,14,15
  76:12  77:4,7,11,23  78:6
  79:16,21  81:15,20  82:4
  82:22  83:2
**sister**
48:9,10,17
**site**
20:19  33:18  37:10
**situation**
43:2  72:14
**six**
12:22
**sixteen**
24:10,12  57:16
**skid**
37:13,14,17  38:13
**sleepy**
22:8
**slowing**
38:9
**small**
73:13
**Smith**
78:12  79:14
**Smoky**
59:20  60:1,18  67:20,23
  68:7
**somebody**
24:13  46:12  50:14  59:7
**son**
14:11
**soon**
39:10
**sooner**

55:22
**sorry**
7:19,21  17:17  31:19  53:2
  54:10  61:13
**sort**
24:2
**southbound**
70:6  72:3
**speak**
55:3
**specifically**
24:2  36:13  63:21
**speed**
24:20  25:4  39:22,23
  40:3,4,8,8
**speeding**
25:7  40:1,3
**spread**
21:12
**St**
3:21
**stand**
11:18
**standards**
57:12,14
**Starnes**
3:14
**started**
8:8  31:9  48:18
**state**
6:4,22  78:1  85:4
**States**
1:1  6:8  9:4
**status**
34:18
**steering**
80:3
**stenotypy**
85:9
**stepped**
14:8,9
**steps**
78:20
**STIPULATED**
2:2
**stipulation**
6:9
**stop**
22:3,7,8,15  30:2
**stopped**
22:17,19
**Street**
6:11  48:3,4
**stretch**
40:12
**stuck**
72:13
**stuff**
19:6  22:21  33:15  35:4
  36:11  52:5,8,10,11  74:13
**subsequent**

59:13,18
**Suite**
3:7
**summary**
70:21
**summer**
26:20
**Sunday**
56:19,23  57:2
*supervised*
27:13  30:4
**supervising**
12:16
**supervision**
85:11
**supervisor**
11:20,22  12:1,12  13:13,20
  14:3  15:11  20:12  21:7
  22:23  27:8  67:18,19
  68:12,15  69:20  83:20
*supervisors*
17:11
**supervisory**
13:14
**supposed**
19:13  24:17  28:17  80:20
**sure**
12:5,8  21:16  26:1,2  33:11
  33:13  35:10  51:15  59:9
  66:12  70:13  71:17
  72:17  74:15  78:22
  80:15
**surgery**
42:17,21
**surprise**
43:8,8
**surprised**
43:9
**sworn**
6:18
**synonymous**
17:16
*Sysco*
1:7,13  3:10  7:12,14,16  8:1
  8:6  9:16,18  10:14  14:15
  14:16,19  23:11  25:14
  26:8,16  27:15  29:11
  30:10  48:13  50:18
  52:22  53:5  55:9  57:4
  57:21  58:7,10  66:17,20
  67:10,17  71:13  75:10
  76:7,18  77:2,5  78:9,23
  79:1  81:5,8,17  83:10
*Sysco's*
77:17
**system**
59:2  78:12  79:14
S-H-E-L-T-O-N
8:14

T

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                    http://www.TylerEaton.com

T
2:1,1  3:18  85:1,1
take
7:8  16:20  22:2,4  25:23
   71:11
taken
2:5  72:23  74:16  85:8
talk
15:12  25:3  26:17  35:5
   37:8  38:23  41:7,11
   42:23  60:11,12  62:13,19
   63:21
talked
34:16,23  35:17  37:4
   38:18  39:3  43:3  62:6
   62:17  72:2  75:6
talking
18:6  41:10  48:18,20  71:23
   79:14
Taylor
40:11,15
teach
78:11,13  79:18  80:19
techniques
78:14,16  80:1
tell
9:22  15:16  16:5  17:9  18:6
   20:4,5  22:16  27:18
   30:16,23  31:1  33:2
   37:11  38:7  39:17  45:6
   45:11,14,18,21  46:19
   56:5  61:4,10  71:6  76:14
teiling
37:20  42:10
tells
24:21
ten
75:22
Teresa
1:20  2:5  6:1
term
29:21
terminate
41:23  46:2  51:11
terminated
41:19  45:6  52:23  53:6
   74:4
termination
42:6,11  54:20  59:14,19
   64:20  75:3
terms
29:6  30:9  45:1  75:17
   83:9
test
25:23  26:6
tested
25:20
testified
6:19  10:6  53:9  55:19
   81:10  82:2
testifying

79:10
testimony
69:21  70:14
testing
25:14
thereto
2:22  85:10
thing
26:20  40:2
things
18:4,7  19:10,18  21:2,22
   24:2,19  74:2
think
12:22  16:10,23  24:23
   31:7  33:17  34:10  36:9
   39:22  40:12,14,16  41:20
   51:2  55:16  56:8  62:10
   64:12  69:11  72:12
   75:20
thirteen
40:13,17
thought
28:21  61:5  66:5
three
9:1,15  13:1  20:1,4  77:20
   78:2  79:6
time
2:20,21  11:5  15:10  18:22
   20:6  21:15,16  22:22
   23:8  24:9  25:14  27:6
   27:11  30:12  32:22  35:6
   35:16  38:22  39:3  40:9
   40:10  46:23  47:1  49:4
   49:15  52:21,22  54:19
   57:20  60:16  64:13
   66:20  67:21  73:2  74:2
   74:20,21  75:10  81:1,17
   83:11,19
times
13:9  20:1,5  21:2  57:4
   63:19  71:9
Timothy
7:1
title
9:12
today
7:5
told
26:3  32:3  33:3,8,21
   34:12,20  37:11  38:1,12
   40:5  41:5  43:15,16
   45:13  48:21  58:5
toolbox
64:3
top
16:8  17:13  28:20
touched
18:13
tow
35:2
towed

62:21  63:8,12
track
58:10,17
tracking
58:7
tractor
10:2  18:11  30:1  62:22
   63:3,8  64:6,9  66:3
   73:19  78:16,19  79:23
   80:2
tractors
28:14
traffic
40:22  41:3
trailer
10:3  18:11,14,18,20  28:20
   28:23  35:3  37:14
   47:20  52:16  78:20
trailers
10:14  18:10,23  27:23
   28:2,3,13  32:5,10  33:10
   33:12  35:8  78:16  79:23
   80:2
transcript
85:13
transportation
11:19,22  12:1  13:13  14:3
   15:11  20:11  21:7  22:23
   27:7  32:11,13  59:21
   60:4,6,8  67:18
traveling
39:21
trial
2:20
Tripmaster
22:5,7,10  24:7,21  38:6
   39:8  41:6,12  58:18
   64:2
truck
9:13  22:13  24:18  35:2
   37:23  38:9  39:20  40:6
   58:14  59:4  62:20  64:1
   64:4
Trucking
8:11,22
trucks
22:12,16  58:5,11,17  71:13
true
85:12
try
54:23
trying
27:1
turn
16:2  17:10  40:15  68:21
turned
68:22
Turquitt
1:20  2:6  6:1
twenty
66:23  75:23

twenty-four
12:18,20
twenty-two
9:7  12:17,20
two
9:15  10:11  13:3  20:1  22:3
   35:8  71:13  80:20
two-way
71:3
typed
68:21
typewriting
85:11

U
2:1
uh
70:11
ultimate
50:13
Umbach
3:12  5:6  7:17  15:14  27:3
   31:21,23  43:11  53:2,8
   53:14  54:8  67:4,13
   69:6,10  74:15  75:11
   79:9,13  81:6,9  82:13,16
   83:3  84:4
underneath
18:16  20:20  61:16
understand
18:11  51:15  70:14
understanding
47:7
United
1:1  6:8  9:4
unusual
68:11
upper
31:10,13  48:23  50:22
upset
18:5,8  46:7,8  51:22,23
use
23:23  47:20  78:17  80:1
usually
72:20

V
van
79:22
vehicle
35:22  36:5  62:6  77:21
   78:3,19  80:7
Vehicles
79:7
verbal
25:3  81:15
Vestavia
3:21
violated
54:7,16

violation
23:10  24:15  66:16
violations
81:4
visually
28:17
vs
1:6,12

W
W
3:12
waiting
38:5
waived
2:11
want
66:12  70:13  74:8  78:17
   78:20  79:9  80:1,8
wanting
14:12
wants
27:4
warehouse
31:17
warned
71:3
wasn't
40:3  44:21  51:7  66:6
way
27:1,15  33:15  34:22
   47:22  58:17  64:13
wear
19:13  20:8
wearing
60:23  61:6  62:15  64:15
   81:12
week
13:9  24:10  56:10,18,20
   57:9,17,19
went
9:15  38:22  33:17  44:23
   48:20  55:23  62:21
   63:19,23  64:1,6  82:2
weren't
22:8  27:1  37:16  71:18
Wheat
4:4  74:23  75:3
wheel
28:4,9,12,14,15  29:1
win
16:11
windshield
61:9,11,20  62:8,23  64:10
   64:11,14
witness
2:10  6:13  7:18  15:13
   49:17  79:16  85:14
words
37:15  49:12  52:4  73:20
   82:23

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                                                                    http://www.TylerEaton.com

FRANK FISCHER
SYSCO FOOD SERVICES OF CENTRAL ALABAMA, INC., ET AL.

JOHN MORRIS
November 21, 2006

wore
21:16
work
7:11 8:10 9:2 10:12,13
18:22 24:8,10 26:23
35:7 44:20 56:14 57:8
57:11,16,18
workday
56:14
worked
7:13 8:1,2,5,11 19:2 24:8
52:22 66:20 75:7
76:22
worker's
36:14,20 65:7,11,14,20
working
7:23 8:8 14:21,22 23:5
26:8 29:11 35:10,20
58:8
works
14:16 30:10 50:1
worst
44:11
wouldn't
26:7
wrecked
58:14
write
24:3,3 25:1 70:5
written
15:6,8 23:18 47:13 65:19
81:14
wrong
38:3,4

_____ X _____
X
5:1

_____ Y _____
yard
11:11 17:7,8 18:10 19:12
20:1,10,18 23:6 35:20
35:21 36:5 47:22
58:22 59:3 62:4,21,21
62:22 63:9 74:1 83:21
yards
10:15 19:10
yeah
8:18 17:17 19:2 34:9
48:11 52:15
year
7:19 15:23 79:2
years
9:6 66:23 75:7,18,18,21
80:20 82:19,20
Yearswise
75:13
y'all
36:7 39:14 62:19

_____ 0 _____
05
7:19,20

_____ 1 _____
1
5:12 55:16 69:17
100
3:15,21
13
46:19
14
24:9
15
80:4,5
1740
3:6
184
6:10
1999
8:9 11:2

_____ 2 _____
2
5:13 76:2,5 79:11,15
2:05-CV-00763
1:4
2:38
6:12
20-foot
10:3
200
3:21
2000
11:7,12
2003
11:16 13:18,18,19
2004
17:19 23:9 26:12 30:18
47:3,6 67:22 74:3
81:18
2005
7:22
2006
1:19 6:12
21
1:19 6:12
210
3:7
23rd
47:6,13
231
19:5 40:11,16 70:10 71:5
25th
48:3,4
26th
48:4
27th
47:3,8 65:2,5 74:3 81:22
271

40:15,20 70:7,9 71:5
29
67:22
29th
34:1 63:6

_____ 3 _____
3
5:14 77:13,16
35209
3:8,16
35216
3:22
360
80:7

_____ 5 _____
5
80:9
50s
83:15
55
39:21,22

_____ 6 _____
6
5:5
6/29/04
66:15
62
24:23
65
27:22,23
69
5:12

_____ 7 _____
7th
3:15
76
5:13
77
5:14

_____ 8 _____
8
80:9
82
5:6
83
5:7
85
40:10

_____ 9 _____
99
7:15,18 8:7

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

FRANK FISCHER, an individual,     )
                                  )
            Plaintiff,            )
                                  )
v.                                ) Civil Action No. 2:05-cv-00763-DRB
                                  )
SYSCO FOOD SERVICES OF            )
CENTRAL ALABAMA, INC., et al.,    )
                                  )
            Defendants.           )


### AFFIDAVIT OF LYNDA WHEAT

1.      My name is Lynda Wheat.  My date of birth is September 22, 1952
and I am competent to testify.  The matters set forth below are based upon my
personal knowledge.

2.      I am the Assistant Vice President for Sysco Food Services of Central
Alabama, Inc.  I have been in charge of Human Resources for Sysco for
approximately 8 years.

3.      In June 2004, I became aware of the fact that Mr. Frank Fischer had
been involved in an accident in a company vehicle.  The Accident Review
Committee determined that the accident was "major."  In every incident where the
Committee has declared an accident to be "major," the employee has been
terminated.  My letter to Fischer's attorney following Fischer's termination and

before his appeal, along with some corresponding attachments, is attached as Exhibit A.

4.    I am familiar with the individuals who investigated Mr. Fischer's accident: Bo Brown, whose date of birth is October 15, 1946, Margie Self, whose date of birth is September 1, 1957, and Danny Harpst, whose date of birth is February 16, 1962. Mr. Fischer's supervisors at the time of his termination were John Morris, whose date of birth is July 21, 1960, and Mike Bullard, whose date of birth is October 4, 1955.

5.    Sysco allows a terminated employee to appeal the decision of termination. Mr. Fischer appealed his termination. The transcripts of the appeals process for Mr. Fischer, including his final hearing held on October 6, 2004, are attached as Exhibits B and C.

6.    The purpose of the appeals hearing is for the employee to bring to the attention of the appeals panel any new information not known at the time of termination that would justify the employee being rehired. Mr. Fischer was represented by counsel at the appeals hearing.

7.    I served as a member of Mr. Fischer's appeals panel, along with Danny Ralph, Executive Vice President, whose date of birth is November 17, 1956 and Chris O'Keefe, Vice President of Merchandising, whose date of birth is May 1, 1959.

{B0663107}

2

8.     The appeals panel unanimously decided not to reinstate Mr. Fischer's after his hearing. I voted not to overturn the termination decision because of Mr. Fischer's statement to his immediate supervisor that he may have fallen asleep, the accident report of the investigating officer which indicates that Mr. Fischer went to sleep, the accident caused major property damage and placed the company at a huge liability risk, and the termination decision was consistent with previous major accident decisions. The memorandum detailing my decision to deny the appeal is attached as Exhibit D. The memoranda detailing the decisions of Mr. Ralph and Mr. O'Keefe are attached as Exhibits E and F.

9.     In January 2005, I received notice from the EEOC that Mr. Fischer had filed an age discrimination charge against Sysco. The form from the EEOC, dated January 24, 2005 and attached as Exhibit G, stated that no action was required by Sysco at that time. I later received another form from the EEOC, dated March 29, 2005 and attached as Exhibit H, which indicated that the EEOC was dismissing Mr. Fischer's charge for failure to cooperate. The EEOC never requested that Sysco respond to Mr. Fischer's charge in the form of a position statement or otherwise.

10.     The above information is true and correct to the best of my knowledge.

3

Lynda Wheat

STATE OF ALABAMA )
                 )
_Shelby_ COUNTY )

Subscribed and sworn to before me on this the _26_ day of _January_, 2007.

Notary Public
My commission expires:_____

[SEAL]

NOTARY PUBLIC
STATE OF ALABAMA
MY COMMISSION EXPIRES
MAY 15, 2009

4

{B0663107}

# EXHIBIT A

 **SYSCO** Food Services of Central Alabama

September 8, 2004

Clifford C. Higby
Bryant & Higby, Chartered
Attorneys at Law
833 Harrison Avenue
P. O. Box 860
Panama City, Florida 32402-0860

                    RE:     *Appeal of Frank Fischer*

Dear Mr. Higby:

      Thank you for your letter of August 23, 2004. In response to your request, enclosed are the documents relating to Mr. Fischer's accident and the decision to terminate his employment. You will notice from these documents that Mr. Fischer's accident was reviewed by the Accident Review Committee. A copy of the Accident Review Policy explaining the makeup of the Committee and the role of the Committee is enclosed. The Committee, made up of Sysco drivers, determined that Mr. Fischer's accident was "major." All accidents that have been determined "major" by the Accident Review Committee have resulted in the termination of the driver involved. Documentation relating to the two other drivers involved in "major" accidents is enclosed.

      Sysco appreciates Mr. Fischer's length of service and good driving record prior to this accident. Those factors were considered in the termination decision, but, in the minds of those involved, did not outweigh the determination of the Accident Review Committee and the seriousness of Mr. Fischer's accident. We regret the timing of Mr. Fischer's termination in relation to his surgery.

      We look forward to hearing Mr. Fischer's appeal and stand ready to reverse the decision to terminate his employment should the information provided warrant such action. Please let me know whether you would be available to reconvene the Appeals Panel on Thursday, September 9th, 3:00 p.m. via telephone. Our attorney, Trip Umbach, plans to be present for the hearing. I look forward to hearing from you.

                  Very truly yours,

                  Lynda Wheat
                  Asst. Vice President, Human Resources

cc:    Arnold W. Umbach III
       Bradley Arant Rose & White LLP
       One Federal Place
       1819 Fifth Avenue North
       Birmingham, AL 35203

# Accident Review Committee Meeting
## Transportation
## 02/13/03

| | |
|---|---|
| Marcus George<br>Calera<br>01/15/03 | Driver did not latch trailer side door correctly. Trailer door swung open and hit and busted back window on van.<br>The committee stated that the driver should always verify that trailer doors are locked correctly before driving. Decision – Serious Accident* |
| Jeremy Cleckley<br>Fresh Express<br>01/23/03 | Driver backed into awning cross bar while making a delivery.<br>The awning was only a month old and the bent cross bar had to be replaced.<br>The committee, after looking at the pictures, noticed that the driver would have hit the garbage dumpster under the awning if he hadn't hit the cross bar first. They also stated that looking at the pictures showed that the driver had a long dock and plenty of room to deliver. There was no reason for the driver to back into that area and hit the awning. Decision – Serious Accident...Written Warning |
| Mark Edwards<br>Panhandle<br>02/03/03 | Driver was closing trailer door and did not have his hand out of the way.<br>The driver smashed his finger.<br>The committee stated that the driver should have known, as many times as he closes the trailer doors, to remove his hand from under the opening. Decision – Minor Accident...Decision based on carelessness, not on actual injury to finger. Documented Verbal Warning |
| Rusty Pody<br>Calera<br>02/04/03 | Driver stopped at a gas station to get some refreshments. Upon leaving the area, the driver was traveling through a fuel island and struck a dumpster with the front right fender/head light of the tractor. The fiberglass was broken/cracked and so was the head light and head light assembly.<br>The committee looked at the pictures and stated that the driver just did not look in front of him or he would have seen the dumpster. They also stated that the driver had plenty of clearance in the area and should have been able to miss the dumpster. Decision – Serious Accident...Written Warning |
| Marcus George<br>Calera<br>02/05/03 | Driver, going through alley, hit an illegally parked car in the alley with the back corner of trailer. The passenger side mirror was broken/knocked off parked vehicle.<br>The committee stated that the vehicle was illegally parked, but the driver should have taken the time to get out and look before proceeding. Decision – Minor Accident* |

Sys 0617

AUG-30-2004  16:09    CO CENTRAL AL    P.13/17

Chris Guarino
Calera
02/05/03

Driver states that he was delivering in a tight parking lot with cars in the way. The driver was attempting to miss cars and did not recognize that trailer was too close to the building. The trailer hit and knocked off three letters of the store sign.

Some of the committee members had delivered to the same location and stated that there was not enough room to deliver. **Decision – Minor Accident...Documented Verbal Warning**

Billy Peppers
North Alabama
02/10/03

Driver left the Calera yard pulling doubles. The driver hit a bump in the road going over bridge. The front trailer was not properly locked to the fifth wheel, and the trailers released. The trailers skidded down the road and came to rest on the guard rail on the side of the road.

The committee stated that looking at the pictures they could see that the trailer was not attached to the fifth wheel. They decided that the weight of the trailer must have kept the trailer attached to the tractor until the driver hit a bump in the road causing the trailer to bounce off the fifth wheel.

The committee was given the opportunity to go and look at the tractor, but a few members stated that they already had and the pictures reflected that the king pin was not properly attached to the fifth wheel. The committee stated that the driver did not do a through pre-trip or he would have noticed the problem. The committee asked that the fifth wheel be tested at this point to verify that a trailer would properly attach. If so, the committee stated that the accident was Major. **Decision – Major Accident...Management Decision**

**\* Driver resigned.**

AUG 30 2004  4:47 PM                                    PAGE.13

Sys 0618

Monday Feb. 12, 2003

I William A. Peppers do hereby Resign
my position as shuttle driver from Sysco
Foods services of Central Alabama effective
immediatedly

William A. Peppers

Sys 0619

AUG-30-2004  16:10       CO CENTRAL AL                                              P.16/17

# Accident Review Committee Meeting
## Transportation
### 07/24/03

**David Hadley**
Calera
07/14/03

Driver stated that he was entering his truck using a three point stance and his foot slipped. The driver stated that he held on but his elbow banged into the truck. The driver sustained a concussion to his right elbow.
The committee stated that fortunately the driver was hanging on and didn't fall. Decision – Minor Accident – Documented Verbal Warning

**Justin Smith**
North Alabama
07/22/03



Driver stated that he thought he hit something in the road causing the left front tire of the tractor to blow out. The truck pulled to the left and driver left the roadway and traveled in a ditch approximately 500 feet. The driver was able to keep the tractor and two trailers being pulled from turning over. The driver ended up hitting a culvert/concrete drainage pipe under a driveway in the ditch. This ultimately stopped the truck. The driver stated that he did not want to hit his brakes for fear of loosing the load.
The committee reviewed the pictures and also went out and looked at the tractor. Some of the statements that the committee stated:

- They did not think that the tractor would have traveled that far with a flat tire.
- The tire/inside of rim should have been full of mud if the tire blew on the roadway before entering the ditch.
- It was hard for them to believe that the driver would not have touched the brakes...human instinct. They stated that he should have used light steady braking.
- If the tire blew, because of the 100 pounds of pressure, the air would have been gone immediately causing the tire to come off the rim.
- They stated that he could have fallen asleep although he had just been out of the truck eating breakfast and that it depended on how much sleep he got the day before. No one could answer that question.
- The driver's story just did not add up to them.

The committee also stated that they felt the tire was punctured when the tire and rim hit the concrete drainage pipe. The committee was unable to make a definite decision as to severity. The decision made was as follows.

| | |
|---|---|
| Todd Harris – | Major Accident |
| Nelson Self – | Major Accident |
| Bobby Dudley – | Serious Accident |
| Shane Harris – | Serious Accident if he had to make a decision but would rather it be left up to management. |
| Jeff White – | Could not make a decision at all. He stated that it should be a management decision. |

Sys 0620

# TRANSPORTATION

**To:**        Justin Smith

**From:**      Smokey Parker

**Date:**      July 28, 2003

**Subject:**   Termination

---

Justin, on Tuesday morning at approximately 3:00 A.M. you were involved in a one vehicle accident that caused major damage to our two (2) trailers, one (1) dolly and one (1) tractor. Upon further investigation into the accident you were found to be speeding and you admitted to Bo Brown that you had set your cruise control to 62 MPH in a 55 MPH zone. Your employment at Sysco Food Services is hereby immediately terminated. Attached is the appeal board procedure.

Acknowledgement of Memorandum          Date

*Refused to sign.*

Sys 0621

*************** -COMM. JOURNAL- *****************  DATE OCT-06-2004 ***** TIME 15:58 *** P.01

MODE - MEMORY TRANSMISSION          START-OCT-06 15:57     END-OCT-06 15:58

FILE NO.- 137

STN NO.   COMM   ABBR NO.   STATION NAME/TEL NO.   PAGES   DURATION

001       OK     ♯          918507851533           001/001  00:00'31"

                                                   - DF-1100  ONRDU0.14  IN -

*****************( DF-1100  V0.14)** -1100  ONRDU0.14- ***** -014  0006        - **(ONM)**

*To: Cliff Hughey*

### Accident Review Committee Meeting
### Transportation Department

July 13, 2004



**Chris Paris**
**Panhandle**
**6/18/04**

Driver stated that he was driving on country club drive when he struck an overhanging tree limb and bent the smoke stack. Committee stated that all the rain that we have had the tree limb could have being hanging lower. Decision – Minor.  First Minor-Verbal Warning.

**Shawn Bell**
**Panhandle**
**7/6/04**

Driver stated that he was backing up at the customers and hit the passenger side taillight on a pick up truck. Committee stated that he should have being watching his surroundings more carefully when backing up. Decision – Minor.  Second Minor in 12 months –Written Warning. Was employee instructed to use cones when previous backing accident occurred per Transportation Policy? If so, additional disciplinary action is warranted for failure to use cones when backing.

**Chris Guarino**
**Calera**
**6/23/04**

Driver stated that he was pulling away from a red light the car next to him came over into him and his wheel tore the chrome off the car front fender. Committee stated that looking at the picture you don't know what really happened. They said the driver should have taken better pictures. Decision – Minor.  Second Minor in 12 months .Written Warning

**Frank Fischer**
**Panhandle**
**6/29/04**

Driver stated that he was heading back to Panama City with two loaded trailers when he came up on the intersection sooner than expected. He hit his brakes and went into the ditch. Committee Stated that the driver was careless and not paying attention what was going on. Decision – Major.  Turned over to management per policy for decision.

Fischer v. Sysco
Sys 0304

# EXHIBIT B

AUG-27-2004 13:31    SYSCO CENTRAL AL    P.04/09

1

1

2

3

4

5    APPEAL HEARING

6    FOR

7    WILLIAM FRANK FISCHER

8

9    AUGUST 13, 2004

10    1:00 P.M.

11

12

13

14

15

16    VIA TELEPHONE:

17    MS. LINDA WHEAT

18    SYSCO, INC.
      100 SYSCO DRIVE
19    CALERA, ALABAMA 35040

20

21

22

23    *Panama Court Reporting Service, Inc.*
      *637 E. 4th Street*
24    *Panama City, Florida 32401*
      *Phone 850-769-4971 Fax 850-914-9800*

25

**ORIGINAL**

2

```
 1              MR. HIGBY:  This is Cliff Higby.
 2              MS. WHEAT:  William Frank Fisher, please?
 3              MR. HIGBY:  Yeah, right.  Frank is right
 4      here with me.
 5              MR. FISCHER:  I'm talking to you.
 6              MR. HIGBY:  Can you hear Frank?
 7              MR. FISCHER:  Hello?
 8              MS. WHEAT:  Hi, it's Linda.
 9              MR. HIGBY:  Mrs. Wheat, this is Clifford
10      Higby, I'm Mr. Fisher's lawyer and I'm here
11      with him, okay.
12              MS. WHEAT:  I'm aware who you are, sir.
13              MR. HIGBY:  Okay.
14              MS. WHEAT:  Frank, are you there?
15              MR. HIGBY:  I'm here, and as well you
16      should know we have a court reporter here,
17      okay?
18              MS. WHEAT:  Fine.  Frank, are you there?
19              MR. FISCHER:  Yes.
20              MS. WHEAT:  All right.  What this meeting
21      is for is for you to give your justification of
22      why you should be -- why you should keep your
23      job.
24              MR. HIGBY:  Okay.  Mrs. Wheat, this is
25      Cliff Higby again, and I wrote you all a couple
```

3

```
 1    of weeks ago and told you that Mr. Fisher would
 2    be appealing his termination and it's my
 3    understanding that this is Sysco's version of
 4    the appeal hearing, is that right?
 5        MS. WHEAT:  Frank, I'm here to talk with
 6    you.  If you would like to appeal please tell
 7    us your justification for your appeal, please?
 8        MR. HIGBY:  Mrs. Wheat, this is Mr. Higby
 9    again.  On Mr. Fisher's behalf, I want to say
10    that we do not have any written notice for, and
11    as his counsel, which I think he has the right
12    to have counsel here, I don't have any notice
13    as to any specific provision or reason that Mr.
14    Fisher was terminated other than the fact that
15    he has had an accident and filed a worker's
16    compensation claim.  Can you tell me why he was
17    fired, please?
18        MS. WHEAT:  He did not file for his appeal
19    in the proper manner, so if we want this appeal
20    to go forward I will talk with Mr. Fisher.
21        MR. HIGBY:  Well, again, I just want the
22    record to be clear, you're objecting to Mr.
23    Fisher having his lawyer present at this
24    proceeding?
25        MS. WHEAT:  I'm not objecting to him
```

Fischer v. Sysco
Sys 0526

4

```
 1        having his lawyer present.  Mr. Fisher did not
 2        file for his appeal the way he was supposed to.
 3        We are giving him his appeal.
 4            MR. HIGBY:  How was he supposed to file
 5        for his appeal and we can refile it and do it
 6        the way you want us to.
 7            MS. WHEAT:  It's too late to do that, sir.
 8        We are going to hear his appeal, but we are
 9        speaking only with Mr. Fisher.
10            MR. HIGBY:  Well, ma'am, I've got, I will
11        be asking Mr. Fisher questions in order to, to
12        create a record and testimony which will
13        validate his appeal.  But my question to you
14        before we get started, again, is what and why
15        was Mr. Fisher fired and then we'll know what
16        we should be appealing.
17            MS. WHEAT:  This appeal hearing is not
18        going on.  It was not filed properly, we gave
19        him a chance, he did not do it properly.  I am
20        not going to talk to an attorney today, I am
21        talking to Mr. Fisher.  Good day gentlemen.
22            MR. HIGBY:  Cathy, just let the record
23        reflect that that was Linda Wheat of Sysco that
24        called in.  She would not tell us why the quote
25        "appeal" was improperly filed.  I want the
```

AUG-27-2004 13:32    SYSCO CENTRAL AL    P.08/09

5

```
 1      record to also reflect that, and I think what
 2      I'll do is just attach a copy of my letter to
 3      this transcript.  I wrote a letter on behalf of
 4      Mr. Fischer which constituted written notice to
 5      Sysco that he would like to appeal his
 6      termination from the company, and Mrs. Wheat
 7      would not tell us why or how that appeal was
 8      quote "improper".  And with that that's all we
 9      need to say.
10                    NOTHING FURTHER
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

08/23/04  14:49 FAX 850 785 1533    BRYANT & HIGBY, CHARTERED    006

6

```
 1              CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA

 3   COUNTY OF BAY

 4          I, Catherine A. Aldea, Court Reporter and Notary

 5   Public in and for the State of Florida at Large.

 6          DO HEREBY CERTIFY that the foregoing proceeding

 7   was heard before me at the time and place therein

 8   designated, that the hearing was taken down by machine

 9   shorthand and tape recorded, and thereafter reduced to

10   typewriting by me, and the transcript pages numbered 1

11   through 5 are a true and correct record of the aforesaid

12   proceedings.

13          I FURTHER CERTIFY that I am not a relative,

14   employee, attorney or counsel of any of the parties, nor

15   relative or employee of such attorney or counsel, or

16   financially interested in the foregoing action.

17          WITNESS MY HAND AND SEAL THIS 23rd day of AUGUST,

18   2004, IN THE CITY OF PANAMA CITY, COUNTY OF BAY, STATE OF

19   FLORIDA.

20

21

22              Catherine A. Aldea

23

24

25
```

TOTAL P.09

# EXHIBIT C

1

<pre>
 1
 2
 3
 4
 5                    APPEAL HEARING
 6                        FOR
 7          MR. WILLIAM FRANK FISCHER
 8
 9                  OCTOBER 6, 2004
10                    3:00 P.M.
11
12
13
14
15
16   FOR SYSCO, VIA TELEPHONE:        FOR EMPLOYEE:
17   TRIP UMBACH, ESQ.                CLIFF HIGBY, ESQ.
     SYSCO, INC.                      BRYANT & HIGBY, CHARTERED
18   1000 SYSCO DRIVE                 833 HARRISON AVENUE
     P. O. BOX 1750                   PANAMA CITY, FLORIDA  32401
19   CALERA, ALABAMA 35040
20
21
22
23
24        Panama Court Reporting Service, Inc.
                    637 E. 4th Street
25           Panama City, Florida  32401
          Phone 850-769-4971 Fax 850-914-9800
</pre>



2

1        MR. UMBACH:  This is Trip Umbach.

2        MR. HIGBY:  Hi Trip.  This is Cliff Higby in

3    Panama City.

4        MR. UMBACH:  How are you?

5        MR. HIGBY:  I'm fine.  I tried to call you

6    earlier.  Actually I have been up in your neck of

7    the woods.  I was in up in Birmingham and

8    Demopolis yesterday, and this morning, on

9    depositions.

10        MR. UMBACH:  And you were able to make it

11    back?

12        MR. HIGBY:  Well, I got back about noon

13    today.

14        MR. UMBACH:  Okay.  Short depositions.

15        MR. HIGBY:  Pardon me?

16        MR. UMBACH:  Short depositions.

17        MR. HIGBY:  Did you want to talk with me at

18    all before we get started on it?

19        MR. UMBACH:  I was really calling to confirm

20    it and to kind of talk about the logistics.  My

21    thought about this is I don't intend to say much.

22    I'm going to let, really, the others run it and

23    you say what you need to say.  But I'm really here

24    because you're here.

25        MR. HIGBY:  Okay.  Well, let me just say

3

```
 1        this.  I have a court reporter here.
 2              MR. UMBACH:  All right.
 3              MR. HIGBY:  Her name is Cathy Aldea, and
 4        she's here and she's taking everything down.
 5              MR. UMBACH:  Are we on the record now?
 6              MR. HIGBY:  She's taking notes.  And we also
 7        have Frank Fischer here, the former Sysco
 8        employee; and Frank's sister, Marge Loberger is
 9        here.  Do you have any problem with her being in
10        the room, Trip?
11              MR. UMBACH:  No.  Give me the name of the
12        court reporter again.
13              COURT REPORTER:  My name is Catherine A.
14        Aldea, A L D E A, and my phone number is
15        850-769-4971.
16              MR. UMBACH:  Okay, and Mr. Fischer is there?
17              MR. HIGBY:  That's right.
18              MR. UMBACH:  And his sister?
19              MR. HIGBY:  His sister, Marge Loberger.
20              MR. UMBACH:  How do you spell that?
21              MS. LOBERGER:  L O B E R G E R.
22              MR. UMBACH:  Okay.
23              MR. HIGBY:  And she's not going to be talking
24        or anything.  She's just here because she's got to
25        help take care of Frank after his accident, and
```

4

1    what have you.  She's not going to be

2    participating.  Okay.

3         MR. UMBACH:  On our end we've got Lynda

4    Wheat.  And let me spell that for the court

5    reporter.  L Y N D A, W H E A T; and Chris

6    O'Keefe; and Danny Ralph, R A L P H.

7              Cliff, let me say one other thing.  We

8    just faxed you, two minutes ago, a document

9    reflecting the Accident Review Committee's

10   conclusion on this accident.  I was looking back

11   at what Linda had sent to you and I noticed, at

12   least I don't think it included the page for

13   Mr. Higby.  Did you notice that?  I mean, I'm

14   sorry...

15        MR. HIGBY:  Is this the July 23rd memorandum

16   from Danny Harps?  The one that they asked Frank

17   to sign that they wouldn't sign?

18        MR. UMBACH:  No.  This is -- yeah, I don't

19   think it was sent to you.

20        MR. HIGBY:  Okay, well I'd like to see that

21   before we get started, if I may.

22        MR. UMBACH:  Yeah, it says Accident Review

23   Committee Meeting Transportation Department,

24   July 13th, 2004 at the top.

25        MR. HIGBY:  Okay.

5

1       MR. UMBACH:  And it was just faxed to you.

2   What number did we fax it to?

3       MR. HIGBY:  Let me go see if it's on the fax

4   machine.  Sit tight.

5              OFF THE RECORD

6       MR. HIGBY:  Trip, are you there?

7       MR. UMBACH:  Yes.

8       MR. HIGBY:  Okay.  This is a -- I got the.  I

9   got this one page memorandum.  There's several,

10   there's a handful of other incidents on there.

11       MR. UMBACH:  Right.

12       MR. HIGBY:  And then down at the bottom it

13   says, it talks about Frank's accident.  Am I to

14   understand that this Accident Review Committee

15   meeting took place on July 13th?

16       MR. UMBACH:  Yes.

17       MR. HIGBY:  Okay.  Then it says "turned over

18   to management per policy for a decision"

19       MR. UMBACH:  That's correct and it should

20   have been sent to you earlier and we just noticed

21   that it wasn't included.

22       MR. HIGBY:  Okay.  There might have been

23   something in here.

24       MR. UMBACH:  Well, we weren't positive we

25   hadn't, but we wanted to make sure you had it.

6

1        MR. HIGBY:  Can you tell me when the

2   management decision was made?  Was that

3   July 23rd?  Yes, the date of this memorandum on

4   Frank.

5        MR. UMBACH:  Probably so.

6        MR. HIGBY:  Okay.

7        MR. UMBACH:  But you should have everything

8   now.  So at this point my thought is to turn it

9   over to the committee.

10       MR. HIGBY:  Okay.  Well, what I'd like to do

11  is, and the last time we started to do this me and

12  Ms. Wheat were kind of a little bit at odds.  She

13  kept saying what's the basis of the appeal, and I

14  said well, I have to confess I don't know why he

15  was fired because, you know, at that point we had

16  not been given any of this memorandum and none of

17  this stuff.  And now we have.  So I think I can

18  state the basis for the appeal here today.

19            And in sum, the basis for the appeal is

20  that we don't believe Mr. Fischer was grossly

21  negligent or reckless in terms of this accident,

22  number one; and that there's really no other, I

23  mean, there's no legitimate reason for the company

24  to fire Frank.  And it seems to me that the only

25  reason he's been fired is that he's filed a

7

1    Worker's Compensation claim.  Now, you may take

2    issue with that and we'll go through, and I want

3    to appeal on the merits of the alleged termination

4    and we want, I want to try to show the committee

5    that Mr. Fischer was not grossly negligent.  That

6    he did do things that a reasonable person would do

7    to try to prevent this accident and I'm going to

8    quote to you from the memorandum that was given to

9    Frank, which he did not sign.

10          And then finally I want it to be clear

11    to the committee that while Mr. Fischer has not

12    been released to work yet, he's been a, almost a

13    27 year employee of the company; he had never had

14    so much as a parking ticket; he did not receive

15    any citation or ticket in this accident; and he

16    valued his job with Sysco; and he was Sysco's most

17    senior driver.  I don't know if he was the highest

18    paid driver, he may have been.  But it just seems

19    to me that this is unwarranted, and we hope that

20    he will be rehired.  That you will reconsider the

21    termination and that you'll bring Frank back to

22    work when Dr. Goodwiller, his doctor, allows him

23    to.

24          What I'm going to do is ask Frank some

25    questions.  This isn't going to be long, and

8

```
 1     hopefully this information will be useful to you

 2     and you can reconsider and consider this his

 3     appeal.  Okay.

 4              Frank, I'm going to ask you some

 5     questions and I want to you speak up so these

 6     folks can hear you.  Okay?

 7          MR. FISCHER:  Okay.

 8          MR. HIGBY:  With respect to this accident on

 9     June 29th, did you receive or have you received

10     any traffic citation or ticket from the Alabama

11     Highway Patrol, Montgomery Sheriff's Department,

12     anything like that?

13          MR. FISCHER:  I received no ticket.

14          MR. HIGBY:  Okay.  Did you ever tell the

15     officer that you fell asleep?

16          MR. FISCHER:  I do not believe I told him

17     that I fell asleep.

18          MR. HIGBY:  Okay.  In your 26 plus years with

19     Sysco, had you ever received even a parking ticket

20     while on the job?

21          MR. FISCHER:  None.

22          MR. HIGBY:  In some of the materials that

23     were provided to us by Sysco there was reference

24     to a conversation with a John Crews.  Do you

25     recall that on the day of the accident?
```

1          MR. FISCHER:  Yes, I talked to him on the

2     radio phone.  Told him I got out of the warehouse

3     at a decent time and looks like, everything looks

4     like I'm having a good run.

5          MR. HIGBY:  Was there anything said about

6     construction barriers on a particular part of

7     y'all's route?

8          MR. FISCHER:  No.

9          MR. HIGBY:  Were there construction barriers

10    in the area where this accident occurred?

11         MR. FISCHER:  No.

12         MR. HIGBY:  That had nothing to do with this

13    accident?

14         MR. FISCHER:  That had nothing to do with

15    this accident.

16         MR. HIGBY:  Just for the committee's benefit

17    I would tell you that in the incident,

18    Supervisor's Incident Review Mr. Morris makes some

19    reference to that fact that Mr. Crews had

20    allegedly warned Frank about certain areas.

21    That's not even the area -- there were no

22    construction barriers in the area where Frank's

23    accident occurred.

24          Mr. Fischer, were you ever given any

25    training materials or any specific training from

10

1       Sysco regarding driver fatigue or sleepiness?

2           MR. FISCHER:  I do not believe so.

3           MR. HIGBY:  Do you recall receiving something

4       one week after this accident with your paycheck?

5           MR. FISCHER:  Yes.

6           MR. HIGBY:  What was that?

7           MR. FISCHER:  A paper Entitled "dangers of

8       Driving Sleepy".

9           MR. HIGBY:  Had you ever been given that

10      before?

11          MR. FISCHER:  I never saw one like that

12      before.

13          MR. HIGBY:  Trip, I have a one page

14      memorandum here that came with Frank's paycheck

15      after this accident and I don't know, you all may

16      have one up there.  I would certainly be happy to

17      provide you with a copy of this, but basically

18      it's a memo regarding dangers of driving sleepy

19      and certain safety tips and what have you.

20          MR. UMBACH:  Do you have a copy of that for

21      the court reporter?

22          MR. HIGBY:  I'm going to attach a copy of

23      this to the transcript.

24          MR. UMBACH:  All right.

25          MR. HIGBY:  And I'll be happy to fax that to

11

1     you when we get done here, if you want me to.

2         The week prior to this accident, did you

3     receive any supplemental pay from Sysco as a

4     safety award or something like that?

5         MR. FISCHER:  Yes, we'd been awarded a safe

6     driving award.

7         MR. HIGBY:  You got a safety driving award

8     one week before this accident?

9         MR. FISCHER:  I believe it was before or at

10    the time of the accident, yes.

11        MR. HIGBY:  And why do you get those?

12        MR. FISCHER:  For not having an accident, no

13    traffic tickets.

14        MR. HIGBY:  Okay.  In the memorandum which

15    Sysco gave you and which you refused to sign, and

16    let me just ask you.  Why did you refuse to sign

17    the memo that was given to you by Mr. Morris on

18    July 22nd?

19        MR. FISCHER:  Because it accused me of being

20    a reckless driver, and I did not believe I was a

21    reckless driver.

22        MR. HIGBY:  Okay.  It says in here that the

23    Accident Review Committee policy states that quote

24    "a preventable accident is a accident that's

25    caused by an individual who failed to do

12

```
 1      everything reasonable to prevent the accident."

 2      Can you tell me what you did to prevent this

 3      accident?

 4          MR. FISCHER:  I slammed on the brakes hard.

 5      I kept the trailers from jack-knifing.  I kept the

 6      trailers from tipping over.  I did not hit any

 7      car.  I did not hit any power poles or stop lights

 8      or signs in the area.

 9          MR. HIGBY:  Was the load upright?

10          MR. FISCHER:  Yes.

11          MR. HIGBY:  You didn't hit any other

12      vehicles?

13          MR. FISCHER:  Didn't hit nothing.

14          MR. HIGBY:  You didn't hit any street signs

15      or anything like that?

16          MR. FISCHER:  Didn't touch them.

17          MR. HIGBY:  Okay.  It's my understanding that

18      Sysco called you a few times after the accident,

19      and who was this, your supervisor, John Morris?

20          MR. FISCHER:  John Morris.

21          MR. HIGBY:  He called you to check on you to

22      see how you were doing?

23          MR. FISCHER:  Yes.

24          MR. HIGBY:  Do you recall speaking with

25      Mr. Morris about the time of your MRI?
```

13

1           MR. FISCHER:  Yes.

2           MR. HIGBY:  What was that conversation?

3           MR. FISCHER:  I told him that the tendon had

4    been ripped completely off the bone and that the

5    doctor is going to have to put it back on again.

6           MR. HIGBY:  You told him you were going to

7    have to have surgery?

8           MR. FISCHER:  Yes.

9           MR. HIGBY:  What was his response?

10          MR. FISCHER:  He was surprised, he said

11   "you're kidding" that it was that bad.

12          MR. HIGBY:  And about when did that

13   conversation take place?

14          MR. FISCHER:  Around July 14th.

15          MR. HIGBY:  July 14th?

16          MR. FISCHER:  Somewhere around there, yes.

17          MR. HIGBY:  When was the next time you saw

18   Mr. Morris or talked to him?

19          MR. FISCHER:  When I was terminated.

20          MR. HIGBY:  The last time you talked with

21   Mr. Morris you told him you were going to have

22   surgery?

23          MR. FISCHER:  I believe so.

24          MR. HIGBY:  And the next time you saw him he

25   was handing you a piece of paper telling you you

14

1    were fired?

2         MR. FISCHER:  That I had to sign it; yes.

3         MR. HIGBY:  Okay.  Who was your supervisor

4    prior to Mr. Morris?

5         MR. FISCHER:  Denita Donnigan.

6         MR. HIGBY:  Do you recall having a

7    conversation with Mrs. Donnigan regarding early

8    retirement?

9         MR. FISCHER:  Yes.

10        MR. HIGBY:  What did she tell you?

11        MR. FISCHER:  She recommended that I consider

12    early retirement.

13        MR. HIGBY:  Did she ever tell you why?

14        MR. FISCHER:  No, but I just told her that I

15    was shooting for 40 years.

16        MR. HIGBY:  You told her you wanted to work

17    for the company for 40 years?

18        MR. FISCHER:  Yes.

19        MR. HIGBY:  At the time Ms. Donnigan made

20    that statement to you, were you the oldest driver

21    at Sysco?

22        MR. FISCHER:  I believe I was.

23        MR. HIGBY:  Were you the most senior driver

24    for Sysco?

25        MR. FISCHER:  Yes, I believe I was.

15

1    MR. HIGBY:  If and when Doctor Goodwiller

2    returns you to work and says that you're

3    physically able to return to work, would you be

4    willing to go back and drive for Sysco?

5    MR. FISCHER:  Yes.

6    MR. HIGBY:  Trip.  I would just say that I

7    would note one other thing.  I didn't see gross

8    negligence defined in the employee handbook and I

9    think in the memorandum that they gave Frank they

10   said he had violated rule ten, and rule ten deals

11   with harassment.  I think it might have been

12   referring to rule 11 which is Safety and Health.

13   But in any event Frank was not written up and

14   didn't get a ticket for this accident and it would

15   be our position that he didn't do anything in this

16   accident which qualified as gross negligence or

17   recklessness.  At most I think it could be said

18   that he had a momentary lapse where he got up on a

19   intersection a little bit quicker than he thought

20   he was going to.  He took evasive action.  He

21   applied the brakes, he kept the rig upright.  He

22   didn't hurt anybody else.  He didn't run into any

23   other vehicles.  He didn't destroy any other

24   property, and that would be our position on the

25   committee's finding that he was grossly negligent.

16

1    And if anybody has any questions for Mr. Fischer,

2    he's here for the asking.

3         MR. UMBACH:  Let me ask just one question.  I

4    didn't hear part of the answer about.  Was it Ms.

5    Donnigan?

6         MR. HIGBY:  Denita Donnigan, that's right.

7         MR. UMBACH:  All right, and I understand

8    there was a conversation about early retirement?

9         MR. FISCHER:  Yes.

10         MR. UMBACH:  Did Mr. Fischer say when that

11    conversation took place?

12         MR. FISCHER:  I don't know off hand the exact

13    date.  Just one of the meetings that, where we all

14    get together and somewhere along the line

15    something would get said about that.

16         MR. HIGBY:  She was Mr. Fischer's supervisor

17    prior to John Morris, and I think John Morris had

18    been a supervisor for about a year.

19         MR. FISCHER:  At least a year.

20         MR. HIGBY:  So that, that's, and Mrs.

21    Donnigan is now driving again for Sysco as I

22    understand it.

23         MR. UMBACH:  Okay.  And did I understand him

24    to say that this was in a meeting with others

25    present?

17

1    MR. HIGBY:  When did this conversation take

2    place?

3    MR. FISCHER:  At a driver's meeting get

4    together, and then I would be asked what do you

5    think about early retirement.  If I would consider

6    it.  You know, you got 20 years in with the

7    company already so you might want to consider

8    early retirement.  I said I was hoping to shoot

9    for 40 years.

10    MR. HIGBY:  Were there other people around

11    when that conversation took place, if you

12    remember?

13    MR. FISCHER:  I don't remember.  It wasn't a

14    private conversation, it was just like right now.

15    Whether anybody paid any attention to it or not, I

16    don't know.

17    MR. HIGBY:  So there were other drivers

18    around when this conversation took place?

19    MR. FISCHER:  Yes.

20    MR. HIGBY:  Did you hear that, Trip?

21    MR. UMBACH:  I heard him say yes.  Does he

22    recall the names?

23    MR. HIGBY:  Do you recall the names?

24    MR. FISCHER:  No.  It wasn't no private

25    conversation.  It was just where she come up, you

18

```
 1        know, just making, almost like making small talk
 2        where you come up to me, Frank, when you going to
 3        retire?  You got 20 years in.  You might want to
 4        consider retiring or something like that.
 5        Something in that order, not exact, but mention of
 6        the early retirement has been brought up.
 7              MR. HIGBY:  Any other questions for Frank?
 8              MR. UMBACH:  Did he complain to anyone at
 9        Sysco about that statement from Ms. Donnigan?
10              MR. HIGBY:  I don't know if there was any
11        reason for him to complain.  He was just---
12              MR. FISCHER:  I don't have a complaint about
13        it, I just said no thank you.  I've got another 15
14        years to go.
15              MR. HIGBY:  Anybody else have any questions?
16              MR. UMBACH:  No.
17              MR. HIGBY:  Okay.  That's it.
18              MR. UMBACH:  Cliff, are you going to send us
19        a copy of the transcript with that document?
20              MR. HIGBY:  Yes.  I'll do that.  Do you want
21        to split the copy of the transcript with me?  You
22        don't have to.  I'll pay for it.  I'll send that
23        to you, Trip.  Where do you want me to send that
24        to you, at your office in Birmingham?
25              MR. UMBACH:  Send it to Sysco.
```

19

1      MR. HIGBY:  Okay.

2      MR. UMBACH:  You got that address?

3      MR. HIGBY:  Linda Wheat's address.  Yes, I

4  do.

5      MR. UMBACH:  Send it to Linda Wheat.

6      MR. HIGBY:  And again, just on behalf of Mr.

7  Fischer, I mean, you've got a gentleman here who

8  has been employed with the company for 27 years.

9  Never had a accident until this incident, and I'm

10  at a loss as to why the company would want to get

11  rid of an employee such as Mr. Fischer who has

12  such an excellent record.

13      If you look at his -- if you look at his

14  driver review the year before this, he gets

15  excellent marks on everything, and I think it even

16  says something to the affect of "great work!!!"

17  with three exclamation points behind it.  What

18  have you.

19      *Mr. Fischer* would be ready and willing

20  to come back to work as soon as he gets released

21  by Dr. Goodwiller.  He's got a good orthopedic

22  surgeon here in Panama City who I think is going

23  to get him well and we hope that the committee

24  will reconsider and bring Mr. Fischer back on

25  board.

20

1    MR. UMBACH:  Thank you, Cliff.  And we'd like

2    to wait and review the transcript.

3        MR. HIGBY:  That's not a problem.

4        MR. UMBACH:  As part of this committee's

5    decision.

6        MR. HIGBY:  Be happy for you to do that.

7        MR. UMBACH:  All right, so we, in terms of

8    timing we'll wait and get that transcript, and

9    then have a decision after we review it.

10       MR. HIGBY:  Okay and just, Trip, if you don't

11   mind, when you make your determination -- I don't

12   know if they will send out a written determination

13   or what you will do, but send it along to me and

14   copy me, whatever.

15       MR. UMBACH:  Will do.  All right, do you want

16   to go off the record?

17       MR. HIGBY:  Yes, we can go off the record.

18               NOTHING FURTHER

19

20

21

22

23

24

25

21

```
 1              CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA

 3   COUNTY OF BAY

 4          I, Catherine A.  Aldea, Court Reporter and Notary

 5   Public in and for the State of Florida at Large.

 6          DO HEREBY CERTIFY that the foregoing appeal

 7   hearing was reported by me at the time and place therein

 8   designated.  That the hearing was taken down by machine

 9   shorthand and tape recorded, and thereafter reduced to

10   typewriting by me, and the transcript pages numbered 1

11   through 20 are a true and correct record of the aforesaid

12   proceedings.

13          I FURTHER CERTIFY that I am not a relative,

14   employee, attorney or counsel of any of the parties, nor

15   relative or employee of such attorney or counsel, or

16   financially interested in the foregoing action.

17          WITNESS MY HAND AND SEAL THIS 13th day of OCTOBER,

18   2004, IN THE CITY OF PANAMA CITY, COUNTY OF BAY, STATE OF

19   FLORIDA.

20

21

22                    Catherine A. Aldea

23

24

25
```

# EXHIBIT D

*Human Resources*



### MEMORANDUM

**TO:**       File

**FROM:**    Lynda Wheat

**DATE:**    October 20, 2004

**SUBJECT:** Frank Fischer Termination Appeal

---

The appeal hearing for Frank Fischer was heard on October 6th. The hearing was a telephone appeal hearing with Frank Fischer and his attorney, court reporter, Trip Umbach, attorney, Bradley-Arant (Sysco's attorney) Danny Ralph, EVP, Chris O'Keefe, VP Merchandising, Lynda Wheat, AVP Human Resources.

The appeals hearings are for employees to bring to us any new information that we may not have known at the time of their termination which would justify the employee being re-hired.

Facts:

1. Mr. Fischer is a 5 and ½ year employee of Sysco Central Alabama. Prior to April 1999, Mr. Fischer worked for other Sysco companies.

2. Mr. Fischer has been driving this same route for approximately 5 and ½ years.

3. Mr. Fischer called his supervisor immediately after the accident and advised his supervisor that he must've fallen asleep.

4. The police officer who investigated the accident wrote on the accident report that our driver, Mr. Fischer, went to sleep, causing him to lose control of the vehicle.

5. This accident not only caused injury to the employee and major property damage, but in going through this intersection into a private yard where there was no road, he put Sysco at a huge liability risk. Had he hit a car which could have been in front of our vehicle or a car or cars going through the intersection at the time he went through without stopping or turning, it would have severely injured them if not killed them. The safety of the general public was endangered as well as the life of the employee.

6. The accident review committee is composed of a group of peers, all CDL-A certified. In their meeting, they determined, based on the facts, that this was a "major" accident and classified it accordingly.

**Fischer v. Sysco**
**Sys 0280**

Mr. Fischer's worker's compensation claim has nothing to do with the fact that carelessness caused this accident. Sysco provided immediate care for the employee and has continued to care for his injuries and wish Mr. Fischer a speedy recovery. However, his actions alone caused the injuries.

In an effort to be consistent with past terminations, and to be a responsible company within our communities as well as provide safe driving as required under the Department of Transportation, I vote that that the termination stand.

# EXHIBIT E



# MEMORANDUM

To:        Lynda Wheat

From:      Danny Ralph

Date:      October 12, 2004

RE:        Frank Fisher's Appeal

---

I have reviewed the information regarding Mr. Fisher's accident, termination and appeal. The investigating officer's opinion as stated in his report was that Mr. Fisher went to sleep causing him to lose control of the vehicle. Immediately following the accident when asked how the accident happened by his supervisor, Mr. Fisher stated "uh I don't know, maybe I fell asleep." Data from the tripmaster report shows an abrupt stop from 56 to 0 miles per hour in 1 second after passing through a four lane intersection.

It is my opinion that Mr. Fisher did not exercise proper care and did not follow safe driving procedures resulting in an accident with significant property damage and personal injury to himself. I find that his termination is justified in the interest of his and the safety of the general public and must deny his appeal.

WDR:la

Fischer v. Sysco
Sys 0278

# EXHIBIT F



# MEMORANDUM

**To:**      Lynda Wheat

**From:**    Chris O'Keefe

**Date:**    October 18, 2004

**RE:**      **Frank Fisher's Appeal**

---

Based on the facts presented, I must agree with the Accident Review Committee that Mr. Fisher's driving was "careless" and the incident was "major". Mr. Fisher responded to his supervisor that morning when asked what had happened, "maybe I fell asleep". The officer investigating the accident also stated that Mr. Fisher "went to sleep causing him to lose control of the vehicle." And according to the vehicle's tripmaster the vehicle went from 56 to 0 mph in less than 5 seconds, causing injury to Mr. Fisher as well as extensive damage to the vehicle. We cannot take the risk of this happening again. Therefore I must vote to deny Mr. Fisher's appeal to overturn his termination.

# EXHIBIT G

EEOC FORM 131 (5/01)

## U. S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Linda Wynda<br>Assistant V. P. Human Resource<br>SYSCO FOOD SERVICE CENTRA<br>P. O. Box 1750<br>Calera, AL 35040 | **Frank Fisher** |
| | THIS PERSON *(check one or both)*<br>☐ Claims To Be Aggrieved<br>☐ Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>**130-2005-01796** |

### NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

☐ Title VII of the Civil Rights Act          ☐ The Americans with Disabilities Act

☒ The Age Discrimination in Employment Act          ☐ The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. ☒ No action is required by you at this time.

2. ☐ Please call the EEOC Representative listed below concerning the further handling of this charge.

3. ☐ Please provide by          a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. ☐ Please respond fully by          to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. ☐ EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by          to          If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| **Murry A. Gosa,**<br>**Intake Supervisor**<br>*EEOC Representative* | **Birmingham District Office**<br>**Ridge Park Place**<br>**1130 22nd Street, South**<br>**Birmingham, AL 35205** |
|---|---|
| *Telephone:* **(205) 212-2119** | |

Enclosure(s): ☐ Copy of Charge

### CIRCUMSTANCES OF ALLEGED DISCRIMINATION

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN   ☒ AGE   ☐ DISABILITY   ☐ RETALIATION   ☐ OTHER

**ISSUES:** Discharge

**DATE(S) (on or about): EARLIEST: 07-23-2004   LATEST: 07-23-2004**

| Date<br>**Jan 24, 2005** | Name / Title of Authorized Official<br>**Bernice Williams-Kimbrough,**<br>**District Director** | Signature<br>*Bernice Williams-Kimbrough*<br>*(REM)* |
|---|---|---|

Sys 0267

*Enclosure with EEOC*
*Form 131 (5/01)*

## INFORMATION ON CHARGES OF DISCRIMINATION

### EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge -- the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods -- generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14  Preservation of records made or kept.** . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

### NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

# EXHIBIT H

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Frank Fisher
3907 West 19th Street
Panama City, FL

From: Birmingham District Office
Ridge Park Place
1130 22nd Street, South
Birmingham, AL 35205

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 130-2005-01796 | Murry A. Gosa, Intake Supervisor | (205) 212-2119 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[X] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ] While reasonable efforts were made to locate you, we were not able to do so.

[ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[ ] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed <u>**WITHIN 90 DAYS**</u> of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>**more than 2 years (3 years)**</u> before you file suit may not be collectible.

On behalf of the Commission

_____          3/29/05
Bernice Williams-Kimbrough,        (Date Mailed)
District Director

Enclosure(s)

cc: Linda Wynda
Assistant V. P. Human Resource
SYSCO FOOD SERVICE CENTRA
P. O. Box 1750
Calera, AL 35040

**Fischer v. Sysco
Sys 0265**

Enclosure with EEOC
Form 161 (3/98)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within
90 days** of the date you *receive* this Notice. Therefore, you should keep a record of this date. Once this 90-day
period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an
attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the
date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent
that your suit be filed within 90 days of the date this Notice was *mailed* to you (as indicated where the Notice is
signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate
State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after
talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement
of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the
charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.
Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be
brought where relevant employment records are kept, where the employment would have been, or where the
respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk
of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy
decisions for you.

## PRIVATE SUIT RIGHTS -- Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred more than 2 years (3 years) before you file suit may not be collectible. For
example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit before
7/1/02 – not 12/1/02 – in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is
separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also
plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90
days of this Notice and within the 2- or 3-year EPA back pay recovery period.

## ATTORNEY REPRESENTATION -- Title VII and the ADA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above,
because such requests do not relieve you of the requirement to bring suit within 90 days.

## ATTORNEY REFERRAL AND EEOC ASSISTANCE -- All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge
file, please make your review request within 6 months of this Notice. (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**Fischer v. Sysco
Sys 0266**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

FRANK FISCHER, an individual,   )
                             )
          Plaintiff,         )
                             )
v.                          ) Civil Action No. 2:05-cv-00763-DRB
                             )
SYSCO FOOD SERVICES OF    )
CENTRAL ALABAMA, INC., et al., )
                             )
          Defendants.      )

## <u>AFFIDAVIT OF DANNY HARPST</u>

1.    My name is Danny Harpst. My date of birth is February 16, 1962 and I am competent to testify. The matters set forth below are based upon my personal knowledge.

2.    I am employed as the Transportation Manager for Sysco Food Services of Central Alabama, Inc. and have been employed in that capacity for almost eight years.

3.    As the Transportation Manager, I am involved in the hiring and termination process of shuttle drivers. I joined Smokey Parker and Eddie O'Connor in making the decision to terminate Frank Fischer in July of 2004, following the investigation of Mr. Fischer's involvement in an accident on June 29,

{B0663035}

2004. The termination letter that I presented to Mr. Fischer is attached as Exhibit A.

4.    The sole reason that Mr. Fischer was terminated was because he was involved in a major accident as defined by the Accident Review Committee and the Accident Review Policy. The Accident Review Policy is attached hereto as Exhibit B. The Accident Review Committee is comprised of other Sysco drivers who have had no more than one minor accident within the last revolving year.

5.    I was involved, with others, in investigating the accident of Mr. Fischer. We determined that no factors other than inattention as admitted by the driver could have contributed to the accident. Specifically, Mr. Fischer told his immediate supervisor, Mr. John Morris that he may have fallen asleep. The police officer who investigated the accident concluded that Fischer had fallen asleep. In addition, Mr. Fischer, in a written statement, indicated that he did not realize he was close to an intersection where he would be required to stop, he hit his brakes, slid through the intersection, and went into a ditch. The information collected from our investigation was turned over to the Accident Review Committee for consideration. The following investigation documents are attached:

Exhibit C – Uniform Traffic Accident Report,

Exhibit D – Driver's Report of Accident,

Exhibit E – Handwritten Statement of Frank Fischer on Accident,

{B0663035}

Exhibit F – Accident Accountability Statement,

Exhibit G – Supervisor Incident Report, and

Exhibit H – Vehicle Event Report.

 6. The above information is true and correct to the best of my

knowledge.

_____

Danny Harpst

STATE OF ALABAMA )
        )
_Shelby_ COUNTY )

 Subscribed and sworn to before me on this the 26 day of
_January_, 2007.

_____

Notary Public

My commission expires:_____

NOTARY PUBLIC
STATE OF ALABAMA
MY COMMISSION EXPIRES
MAY 15, 2009

[SEAL]

{B0663035}

# EXHIBIT A

## *Transportation* 

# MEMORANDUM

July 23, 2004

To:        Frank E. Fischer

From:      Danny Harpst,
           Transportation Manager

Subject:   Dismissal

On Tuesday, June 29, 2004, you had an accident where you proceeded through a stoplight and four lanes of traffic at the intersection of Highway 271 & 231 and hit an embankment.

During our investigation of the accident mentioned above, we could not determine any factors that could have contributed to the accident other than that of inattention admitted to by the driver. In your statement regarding the accident, you wrote, "didn't realize I was close to 231 & 271 intersection and had to stop – slid through intersection and went into ditch." The accident review committee determined the accident to be classified as a "Major Accident". Our Accident Review Policy states, *"A preventable accident is an accident that is caused by an individual who failed to do everything reasonable to prevent the accident." The policy goes on to state "An accident will be classified as 'major' if the individual who caused the accident was 1. Determined to be working under the influence of alcohol or drugs or 2. The accident was a result of gross negligence or reckless behavior."* The committee determined that your actions fell within the guidelines of part 2.

Frank, your actions on June 29th disregarded company policies and rules, as well as, safety for yourself and the public. By your own admission, this was an act of not paying attention. Frank, you not only placed yourself in unnecessary danger, but the general public as well. Should someone have been crossing that intersection at the time of your accident, the results would have been catastrophic. You have violated Company Policy No. 408: Rules of Conduct, Rule No. 10, Safety & Health, Rule No. 19, Negligence, as well as, our Defensive Driving Program.

Due to your actions, your employment with Sysco Food Services of Central Alabama is terminated effective today. You may appeal this decision to the Employee Appeals Board by submitting your appeal, in writing, to the Human Resources Department within (3) business days of the termination. A copy of the procedure by which to appeal is attached to this memo.

_____
Employee Signature

_____
Danny Harpst, Transportation Manager

*Frank wouldn't sign Statement*

7-27-04
_____
Date

_____
Witness

PS. Your contact for your worker's compensation claim is Nicole Bobe, Gallagher Bassett Insurance Company at 1-800-843-8999 extension 242.

# EXHIBIT B

## *ACCIDENT REVIEW POLICY*

The purpose of the Accident Review Policy and Committee is to prevent future accidents from hapening whenever possible.

## DEFINITIONS

### Preventable Accident:

A preventable accident is an accident that is caused by an individual who failed to do everything reasonable to prevent the accident. A preventable accident can happen within the distribution facility, on the grounds of the facility, or on the road. A vehicle, forklift, or other tools may or may not be involved. The safety committee will determine whether or not an employee has done everything reasonable to prevent an accident.

### Lost Time Accident:

An accident to an employee regardless of how long he/she has been on duty. Where he/she is sent to the doctor and/or home and is unable to work for his/her next scheduled workday.

### Incident:
An accident to an employee regardless of how long he/she has been on duty. Where he/she is or is not sent to the doctor and/or home and is able to report back to work for his/her next scheduled workday.

### Accident categories:

There are (3) accident classifications: minor, serious, and major. The safety committee will decide into which classification each preventable accident will fall using the following guidelines:

A. Major Accident
An accident will be classified as "major" if the individual who caused the accident was:
1. The accident was a result of gross negligence or reckless behavior.
2. If determined the employee was working under the influence of alcohol or drugs, Management will make the final decision.
In either case, the amount of property damage or degree of injury to another individual is immaterial.

B. Serious Accident
An accident will be considered "serious" if the individual who caused the accident was careless and the accident resulted in bodily injury or resulted in property damage.

**C. Minor Accident**
The accident will be "minor" if the individual causing the accident was careless but the resulting injury was slight and/or the damage was a small amount.

*Safety Committee*

The Safety Committee will make determinations as to which category each accident will be classified. The Safety Committee will also consist of peers of the employee involved in the accident that have had no more than 1 minor accident within the last revolving year. Employees with accidents found non-preventable will also be allowed to serve on the committee.
The individual involved in an accident, if he or she chooses, will have the opportunity to explain the circumstances surrounding the accident to the committee.

*Disciplinary Actions*

| Classification | Verbal Warning | Written Warning | 1 Day Suspension | Termination |
|---|---|---|---|---|
| Minor | 1st | 2nd | 3rd | 4th |
| Serous | | 1st | 2nd | 3rd |
| Major | Determined by Management | | | |

A combination of two minors and one serious can include disciplinary action up to and including termination. A combination of one minor and one serious is a one-day suspension. Disciplinary action is based on a twelve month rolling history. An employee involved in any type of accident at work with a total (any combination) cost of $150.00 or more will be asked to submit to a urine drug screen.

*Reporting an Accident*

All accidents, no matter how minor, must be reported immediately to your immediate Supervisor or Manager. **Failure to report an accident or intentional false information about an accident will be cause for disciplinary action up to and including termination.**

*Exclusions*

As discussed in section A above, management according to company policy will handle any accidents containing illegal substance or alcohol.

**Reckless Driving Complaints**
The Accident Review Committee will also review calls received due to dangerous/reckless driving by Transportation Delivery Associates. The complaints will be reviewed based on the merits and credibility of the call. These incidents will be reviewed in the same way as accidents.

**Safety Violations- (No Accident or Injury)**
All Reports of safety violations will be reviewed and appropriate disciplinary action, if any, will be taken by management.          Revised February 2003

# EXHIBIT C

AST-27
REV. 1/97

**ALABAMA UNIFORM TRAFFIC ACCIDENT REPORT**

OPS
Accident No

Shaded Areas To Be Used By Data Processing Only    4389    Sheet 1 of 2 Sheet(s)    Microfilm No.    Local Case No

05335

## LOCATION AND TIME

| Date 06 29 2004 | Time 0135 AM/PM | Day of Week M □T □W □Th □F □S □Su | County City 03 Montgomery | Rural | Highway Classification 1—Interstate  5—State 2—Federal  6—County 3—U.S.  7—City | 4—Municipal  P—Private Prop O—Other | Local Zone 19 |

On Street, Road or Highway
Taylor Road

At Intersection of or Between (Node 1)
Troy Highway

And (Node 2)
N/A

NONCOLLISION EVENT
01 - Overturn
02 - Fire/Explosion
03 - Immersion
04 - Gas Inhalation

COLLISION EVENT

Street or Road Feet 1187    5554

Mile Post    Fuel    from 1 to 2 (Circle One)    Node

Intersection Related    1 Mile Post    Control Access    Access Related    Prime Contrib Causes 27    Phone Contr Unit No 1    ...

First Harmful Event 74    Event Location 2    Distance to Fixed Object N/A    No of Vehicles 1    No Pedestrians 0    No Injured 1    No Fatalities 0    Unit 1 Type    Unit 2 Type

## UNIT NO 1 / DRIVER

Driver Full Name
Frank E. Fischer    3707 W 19th Street    City and State Panama City, FL    ZIP 32406    Telephone No 772-216...

DOB 12 24 1953    Race M    Sex M    DL Class R    Driver License No F 260-265-53-464-0    DL States FL    CDL Status C    Lst Restrictions Not Complied With    COL Status C    Lst Endorsements Not Complied With    Less Than 25 Mo

Place of Employment
Sysco Food Services    Liability Insurance Co    Self Insured    Social Security No 394-60-092...

Driver Condition 1 - No Defect    2 - Apparently Asleep    4 - Ill    7 - Fatigued    8 - Other    9 - Unknown    Sobriety    Officers Opinion    Alcohol Drugs    Yes No    Type Test Given    No Test    1 Blood Test  3 Urine Test    2 Breath Test  4 Unable to Administer    Refused Test    Test No

Maneuver 01    Travel Road Name Taylor Road    Road Code 1187    Travel Direction N A-Not on Rd U-Unk    Other Contr Circumstance 72    Prime Harm Event 74    Event Loc

## COM VEH (UNIT 1 VEHICLE)

Veh Year 2001    Make Ster    Model 80000    Body VA    VIN 2FWBA3ANDIAE27479    License Tag Number 503135    State AL    Zip

Owner's Name Sysco Food Services    Street or RFD 1000 Sysco Drive    City Calera    State AL    ZIP 35040

Type
1 - Auto    11 - Moped
2 - StaWagon    12 - M Scooter
3 - Pick Up    13 - Pedal Cycle
4 - Van    14 - Farm Mach
5 - Truck Tractor  15 - Tram
6 - Other Truck   16 - Road Equip
7 - Comm Bus    17 - Ridden Animal
8 - School Bus   18 - M Home (R.V.)
9 - Other Bus    19 - ATV
10 - Motorcycle   98 - Other

Usage
1 - Personal    10 - Police
2 - Driver Trng  11 - Other
3 - Construction    Business
4 - Ambulance/
     Paramedical   12 - Bus/Pass
5 - Military        Transport
6 - Fire Fighting
7 - Transport Prop
8 - Agriculture
9 - Wrecker/Tow

Hazardous Cargo
1 - None
2 - Explosive
3 - Gas
4 - Flam/Combust Liq
5 - Flammable Solids
6 - Oxidizer/Peroxide
7 - Poison
8 - Radioactive Mat
9 - Corrosive Material
98 - Other

Attachment
1 - None    6 - Camper Trailer
2 - Mobile Home  7 - Towed Vehicle
3 - Semi Trailer  8 - Tanker
4 - Utility Trailer  9 - Pole Trailer
5 - 4-Wheel Trailer 10 - Double Trailer
98 - Boat Trailer   98 - Other

Contributing Defects
1 None    9 - Windows/
2 - Brakes       W Shield
3 - Steering    10 - Restraint Sys
4 - Power Plant  11 - Wheels
5 - Suspension  12 - Truck
6 - Tires          Coupling
7 - Exhaust     13 - Cargo
8 - Lights      14 - Fuel System
9 - Turn Signal  98 - Other
                  99 - Unknown

Posted Speed 55 MPH    Est Speed 85 MPH    Citation Offense Charged None    Damage Severity 1 - Minor Visible 2 - Mod Disabled    □Disabled    Vehicle Towed Here? Yes No    Occupants in Unit 1

Vehicle Towed By Whom    Waldrops Wrecker Service    To Where Waldrips Impound Lot

## UNIT NO / DRIVER (blank)

| Driver/Pedestrian Full Name | | | Street Address | | City and State | | | ZIP | | Telephone No |

DOB  Month  Day  Year    Race    Sex    DL Class    Driver License No    DL Class    DL States    Lst Restrictions Not Complied With    COL Status    Lst Endorsements Not Complied With    Less Than 25 Mo

Fischer v. Sysco
Sys 0123

**SEATING**

Unit 1: | 1 | 24 | 10 |
| 9 | | 11 |

Other Involved Unit (Circle One)
12 - Pedestrian
13 - Rider of Domestic Animal
14 - Occ. of Non-Motorized Vehicle
15 - Victim of Other Circumstance / Codes Not Applicable
Other Involved Safety Equipment

Unit 2: NA

Other Involved Unit (Circle One)
12 - Pedestrian
13 - Rider of Domestic Animal
14 - Occ. of Non-Motorized Vehicle
15 - Victim of Other Circumstance / Codes Not Applicable
Other Involved Safety Equipment

**CODES** / SAFETY EQUIPMENT (partial, right column)

**VICTIMS**

| Name | Address | Unit No | Seat Pos | Injury Type | Age | Sex | Ejection | First Aid By |
|------|---------|---------|----------|-------------|-----|-----|----------|--------------|
| Frank E. Fischer | 3907 W. 19th St. Panama City, FL 32406 | 1 | 1 | C | 50 | M | N | M |

Taken To: Baptist Hospital   Taken By: Care Ambulance

**Injury Type**
K - Killed     A - Visible or Carried from Scene     N - Not     N - Trapped
B - Bruise/Abrasion/Swelling     C - Not Visible—Not Pain/Faint     F - Fully     U - Unknown
Ejected: P - Partially     A - Not Applicable
First Aid By: A - Ambulance Attended     M - Paramedic     P - Police
O - Doctor     O - Other     N - None

**NARRATIVE AND DIAGRAM**

Diagram Shows Southbound Lanes Only

Tray Away

DITCH

DITCH

Taylor Road

Drawing Not To Scale

Officer's Opinion of What Happened: Veh #1 was traveling southbound on Taylor Rd. Driver of veh #1 went to sleep causing him to lose control of the vehicle veh #1 went through the traffic signal and left the roadway and collided with the ditch.

**ROADWAY ENVIRONMENT**

Unit 1: | 4 - None | 1 - Asphalt | 1 - Dry |
Unit 2: (checked N/A)

Accident Is Or Related To Road Construction Zone? Yes / No (No circled)

Material in Roadway: 1 - None
Traffic Control Functioning: Yes (circled)
Oppising Lanes Separated By: 1 - None
Trafficway Lanes: 4 - Four Lanes (circled)

Vision Obscured By: 97 - Not Obscured
One-Way Street: No

**INVESTIGATION**

Light: 5 - Darkness—Road Lit (circled)
Weather: 1 - Clear (circled)
Locale: 1 - Open Country (circled)
Non-Vehicular Property Damage: 4 - Severe (circled)

Property Damage Description: Barb Wire Fence 100 ft
Owner: Bobby Sides
Address: 6800 Eastern Oak Ct Mont AL 36117

| Time Police Notified | Time Police Arrived | Time EMS Arrived | Name of Photographer |
|---|---|---|---|
| 0136 | 0142 | 0141 | NA |

Witness Full Name: John Chiofolo
Address: 6230 Taylor Ridge Rd Montgomery AL 36116
Telephone: 339-754-2712

Witness Full Name: None

Name of Investigating Officer: P of C. Tate Jr.     Officer ID: 879     Agency ORI: 0030105
Name of Other Investigating Officer(s) at Scene: NA

Fischer v. Sysco
Sys 0124

Unit No. _1_
(same as on main report)

## Alabama Uniform Traffic Accident Report
## Truck/Bus Supplemental Sheet

5339

AST-347
1/94

Sheet _2_ of _2_ Sheets

### General Instructions

*Complete this form for each qualifying vehicle ONLY if the accident meets BOTH of the following criteria:*

1. The accident involved a qualifying vehicle (truck with 6 or more tires or Haz/Mat placard, or a bus designed to carry 16 or more, including driver) and;
2. The accident resulted in at least one of the following: **A.** one or more fatalities **B.** one or more persons injured and taken from the scene for immediate medical attention, or **C.** one or more involved vehicles had to be towed from the scene as a result of disabling damage or had to receive assistance to leave.

### Screening Information

*Number of Qualifying Vehicles;*

Trucks with 6 or more tires or Haz/Mat placard __1__
Buses designed to carry 16 or more (including driver) _____

*Number of Persons:*

Sustaining fatal injuries _____
Transported for **immediate** medical treatment _____

Number of vehicles towed from scene due to damage or provided assistance _____

### Vehicle Information

*Gross Vehicle Weight Rating (GVWR)*

A. Truck, tractor or bus    __3,970__
B. Trailer or trailers (total)    __32,000__
Total GVWR for unit (A+B)    __35,470__

Total number of axles    __5__

*Hazardous Material Involvement*

Did vehicle have a Haz/Mat placard ____ Yes ____ No
If Yes, include following information from placard
    **A.** Name or 4-digit number from diamond or box _____
    **B.** The 1-digit number from bottom of diamond _____
Was hazardous material released from THIS vehicle's cargo? ____ Yes ____ No

*Vehicle Configuration    (circle one number):*

1. Bus    2. Single unit truck (2 axles/ 6 or more tires)    3. Single unit truck (3 or more axles)
4. Truck with trailer    5. Truck tractor only (bobtail)    6. Tractor with semi-trailer    ⑦ Tractor with double trailers
8. Tractor with triple trailers    9. Unknown class heavy truck    0. Any other 4-tired vehicle

*Cargo Body Type    (circle one number)*

1. Bus    ② Van/enclosed box    3. Cargo tank    4. Flatbed    5. Dump
6. Concrete mixer    7. Auto transporter    8. Garbage/ refuse    9. Other

### Motor Carrier Information

NOTE: If NOT a motor carrier, enter NONE under Carrier Name, 0 for None under Carrier Identification Numbers, and go to Sequence Of Events Section

Carrier Name __Sysco Food Service__

Source (circle one number)    ① Vehicle side    2. Shipping papers    3. Driver    4. Other

Carrier mailing address (Street or P.O. Box) __1000 Sysco Drive__

City, State, Zip __Calera, AL 35040__

Carrier Identification Numbers    ( _____ None = 0)

US DOT __792056__    ICC MC _____    STATE NO. _____    STATE _____

### Sequence of Events

Note: for THIS vehicle – list up to four    Event #1 __1__    Event #2 _____    Event #3 _____    Event #4 _____

| EVENT CODES | Non-Collision | 1. Ran off road | 2. Jackknife | 3. Overturned (rollover) | 4. Downhill runaway |
| | | 5. Cargo loss or shift | 6. Explosion or fire | 7. Separation of units | 8. Other non-collision |
| | Collision With | 9. Pedestrian | 10. Non-parked vehicle | 11. Parked vehicle | 12. Train |
| | | 13. Pedalcycle | 14. Animal | 15. Fixed-object | 16. Other object |

Signature of Reporting Officer    Officer ID    Reporting Police Agency ORI    Date    Time    AM PM

Fischer v. Sysco
Sys 0125



## Definitions

### Truck

A motor vehicle designed, used or maintained primarily for the transportation of property. For the purpose of this form the vehicle must also meet one of the following criteria:
- Have at least 6 tires on the ground, or
- Carry a Hazardous Material Placard.

### Bus

A motor vehicle providing seats for 16 or more persons including the driver and used primarily for the transportation of persons.

### Trailer

A non-power vehicle towed by a motor vehicle.

### Reportable Accident

A highway related incident normally investigated by a police officer and reported on a standard accident report form involving one or more trucks or buses (as defined here) which results in:
- One or more fatalities, or
- One or more non-fatal injuries requiring transportation for the purpose of obtaining immediate medical treatment, or
- One or more of the vehicles being removed from the scene as a result of disabling damage, or
- One or more vehicles requiring intervening assistance before proceeding under its own power.

## Typical Vehicle Silhouettes

## Typical Hazardous Material Placards



# EXHIBIT D

08/02/04  08:04 FAX 4072019033     GALLAGHER BASSETT SYS     ☎019
JUL-07-2004  14:17     SYSCO CENTRAL AL     P.03/05

# Driver's Report Of Accident

**To Be Filled Out By Driver Immediately After Any Accident And Turned In When Done With Route.**

Date: 6-29-4          Time of Accident: AROUND  130 - 2AM

Name: FRANK FISCHER  Driver#: 2408

Address: 3907  W  19th  St  PANAMA  CITY FL 32405

Phone#: 850 822 2165     Age: 50   Birthday: 12-24-53

Social Security#: 394 6A 0920     License#: F260265534640

Date of Hire: MAY  1977  # of Hours on Job: ABOUT 8   Route#: _____

## Accident Information

Tractor#: 2006          Trailer#: _____

*Tractor VIN number* _____

Location of Accident (Including City an State): 271 + 231  INTERSECTION
MONTGOMERY  AL

Brief Description of Accident: CAME  TO  INTERSECTION  SOONER
THAN EXPECTED — HIT BREAKS  AND  WENT  INTO
DITCH

## Other Party Information

Name: NONE          INS. Policy Name an #: _____

Address: _____

Phone#: _____          License Plate#: _____

Property Make, Model, an Year: _____

Damage to Other Vehicle: _____

Signature: Frank Fisch          Date: 7-3-4

Fischer v. Sysco
Sys 0026

# EXHIBIT E

On monday the 28th of June around 2AM I was heading back to Panama City yard with 2 full trailers — went south on 65 and turned off at 85 exit going toward Atlanta — turned off at exit #9 which is Hwy 271 and headed east towards 231 — didnt realize I was close to 231 + 271 intercection and had to stop — slid through intercetion and went into ditch

Fischer

Fischer v. Sysco
Sys 0119

# EXHIBIT F

JUL-07-2004  14:17     SYSCO CENTRAL AL                                                    P.04/05

# Accident Accountability Statement

Date: 7-3-4

Name: FRANK FISCHER

### Give Description Of Accident Or Injury:

CAME TO INTERSECTION SOONER THAN EXPECTED AND
COULDN'T STOP — SHOULDED ON LEFT SIDE GOT
HURT — VERY LARGE BRUSE ON GUT + UPPER ARM
DOC SAYS NEED MRI — HEAD HIT WINDOW EVEN
THOUGH SEAT BELT WAS ON

### Give Statement How To Prevent A Future Occurrence and Preferred Work Method to Follow: ?

Section 13A-11-124     (Acts 1994, No. 94-653, §1.)

Making false statements to obtain workers' compensation benefits.

Any person who makes or causes to be made any knowingly false or fraudulent material statement or material representation for the purpose of obtaining compensation, as defined in Section 25-5-1(1), as amended, for himself or herself or any other person is guilty of a Class C felony. (punishable by a fine of up to $5,000.00 and a jail term of one to ten years).

_Frank Fischer_
Employee Signature                                    Supervisor Signature

## Forward Original To The Safety Department

# EXHIBIT G



## *SUPERVISOR INCIDENT REPORT*

**Transportation to complete sections A, B and C.**
**Operations to complete sections A and C.**

**A:**

Employee name: ___Frank Fischer_____ ___ _____

Date: _06/30/04_____

Job description: __Shuttle Driver_____Date of incident: 06/29/2004_____

Time of incident: _12:00 AM-1:30 AM_____    Time reported: 12:30 AM-1:30 AM __

Location of incident: _____Intersection of HWY 271/HWY 231 Montgomery, Alabama__ .  __

Description of damage to any equipment or property:
____Front of tractor, Dolly, Refer unit of trailer

Description of incident:

 Between the hours of 1230-0130AM on 29 June 2004, I received a cell phone call from Frank Fischer stating: I've had an accident. I asked how bad and are you okay? Frank stated: Major accident and that my left shoulder hurts. I asked where are you and what happened? Frank stated: He was south bound on HWY 271 and ran off the road at the intersection of HWY 271 and HWY 231. I asked how did that happen? Frank stated: Uh I don't know, maybe I fell asleep. I told him I'll call him back. At that point I called other supervisors about the accident. I called Frank again and asked the condition of the trailers and the cases. Frank stated: The trailers were vertical but probably can't be used.  I also called Frank several times to check on his condition and the status of the Ambulance and Police.

Hazard Assessment: [ ] Dry        [ ] Cooler      [ ] Freezer      [ ] Maintenance

                   [ ] Shipping  [ ]Receiving    [ x ] Transportation

                   [ ] Other: _____

Investigation summary:

Between the hours of 0600-0645 on 29 June 2004, I received a cell phone call from John Cruz asking about Frank Fischer condition. During our conversation John made the comment he called Frank on the two-way early that morning and warned him about the construction barriers at the end of HWY 271 before you approach HWY 231 and told him to use caution in that area.  I asked John where was Frank when he talked to him. John replied: South bound on I-65.

**Fischer v. Sysco**
**Sys 0121**

Is further investigation of this incident necessary: [ X]Yes    [ ] No

What do you think caused this incident…"Root Cause"  If stuck ask, "if you were in the exact same situation right now what would you do different?"

Action to be taken:  Accident Review Committee

Include a Preferred Work Method to prevent or control similar incidents:

  Use safe driving habits throughout trip.

**Section B to be completed if incident involves a company vehicle B.**

Chemical Exposure: (to include fuel spills) _N/A

Did the weather contribute to the incident.  [ ] Yes    [ x ] No

What were the conditions at the time of incident:  [ ] Day  [ x ] Night  [ ] Dry  [ x ] Raining  [ ]Snow  [ ] Ice

[  Other

What caused the incident:  __Under investigation

**Section C to be completed by every department C.**

Supervisor print name:  ___John Morris

Supervisor sign name: _____

Phone extension: _____    Date: _____

Fischer v. Sysco
Sys 0122

# EXHIBIT H

P.07/12



AUG-30-2004  12:23    SYSCO CENTRAL AL

hicle Event Report
ver:Frank, Fischer ID:2408

cnly Number:    13
alled Data At:    8/28/2004  01:33:44

Data Sample Rate    1    Second Between Samples
Shorttest Recorded Duration 1 second

## Sysco Of Central Alabama
SYSCO CALERA
1000 Sysco Drive
Calera, AL 35040

Date : 8/28/2004
Vehicle : 2008
Odometer : 339950.9

Cause :    Impact
Graph Number 1 of 1

oTrax 2004 4/1/2004

Page - 5

Extraction #10 8/29/2004

Fischer v. Sysco
Sys 0296